Receipt number AUSFCC-9361858

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JENNER TORRENCE, | |
| Plaintiff, | |
| v. | Case No. 24-258 C |
| UNITED STATES OF AMERICA, | |
| Defendant, | |

## **COMPLAINT**

NOW COMES the Plaintiff, Lieutenant Colonel (Ret.) Jenner Torrence, by and through undersigned counsel, Tully Rinckey PLLC, as and for his complaint against the Defendant, the United States of America, alleges the following:

## **INTRODUCTION**

1. This case arises from the arbitrary, capricious, and unsupported issuance of reprimands against the plaintiff by his former commander within the D.C. Air National Guard. These reprimands (exhibits 1 and 2) formed the basis of his involuntary release from active duty, and thus the loss of 257 days of military pay and allowances (1 July 2018-14 March 2019), to include a corresponding reduction in his retirement pay and the loss of $75,000 in Aviation Continuation Pay (ACP).

2. These reprimands accused the plaintiff of violating the standards of Air Force Instructions (AFI) 1-1 and 36-2909, with respect to his relationships with other Air Force personnel. However, the reprimands were based on investigations that did not contain substantial evidence to support these accusations. In particular, the investigations did not contain substantial evidence to support a finding that the plaintiff had violated Air Force standards as set down in those regulations.

3. Based on these investigations, and therefore based on no substantial evidence, the plaintiff's command placed reprimands in his personnel files, issued him a negative Officer Performance Report (OPR), and recommended that his tour as an Active Guard and Reserve (AGR) officer be involuntarily curtailed (i.e., that he be released from active duty and cease to receive full time pay).  At the request of his Wing Commander the District of Columbia National Guard Commanding General (CG) did curtail his AGR tour and explicitly did so based on the ill-grounded investigations and reprimands (exhibit 3).

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. The plaintiff's claims arise under federal statutes and military regulations.  The money mandating statutes are 37 U.S.C. § 204(a)(1) (military pay act), 37 U.S.C. § 301a (incentive pay, aviation career), 37 U.S.C. § 301b (special pay: aviation career officers), 38 U.S.C. § 402 (basic allowance for subsistence), 38 U.S.C. § 403 (basic allowance for housing), and 10 U.S.C. § 8929 (Air Force retirement pay statute).   The amount the plaintiff seeks exceeds $10,000, giving this court exclusive jurisdiction over his claim.

## FACTS

### I.  The Plaintiff's Professional Background and Air Force Career

5. The plaintiff commissioned into the USAF out of ROTC at Wright Patterson AFB on 10 June 2000 and began his active duty service on 8 August 2000.  He served continuously on active duty or on active duty reserve component orders until 30 June 2018.  He first qualified as a pilot on 10 January 2002 and had only one break in his flying service because of a combat deployment, accumulating 207 operational flying duty months befor his flying career was maliciously curtailed.

6. From 08 August 2000 until 30 June 2018, the Plaintiff served as an active duty USAF officer or on active duty reserve component orders. From 23 April 2016 to 30 June 2018, Plaintiff was on "AGR"—Active Guard and Reserve—orders, meaning that he was serving on long-term full-time military duty with a National Guard organization, as provided by 10 U.S.C. § 101(d)(3). For purposes of retirement, his service under temporary active duty orders and as an AGR officer counted as active service under 10 U.S.C. § 7326.

7. After being involuntarily removed from full-time AGR status—the subject of this lawsuit—the plaintiff was a "drill status" officer with the D.C. Air National Guard from 1 July 2018 to 14 March 2019, receiving pay only for monthly weekend drills and annual training. He again served on active duty orders as a reservist from 15 March 2019 until 28 February 2022, but he was not able to fly during these assignments due to the aftereffects of his curtailment. Lt Col Torrence retired from the USAF on March 1, 2022.

## II. The Accusations of Unprofessional Relationships Between Lt Col Torrence and Maj A.M. (December 2016-February 2017)

8. On 13 June 2017, the Plaintiff received a Letter of Reprimand from his commander, Col John E. Vargas, of the 113th Operations Group (OG), D.C. Air National Guard. This Reprimand accused him of "creat[ing] the perception of an inappropriate relationship with another officer, were prejudicial to good order and discipline, and were of a nature to bring discredit upon the Armed Forces of the United States in violation of AFIs 1-1 and 36-2909." Later, it formed part of the basis of the plaintiff's curtailment and loss of pay.

9. The accusation that the plaintiff violated the Air Force Instructions was unsupported by substantial evidence. Col Vargas' decision to issue the unsupported reprimand was arbitrary and capricious. It also misapplied Air Force regulations.

<u>A. Standards for "Unprofessional Relationships" Used by the Air Force.</u>

10. AFI 1-1, *Air Force Culture*, para. 2.2.2., defines "unprofessional" relationships between Air Force officers.  "Relationships are unprofessional when they detract from the supervisor-to-subordinate authority or reasonably create the appearance of favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests."

11. AFI 1-1, para. 2.2.6. warns that "[r]elationships in which one member exercises supervisory or command authority over another can become unprofessional. Similarly, differences in grade increase the risk that a relationship will be, or will be perceived to be, unprofessional because senior members in military organizations exercise authority, or have some direct or indirect organizational influence, over the duties and careers of junior members."

12. AFI 1-1 does forbid dating and sexual relations between officers and enlisted Airmen, with certain exceptions that do not apply to this case.  AFI 1-1 does *not* forbid dating and sexual relations between officers, not even officers of different rank, except insofar as they violate the standards in paragraphs 2.2.2. and 2.2.6.

13. AFI 36-2909, *Air Force Relationships and Conduct*, largely tracks the language of AFI 1-1. Paragraph 2.2 defines "unprofessional relationships" in almost identical terms as AFI 1-1, para. 2.2.2: "Relationships are unprofessional, whether pursued on or off duty, when the relationship detracts from the authority of superiors or results in or reasonably creates the appearance of: favoritism, misuse of office or position, or the abandonment of organizational goals for personal interests."

14. AFI 36-2909, para. 2.2.2., forbids all relationships that have, or reasonably appear to have, the effects noted in paragraph 2.2 (such as detracting from supervisory authority).  It also forbids relationships that are, or appear to be, exploitative or coercive, or create an actual or

reasonably foreseeable adverse impact on good order and discipline, authority, morale, or mission accomplishment.

15. AFI 36-2909, para. 2.3.3., states that "dating and close friendships" between Air Force personnel "are subject to the same policy considerations as are other relationships." In other words, they are not forbidden unless they run afoul of the standards in paras. 2.2. and 2.2.2. (Dating relationships *are* forbidden by the regulation in circumstances not relevant to this case, e.g., between cadets at the Air Force Academy and officers in the Air Force.)

16. Neither AFI 1-1 nor AFI 36-2909 regulates sexual conduct or friendship based on marital status, whether by officers or anyone else. The Secretary of the Air Force has not exercised his authority to enforce marriage vows, only to enforce supervisory authority and discipline within the ranks.

### B. The accusations regarding the plaintiff's relationship with Major A.M.

17. Col Vargas' claim that the plaintiff violated AFI 1-1 and 36-2909 was unsupported by substantial evidence. It was not based on consideration of all the relevant factors and was therefore arbitrary and capricious; it also misapplied Air Force regulations.

18. The basis for Col Vargas' reprimand was an investigation ordered by his predecessor as commander of the 113th OG. The investigation was completed on 31 May 2017.

19. This investigation examined rumors about the plaintiff and Major A.M., who were both deployed to Guam between December 2016 and February 2017.

20. At the time of their deployment, both the plaintiff and Major A.M. were wearing the rank of major, though the plaintiff was selected for expedited promotion to lieutenant colonel while he was in Guam, and was promoted to that rank after his return.

21. The investigator did not find that the plaintiff and Major A.M. (both of whom were married to other persons) ever engaged in any sexual activity.  He did find that in Guam they behaved in a way that created that appearance and fueled rumors to that effect, for example, by spending a lot of time together and arriving to work in the same car.

22. The investigator noted that another officer suspected sexual activity between the plaintiff and Major A.M. at Andrews Air Force Base in May 2017.  The investigator did *not* find that any such activity had taken place, but he found that the "event"—in which the plaintiff was seen in the same part of the same building as Major A.M. after she had been acting suspiciously— was "just one of several examples where an inappropriate relationship is apparent."  What was "inappropriate" about it, he did not (and could not) say.

23. Of key importance to this action, the investigator did not find, substantiate, or even allege a single fact to show that a close friendship or even a sexual relationship between the plaintiff and Major A.M. would have compromised supervisory authority, would have created the appearance of favoritism, or would even have appeared to detract from the Air Force mission.

24. The plaintiff, a pilot, did not supervise Major A.M., an intelligence analyst, though he did work with her when their duties required it.  He did not have input into her performance evaluations, her awards, or her career progression.  The deployment to Guam was successful. In short, even if the plaintiff and Major A.M. had been doing everything the gossipmongers suggested, they would not have been violating either AFI 1-1 or AFI 36-2909.

25. The investigator found that the deputy commander of the Guam mission had suggested that the plaintiff and Major A.M. "knock off" any behavior that would create the appearance of sexual relations.  He also found that the deputy commander gave no order to this effect, only

a suggestion.  (In fact, even this finding was an exaggeration of what the deputy commander had really said, which was more like, "if you aren't doing anything wrong, keep doing what you are doing."  But in no case could the deputy commander's words support the idea that the plaintiff was disobeying orders, flouting command authority, or violating the standards of AFI 1-1 or 36-2909.)

26. The investigator found that the apparent relationship between the plaintiff and Major A.M. compromised good order and discipline, because (1) the deputy commander had "clearly told them" about the appearance they were creating, and (2) "others in the unit began spreading rumors."  What the investigator did not do was produce a scrap of evidence or Air Force policy showing that a sexual relationship, even if true, would have hurt good order and discipline or the mission, or otherwise violate AFI 1-1 or 36-2909.  He simply assumed it.

27. Col Vargas' claim that the Plaintiff violated AFI 1-1 and AFI 36-2909, the claim on which he explicitly based his first reprimand, was not supported by substantial evidence, because no fact established that his relations with Major A.M. met the definition of "unprofessional" as laid out in those regulations.

28. Furthermore, the plaintiff and Major A.M. were both members of the 113th OG, a D.C. Air National Guard unit.  As acknowledged by the investigation, while serving in this unit under Col Vargas' command, they were governed by Title 32 of the United States Code.  But when they were deployed to Guam, they were serving on active duty under the National Guard Bureau's 201st Mission Support Squadron (MSS), and were governed by Title 10, United States Code.

29. Col Vargas' reprimand was primarily based on actions taken when the plaintiff was under Title 10, not Title 32 authority.  As the Judge Advocate General of the Air Force has

explained in OpJAGAF 2019-21, a commander's authority to issue reprimands depends on the status of the accused at the time of the alleged misconduct.  Title 10 commanders can reprimand Air Force personnel for what they do on Title 10 status; Title 32 commanders can reprimand Air Force personnel for what they do on Title 32 status.  But commanders cannot reprimand across status; a Title 10 commander cannot reprimand an ANG member for what he does while under title 32 authority.  By logical inference, a Title 32 commander cannot reprimand an ANG member for what he does on Title 10 status, either.

30. Thus, the reprimand was not only based on no substantial evidence even on its own terms but was largely based on conduct the commander had no authority to reprimand the plaintiff for.

### III. The Accusations of Fraternization Between Lt Col Torrence and an Enlisted Airman (16 October 2017)

31. On 26 January 2018, the plaintiff received a second Letter of Reprimand from Colonel Vargas.  This Reprimand accused him of "fraterniz[ing] with an enlisted member . . . in violation of AFIs 1-1 and 36-2909."  This reprimand was placed in the plaintiff's Unfavorable Information File.  Shortly thereafter it formed part of the basis of his curtailment and loss of pay.

32. The accusation that the plaintiff fraternized with an enlisted Airman was unsupported by substantial evidence.  The decision to issue the unsupported reprimand was arbitrary and capricious.

#### A. Standards for "Fraternization" Used by the Air Force.

33. AFI 1-1, para. 2.2.5, provides that "[t]here is a long-standing and well-recognized custom in military service, as well as set forth in the UCMJ and DAF issuances, that officers and enlisted personnel shall not fraternize."  It defines fraternization thusly: "Fraternization exists when a relationship between an officer and an enlisted member puts the enlisted member on

terms of military equality with the officer in such a way that prejudices good order and discipline in the armed forces or is of a nature to bring discredit upon the armed forces."

34. AFI 36-2909, para. 3.1.1, further clarifies the meaning of "fraternization" in the Air Force. "Fraternization is a unique type of unprofessional relationship between an officer and enlisted member that is specifically criminalized in the Uniform Code of Military Justice under Article 134, Fraternization (Manual for Courts-Martial (2019), Part IV, Paragraph 83)."

35. The relevant section of the Manual for Courts-Martial lays out the elements of fraternization as follows: (1) that the accused was a commissioned or warrant officer; (2) that the accused fraternized on terms of military equality with one or more certain enlisted member(s) in a certain manner; (3) that the accused *then knew the person(s) to be (an) enlisted member(s)*; (4) that such fraternization violated the custom of the accused's Service that officers shall not fraternize with enlisted members on terms of military equality; and (5) that under the circumstances the conduct of the accused was either: (i) to the prejudice of good order and discipline in the armed forces; (ii) was of a nature to bring discredit upon the armed forces; or (iii) to the prejudice of good order and discipline in the armed forces."

36. Thus, under the standards used by the Air Force, conduct between an officer and an enlisted person cannot be fraternization unless it involved "terms of military equality" *and* knowledge on the part of the officer that the other party was enlisted, not civilian.  Not only are these explicit elements of the offense relied on by the Air Force Instruction, but without them, prejudice to good order and discipline would not result.

B. The accusations regarding the plaintiff's alleged fraternization with an enlisted female.

37. Col Vargas' claim that the plaintiff fraternized with an enlisted Airman was unsupported by substantial evidence. It was not based on consideration of all the relevant factors and was therefore arbitrary and capricious.

38. The basis for Col Vargas' reprimand was an investigation ordered by Col Vargas and completed on 19 January 2018. This investigation examined occurrences in a bar in Tucson, Arizona on 16 October 2017, while he was on temporary duty for the Air Force's Weapons and Tactics (WEPTAC) conference.

39. The investigator found that the plaintiff conversed with a woman at a hotel bar in Tucson. The plaintiff himself was in an Air Force flight suit, but the woman was in civilian clothes and wearing her hair in a civilian hairstyle. The investigator found that the woman stood with her back against the plaintiff's body and his "hands" on her waist, while he spoke closely into her ear. The investigator made these findings based on photos and film footage that do not in fact show these things.

40. The photos show the plaintiff standing behind the woman, with his right hand on her hip on top of her belt, as if to steady her, while they appear to be looking in the same direction (exhibit 4). The woman's own left arm is lying across her abdomen. In these pictures, if *her* left arm had been *his* left arm, the appearance might have been of a loose embrace from behind; but it was not. Film footage—from a security camera in the crowded bar—shows the two from the other side at the same moments. This footage shows that the plaintiff's left hand was on the bar, sometimes holding his drink, sometimes gesticulating (the two are in fact facing and conversing with some of the woman's friends, off screen to the left in the footage). Neither the photos nor the footage shows his "hands" on any part of her body. The

investigator's claim about the accused's "hands" is simply untrue, and unsupported by the evidence the investigator cited.

41. The investigator also claimed that the video "clearly show[s]" the plaintiff "engaging in an unprofessional manner with a female." This also is untrue. The video footage shows them talking, nothing more or less, in a crowded bar, and sometimes talking to other people off to the left of the screen. No physical intimacies are being shared, nor is there any indication that anything improper is being said. *Honi soit qui mal y pense.*

42. Three witnesses, but not the plaintiff, later reviewed the footage and identified the woman as an enlisted Airman from the Toledo, Ohio Air National Guard (which is to say, not from the plaintiff's unit or command). Apparently, this woman was part of a "services team" who had worked at the WEPTAC conference. In talking to the investigator, the woman herself confirmed that she had been at the bar with two friends, that she believed she was the one pictured with the plaintiff based on the clothes she had been wearing, that there were many pilots and not many women at the bar, and that the events at the bar were "nothing too out of the ordinary." No witness and no evidence contradicted her.

43. The investigator found that the plaintiff noticed he was being photographed by another officer, Major Paul Doughty, who had "bad blood" with him from matters dating back to the Guam deployment. The investigator chose not to explain these matters in the investigation's "factual background," but in fact the plaintiff had been a witness against Major Doughty, who had been accused and was undergoing judicial process for, without consent, groping Major A.M.'s buttocks and then touching her inner thigh under her skirt in a circumstance where Lt Col Torrence had to intervene. In a later investigation, the plaintiff bore witness to Major Doughty's sexually harassing Major A.M. in Guam, which was substantiated. After

taking the photographs of the plaintiff, Major Doughty suggested to Lt Col Torrence that he should speak to his attorney on his behalf.  The two officers were not on good terms.

44. The investigator found that the plaintiff left off his conversation with the woman to speak with Major Doughty about the photography.  The investigation did not substantiate any wrongdoing by either the plaintiff or Major Doughty in connection with the subsequent confrontation; the only "substantiated" offense from that evening was fraternization with the enlisted woman.

45. Of key importance to this action, the investigator did not find, substantiate, or even allege a single fact to show that the plaintiff knew the young woman was anything but a civilian. Without such knowledge, there could be no "military equality" and no fraternization; and the plaintiff's engagement with her would not be "unprofessional" as defined in AFI 1-1 and 36-2909.  The investigator produced only speculation from people who *did* know the enlisted Airman, e.g., Major Robert Bielanski, who said "I would think anyone would know that the women at the bar were the enlisted service women working refreshments at WEPTAC."

46. Of note, exhibit 4 shows Major Bielanski on the left side, looking on while the plaintiff and the woman in civilian clothes are talking.  The security footage shows several other officers passing by and socializing in the area.  None of them, including Major Bielanski, raised the slightest comment at the time about the plaintiff's conduct with the woman in civilian clothes, presumably because it was easy to see that nothing untoward was going on, whether they knew she was enlisted or not.

47. Col Vargas' claim that the Plaintiff violated AFI 1-1 and AFI 36-2909 was not supported by substantial evidence, because no fact established that the Plaintiff "fraternized" with an enlisted Airman as the term is used in those regulations.

C. The accusation of false statements by the plaintiff in connection with the investigation

48. In connection with this investigation, the plaintiff spoke to the investigator.  He said that he did not know the woman was enlisted.  He then invoked his right to silence.  He also provided a written statement in which he said nothing about the woman in the bar but expressed his opinions about the motivations behind the investigation, including his "grave concerns" that Major Doughty was in the bar filming him.  The investigator found no evidence that these statements were false.

49. In search of false statements, the investigator questioned two other officers about private conversations they had had with the plaintiff on the night of 16 October 2017.  According to these officers, the plaintiff said the woman had "leaned against him" or "straddled" him and that he had "pushed her away" when she leaned against him.  He had not in fact said anything about the woman "straddling" him or doing anything like that, and the investigator acknowledged that she could not "confirm exactly what was said on the evening of 16 Oct 17 to current witness statements."  Thus, the investigator quite rightly gave little weight to these summaries of weeks-old conversations.

50. The investigator also obtained a private text message between the plaintiff and Major A.M., in which the plaintiff said that the woman was "up against him" and he "move[d] one leg around her at a time to get faced away from the bar" when he got up to confront Major Doughty.  These statements were wholly consistent with the photos and film footage.

51. In each case, the plaintiff's statements were primarily concerned with the fact that he had seen Major Doughty photographing or filming him for no good reason, and that he had left his seat at the bar to confront Major Doughty about this.

52. The investigator "substantiated" an allegation that "false statements were made by [the plaintiff] about what occurred on the night of 16 Oct 17 in regard to the female who was at the bar."  She did so in the following language:

> After reviewing the various witness testimonies as well as during [the plaintiff's] interview with his lawyer present, he stated he could not remember all of the events. Despite this his statements to [the two other officers] texts to Maj [A.M.] where he stated the female at the bar fell into his crotch and or straddled him and or he turned his barstool towards them to get up and go to the restroom and a girl is up against him because the bar is jammed and I have to move one leg around here at a time to get faced away from the bar, then he pushed her away, neither statements are supported by the video. *The video shows from 2315 to 2345 Lt Col Torrence and a female in very close contact with continued contact until 0010 on 17 Oct 17 when they both leave the bar.* The video also shows them in very close contact. *Additionally the photographs and video show [the plaintiff's] hands around the female's waist for a period of time. I cannot confirm exactly what was said on the evening of 16 Oct 17 to current witness statements*; however, the inconsistencies between the witness statements, sworn statement submitted to his lawyer, 4 Nov 17 [memorandum for record] submitted by [the plaintiff], Texts to Maj [A.M.], and the video . . . provide sufficient evidence to show that false statements were made by [the plaintiff] about what occurred on the night of 16 Oct 17 in regards to the female who was at the bar.

53. Some of the investigator's statements are objectively untrue, and taken together in light of the evidence, they do not provide substantial evidence of a false statement by the plaintiff.

54. Firstly, neither the photos nor the video shows the plaintiff's hands around the woman's waist.  This is a false statement by the investigator, not by the plaintiff.

55. Secondly, the video does not show the two being "in close contact" from 2315 to 2345 (i.e., 11:15 to 11:45).  Going by the wall clock in the bar, which is what the investigator was using for her timestamps, at 11:15 they are sitting close to each other, looking at and talking to a group of persons off screen to the left.  The plaintiff gets up at 11:25, pushing lightly past the woman to do so, and confronts Major Doughty.  The plaintiff talks to Major Doughty for half an hour and never sits down again. (Major Doughty, in civilian clothes, stands directly under the clock during this conversation.)

56. Another officer sitting at the bar, Major Bielanski, briefly engages with Major Doughty and the plaintiff after the plaintiff stands up at 11:25 (Major Doughty later confirmed Major Bielanski's identity to the investigator, describing him as "a friend in the vicinity").  Major Bielanski—who later said "anyone would know" the women in the bar were enlisted—then sits close to the woman himself, sometimes putting his arm around her, sometimes talking to her from behind (about as closely as the plaintiff had been sitting), sometimes talking to her from in front, and giving her a one-armed hug at about 11:29. The woman talks to other officers, to civilian men, and to two other women in civilian clothes, sometimes touching, hugging, or shaking hands.

57. As the crowd thins out, the plaintiff (who had left after his long talk with Major Doughty) returns at 11:56.  He has drinks and talks to various individuals but does not sit down anymore.  He departs to the left at around 12:08.  The woman departs to the right in the company of another woman around 12:10.  The investigator's insinuation that they were leaving together has no basis in the footage.

58. There is simply no way to reconcile the video footage with the investigator's summary of it. The investigator may possibly have mistaken Major Bielanski for the plaintiff at some point, but even Major Bielanski was not doing anything more intimate than sitting close to the woman, putting an arm around her once, and giving her a one-armed hug around the shoulders.  Again, the demonstrably false statements were made by the investigator, not the plaintiff, and the investigator's false statements form part of the basis for the second reprimand and thus for the plaintiff's loss of pay.

59. Thirdly, the video footage is wholly consistent with the plaintiff's text to Major A.M. and his own statements to the investigator. It is also consistent with the enlisted Airman's own statement, that there was "nothing too out of the ordinary" that night.

60. The investigator herself admits she cannot be sure of the plaintiff's conversations with the other two officers and is extremely vague about the "inconsistencies" she claims to find. Given the investigator's misstatements about key points of the evidence, and the consistency between all the items that can be verified, her finding of "false statements" cannot be said to rest on substantial evidence.

**IV. The Plaintiff's Responses to the Reprimands**

61. The plaintiff, as was his right, submitted his own responses to the two reprimands, pointing out the deficiencies in evidence, and also clarifying his own stance.

62. When the first Letter of Reprimand was issued, the administrative officer who delivered the letter said to the Plaintiff, "I think this has something to do with your lack of Christian faith." In his response to the letter, the Plaintiff pointed out that he was an open atheist and secular humanist who did not share "traditional Abrahamic values" concerning relations between the sexes and did not consider himself bound to avoid the company of a female officer simply because people who *do* hold such values might find it scandalous. He had stayed inside the standards imposed by the Air Force and that should have ended the matter.

63. Col Vargas, after receiving the plaintiff's rebuttal, conducted an impromptu "inquiry" of his own. He obtained two new witness statements, which he used in making his decision but did not give the plaintiff the opportunity to rebut. When he decided to act on the reprimand, he verbally told the plaintiff that he had conducted this "inquiry" and that the statements he obtained matched the testimony from the investigation. In fact, the statements were both

about temporary duty in Las Vegas in 2016, before the Guam deployment.  These statements both claimed that the plaintiff and Major A.M. had kissed each other.

64. This testimony was from plaintiff's Title 10 service, and was outside the timeframe covered by the reprimand and the investigation. Importantly, it did not establish any arguable violation of AFI 1-1 or 36-2909, any more than the original investigation had done, nor did it represent reality.  Had the plaintiff been allowed to respond to this "evidence," as he should have been, he would surely have pointed this out.

65. The plaintiff's response to the second letter included a letter from his wife, dated 4 February 2018, titled "Your Inappropriate Imposition of Personal Values on My Family."  In this letter, she asked Col Vargas to "cease imposing [his] own strongly held values with respect to matrimony and cross gender relationships on [the plaintiff] or anyone else with whom he chooses to associate."  As far as she was concerned, outside of the standards imposed by the Air Force, "the nature of [the plaintiff's] relationships with others, regardless of gender, are a concern only between him and [herself]. It is not the US Government's concern, it is not the concern of the United States Air Force, and it is certainly not [Col Vargas'] concern."

66. Despite the plaintiff's responses, Col Vargas decided to have both letters of reprimand maintained in the Plaintiff's personnel files, where they would be sure to affect his chances of promotion.

67.  On 8 February 2018, Col Vargas informed the Plaintiff that he would establish an Unfavorable Information File for the Plaintiff and place these letters of reprimand in it.

68. Additionally, in 2019, Col Vargas issued an unfavorable Officer Performance Report (OPR), based on the same findings as the reprimands.

**V. The Consequences of the Poorly Grounded Reprimands.**

69. An officer who serves 20 years of active duty, including AGR duty, may retire and receive a pension upon retirement under 10 U.S.C. § 7311.  An officer who attains 18 years of active service reaches "sanctuary" and may continue to serve until he reaches 20 years under 10 U.S.C. § 12646.  In accordance with Air National Guard Instruction 36-101, para. 8.2.1, an AGR officer who reaches sanctuary will not have his tour curtailed except by order of the Secretary of the Air Force.

70. An officer with an aviation designation who engages and remains in aviation service so that he completes 144 months of operational flying toward the Operational Flying Duty Accumulator (OFDA) requirement is entitled to Aviation Career Incentive Pay until 25 years of service under 30 U.S.C. § 301a.  Lt Col Torrence accumulated 207 months before his curtailment.

71. On 26 January 2018, Col Vargas told the plaintiff that, because of the two reprimands, his security clearance was going to be suspended and that he would not be able to access his squadron's work area.  This prevented the plaintiff from being able to fly.  It also prevented the plaintiff from being able to maintain "currency" in the various aircraft that he was qualified to fly (that is, he was not able to keep his experience in these aircraft current by Air Force standards).  He was not able to regain this currency for the rest of his Air Force career.  As it happened, Col Vargas had not actually suspended the plaintiff's security clearance, but the practical effects of his actions were the same as if he had.

72. On 15 March 2018, based on the recommendation of Col Vargas, Brigadier General Jeffrey C. Bozard notified the plaintiff that he intended to request that the Commanding General of the D.C. National Guard "involuntarily curtail" the plaintiff's AGR service, that is to remove

him from active duty, so that he would no longer be receiving active duty pay.  Brig Gen
Bozard explicitly said he was basing this decision on "substantiated allegations" of
unprofessional relationships with both officer and enlisted military members, and of false
statements in connection with the same, as described in the two command directed
investigations, the letters of reprimand that resulted from them, and the two additional
statements obtained by Col Vargas.  Exhibit 3.

73. Despite the plaintiff's rebuttals, the Commanding General, Major General Walker, curtailed
the plaintiff's AGR service on 30 June 2018, forty days before the plaintiff was to reach his
18-year sanctuary.

74. The plaintiff did not resume active duty until 14 May 2019, when through his own initiative
he was able to secure further duty as an activated reservist.   If his AGR tour had not been
curtailed, he would have remained on active duty and been paid accordingly between 30 June
2018 and 14 May 2019.

75. As shown by exhibit 3, this curtailment directly resulted from the ill-grounded investigations
and reprimands ordered and acted upon by Col Vargas.

76. The military pay the plaintiff would have received between 30 June 2018 and 14 May 2019
amounted to approximately $74,762 in salary plus $27,588 in Basic Allowance for housing,
$2,162 in Basic Allowance for Substistence, and $7,140 in Aviation Career Incentive Pay.
The pay he received as a reservist for performing weekend drills amounted to about $8,952
during this same period, and he did not receive the other allowances noted above.  He also
lost the $75,000 in Aviation Continuation Pay he would have been entitled to under 37
U.S.C. § 301b (special pay: aviation career officers).

77. The plaintiff did eventually retire on 1 March 2022 and now receives retirement pay.  If he had been able to serve the additional 257 days from 2018-19, his retirement pay would be approximately 3% higher.

78. In June 2021, while he was still in the Air Force, the plaintiff filed a petition with the Air Force Board for Correction of Military Records to remove the offending letters and OPR.  In April 2022, after he had left the Air Force, the Board denied relief.  Relying on the investigations noted above and adding nothing to their reasoning, the Board concluded that "the evidence is sufficient to conclude the applicant violated AFI 36-2909 by failing to maintain professional relationships and displaying poor judgment, which were prejudicial to good order and discipline."

## **LEGAL CLAIM**

**The decisions that led to the plaintiff's curtailment and his inability to maintain currency as a pilot were arbitrary and capricious, unsupported by substantial evidence, and contrary to Air Force Regulations.**

79. The decision of Col Vargas to issue and maintain the two letters of reprimand was arbitrary and capricious, because the key findings on which they were based—that the Plaintiff violated the standards of AFI 1-1 and 36-2909—were not supported by substantial evidence. The same is true of his decision to issue an unfavorable OPR, to tell the plaintiff his security clearance was suspended, and to restrict the plaintiff from the flight line.

80. The decision of Maj Gen Walker to curtail the plaintiff's AGR tour, and thus deprive him of military pay after 30 June 2018, was also arbitrary and capricious, unsupported by substantial evidence, and contrary to Air Force regulation, because it rested on the same ill-grounded investigations and reprimands.

81. The decision of the AFBCMR to refuse to remove the offending paperwork from the plaintiff's personnel files was also arbitrary and capricious, unsupported by substantial evidence, and contrary to Air Force regulation, because it rested on the same ill-grounded investigations and reprimands.

82. The curtailment of the plaintiff's AGR tour led to the loss of 257 days of military pay and allowances, a reduction in the amount of his retirement pay, and a loss of some of his aviation-related bonuses.  The plaintiff's inability to maintain currency in the aircraft he used to pilot led to the loss of another bonus.

## **DEMAND FOR RELIEF**

Accordingly, the plaintiff requests the following relief:

1.  Back pay equal to what he would have received between 30 June 2018 and 14 March 2019, less the amount he actually received as a drilling reservist;

2.  Basic Allowance for Housing for the same period, $75,000 in Aviation Continuation Pay, and $6,300 in Aviation Career Incentive Pay;

3.  An order that his retirement pay be increased to reflect an additional 257 days of service, with back pay of the difference between the date of his retirement and the date of judgment;

4.  Declaratory relief, affirming that the reprimands, the OPR, and the curtailment were arbitrary, capricious, unsupported by substantial evidence, contrary to Air Force standards, and apparently based on the desire of certain leaders to impose their own ideas of personal conduct in place of Air Force standards;

5.  Injunctive relief, ordering the removal of the offending reprimands, OPR, and any other documents evincing the ill-grounded accusations from the plaintiff's military personnel files;

6.  Upon an appropriate showing, attorney's fees under the Equal Access to Justice Act; and

7.  Any other relief deemed appropriate by the Court.

Respectfully Submitted,

*Sean C Timmons*

Sean C. Timmons, Esq., LL.M.
(*Admitted Pro Hac Vice*)
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235
Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com
Attorney for Plaintiff