IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JENNER TORRENCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24-258 |
| v. | ) | (Judge Kathryn C. Davis) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

Of Counsel:

MAJOR KENNETH L. VAUGHT
Litigation Attorney
United States Air Force
Military Personnel Division
1500 West Perimeter Road, Suite 1370
Joint Base Andrews, MD 20762

DELISA M. SANCHEZ
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-0337

July 25, 2024

Attorneys for Defendant

# Table of Contents

| Page Number | Contents |
| --- | --- |
| 001 | Table of Contents |
| 002 | Certification |
| 003 | Signed Decisional Instrument, dated 29 April 2022 |
| 004 | Record of Proceedings, dated 26 April 2022 |
| 010 | Exhibit A:  Application, DD Form 149, w/atchs, dated 22 June 2021 |
| 182 | Exhibit B:  Documentary Evidence, including relevant excerpts from official records |
| 207 | Exhibit C:  Advisory Opinion, DCNG/JA, w/atchs, dated 11 February 2021 |
| 228 | Exhibit D:  Notification of Advisory, SAF/MRBC to Applicant, dated 23 February 2022 |



# United States of America
## DEPARTMENT OF THE  AIR FORCE

Joint Base Andrews, Maryland, May 15, 2024

I am the Director of Operations, Air Force Board for Correction of Military Records (AFBCMR). My duties include the administrative management of records and cases reviewed by the AFBCMR. The facts attested to herein are based on my personal knowledge or on information made available to me in the course of my official duties. I certify to the best of my knowledge and belief that the documents annexed hereto and described in the attached index are all the non-privileged materials considered in the adjudication of the case of Torrence, Jenner, docket number BC-2021-02580, and constitute the contents of the Administrative Record. Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

X _Janet Hutson_

**JANET HUTSON**
Director of Operations
Air Force Board for Correction
of Military Records

I HEREBY CERTIFY that JANET HUTSON, who signed the foregoing certificate, is the Director of Operations of the Air Force Board for Correction of Military Records and OFFICIAL CUSTODIAN, and that her certification as such, full faith and credit are and ought to be given.



IN TESTIMONY WHEREOF, Frank Kendall, Secretary of the Air Force, have hereunto caused the seal of the Department of the Air Force to be affixed and my name to be subscribed by the Administrative Assistant to the Secretary of the Air Force, at the city of Arlington, State of Virginia.

This __22nd__ day of _____ May _____, 2024.

**FRANK KENDALL**
_Secretary of the Air Force_

By _____

**EDWIN H. OSHIBA**
_Administrative Assistant_

**AF FORM 44** AUG 60  *(EF) (MSWord 2.0)*       PREVIOUS STOCK WILL BE USED UNTIL STOCK IS EXHAUSTED

**DEPARTMENT OF THE AIR FORCE**
WASHINGTON DC

Office of the Assistant Secretary

Air Force Board for Correction of Military Records
SAF/MRBC
3351 Celmers Lane
Joint Base Andrews NAF Washington, MD 20762-6435

Dear Applicant:

After careful consideration of your application, Docket Number BC-2021-02580, the Air Force Board for Correction of Military Records determined there was insufficient evidence of an error or injustice. Accordingly, your application is denied.

You have the right to request reconsideration. To do so, you must send in a new DD Form 149, *Application for Correction of Military Record*, with supporting evidence, to the address above. You must present and identify evidence not considered with your original application. Please note that restating facts previously addressed by the Board, making uncorroborated personal observations, or making additional arguments are not grounds for reopening a case.

The Board also determined there was insufficient evidence to conclude you were the victim of reprisal in violation of Title 10 U.S.C. §1034. Under the provisions of Title 10 U.S.C. §1034, you have the right to appeal this decision within 90 days of receipt of this letter to the Deputy Under Secretary of Defense for Program Integration (DUSD(PI), Attention: Director, Legal Policy, 4000 Defense Pentagon, Washington, DC 20301-4000. Your written request must include your name, address, email address, and telephone number; a copy of the application to the AFBCMR, the final decision of the Secretary of the Air Force, and a statement of the specific reasons you are not satisfied with the decision.

This action is taken under authority delegated by the Secretary of the Air Force.

Sincerely,

4/29/2022

X _____

Signed by: JACKSON.NICOLE.D.1185828545
NICOLE D. JACKSON, GS-15, DAF
Executive Director, AFBCMR

Attachment:
Record of Proceedings

cc:
DoD/IG
SAF/IG

003



CUI//SP-MIL/SP-PRVCY

# UNITED STATES AIR FORCE
# BOARD FOR CORRECTION OF MILITARY RECORDS

## RECORD OF PROCEEDINGS

**IN THE MATTER OF:**

JENNER M. TORRENCE

**DOCKET NUMBER:** BC-2021-02580

**COUNSEL:** SEAN C. TIMMONS

**HEARING REQUESTED:** NO

## APPLICANT'S REQUEST

He requests the following based on allegation of reprisal pursuant to DODD 7050.06, *Military Whistleblower Protection*, and 10 U.S.C. § 1034:

1.  His letters of reprimand (LOR) dated 13 Jun 17 and 26 Jan 18 be removed from his record; or in the alternative, they be placed in a secured file.

2.  His referral officer performance report (OPR) for the reporting period ending 1 Nov 18 be removed from his record.

## APPLICANT'S CONTENTIONS

Counsel, on behalf of the applicant, states he was the subject of a baseless investigation conducted after fraudulent accusations were made in reprisal for making protected communications concerning another investigation. The commander directed investigation (CDI) was conducted by a biased investigating officer (IO) who had close personal ties with the complainant. The IO failed to establish the requisite elements by a preponderance of the evidence, rendering the findings legally insufficient. As such, the LORs based on two separate CDIs must be removed in the interest of justice. The CDI reviewing officer was so disgusted with the egregiously biased CDI, he asked to be recused as the IO. The OPR was premised on the same factually and legally insufficient conclusions reached by the IOs.

The first CDI was conducted after he was falsely accused of misconduct, to include having a sexual relationship with a married female officer and engaging in an inappropriate relationship, which was prejudicial to good order and discipline. He and the female officer vehemently denied engaging in sexual intercourse while inside a vault and the CDI concluded there was not enough evidence to substantiate the allegation. The complainant received a less than favorable OPR from the female officer and was exhibiting concerning behavior. Further, during the investigation, several witnesses came forward and provided statements contradicting the complainant. Despite the overwhelming statements indicating nothing inappropriate occurred, the IO substantiated the allegation. The IO engaged in gender stereotypes and concluded a male and female service member should not be seen together because of perception.

On 13 Jun 17, he received an LOR for his alleged inappropriate relationship. In his rebuttal on 13 Dec 17, he outlined the shortcomings of the IO, to include being overly familiar with the complainant, failure to make an appropriate credibility determination and the inability to apply the facts uncovered.

Controlled by: SAF/MRB
CUI Categories: SP-MIL/SP-PRVCY
Limited Dissemination Control: N/A
POC: SAF.MRBC.Workflow@us.af.mil

CUI//SP-MIL/SP-PRVCY

On 21 Nov 17, he received notice of a second CDI for events that occurred on 16 Oct 17. An officer facing sexual assault/harassment allegations attempted to take pictures of him in order to coerce him into making statements on his behalf. The Board should be aware he was the primary witness against the officer regarding sexual assault/harassment charges.

On 19 Jan 18, the IO concluded the investigation into allegations he fraternized with an enlisted member and made false official statements during the course of the investigation. There was no evidence uncovered during the course of the investigation that he knew the woman in question was an enlisted service member. However, on 26 Jan 18, he received an LOR for the alleged incident while on temporary duty (TDY).

On 31 May 19, he was served with notification he was receiving a referral OPR. The OPR contains numerous inaccuracies, false statements and other regulatory violations. The OPR references conduct which occurred outside the rating period, to include mentioning both LORs. In Sep 19, he submitted his rebuttal to the referred OPR and highlighted the inaccuracies, false statements and regulatory violations.

On 7 Jul 20, an IO was appointed to look into the allegations the vice commander discriminated against the applicant. On 30 Oct 20, the IO requested to be recused stating he did not agree with the series of findings leading to the investigation. He stated after reviewing over 1,089 documents provided by the Equal Opportunity (EO) Office, he concluded the informal resolution request (IRR) preceding the formal resolution request (FRR) insufficiently addressed the circumstances leading to the LOR. The IRR failed to fully consider the nature of the CDI, which relied on circumstantial evidence or assumptions and not concrete evidence to materially support actions taken. There is ample evidence to indicate that it is more likely than not that the allegations are false and were made in retaliation. The IO in the report of investigation (ROI) noted the complainant displayed paranoid behavior and consistently brought up their less than positive OPR shortly before the allegations were made. Several witnesses interviewed denied any inappropriate relationship had occurred.

The applicant's complete submission is at Exhibit A.

## STATEMENT OF FACTS

The applicant is a lieutenant colonel (O-5) in the Air Force Reserve.

Counsel provides extracts of a redacted ROI showing a CDI was conducted pertaining to allegations the applicant, a married man, and [Redacted], an officer and married woman wrongfully had sexual intercourse to the prejudice of good order and discipline.

Allegation 1: The complainant on 4 May 17 entered the intelligence vault and discovered the applicant and [Redacted] inside a room in the vault. There were no other direct witnesses and while the circumstantial evidence was strong, the IO could not find a preponderance of the evidence to show the applicant wrongfully had sexual intercourse on the evening of 4 May 17. **(UNSUBSTANTIATED).**

Allegation 2. The applicant knowingly had an extramarital affair or unprofessional relationship. Based on the preponderance of the evidence and credible testimony regarding the TDY and circumstantial evidence, the IO concluded the applicant knowingly had an extramarital affair or unprofessional relationship. **(SUBSTANTIATED).**

CUI//SP-MIL/SP-PRVCY

On 13 Jun 17, the applicant received an LOR for displaying poor judgment and failure to fulfill his responsibilities as a field grade officer from Dec 16 to May 17. His actions created a perception of an inappropriate relationship with another officer, which was prejudicial to good order and discipline. In a rebuttal response dated 13 Dec 17, the applicant stated much of the testimony was false, inaccurate or misrepresented by the IO and/or influenced by discredited witnesses. He also requested consideration as this was the first administrative action ever taken against him in over 17 years of service.

SAF/IG provided ROI of CDI concerning abuse of authority and other misconduct dated Jan 18, which shows a CDI was initiated on 17 Nov 17 pertaining to events occurring on 16 Oct 17 during a TDY. The factual background for the CDI was an alleged altercation between the applicant and [Redacted-major] while TDY when both went to a hotel bar following the events of an industry day. The ROI addresses the following allegations pertaining to the applicant:

Allegation 2: On or about 16 Oct 17, the applicant caused an altercation to occur that would be considered a violation of Air Force standards **(UNSUBSTANTIATED).**

Allegation 3: On 16 Oct 17, the applicant engaged in an unprofessional relationship (fraternization) as the term is defined in AFI 36-2909, *Air Force Professional Relationships and Conduct*. A video showed the applicant with a female in civilian clothes who was an enlisted services team member from another State Air National Guard (ANG). The IO noted the applicant was married to someone else. **(SUBSTANTIATED).**

Allegation 5: On or about 16 Oct 17, the applicant made false statements concerning the 16 Oct 17 allegations. After reviewing the various witness testimonies, to include the applicant's interview with his attorney stating he could not remember the events, video and texts, the IO determined there was sufficient evidence to show the applicant made false statements. **(SUBSTANTIATED).**

Allegation 7: On or about 16 Oct 17, the applicant made threatening statements to [Redacted] concerning an ongoing Office of Special Investigations (OSI) investigation. While the applicant stated [Redacted] should apologize or that it could go to court martial and that he was going to be done could have been perceived threatening, there were no witness statements to support the allegation. **(UNSUBSNTATIATED).**

On 26 Jan 18, the applicant received an LOR for compromising his standing as a field grade officer while on TDY. On 16 Oct 17, while in uniform, he fraternized with an enlisted member and engaged in unprofessional behavior. He was also untruthful to his chain of command concerning the 16 Oct 17 encounter, choosing to make false verbal and written statements about the allegations on a number of occasions. On 5 Feb 18, counsel and applicant submitted a rebuttal to the LOR disagreeing with how the LOR characterizes the events on 16 Oct 17. The video evidence in the CDI was gathered in an attempt to slander the applicant. There was also no evidence in the CDI that supported the claim he knew the subject was an enlisted member or that he was untruthful to his chain of command. It was obvious his command was purposely orchestrating actions to slander him. His counsel requested the applicant's positive service record be considered and the LOR be rescinded.

The applicant received a referral OPR for the reporting period ending 1 Nov 18 for appearance of an unprofessional relationship at home and deployed with a major and fraternization in uniform at a bar and lying when asked. It also stated two LORs were issued.

006

CUI//SP-MIL/SP-PRVCY

The Wing Equal Opportunity (EO) memorandum for record (MFR) dated 9 Jul 20, stated an IO was appointed for investigation into allegations of alleged discrimination against the applicant by the operations group commander (OG/CC). It stated the matter had already been through the IRR and the complainant appealed to the FRR and that the National Guard Bureau Equity and Inclusion Complaints Management and Adjudication Office would make the final determination on the FRR.

On 30 Oct 20, the appointed IO into the applicant's discrimination complaint requested he be relieved as the IO. His review of the documents prejudiced him in that he did not agree with the series of findings leading to the investigation. He also stated the IRR and FRR insufficiently addressed the circumstances leading to the LOR for the complainant. The subsequent leadership inquiry report (LIR) relied on circumstantial evidence or assumptions of fact and not concrete evidence. There was considerable doubt about the veracity of the statements leading to a substantiated claim of an improper relationship of an extramarital affair or unprofessional relationship. The applicant also highlighted issues with the command climate that were not sufficiently considered in the inquiries and CDI.

For more information, see the excerpt of the applicant's record at Exhibit B and the advisory at Exhibit C.

**APPLICABLE AUTHORITY/GUIDANCE**

Per 10 U.S.C. § 1034 and AFI 90-301, *Inspector General Complaints Resolution*, reprisal against military members for making protected disclosures is prohibited.

**AIR FORCE EVALUATION**

XXNG/JA recommends denial. The applicant has not met the burden to demonstrate that the CDIs or resulting LORs and OPR were based on material errors or injustices or that they were not legitimate agency actions. The command should not be expected to ignore information, even if it came from a motivated or biased source, and evidence of officer misconduct, even when provided by a source that might be demonstrated to have animus can lead to CDIs and consequences if the commander determines adverse administration action is appropriate. More importantly, the original CDI was not in retaliation or reprisal but was more likely an indication of a pattern of CDIs into a unit that was experiencing an overall breakdown of good order and discipline.

In accordance with AFI 36-2907, commanders and other members of the chain of command can issue administrative actions in an effort to improve, correct and instruct subordinates who depart from standards of performance or whose actions degrade the individual and unit mission. The actions taken by the applicant's chain of command were within their authority and insufficient evidence was provided to justify overturning the decisions to issue the LORs and referral OPR. Further, the applicant was afforded due process during the CDIs and when he received the LORs and the referral OPR. The conclusions of the CDIs are legally sufficient and the LORs and referral OPR were within the commander's discretion and authority.

The allegations of reprisal are also without merit. The applicant was investigated for misconduct unrelated to the alleged reprisal and for matters that are sufficient for a CDI and when substantiated. Counsel contends the applicant was the subject of a baseless investigation conducted after fraudulent accusations were made in reprisal for engaging in protected communications concerning another investigation. What the protected communication was seems intentionally vague but it appears to be related to the applicant's previous cooperation in an investigation concerning coercion to prevent further cooperation. The alleged reprisal appears to

007

CUI//SP-MIL/SP-PRVCY

be the CDI into the applicant after the applicant was a witness in an investigation against [Redacted].

Per 10 U.S.C. § 1034 and AFI 90-301, members of the armed forces shall be free from reprisal for making protected communication. Reprisal means taking or threatening to take an unfavorable personnel action or withholding or threatening to withhold a favorable personnel action for making protected communication. However, AFI 90-301 is clear that nothing in the instruction would dissuade commanders from taking timely and appropriate corrective actions for legitimate reasons, whether the information regarding the misconduct came through a protected communication. Further, the record does not show the applicant filed any IG within the required time period, although he indicated in the rebuttal to the LOR dated 26 Jan 18 that there would be calls from his Congressional office and IG.

The complete advisory opinion is at Exhibit C.

**APPLICANT'S REVIEW OF AIR FORCE EVALUATION**

The Board sent a copy of the advisory opinion to the applicant on 23 Feb 22 for comment (Exhibit D), but has received no response.

**FINDINGS AND CONCLUSION**

1. The application was timely filed.

2. The applicant exhausted all available non-judicial relief before applying to the Board.

3. After reviewing all Exhibits, the Board concludes the applicant is not the victim of an error or injustice. The Board concurs with the rationale and recommendation of XXNG/JA and finds a preponderance of the evidence does not substantiate the applicant's contentions. Counsel contends the applicant's LORs and referral OPR should be removed from his record due to the baseless investigations conducted after false accusations and the bias of the IO who had close personal ties with the complainant. However, the Board finds counsel has not sustained his burden of proof to overturn the presumption of regularity. Absent evidence to the to the contrary, there is a presumption of regularity in the conduct of governmental affairs in that officers of the government discharge their duties in accordance with law and policy. In this respect, the Board concludes while counsel contends the applicant did not commit adultery or engage in fraternization, the evidence is sufficient to conclude the applicant violated AFI 36-2909 by failing to maintain professional relationships and displaying poor judgment, which were prejudicial to good order and discipline. Counsel also contends the applicant was reprised against for making protected communication. However, based on the evidence, it appears the applicant's EEO complaint of discrimination and reprisal was reviewed by the IRR and FRR in accordance with established regulations. Moreover, the Board finds no evidence the applicant was reprised against for making protected communication, in violation of AFI 90-301. Therefore, the Board recommends against correcting the applicant's records.

**RECOMMENDATION**

The Board recommends informing the applicant the evidence did not demonstrate material error or injustice, and the Board will reconsider the application only upon receipt of relevant evidence not already presented.

008

CUI//SP-MIL/SP-PRVCY

**CERTIFICATION**

The following quorum of the Board, as defined in Air Force Instruction (AFI) 36-2603, *Air Force Board for Correction of Military Records (AFBCMR)*, paragraph 1.5, considered Docket Number BC-2021-02580 in Executive Session on 21 Apr 22:

      Mr. Clifford D. Tompkins, Panel Chair
      Ms. Amy L. Graveley, Panel Member
      Ms. Wanda T. Jones-Heath, Panel Member

All members voted against correcting the record.  The panel considered the following:

      Exhibit A:  Application, DD Form 149, w/atchs, dated 22 Jun 21.
      Exhibit B:  Documentary evidence, including relevant excerpts from official records.
      Exhibit C:  ROI, SAF/IG, dated Jan 18 (WITHDRAWN)
      Exhibit D:  Advisory Opinion, DCNG/JA, w/atchs, dated 11 Feb 21.
      Exhibit E:  Notification of Advisory, SAF/MRBC to Applicant, dated 23 Feb 22.

Taken together with all Exhibits, this document constitutes the true and complete Record of Proceedings, as required by AFI 36-2603, paragraph 4.11.9.

4/26/2022

X _____

Board Operations Manager, AFBCMR
Signed by: DANZY.CATHERINE.M.1029660375

009

Prescribed by: DoDD 1332.41, DoDI 1332.28

| APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552 *(Please read Privacy Act Statement and instructions on back BEFORE completing this application.)* | OMB No. 0704-0003 OMB approval expires: 20221031 |
|---|---|

**BC-2021-02580**

| | DO NOT WRITE BELOW |
|---|---|
| | CASE NUMBER |

**SECTION 1: SERVICE MEMBER** *(The person whose discharge is to be reviewed.)*      PLEASE PRINT OR TYPE INFORMATION

**1. BRANCH AT TIME OF ERROR OR INJUSTICE**  ☐ ARMY  ☐ NAVY  ☒ AIR FORCE  ☐ COAST GUARD  ☐ MARINE CORPS

**2. COMPONENT AT TIME OF ERROR OR INJUSTICE**  ☐ REGULAR  ☐ RESERVE  ☒ GUARD

| **3. NAME WHILE SERVING** | Last | T O R R E N C E | | MI | M | Suffix | |
|---|---|---|---|---|---|---|---|
| | First | J E N N E R | | | | | |

| **4. CURRENT NAME** *(if different)* | Last | | MI | | Suffix |
|---|---|---|---|---|---|
| | First | | | | |

**5a. SSN WHILE SERVING** ▮▮▮▮▮ - 4 4 8 7   *CURRENT SSN (if different)* - -

**5b.** *(provide, if applicable)* ☐ DoD ID Number,  ☐ SERVICE NUMBER, or  ☐ TIN

**6. MAILING ADDRESS** *(If Service Member is deceased, skip this question.)*

| Street | | 1208 5th Street NE |
|---|---|---|
| City, State / APO / Country or Foreign Address | *Washington, D.C.* ZIP | 20002 |
| Email | *jennertorrence@yahoo.com; jennertorrence@hotmail.com* Phone | (202)0876-4020 |

**SECTION 2: SEPARATION INFORMATION** *(if not currently serving)*

| **7. CURRENTLY SERVING?**  ☒ YES  ☐ NO | **8. DATE OF SEPARATION** *(YYYYMMDD)* |
|---|---|

**9. CHARACTER OF SERVICE** *(If by court-martial, also state Type of Court in space provided.)*

☐ Honorable  ☐ Under Honorable Conditions (General)  ☐ Under Other than Honorable Conditions  ☐ Bad Conduct Discharge  ☐ Dishonorable

☐ Dismissal  ☐ Uncharacterized / Entry Level Separation  ☐ Other  _____  *Type of Court* _____

**SECTION 3: ERROR OR INJUSTICE**

**10a. IS THIS A REQUEST FOR RECONSIDERATION OF A PRIOR APPLICATION TO THE BOARD?**  ☐ YES  ☒ NO

**10b. IF YES AND KNOWN, PROVIDE CASE NUMBER** _____   **AND DECISION DATE** *(YYYYMMDD)*

**11. CATEGORY** *(Select all that apply.  Example: Administrative Correction - change in name, DOB, SSN.)*

☐ Administrative Correction  ☐ Pay & Allowance  ☐ Decoration / Awards  ☒ Performance / Evaluations / Derogatory Information

☐ Disability  ☐ Promotions / Rank  ☐ Discharge / Separation  ☐ Other

**12. WHAT CORRECTION AND RELIEF ARE YOU REQUESTING FOR THIS ERROR OR INJUSTICE IN THE SERVICE MEMBER'S RECORD?** *(required)*

We respectfully ask this honorable Board to remove and destroy the two Letters of Reprimand issued to Lt Col Torrence on 13 June 2017 and 26 January 2018; or in the alternative, place these two Letters of Reprimand into a secured file. Additionally, we respectfully request this Board remove the Officer Performance Report ending 1 November 2018 from Lt Col Torrence's records.

**13. ARE ANY OF THE FOLLOWING ISSUES/CONDITIONS RELATED TO YOUR REQUEST:** *(Select all that apply.)*

☐ PTSD  ☐ TBI  ☐ Other Mental Health  ☐ Sexual Assault / Harassment  ☐ DADT  ☐ Transgender  ☐ Reprisal / Whistleblower

**14. WHY SHOULD THIS CORRECTION BE MADE?** *(required)*

The investigations into Lt Col Torrence were predicated upon materially fraudulent accusations and the Letters of Reprimand were issued after an egregiously sloppy investigation, in which the investigating officer failed to make appropriate credibility determinations and then issued findings contrary to the great weight of the evidence; thus, rendering the findings legally and factually insufficient. Further, Lt Col Torrence's Officer Performance report contains materially false statements, mentions conduct falling outside of the stand-alone rating period, and is otherwise contrary to controlling regulations. Please see attached brief from counsel for further discussion of these matters.

**15. APPROXIMATE DATES** *(YYYYMMDD)* Feb 8, 2018   THE ERROR OR INJUSTICE OCCURRED: 20180208   AND WAS DISCOVERED: 20180208

IF THE DATE OF DISCOVERY IS MORE THAN 3 YEARS AGO, EXPLAIN YOUR DELAY AND WHY THE BOARD SHOULD CONSIDER YOUR REQUEST.  REFER TO BLOCK 18.

| **DD FORM 149, DEC 2019** | PREVIOUS EDITION IS OBSOLETE. | Page 1 of 3 |
|---|---|---|

010

Prescribed by: DoDD 1332.41, DoDI 1332.28

| 17. DO YOU WISH TO APPEAR AT YOUR OWN EXPENSE BEFORE THE BOARD IN WASHINGTON, D.C.? | ☐ YES. *(IN PERSON)* | ☐ YES. *(VIA VIDEO / TELEPHONE)* | ☒ NO. CONSIDER MY APPLICATION BASED ON RECORDS & EVIDENCE. |
|---|---|---|---|
| | | THE BOARD WILL DETERMINE IF WARRANTED. | |

**18. ADDITIONAL REMARKS/CONTINUATION OF INFORMATION** *(If more space is needed, please submit additional narrative as required.)*
Due to complications flowing from the Covid 19 pandemic, as well as issues arising from an OCONUS deployment, this application has not been timely filed. We respectfully ask that this honorable Board waive the untimely filing of this petition in the interests of justice.

## SECTION 4: EVIDENCE, RECORDS, AND ADDITIONAL REMARKS

**19. IN SUPPORT OF THIS CLAIM, THE FOLLOWING DOCUMENTARY EVIDENCE IS ATTACHED (LIST DOCUMENTS):** *Example evidence / records: Separation packet, medical documents (e.g. diagnosis, VA rating), post-service documents (e.g. diplomas, professional certificates, character references), and/or investigations. (Do NOT submit irreplaceable original documents. They will NOT be returned.)*

| a. See attached brief from counsel with 14 exhibits. | d. | g. |
|---|---|---|
| b. | e. | h. |
| c | f. | i. |

LIST ADDITIONAL SUPPORTING DOCUMENTS *(if needed)*

IMPORTANT NOTE: If the basis of your request involves the effects of one or more *physical, medical, mental, and/or behavioral health condition(s)* and if available, please attach copies of any VA rating decisions, relevant medical records, and counseling treatment records.

## SECTION 5: CLAIMANT *(if other than the Service Member)*

**20. RELATION TO SERVICE MEMBER**

Claimants are normally Service Members seeking to correct their own records. The Service Member or former Service Member is not able to sign the

application because they are ☐ deceased, ☐ incapacitated, or ☐ other _____

Please designate appropriate signatory below.

I am the heir of the Service Member: ☐ widow(er), ☐ son, ☐ daughter, ☐ parent, ☐ sibling, ☐ Other _____

Please provide Service Member's death certificate and marriage license or heir's birth certificate, as appropriate to prove relationship.

I am the ☐ conservator, ☐ guardian, or ☐ attorney-in-fact of the Service Member.

Please provide a notarized power of attorney or court appointment of conservatorship or guardianship to prove status.

I am the ☐ spouse, ☐ former spouse, or ☐ dependent of the Service Member.

Please provide marriage license, divorce decree, or dependent birth certificate, as appropriate to prove relationship

| 21. NAME | Last | | | | | | | | | | | | | | | | | | | MI | | Suffix | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | First | | | | | | | | | | | | | | | | | | | | | | |

| 22. MAILING ADDRESS     Street | |
|---|---|
| City, State / APO / Country or Foreign Address | ZIP |
| Email | Phone |

## SECTION 6: REPRESENTATIVE OR COUNSEL *(if applicable)*

The following representative is authorized to receive and provide communication regarding this application.

| 23. NAME | Last | T | I | M | M | O | N | S | | | | | | | | | | | | MI | C | Suffix | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | First | S | E | A | N | | | | | | | | | | | | | | | | | | |

24. ORGANIZATION

| 25. MAILING ADDRESS     Street | | 2925 Richmond Ave, 12th Floor |
|---|---|---|
| City, State / APO / Country or Foreign Address | Houston, TX   ZIP | 77098 |
| Email | simmons@rdlyle-gol.com   Phone | (832) 241-5888 |

## SECTION 7: SIGNATURE

| 26. I WOULD LIKE TO RECEIVE ALL CORRESPONDENCE & DOCUMENTS ELECTRONICALLY. *(This may reduce overall processing time.)* | ☒ YES | ☐ NO |
|---|---|---|

CERTIFICATION: I MAKE THE FOREGOING STATEMENTS, AS PART OF THIS CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM. *(U.S. Code, Title 18, Section 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

| 27a. SIGNATURE | 27b. DATE SIGNED *(YYYYMMDD)* |
|---|---|
| TORRENCE.JENNER.MICHAEL. 1078498850   Digitally signed by TORRENCE.JENNER.MICHAEL.1078498850 Date: 2021.06.23 00:38:55 -04'00' | 20210622 |

| 16. IS THIS REQUEST RELATED TO ANY OF THESE WARS OR CONTINGENCY OPERATIONS? | ☐ Operation Freedom Sentinel (OFS) (01/01/2015 - Present) | ☐ Persian Gulf War (08/02/1990 - 11/30/1995) |
|---|---|---|
| | ☐ Operation Inherent Resolve (OIR) (08/08/2014 - Present) | ☒ Vietnam War (01/01/1961 - 04/30/1975) |
| | ☐ Operation Enduring Freedom (OEF) (09/11/2001 - 12/31/2014) | ☐ Korean War (06/27/1950 - 07/27/1954) |
| ☐ Yes *(Select all that apply.)*   ☒ No | ☐ Operation New Dawn (OND) (09/01/2010 - 12/15/2011) | ☐ World War II (12/07/1941 - 09/02/1945) |
| | ☐ Operation Iraqi Freedom (OIF) (03/19/2003 - 08/31/2010) | ☐ Other _____ |

DD FORM 149, DEC 2019                    PREVIOUS EDITION IS OBSOLETE.                    Page 2 of 3

Prescribed by: DoDD 1332.41, DoDI 1332.28

### INSTRUCTIONS FOR COMPLETION OF DD FORM 149

Under Title 10 United States Code Section 1552, current and former members of the Armed Forces, their lawful or legal representatives, spouses and ex-spouses of former members seeking Survivor Benefit Program (SBP) benefits, and civilian employees seeking correction of military records other than those related to civilian employment, who feel that they have suffered an injustice as a result of error or injustice in military records may apply to their respective Boards for Correction of Military (or Naval) Records (BCMR/BCNR) for a correction of their military records. These Boards are the highest level appellate review authority in the military. Therefore, applicants must exhaust all other administrative correction and appeal procedures before applying to the Boards.

This form collects the basic data that the Boards need to process and act on the request. Type or print all entries for all applicable items. If the item is not applicable, enter "NA." If the space provided is insufficient, attach an extra page.

SECTION 3, ITEM 12. State the specific correction of record and all relief desired. If possible, identify exactly what document or information in your record you believe to be erroneous or unjust and indicate what correction you want made to it. For additional errors or injustices, use Section 8.

ITEM 14. To justify correction of a military record, you must explain and show to the satisfaction of the Board that the alleged entry or omission in the record is in error or unjust.

ITEM 15. U.S. Code, Title 10, Section 1552(b), states that no correction may be made unless the request is made within three years after the discovery of the error or injustice, but the Board may excuse failure to file within three years in the interest of justice.

ITEM 16. Indicate whether you attribute the error or injustice to your involvement in a particular war or contingency operation.

ITEM 17. A hearing is not required to ensure the Board's full and impartial consideration of your application. If the Board decides that a hearing is warranted, you, your witnesses, and your counsel may attend at no expense to the government, except that counsel may be provided if the Inspector General has reported reprisal against you.

SECTION 4. You are responsible for obtaining and submitting clear, legible evidence to persuade the Board to grant your request, including any evidence that is not already in your military record. Do not assume a document is in your record. Your evidence should be submitted with this form and may include, for example, military records and orders, witnesses' sworn affidavits, and a brief of arguments supporting your request. List your evidence in item 19 and, if your case involves a medical condition, submit relevant medical records and VA rating decisions as noted in item 20. Do not send irreplaceable original documents because they will not be returned.

SECTION 5. The person whose record will be corrected if relief is granted must sign this form in Section 7. If that person is deceased or incompetent to sign, a lawful claimant, such as a spouse, widow(er), next of kin (child, parent, or sibling), or legal representative, may sign the form. Proof of death, incompetency, or power of attorney must be submitted. Former spouses may apply as claimants for SBP issues

SECTION 6. You may want counsel if your case is complex. Some veterans and service organizations furnish counsel without charge. Contact your local post or chapter.

For detailed information on application and Board procedures, see: Army Regulation 15-185 and www.arba.army.pentagon.mil; Navy - SECNAVINST 5420.193 and www.hq.navy.mil/bcnr/bcnr.htm; Air Force Instruction 36-2603, Air Force Pamphlet 36-2607, and www.afpc.randolph.af.mil/safmrbr; Coast Guard - Code of Federal Regulations, Title 33, Part 52 and www.uscg.mil/Resources/legal/BCMR.

### MAIL COMPLETED APPLICATIONS TO APPROPRIATE ADDRESS BELOW

| ARMY | NAVY AND MARINE CORPS | AIR FORCE | COAST GUARD |
|---|---|---|---|
| Army Review Boards Agency<br>251 18th Street South, Suite 385<br>Arlington, VA 22202-3531<br>http://arba.army.pentagon.mil | Board for Correction of Naval Records<br>701 S. Courthouse Rd, Suite 1001<br>Arlington, VA 22204-2490<br>http://www.secnav.navy.mil/mra/bcnr/Pages/default.aspx | Air Force Board for Correction of Military Records<br>3351 Celmers Lane<br>Joint Base Andrews, MD 20762-6435<br>http://www.afpc.af.mil/Board-for-Correction-of-Military-Records/ | DHS Office of the General Counsel<br>Board for Correction of Military Records, Stop 0485<br>2707 Martin Luther King Jr. Ave. S.E.<br>Washington, DC 20528-0485<br>https://www.uscg.mil/Resources/legal/BCMR/ |

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or burden reduction suggestions to the Department of Defense, Washington Headquarters Services, at whs.mc-alex.esd.mbx.dd-dod-information-collections@mail.mil. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON PAGE 3.

### PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 1552. Correction of military records; claims incident thereto; and E.O. 9397 (SSN), as amended.
PRINCIPAL PURPOSE(S): To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record. Completed forms are covered by correction of military records SORNs maintained by each of the Services or the Defense Finance and Accounting Service.
ROUTINE USE(S): The DoD Routine Uses can be found in the applicable system of records notices below:
Army (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/569531/a0015-185-sfmr.aspx)
Navy and Marine Corps (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570411/nm01000-1/)
Air Force (https://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/569333/f036-safcb-a/)
Defense Finance and Accounting Service (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570192/t7340b/)
Coast Guard (https://www.gpo.gov/fdsys/pkg/FR-2013-10-02/html/2013-23991.htm)
Official Military Personnel Files:
Army (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570054/a0600-8-104-ahrc.aspx)
Navy (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570310/n01070-3/)
Marine Corps (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-wide-SORN-Article-View/Article/570026/m01070-6/)
Air Force (http://dpcld.defense.gov/Privacy/SORNsIndex/DOD-Component-Article-View-Article/569821/f036-af-pc-p/)
Coast Guard (http://www.gpo.gov/fdsys/pkg/FR-2011-10-28/html/2011-27881.htm)
DISCLOSURE: Voluntary. However, failure by a spouse to provide the information not annotated as "optional" may result in a denial of your application. A claimant's SSN is used to retrieve these records and links to the member's official military personnel file and pay record.

**DD FORM 149, DEC 2019**       PREVIOUS EDITION IS OBSOLETE.       Page 3 of 3



# TULLY RINCKEY PLLC
## ATTORNEYS & COUNSELORS AT LAW

2925 RICHMOND AVENUE, 12TH FLOOR
HOUSTON, TEXAS 77098
WWW.TULLYLEGAL.COM
PHONE: (832) 241-5888
FAX: (832) 533-8999
EMAIL: INFO@TULLYLEGAL.COM

***Via Priority Mail***

14 June 2021

Air Force Board for Correction of Military Records
SAF/MRBC
550-C Street West, Suite 40
Randolph AFB, TX 78150-4742

> Re:    Col Jenner Torrence
> SSN: ████4487
> Our File No.: 17-4259

Dear Air Force Board for Correction of Military Records:

Please be advised that our Firm has been retained to represent the above-mentioned individual in regards to his request to remove two Letters of Reprimand (LOR) and a referred Office Performance Report (OPR) that was issued in violation of applicable regulations. (*See* Power of Attorney, Encl. 1). Lt Col Torrence was the subject of a baseless investigation which was conducted after fraudulent accusations were made in reprisal for engaging in protected communications concerning another investigation. The Command Directed Investigations (CDI) into the below mentioned accusations were wholly inadequate, conducted by a biased investigator who had acknowledged close personal ties with the complainant, and who failed to establish the requisite elements by a preponderance of the evidence; thereby rendering the investigative findings legally insufficient. As such, the LORs, which are based off of these investigations, must be removed in the interest of justice. This honorable Board should be aware that an impartial review of the first CDI was conducted, and the findings of the reviewing IO indicate that the allegations against Lt Col Torrence should have never been substantiated in the first instance; therefore, any administrative actions flowing from this inadequate investigation must be expeditiously overturned and any associated documentation must be removed from Lt Col Torrence's file. More so, the reviewing officer was so disgusted with the egregiously biased CDI that he asked to recuse himself as the IO. This is Lt Col Torrence's first attempt at correcting the injustice's described below. Lt Col Torrence has exhausted all administrative remedies available to him, and the Discharge Review Board does not have the authority to grant the relief requested herein. Therefore, this honorable Board is the only agency vested with the authority to grant the relief requested. Please forward all future correspondence in this matter to our office.

## REQUESTED RELIEF

We respectfully request the following relief for Lt Col Torrence:

1. Removal of the Letter of Reprimand, dated 13 June 2017, from all of Lt Col Torrence's military records;
2. Removal of the Letter of Reprimand, dated 26 January 2018, from all of Lt Col Torrence's military records;
3. In the alternative, placement of the above mentioned Letters of Reprimand into a secured file; and
4. Remove the Officer Performance Report ending 1 November 2018 for Lt Col Torrence's records.

## STATEMENT OF THE CASE

We respectfully contend that the investigations conducted into false accusations levied against Lt Col Torrence were wholly deficient, as both investigating officers (IO) failed to take basic investigatory steps, such as interviewing all witnesses, and made determinations that were inapposite to the evidence on record. The two LORs that were issued in response to the investigative findings are contrary to applicable regulations and justice demands that they be expeditiously removed from Lt Col Torrence's records. *This honorable Board need look no further than the recusal request of Col Franken, who indicated that the allegations against Lt Col Torrence are without merit after conducting an impartial review of the evidence*. Further, the OPR that was issued to Lt Col Torrence contains numerous materially false statements, mentions conduct occurring outside the stand-alone rating period, and is otherwise contrary to the controlling regulations. More so, the OPR was premised on the same factually and legally insufficient conclusions reached by the IOs. In light of these clear violations of applicable regulations, we respectfully request this honorable Board grant the relief requested herein.

## EXHIBITS

1. Power of Attorney
2. Unfavorable Information File
3. CDI 1
4. Letter of Reprimand, dated 06/13/2017
5. Rebuttal to Letter of Reprimand, dated 12/13/2017
6. Initiation of CDI
7. CDI 2
8. Letter of Reprimand, dated 01/26/2018
9. Rebuttal to Letter of Reprimand, dated 02/05/2018
10. Memorandum from Lt Col Lewis
11. Officer Performance Report

12. Rebuttal to Officer Performance Report
13. Appointment Memorandum
14. Recusal Request

## JURISDICITON

Per 10 U.S.C. 1552 (b) applications for the correction of military records must be filed within 3 years after discovery of the alleged error or injustice. Lt Col Torrence unjustly received 2 Letters of Reprimand that were placed in his file on 8 February 2018. (See Unfavorable Information File, Encl. 2). Therefore, this application is just outside the three year limitation period; however, this honorable Board may waive an untimely submission if it is in the interests of justice. Lt Col Torrence prays this Board considers his application in the interests of justice. Lt Col Torrence has exhausted all administrative remedies available to him and the Air Force Discharge Review Board does not have the authority to grant the relief requested herein.

## FACTS

The allegations surrounding the two LORs issued to Lt Col Torrence stem from two separate CDIs which were initiated after maliciously false allegations were made against Lt Col Torrence. The investigations will be discussed in turn, and separated for ease of reviewing.

### *Facts Specific to First CDI*

The first CDI was conducted after Lt Col Torrence was falsely accused of several instances of misconduct, to include having sexual relationships with a married female officer, and engaging in an inappropriate relationship which was prejudicial to good order and discipline. (See CDI 1, Encl. 3).

The first allegation of the CDI accused Lt Col Torrence and Maj Murphy of engaging in sexual intercourse while inside a vault. Both individuals involved vehemently denied the allegation. The CDI concluded that there was not enough evidence to substantiate the aforementioned allegation. *Id.*

The Complainant, Capt Richardson, had received a less than favorable Officer Performance Report (hereinafter "OPR") from Maj Murphy just prior to making the above mentioned accusations. It is imperative to note that ***Capt Richardson was exhibiting "some concerning behavior***" during the course of the investigation. *Id.* The Investigating Officer (IO) noted that Capt Richardson mentioned this less than flattering OPR on several occasions and appeared to be upset over it, yet the IO dismissed any notion of reprisal on Capt Richardson's part. The IO's purported reason for dismissing the clear motive of Capt Richardson was because the IO had known Capt Richardson for "some time now." *Id.*

Lt Col Latner Torrence
v. et Title No.: 17-4259

A second allegation in the CDI accused Lt Col Torrence of having an inappropriate relationship with MAJ Murphy. ***During the investigation several witnesses came forward and provided statements that directly contradicted the statements made by Capt Richardson, and Maj Doughty***. Despite this information, the IO concluded that Maj Doughty was more credible than other witnesses. *Id.* Of additional importance is the testimony of "witness 9", who was a former secret service agent and who had "a lot of experience with investigations." *Id.* This witness "expressed grave doubts about COMPLAINTANT'S allegations due to some outlandish claims he made to MSgt WITNESS6. . . . ***I understand [his] reservations . . . but I have known complainant a long time and do not find his behavior suspicious.***" *Id.*

Witness12 was called to corroborate Witness7's (Maj Doughty) testimony regarding the alleged inappropriate relationship between Lt Col Torrence and Maj Murphy. ***However this witness denied anything unusual about the time Lt Col Torrence and Maj Murphy spent together in Guam***. Additionally, the witness was surprised that an investigation was going on, and did not think Lt Col Torrence and Maj murphy were engaging in inappropriate behavior. *Id.*

Despite the overwhelming statements indicating that nothing inappropriate was occurring between Lt Col Torrence and Maj Murphy, the IO found this specific allegation to be substantiated. *Id.*

In the analysis section for this allegation, the IO engages in gender stereotypes and effectively concludes that a male and female service member cannot been seen together because it creates a perception that an inappropriate relationship is occurring. *Id.*

On 13 June 2017 Lt Col Torrence received a Letter of Reprimand for his alleged inappropriate relationship with a fellow officer. (*See* Letter of Reprimand, dated 06/13/2017, Encl. 4). The LOR was based on the egregiously biased CDI and its illogical and irrational conclusions.

On 13 December 2017 Lt Col Torrence submitted a rebuttal in response to the LOR that was issued on 13 June 2017. In his rebuttal Lt Col Torrence outlines the egregious shortcomings of the Investigating Officer, to include being overly familiar with the Complainant, failure to make appropriate credibility determinations, and the IO's inability to apply the facts uncovered to the requisite elements of the Articles that were allegedly violated. (*See* LOR Rebuttal, Encl. 5).

<u>*Facts Specific to Second CDI*</u>

On 21 November 2017, Lt Col Torrence received notice that a second CDI was being initiated to investigate events that occurred on 16 October 2017. (See Initiation of CDI, Encl. 6). This investigation was the result of Maj Doughty taking photos of Lt Col Torrence in order to coerce Lt Col Torrence into making statements on his behalf in connection with SAPR related

UCMJ proceedings stemming from Maj Doughty's repeated sexual harassment of a female Officer, Maj Murphy. It is imperative that this Board be aware of the fact that Lt Col Torrence was the primary witness against Maj Doughty in these sexual assault/harassment allegations.

On 19 January 2018, the IO conclude her investigation into the numerous false allegations against Lt Col Torrence. These allegations surrounded accusations that Lt Col Torrence fraternized with an enlisted member of the United States military, and made false official statements during the course of the investigation. (See CDI 2, Encl. 7). These allegations will only be discussed insofar as they were found to be substantiated, and served as the basis for the second LOR.

The first allegation, which was wrongfully substantiated by the IO, was an accusation that Lt Col Torrence fraternized with an enlisted member of the Ohio Air National Guard. ***The video evidence obtained from bar security footage depicts Lt Col Torrence wearing his flight suit and a blonde female in civilian clothes.*** *Id.* At no point in the video footage does the female in question appear to be wearing any sort of military uniform and any type of clothing that would cause a reasonable person to suspect that she was an enlisted member of the military.

During the course of the investigation, the ***IO had to track down the female in the video to confirm whether she was in fact an enlisted member of U.S. military because there was no indication from an objective perspective that she was either a service member, or enlisted.*** *Id.*

There was no evidence uncovered during the course of the investigation to suggest that Lt Col Torrence knew the woman in question to be an enlisted service member prior to the conclusion of the investigation. Rather, the IO assumed that Lt Col Torrence had knowledge of the female's status as an enlisted military member because enlisted females from the WEPTAC service team had been serving refreshments at the event. *Id.* However, the IO failed to mention or otherwise consider the fact that the alleged incident occurred on the first day of WEPTAC and members likely would have had very little interaction with the enlisted service members working the concessions.

The second allegation in the CDI (Allegation 5) accuses Lt Col Torrence of making false statements surrounding the alleged incident at the DoubleTree bar. The CDI concludes that the statements provided by Lt Col Torrence are inconsistent with witness statements and text messages to an undisclosed Major. *Id.*

This conclusion by the IO is contrary to an allegation which accused Maj Doughty of making false statements, and where the IO found the allegation to be unsubstantiated because the "inconsistencies" could be attributed to lack of memory. *Id.* This double standard raises serious concerns about impartiality, and these concerns are only compounded by the IO's clear predisposition towards substantiating the allegations against Lt Col Torrence.

Maj Murphy details the indecent interactions between herself and Maj Doughty in a Memorandum for Record. In the memorandum, Maj Murphy describes an incident where Maj Doughty attempted to grab her breasts, and reached up her skirt. Maj Doughty continued to make sexually inappropriate comments towards Maj Murphy over the course of several months.

Around February 7, 2017, Lt Col Torrence had a conversation with Maj Doughty regarding the inappropriate comments that Maj Doughty has been making toward Maj Murphy. During the course of the conversation Maj Doughty became upset and stormed off.

Later on that same day a meeting was held between Maj Doughty, Lt Col Torrence, Maj Murphy, and Lt Col Lewis. The conversation of that meeting centered on Maj Doughty's inappropriate behavior towards Maj Murphy.

On January 26, 2018, Lt Col Torrence received a Letter of Reprimand for alleged incidents that occurred on October 16, 2017, while he was TDY at Tucson Arizona. (*See* Letter of Reprimand, dated 01/26/2018, Encl. 8). The LOR accuses Lt Col Torrence of fraternization with an enlisted member, and making false statements about the incidents.

On 5 February 2018 Lt Col Torrence submitted a rebuttal to the 26 January 2018 LOR. In his rebuttal Lt Col Torrence outlines the egregious errors that were committed during the investigation into his purported misconduct, to include the failure of the IO to establish all requisite elements of fraternization and making a false official statement. (*See* Rebuttal to Letter of Reprimand, dated 02/05/2018, Encl. 9).

On 31 May 2019 Lt Col Torrence was served with notification informing him of a referred OPR. (*See* Memorandum from Lt Col Lewis, Encl. 10). The Referred OPR that was issued to Lt Col Torrence contains numerous inaccuracies, false statements, and other regulatory violations. The OPR references conduct which occurred outside of the stand-alone rating period, 2 November 2017 to 1 November 2018, to include mentioning both Letters of Reprimand. (*See* Officer Performance Report, Encl. 11).

In September 2019 Lt Col Torrence submitted his rebuttal to the Referred OPR. In his rebuttal Lt Col Torrence highlights the numerous inaccuracies, false statements, and regulatory violations that are facially evident upon review of the OPR. (*See* Rebuttal to OPR, Encl. 12).

On 7 July 2020, Col Paul Franken, Deputy Commander, DCARNG, was appointed as the investigating officer to look into "allegations of alleged discrimination by Colonel John Vargas against Lt Col Jenner Torrence in the 113th Operations Group." (*See* Appointment Memorandum, Encl. 13). On 9 July 2020, Capt Allison Hartsfield sent an IO Appointment Brief to Col Franken. In that memorandum, Capt Hartsfield states the following: "*after reviewing the Leadership Inquiry Report and the Notice of Proposed Resolution associated with the IRR [informal resolution request] as well as the complainant's FRR [Formal Resolution Request], NGB-EI-CMA deemed the IRR inquiry to have been insufficient.*" *Id.*

On 30 October 2020, Col Franken sent a formal request to be recused of his duties as Investigating Officer to Col John Campo, 113 WG/CC. In his request Col Franken stated the following: "my review of the documents provided prejudices me in carrying out the duties required by the National Guard Bureau to complete the investigation. *I do not agree with the series of findings leading to this investigation*." (*See* Recusal Request, Encl. 14). Col Franken went on to state:

> After multiple reviews of over 1,089 documents provided to me by the 113th Wing Equal Opportunity (EO) Office at the start of my duty, I arrived at the following conclusions regarding this case:
>
> a. The Informal Resolution Request (IRR) inquiry preceding this Formal Resolution Request (FRR) insufficiently addressed the overall circumstances leading to a Letter of Reprimand (LOR) for the complainant. The subsequent Leadership Inquiry Report (LIR) to address Lt Col Torrence's IRR failed to fully consider the nature of the Command Directed Investigation (CDI) which led to the LOR and its potential conflicts therein. *My review of the CDI and associated documents demonstrate that the conclusions of the LIR relied on circumstantial evidence, or assumptions of fact and not concrete evidence to materially support actions taken*.
>
> b. The CDI relied heavily on the statements of two Officers; however, my objective view of both these Officers is that they could have been prejudiced in their statements and actions. *This creates considerable doubt in my mind about the veracity of their statements leading to a substantiated claim of an improper relationship of an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the Armed Forces of the United States in violation of AFI 1-1 and AFI 36-2909*.

*Id.* [Emphasis added]. When discussing the evidence uncovered during the course of the investigation, Col Franken stated the following:

> In my review of the documents, I assess that documents provided by Lt Col Torrence indicates a climate existed where good order and discipline at all levels of Command broke down, especially during the deployment to Guam. This led to claims, and counter claims about the nature of male and female interactions and behavior, both on and off duty. These claims, innuendo, and other actions between the Airmen could have led to the perception issues about the appropriateness of the relationship between Lt Col Torrence and Maj Murphy, and the true nature of that relationship… Lt Col Torrence highlights several issues with the Command climate that undermined good order and discipline that I do not feel were sufficiently considered during the series of inquiries and CDI. *There was no specific evidence shown how his relationship with Maj Murphy specifically undermined good order and discipline. A strong case could be made that the actions and statements by others in the Command, towards Maj Murphy in particular, were more*

*detrimental and corrosive to good order and discipline. My assessment, based on documents made available to me, does not indicate that the relationship between Lt Col Torrence and Maj Murphy undermined good order and discipline, thus I disagree with findings in the CDI.*

*Id.* [Emphasis Added].

## DISCUSSION

The Letters of Reprimand that were issued to Lt Col Torrence were premised on two inherently faulty investigations that were conducted by clearly biased investigators who failed to properly weigh the evidence on record and made unsupportable assumptions in order to justify their findings. After an objective review of the evidence and circumstances is made, it is abundantly clear that the investigation started off as a conclusion, and the IOs then went in search of facts that would support their pre-determined narrative. An internal investigation of the first CDI was conducted by Col Franken, who concluded that no misconduct had occurred. Notwithstanding the fact that these investigations are wholly void of any misconduct on the part of Lt Col Torrence, he was wrongfully issued a referred OPR based upon these egregiously flawed, legally and factually insufficient investigations. The OPR issued to Lt Col Torrence contains numerous false statements and multiple regulatory violations, to include commenting on conduct falling outside of the stand-alone rating period. Thus, the OPR is highly inaccurate and does not adequately address Lt Col Torrence's performance during the rating period. As such, we respectfully ask that this honorable Board grant the relief requested herein.

I.    **The LOR, dated 13 June 2017, was Premised on A Legally and Factually Insufficient Investigation and Justice Demands That it Be Removed.**

The LOR that was issued to Lt Col Torrence was based on a legally and factually insufficient investigation that failed to take into consideration overwhelming contradictory evidence, while simultaneously lending improper weight to the testimony of several individuals who had a motive to lie. The allegations contained within the LOR are materially false and justice demands that the LOR be removed from Lt Col Torrence's file.

The LOR that was issued to Lt Col Torrence was premised on materially false accusations and a wholly and egregiously deficient investigation conduct by an officer who was admittedly overly familiar with the complainant. The familiarity between the IO and the complainant, standing by itself, renders the investigation fundamentally biased from the start and an objective review of the evidence makes it abundantly clear that Lt Col Torrence did not engage in an inappropriate relationship with a fellow officer. As discussed above, *a review of the investigation and its associated documentation conducted by an impartial Officer, Col Franken, led to the conclusion that the great weight of the evidence indicates that the alleged misconduct did not occur.*

As the IO indicated in the Record of Investigation, the allegation that Lt Col Torrence engaged in sexual intercourse with Maj Murphy inside a vault on Joint Base Andrews in May 2017 was without merit. Capt Richardson, the individual making the complaint, exhibited concerning behavior to the IO during the course of the investigation which led the IO to suggest that Capt Richardson should seek professional mental health services. Despite this acknowledgement by the IO that Capt Richardson's mental faculties were in question, the IO seems to dismiss this issue. Further, the ***IO notes that Capt Richardson made these allegations after his rater, Maj Murphy, gave him a less than favorable Officer Performance Report*** (OPR). The fact that Maj Richardson had exhibited mental health issues and had made an allegation involving his rater and Lt Col Torrence in close proximity to receiving a poor OPR renders his testimony inherently suspect and gives rise to a clear motive to fabricate the allegations. While the IO does note that Maj Richardson's actions could be considered reprisal, he summarily dismiss the notion. The IO's actions and comments regarding Maj Richardson are demonstrative of his clear bias towards Maj Richardson and unequivocally unjustly influenced his findings.

The second allegation, which accused Lt Col Torrence and Maj Murphy of having an inappropriate relationship and extramarital affair is premised on the same inherently suspect testimony of individuals who had a clear motive to fabricate their testimony while wholly ignoring the overwhelming evidence to the contrary and engaging in crass gender stereotypes and superimposing secular notions on the underlying military regulations. There is absolutely no evidence to suggest that an inappropriate relationship occurred, and the IO's conclusion to the contrary which was premised on the idea that a male and female cannot be friends is completely misplaced and does not justify such a determination. More so, several witnesses have come forward during the course of the investigation to deny any inappropriate relationship between Lt Col Torrence and Maj Murphy, let alone the appearance of an inappropriate relationship.

During the course of the investigation **Witness 2 explicitly indicates that he did not have reasons to believe that an inappropriate relationship existed** between Lt Col Torrence and Maj Murphy. Witness 4 denied allegations that his girlfriend had told him that Maj Murphy and Lt Col Torrence might have been engaged in an inappropriate relationship, yet the IO dismissed this statement and indicated that she would not reach out to a witness who would contradict the statements made; thereby demonstrating a predisposition towards substantiating the allegations while simultaneously refusing to perform a basic investigatory function. Such inaction on the part of the IO is negligence at best, but is more aptly characterized as an abhorrent dereliction of duty.

Given the clearly conflicting statements obtained during the course of the investigation, the IO's admitted familiarity with the Complainant, and the overwhelming amount of statements contradicting the allegations it is clear that the LOR is based on unfounded accusations and should be removed in the interests of justice. This honorable Board need look no further than the Recusal Request of Col Franken indicating that a serious injustice has occurred.



## II.    The Evidence Collected During the Investigation Does not Support an Adverse Finding.

The investigation conducted into the alleged inappropriate relationship between Lt Col Torrence and Maj Murphy is without merit and the evidence that was collected failed to meet the standard of proof required for an adverse finding. As Col Franken stated after conducting an unbiased and impartial review of the evidence; "the LIR relied on circumstantial evidence, or assumptions of fact and not concrete evidence to materially support [the] actions taken." As such, the LOR must be removed in the interest of justice.

Per AFI 36-2907, the standard of proof required for an adverse administrative action is a "preponderance of the evidence." This requires that it be more likely than not that the events used to justify the adverse action have actually occurred. This determination is not made by the number of witnesses or exhibits. Rather, it requires the evaluating of several factors, to include a witnesses behavior. *See AFI36-2907, 4.1.3.*

In the present matter, there is ample evidence to indicate that it is substantially more likely than not that the allegations are patently false and were made in retaliation for receiving a less than flattering OPR. Again, the IO acknowledged that the complainant was displaying paranoid behavior and had consistently brought up the fact that he had received a less than positive OPR shortly before the allegations were made. Rather than take these facts into consideration when making a credibility determination the IO summarily dismisses these key pieces of evidence and readily admits that he/she has known the Complainant "a long time and [does] not find his behavior suspicious." This statement alone is enough to conclude that the IO was biased toward the Complainant and could not separate his/her personal relationship with the Complainant from his/her role as an investigative authority. ***Several witnesses who were interviewed during the course of the investigation adamantly denied that any inappropriate relationship had occurred*** between Lt Col Torrence and Maj Murphy. Despite the overwhelming evidence and statements suggesting that these accusations were maliciously and patently false, the IO made a wholly unsupported finding contrary to the evidence on record.

Per AFI36-2907, a UIF or their documents must be removed when it is determined that the service member did not commit the offense listed in the LOR. *See AFI36-2907, 2.5.2.2.* When an objective review of the evidence is completed it is clear that the allegations do not overcome the burden of proof required to substantiate the accusations. As such, the LOR must be removed as its placement in LT COL Torrence's UIF is a violation of AFI36-2907.

## III.    The LOR, Dated 26 January 2018, was Based on Patently False Information, is Not Supported By The Evidence Collected, and was Issued In Violation of AFI 36-2907.

The LOR that was issued after Lt Col Torrence was accused of fraternization was based on patently false accusations and was issued after a woefully deficient investigation made

impermissible assumptions in order to substantiate the allegations. The evidence on record does not support a finding that the accusations occurred by a preponderance of the evidence; therefore the LOR must be removed pursuant to AFI 36-2907.

In order for a charge of fraternization to be substantiated, following elements must be satisfied: the accused was a commissioned officer; the accused fraternized on terms of military equality with one or more enlisted members; the accused then knew the person to be enlisted; such fraternization violated the custom of the accused's service; and that the conduct was prejudicial to good order and discipline, or brought discredit to the armed forces. *See* UMCJ Art. 134.

In the present matter, there is absolutely no evidence to even remotely suggest that Lt Col Torrence knew the female in question was an enlisted military member and the fact that she turned out to be enlisted after the alleged incident is wholly irrelevant to substantiating the allegation. The IO's report notes that ***the female in question was wearing civilian clothes at the time of the alleged incident***; thereby preventing anyone from knowing her military status, if any, without prior personal knowledge of that individual. Instead of proving the requisite element of "knowledge" needed to substantiate the allegation, the IO illogically concludes that Lt Col Torrence was guilty of the offense for the mere fact that other individuals claimed to have known that the female in question was enlisted. ***The assumption of knowledge by other individuals cannot be imputed on to Lt Col Torrence***; therefore, the IO's conclusion is legally insufficient. It is wholly illogical and grossly inappropriate to substantiate an allegation of fraternization against a service member for merely sitting in a dark, crowded bar, next to an individual who was later determined to be an enlisted service member.

Per AFI 36-2907, a UIF or their documents must be removed when it is determined that the service member did not commit the offense listed in the LOR. *See* AFI 36-2907, 2.5.2.2. Because the requisite element of "knowledge" has not been proven by a preponderance of the evidence the LOR must be removed from Lt Col Torrence's UIF.

Additionally, the accusation that Lt Col Torrence made a false statement during the course of the investigation fails for similar reasons. In order for Lt Col Torrence to be guilty of making false statements, the IO must prove that Lt Col Torrence made the statements with the "intent to deceive." This element was never met during the course of the investigation, and the IO's finding that this allegation was substantiated is egregiously incorrect. The statements made by Lt Col Torrence were his attempt to clarify the events of the night in question. Furthermore, none of the witnesses in the CDI report support the allegation that Lt Col Torrence made knowingly false statements with the intent to deceive. The lack of information indicating that the statements made by Lt Col Torrence were false, or that they were made with the intent to deceive renders the IO's conclusion legally insufficient. It is imperative to note that the IO dismissed allegations that Maj Doughty made a false official statement during the course of the investigation by attributing the inconsistencies in the statements to "memory." Again, the fact that the IO was willing to brush aside this allegation against Maj Doughty is demonstrative of the

IO's own bias and the predetermined disposition. Further, the mere fact that there may have been inconsistencies between Lt Col Torrence's statements is not enough, standing by itself, to conclude that he made a false official statement. Again, there is absolutely no evidence to suggest that Lt Col Torrence made any statement with the intent to deceive. Additionally, any inconsistency between statements, if any exists, can and should have been attributed to the fact that the incident took place in a dark and crowded bar, and after Lt Col Torrence had consumed alcohol. As such, we respectfully contend that the LOR issued on 26 January 2018 was based on an inadequate investigation which failed to substantiate the allegations by a preponderance of the evidence. In accordance with AFI36-2907, the LOR must be removed from LT COL Torrence's file.

### IV.    The OPR Contains Multiple Factual Inaccuracies and Violations of AFI 36-2406 and Does Not Adequately Reflect Lt Col Torrence's Service During the Rating Period.

The OPR is riddled with numerous false statements and inaccuracies that incorrectly portray Lt Col Torrence's service during the rating period, and grossly mischaracterizes his potential for promotion. As such, the OPR must be removed for these reasons as well.

The OPR states that Lt Col Torrence was engaged in an "unprofessional relationship with a junior officer in the same group." However, this statement is patently false and is only supported by crass gender stereotypes and the wholly unfounded assumption that a male and female cannot engage in a strictly professional relationship. As mentioned above, there is absolutely no evidence to support this contention other than a wholly deficient report by an IO who failed to take rudimentary investigatory steps, such as interviewing all witnesses, and then reached a conclusion unsupported by an overwhelming amount of evidence indicating that no unprofessional relationship occurred. Per AFI 36-2406, 1.12.4.1.1, raters must ensure that documentary evidence relied upon to "document performance, especially derogatory information relating to unsatisfactory behavior or misconduct, is reliable and supported by a preponderance of the evidence." Again, as mentioned above, there is absolutely no credible evidence available to suggest that this burden has been met.

Additionally, the purported "inappropriate relationship" was alleged to have occurred in or around December 2016 to May 2017. The OPR covered a rating period from 2 November 2017 to 1 November 2018. Per AFI 36-2406, **comments pertaining to "duty history or performance outside the current rating period" cannot be included in an OPR**. *See AFI 36-2406, 1.12.3.1.* In the present matter, Lt Col Torrence's purported inappropriate relationship occurred outside the rating period and its inclusion in his OPR is in direct violation of the aforementioned regulation. While a commander can include prior events in a subsequent OPR, a commander can only do so if those events "were not known to and considered by the previous evaluators, and were not already reflected in a previous evaluation." *Id. at 1.12.3.4.* Further, a commander is prohibited from including prior instances in the subsequent OPR when the

commander "has considered and made a decision not to comment on a known adverse action." *Id*. Additionally, the regulation states in pertinent part that "**an incumbent commander may not overturn a previous commander's decision by requesting the adverse action be added after the evaluation has been made a matter of record, nor may the incumbent commander include it in the next evaluation.**" *Id*. at 1.12.3.4. Again, the first LOR was issued on 13 June 2017, well before the rating period commenced. The Rater and Senior Rater clearly had ample opportunity to consider the results of the investigation and reference the LOR in Lt Col Torrence's OPR; however, for whatever reason they decided not to incorporate this information into the OPR. As such, no reference could be made towards the first LOR and the alleged conduct that necessitated its issuance. Therefore, the OPR is contrary to applicable regulation and justice demands that it be removed from Lt Col Torrence's records.

Additional inaccuracies contained within the OPR relate to the assertion that there was an "appearance of UPR at home & deployed". A review of the report of investigation indicates that the allegations of an unprofessional relationship "at home" were never substantiated by the IO. Therefore, this comment is materially false and should not have been included in the OPR. It is imperative to point out that Lt Col Lewis, in his own testimony to the IO, indicated that these allegations were unsubstantiated. Therefore, the statement that an unprofessional relationship occurred "at home" is materially false and its inclusion in the OPR is contrary to the applicable regulation. This honorable Board need only look at the recusal request of Col Franken to see that the allegations against Lt Col Torrence are without merit; therefore, any adverse administrative actions stemming from these grossly inadequate investigations must be expeditiously overturned in the interests of justice.

## CONCLUSION

The Letters of Reprimand were based on a wholly deficient investigation whereby both Investigating Officers failed to take rudimentary investigative steps in order to fully develop the circumstances surrounding the allegations, nor did they make appropriate credibility determinations. An objective review of the evidence collected during the course of both investigations indicates that the allegations are without merit. Further, the OPR contains multiple factual inaccuracies, and references conduct occurring outside the rating period in violation of AFI 36-2406. In light of these egregious violations and the overwhelming evidence suggesting that the accusations were without merit, we respectfully request that this honorable Board take the appropriate measures to correct these clear injustices.

Thank you for your time and careful consideration of this matter. If you require additional information please do not hesitate to contact me.

Respectfully Submitted,
Tully Rinckey, PLLC

025

*Sean C. Timmons*

Sean C. Timmons, Esq., LL.M
Managing Partner Tully Rinckey PLLC
Military and National Security Law Attorney
2925 Richmond Ave 12th Floor
Houston, Texas 77098
(832) 240-3273 Phone
(832) 241-5998 Fax
Stimmons@tullylegal.com

Admitted to practice law in Texas and New York

# ENCLOSURE 1



# TULLY RINCKEY PLLC.
## ATTORNEYS & COUNSELORS AT LAW

441 New Karner Rd.
Albany, NY 12205

815 Connecticut Ave. NW Suite 720
Washington, DC 20006

400 Linden Oaks, Suite 110
Rochester, NY 14625

501 West Broadway, Suite 800
San Diego, CA 92101

507 Plum St. Suite 103
Syracuse, NY 13204

4100 Vestal Rd. Suite 104
Vestal, NY 13850

5488 Sheridan Dr. Suite 500
205 Buffalo, NY 14221

3724 Executive Center Drive Suite
Austin, TX 78731

3200 Southwest Freeway, Suite 3300
Houston, TX 77027

777 Third Avenue, 22nd Floor
New York, NY 10017

## POWER OF ATTORNEY

I,

Jenner Torrence

_____

1208 5th St. NE

_____

Washington, DC  20002

_____

202-876-4020

_____

hereby designate the law firm of TULLY RINCKEY, PLLC to serve as my attorneys in all matters relating to and/or arising out of my employment by the federal government of the United States of America.  I authorize all branches, agencies, appointees, officials, and employees of the federal government of the United States of America, as well as of the governments of any State, County, or Municipality in the United States, to fully communicate with and release to my herein designated attorneys any and all information related to me and my employment by the federal government as deemed necessary, as a waiver of my rights under the Privacy Act, 5 U.S.C. § 552a.  This Power of Attorney will remain in effect until withdrawn by me and/or my designated attorneys.

Date: 5 DEC 2017

_____
Signature

028

# ENCLOSURE 2

# UNFAVORABLE INFORMATION FILE ACTION

## PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8013, Secretary of the Air Force and Executive Order 9397 (SSN), as amended.
PURPOSE: Reviewed by commanders and personnel officials to assure appropriate assignment, promotion and reenlistment considerations prior to effecting such actions. UIFs also provide information necessary to support administrative separation when further rehabilitation efforts would not be considered effective.
ROUTINE USES: Disclosure generally permitted under 5 U.S.C. 522e(b) of the Privacy Act. DoD 'Blanket Routine Uses' apply.
DISCLOSURE: Voluntary, failure to provide SSN may impede proper placement in member's military personnel file.
SORN: F036 AF PC L, Unfavorable Information Files (UIF)

**NOTE: This Form may be used to report more than one action.**

| 1 NAME (Last, First, Middle Initial) | 2 Rank | 3 SSN | 4 ORGANIZATION |
|---|---|---|---|
| TORRENCE, JENNER M. | Lt Col | 4487 | 113 Operations Group, DC Air National Guard |

NOTE: Complete Section III and return this Form to the commander within three (3) workdays of receipt. For Non-Extended Active Duty (EAD) Reservists. The individual has 30 calendar days from the date of receipt of the certified letter to return this Form.

## I. INTENDED UIF/CONTROL ROSTER ACTION OF THE COMMANDER

[X] I intend to establish a UIF and place the attached document(s) in that UIF

[ ] I intend to add the attached document(s) in your existing UIF

[ ] I intend to place you on the control roster based on the following rationale. (If required, use Remarks section on page 2)

## II. SIGNATURE OF THE COMMANDER

I have reviewed the career sanctions listed on page 2 of this Form associated with placement on the control roster, if applicable. I have also made the individual aware of these sanctions. (List any attachments in the Remarks section on page 2)

| 5 NAME AND GRADE | 6 SIGNATURE | 7 DATE | 8 ATTACHMENTS |
|---|---|---|---|
| John E. Vargas, Colonel, 113 OG/CC | | 8 FEB 18 | 2x Letters of Reprimand |

## III. ACKNOWLEDGMENT OF THE MEMBER    (Return to Commander within 3 workdays.)

Receipt acknowledged on  8 Feb 18  (date). I have read the information on the reverse about the UIF/control roster. I [X] intend [ ] do not intend to provide information I would like considered before a final decision is made

9. SIGNATURE

## IV. ACTION OF THE COMMANDER

[X] I have decided to establish a UIF and file the document(s) in the UIF

[ ] I have decided to place the document(s) in your existing UIF

[ ] I have decided not to place the information referred to you (Section I) in the UIF. Instead I have [ ] destroyed it [ ] returned it to the originator
    [ ] placed it in your unit assigned personnel information file (AFI 36-2608, Military Personnel Records System)

[ ] I have decided to remove the following document(s) from your UIF. Specify document(s) to be removed. (If required, use Remarks section on page 2.)

[X] I have decided NOT to place you on the control roster

[ ] I have decided to place you on the control roster. OPR/EPR [ ] will [ ] will not be prepared (See AFI 36-2406, Officer and Enlisted Evaluation Systems).

[ ] I have decided to remove you from the control roster early. An OPR/EPR [ ] will [ ] will not be prepared (See AFI 36-2406)

## V. SIGNATURE OF THE COMMANDER    (List any attachments in the Remarks section on page 2.)

| 10. NAME AND GRADE | 11. SIGNATURE | 12. DATE |
|---|---|---|
| John E. Vargas, Colonel, 113 OG/CC | | |

## VI. FSS/CC or MPS/CC RECOMMENDATION TO THE COMMANDER

Request you consider (If required, use Remarks section on page 2)

**AF FORM 1058, 20121031**    PREVIOUS EDITIONS ARE OBSOLETE    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act or 197.

Scanned by CamScanner

# ENCLOSURE 3

*FOR OFFICIAL USE ONLY*

**Findings, Analysis and Conclusions:**

**Allegation 1**: On 4 May 2017, in the vault of building 3029, Joint Base Andrews, did Lt Col SUBJECT1, a married man, and Major SUBJECT2, a married woman, wrongfully have sexual intercourse, to the prejudice of good order and discipline within the armed forces and of a nature to bring discredit upon the armed forces of the united states?

**Facts for Allegation 1:**

On 4 May 2017 around 1900L, COMPLAINANT testified to entering the intelligence (intel) vault located in Bldg 3029, Joint Base Andrews MD [Tab F-1, pp 2-7 of 7]. When he walked in, he did not see anyone inside the vault and thought the vault might be unoccupied which could be a security violation. He shouted, "Hello" and began looking in the various rooms in the vault. No one answered his initial shout but as he attempted to push open the door to the intelligence office in the vault, he found it blocked and then pushed closed against him. He then heard Maj SUBJECT2's voice inside the room say, "Just a minute." He stepped away from the door but was worried Maj SUBJECT2 may be under duress. When Maj SUBJECT2 came out of the intelligence office a few minutes later, he stated that the lights in the room were turned off (evidenced by no light coming from the crack in the door as it opened) and that she barely opened the door and squeezed herself through as if not wanting anyone to see inside that room.

She came out and asked what COMPLAINANT wanted. COMPLAINANT said he needed to talk about TSgt XXXXX, who had been in some administrative trouble earlier in the day. Maj SUBJECT2 then looked relieved and pulled COMPLAINANT by the shirt sleeve outside the vault to SMSgt XXXXXXX office down the hall. As she sat down in SMSgt Scott's office, COMPLAINANT testified that she was visibly distraught, having a hard time controlling her breathing, leaned her head down on the table like she was trying to regain control of her emotions, and brought her hands over her eyes and then slid them down her face as she gathered her thoughts. COMPLAINANT also noticed a thin line of moisture by her lip that seemed to glisten [Tab F-1, p. 2 of 7, p. 5 of 7 and Tab G-2 for a rough sketch showing this area on her face]. He did not ask her about the moisture. Instead, they talked about TSgt Landis and agreed on some administrative action for his earlier insubordinate behavior.

COMPLAINANT thought it strange that she agreed with COMPLAINANT's suggested punishment, which was rather harsh, without even a discussion. At this point, Maj SUBJECT2 excused herself to go to the restroom and COMPLAINANT went into the old command post vault where he found SrA WITNESS4 working on one of the computers. He gave SrA WITNESS4 a "confidential order" to observe and report to him the next person to leave the intel vault. COMPLAINANT then returned to speak with Maj SUBJECT2. At this point, SrA WITNESS4 left the command post vault and enter the intel vault to see who was inside. In the back right briefing room of the vault, SrA WITNESS4 found Lt Col SUBJECT1 sitting alone and working on his upcoming instructor pilot upgrade sortie. SrA WITNESS4 left the intel vault, reported his finding to COMPLAINANT, and returned to working inside the old command post vault.

I found the testimony of COMPLAINANT to be straight forward and exceedingly thorough. Throughout this investigation and in the events related to this investigation, COMPLAINANT

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

exhibited some concerning behavior. Command should consider options to address this behavior to include professional mental health services.

In our initial meeting, toward the end of the interview, COMPLAINANT produced a copy of his most recent Officer Performance Report (OPR) and showed me how his rater (Maj SUBJECT2) had changed several of the bullets provided on a Form 77 from his supervisor at Cyber Command to reduce their impact [Tab G-4-3]. He also told me that Maj SUBJECT2 became his rater near the end of his rating period. He stated that he did not know who his previous rater was and he had not received any initial or mid-term feedback prior to the OPR. The OPR did not contain derogatory information and I did not perceive that COMPLAINANT would make an allegation of Maj SUBJECT2 having an inappropriate relationship as any kind of retribution for the OPR. Additionally, in our final meeting to obtain COMPLAINANT's signed testimony, he presented even more evidence regarding grievances he had with his OPR. He stressed to me that he was not seeking to change his OPR, he just thought it was unprofessional how Maj SUBJECT2 handled it. To me, this was further evidence that COMPLAINANT did NOT fabricate an allegation as retribution for his OPR. COMPLAINANT is a very detail oriented person. He would never have brought the OPR issue to my attention had it been the central impetus behind him looking for an opportunity to catch Lt Col SUBJECT1 and Maj SUBJECT2 in a compromising position.

However, there are no direct witnesses to any sexual act or inappropriate relationship occurring in the vault that night. Although the circumstantial evidence was strong, I could not find a preponderance of evidence showing that Lt Col SUBJECT1, a married man, and Major SUBJECT2, a married woman, wrongfully had sexual intercourse on the evening of 4 May 2017 in the intel vault of Bldg 3029.

**Applicable Rules for Allegation 1:**
UCMJ Articles 92, 133, and 134 could apply to a case of alleged adultery. However, at the time this incident was alleged to have occurred, both Lt Col SUBJECT1 and Maj SUBJECT2 were Active Guard and Reserve (AGR) members in a Title 32 status in the District of Columbia Air National Guard. As such, they are not subject to the UCMJ nor is there District code that reflects provisions similar to the UCMJ as in most other states. Instead, Lt Col SUBJECT1 and Maj SUBJECT2 are accused of violating AFI 1-1, paragraphs 2.2.1, 2.2.2, and 23.6 and AFI 36-2909 paragraphs 4 and 8 and 8.1.

**Analysis for Allegation 1:**
COMPLAINANT entered the intel vault in Bldg 3029 late on a Thursday evening, 4 May 2017 and witnessed what he considered to be odd behavior from Maj SUBJECT2 as she exited the dark intelligence office and later talked with him outside the vault. He saw what he believes to be evidence of sexual activity (semen or saliva) near Maj SUBJECT2's lip. He smelled what he believes to be sexual activity as he walked with Maj SUBJECT2 out of the vault. He was told by SrA WITNESS4, who entered the vault some minutes after Maj SUBJECT2 had exited the vault, and found Lt Col SUBJECT1 sitting alone in the vault. COMPLAINANT saw evidence of what he considers extreme emotional stress in Maj SUBJECT2 as he sat and talked with her just outside the vault. This leads COMPLAINANT to suspect that Maj SUBJECT2 was having sex with Lt Col SUBJECT1 when he walked into the vault that evening. He delated with himself

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

whether or not to report this incident to higher authorities and ultimately decided this indeed warranted reporting.

**Conclusion for Allegation 1:**
Although I applaud COMPLAINANT for coming forward with this information, I cannot find enough evidence to say for certain Maj SUBJECT2 and Lt Col SUBJECT1 were having sex at the time COMPLAINANT walked into the vault. There is a lot of circumstantial evidence that they might have been having sex but I can easily speculate about any number of events that would cause the same appearance yet be perfectly innocent. Both Lt Col SUBJECT1 and Maj SUBJECT2 declined to answer my questions related to the evening in question on advice from their respective counsels.

The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Tab K-6, CDI-Guide, Paragraph 1.4] I simply do not have enough evidence to warrant the claim that sexual activity is more probably than an innocent encounter. I conclude this allegation is **UNSUBSTANTIATED.**

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

**Allegation 2**: Did Lt Col SUBJECT1, a commissioned officer, and Major SUBJECT2, a commissioned officer, knowingly have an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the united states in violation of AFI 1-1 and AFI 36-2909?

**Facts for Allegation 2:**
In the course of investigating the observations made by COMPLAINANT on the evening on 4 May 2017 around 1900 local time [Tab F-1, pp. 2-7 of 7], multiple witnesses came forward to tell me about a long series of events that create a strong appearance that Lt Col SUBJECT1 and Maj SUBJECT2 have been engaged in an unprofessional relationship (at a minimum) that has been prejudicial to good order and discipline and was of a nature to potentially bring discredit upon the armed forces of the united states. The event described by COMPLAINANT on 4 May 2017 is just one of several examples where an inappropriate relationship is apparent.

In researching the claim of alleged sexual activity/inappropriate relationship between Lt Col SUBJECT1 and Maj SUBJECT2, I interviewed the following witnesses (in order). Their testimony can be found in the respective binder tab:

| Tab | Witness/Subject |
|-----|-----------------|
| F-1. | COMPLAINANT |
| F-2. | Lt Col WITNESS1 |
| F-3. | Lt Col WITNESS2 |
| F-4. | SrA WITNESS4 |
| F-5. | Lt Col WITNESS5 |
| F-6. | MSgt WITNESS6 |
| F-7. | Maj WITNESS7 |
| F-8. | Maj WITNESS8 |
| F-9. | Maj WITNESS9 |
| F-10. | Col WITNESS10 |
| F-11. | Lt Col SUBJECT1 |
| F-12. | Maj SUBJECT2 |
| F-13. | WITNESS11 |
| F-14. | WITNESS12 |

Although COMPLAINANT only provided a detailed observation regarding his encounter with Maj SUBJECT2 in the vault on the evening of 4 May 2017, many of the other witnesses described various aspects of a suspected unprofessional relationship between Maj SUBJECT2 and Lt Col SUBJECT1 that had been witnessed since these individuals deployed to Guam from 22 Dec 2016 through 8 Feb 2017. The allegations included many examples of Maj SUBJECT2 and Lt Col SUBJECT1 being seen together and in situations where an inappropriate relationship seemed possible.

I found the testimony of COMPLAINANT [Tab F-1, pp. 2-7 of 7] to be straight forward and exceedingly thorough. Please see my statement in the **Facts** section of **Allegation 1** for further comments related COMPLAINANT.

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

Lt Col WITNESS1's testimony [Tab F-2] was calm and straight forward. He had taken COMPLAINANT's allegations seriously from the beginning and had actually guessed Lt Col SUBJECT1's name before COMPLAINANT even said Lt Col SUBJECT1's name [Tabs F-1, p. 3 of 7; F-2, p. 2 of 8; F-6, p. 2 of 6].

Lt Col WITNESS2's testimony [Tab F-3] was unemotional and avoided speculating about events he did not directly witness. He did not believe Lt Col SUBJECT1 and Maj SUBJECT2 were engaged in an inappropriate relationship in Guam or home station. He does not want to speculate on appearances but assumes "positive intent" until proven otherwise.

SrA WITNESS4 was very poised and well-spoken during his testimony [Tab F-4]. I could plainly see that he was uncomfortable testifying because he did not want to be caught in the middle of something that might affect his future with the unit. I assured him that his leadership understands how important it is to protect both the accuser, witnesses, and subjects of an investigation and Col Magnell would not allow any retribution due to any testimony in the case. SrA WITNESS4 specifically denied that his girlfriend told him Lt Col SUBJECT1 and Maj SUBJECT2 might be engaged in intimate relations after seeing them together at Maj SUBJECT2's promotion party which was alleged by COMPLAINANT [Tab F-1, p. 2 of 7]. I decided not to invite SrA WITNESS4's girlfriend as a witness as her answer either way would not materially change the outcome of this investigation.

Lt Col WITNESS5 was the leader with the most direct contact with Lt Col SUBJECT1 and Maj SUBJECT2 throughout the Guam deployment and after returning to home station. He had been dealing with the appearance of an inappropriate relationship between the two for some time before this investigation was convened. Lt Col WITNESS5's testimony [Tab F-5] seemed honest and straight forward. Lt Col WITNESS5 was the first to speak to both Maj SUBJECT2 and Lt Col SUBJECT1 in Guam because he was seeing indications of an inappropriate relationship [Tab F-5, p. 2 of 5]. Although Lt Col WITNESS5 should be commended for engaging with the individuals early in the deployment, he nonetheless struck me as too reluctant to take action regarding events he was witnessing in Guam. This may have led him to allow this behavior to continue longer than it should have.

MSgt WITNESS6 was very matter of fact and credible during our interview [Tab F-6]. He was the first person to hear COMPLAINANT recount his observations from 4 May 2017. MSgt WITNESS6 avoided speculating on things he did not witness. He was very knowledgeable about vault security and fully explained why the badging system was not tracking entry and exit of the vault that evening. He also commented on COMPLAINANT's paranoid behavior [Tab F-6, p. 2 of 4] but was empathetic about his stress and believed his allegations were not fabricated.

Maj WITNESS7 had the most comprehensive and direct accounts of all the witnesses called [Tab F-7, pp 2-10 of 10]. I found all of his descriptions to be credible. I called Maj WITNESS7 to testify a second time to answer some follow-up questions I had [Tab F-7, p. 2-5 of 5]. During this interview, I needed to read Maj WITNESS7 his rights because I was going to ask him potentially self-incriminating questions regarding an allegation made against him by Maj SUBJECT2 to both Lt Col WITNESS5 and Maj WITNESS9 [Tabs F-5, p. 3 of 5 and F9, p. 2 of

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

4 respectively]. Despite being read his rights, he freely answered all questions and categorically denied ever propositioning Maj SUBJECT2 for sex at any time [Tab F-7, p. 3 of 5]. Maj WITNESS7 presented some testimony regarding a witness seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room late one night [Tab F-7, p. 5 of 10 and Tab F-7 p. 5 of 5] which was contradicted by the witness he named [Tab F-14, p. 2 of 2]. Because these events took place some time ago and no one was writing down any specifics as events happened, it seems reasonable to me that either Maj WITNESS7 or WITNESS12 was mistaken about having made this statement. Maj WITNESS7 was visibly upset toward the end of his first testimony when he expressed his frustration about not being able to help correct some of the ineptitude he sees in the intel shop because his criticism might be seen as retribution now that there is an investigation underway [Tab F-7, p. 9 of 10]. He was also quite upset with Lt Col WITNESS5 for allowing him to fly to the sims recently with Lt Col SUBJECT1 and one other junior squadron member. Maj WITNESS7 said being professional and teaching Lt Col SUBJECT1 as if nothing was going on was one of the most difficult things he has ever done. He believes Lt Col WITNESS5 should not have put him in that position [Tab F-7, p. 10 of 10]. I have no reason to doubt any of Maj WITNESS7's extensive testimony.

Maj WITNESS8's interview [Tab F-8] was short and to the point. She did not deploy to Guam and was quite surprised by the nature of my questioning. She had never perceived any inappropriate relationship between Maj SUBJECT2 and anyone else. She said Maj SUBJECT2 had never confided in her about any kind of inappropriate relationship. My gut tells me Maj WITNESS8 was not telling the entire truth regarding Maj SUBJECT2 making unprofessional statements at Red Flag 2016. However, it is possible she simply doesn't remember and I have no evidence that she wasn't being truthful. Her testimony simply conflicts with Maj WITNESS7's on this point [Tab F-7, p. 3 of 10].

Maj WITNESS9 provided extremely professional and engaging testimony. Maj SUBJECT2 had told Maj WITNESS9 that Maj WITNESS7 propositioned her for sex early in the Guam deployment [Tab F-9, p. 2 of 4]. As a former Secret Service agent, it was clear that Maj WITNESS9 had a lot of experience with investigations. He directly told Maj SUBJECT2 that her oral description of the events in Guam were too disjointed to be credible. [Tab F-9, p. 2 of 4]. Maj WITNESS9 begged her to write down a full account so he could take action but she failed to provide any further details [Tab F-9, p. 3 of 4]. Maj WITNESS9 expressed grave doubts about COMPLAINANT's allegations due to some outlandish claims he made to MSgt WITNESS6 [Tab F-9, p. 4 of 4]. I understand Maj WITNESS9's reservations about COMPLAINANT but I have known COMPLAINANT a long time and do not find his behavior suspicious. Unless a separate CDI concludes COMPLAINANT made his statement as retribution for some interpersonal issue he was having with Maj SUBJECT2 I believe COMPLAINANT was justified in bringing his observations forward.

Col WITNESS10 was only called to testify regarding COMPLAINANT's demeanor during the approximately 1.5 hours COMPLAINANT waited in Col WITNESS10's office and the lobby area of the WG/CC's office the afternoon of 5 May 2017 [Tab F-10]. Col WITNESS10 also noted COMPLAINANT's paranoia but validated that his established personality gave context to his unease and did not detract from his stated observation [Tab F-10, p. 2 of 2]

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

Lt Col Blue sent Lt Col SUBJECT1's counsel a list of my CDI related questions of him. Lt Col SUBJECT1 indicated through counsel that he would not respond to any of my questions [Tab F-11].

Lt Col Blue sent Maj SUBJECT2's counsel a list of my CDI related questions of her. Maj SUBJECT2 indicated through counsel that she would not respond to any of my questions [Tab F-12].

WITNESS11 was called to testify based on Maj WITNESS9's suggestion that she and Maj SUBJECT2 were very good friends and Maj SUBJECT2 may have confided the affair to WITNESS11 if it had happened [Testimony given to Col Campbell during Maj WITNESS9's interview but not recorded in his sworn statement.]. WITNESS11 had not been in the DCANG very long but it was clear that she was a seasoned intelligence officer. Her testimony was unemotional and unequivocal [Tab F-13, p.2-3 of 3]. She indicated that Maj SUBJECT2 did not confide any inappropriate relationship to her at any time. WITNESS11 has no reason to suspect there has been an inappropriate relationship with Lt Col SUBJECT1 or anyone else. WITNESS11 and Maj SUBJECT2 worked together in a previous unit and WITNESS11 is aware of no allegations of Maj SUBJECT2 having any inappropriate relationships in her previous unit [Tab F-13, p. 3 of 3].

WITNESS12 was called to corroborate Maj WITNESS7's testimony regarding seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room late one night [Tab F-7, p. 5 of 10 and Tab F-7 p. 5 of 5]. He denied seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room. WITNESS12's testimony was unemotional yet he was surprised there was an investigation going on. He denied perceiving anything unusual about the time Lt Col SUBJECT1 and Maj SUBJECT2 spent together in Guam. He did not think they were engaging in an inappropriate relationship [Tab F-14, p. 2 of 2]. Of note is the fact that WITNESS12 is a Title 10 Active Duty officer assigned to the 121st Fighter Squadron. He falls outside the DCANG chain of command in terms of anything administrative in nature.

**Applicable Rules for Allegation 2:**
UCMJ Articles 92, 133, and 134 could apply to a case of alleged adultery. At the time the incident which initiated this investigation occurred, both Lt Col SUBJECT1 and Maj SUBJECT2 were Active Guard and Reserve (AGR) members in a Title 32 status in the District of Columbia Air National Guard. However, testimony from various witnesses introduced evidence of events that happened during the Dec 2016 – Feb 2017 timeframe when both individuals had been participating in an overseas Theater Support Package (TSP) under Title 10 status. As such, they are subject to UCMJ during portions of this investigation and not subject to the UCMJ during other portions. However, in order to assert any violation of the UCMJ, it might be required to transfer the CDI to the 201st MSS for a Title 10 officer to conduct the investigation. Regardless, when not subject to the UCMJ, the District of Columbia does not have any provisions of their code similar to the UCMJ. During UCMJ and non-UCMJ periods, Lt Col SUBJECT1 and Maj SUBJECT2 are accused of violating AFI 1-1, paragraphs 2.2.1, 2.2.2, and 2.3.6 and AFI 36-2909 paragraphs 4 and 8 and 8.1. During periods of time they are subject to the UCMJ, they are also accused of violating UCMJ Articles 92, 133, and 134.

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

The existence of an extramarital affair is open for debate and not substantiated in this report. However, AFI 36-2909 defines Unprofessional Relationships as:

"…those interpersonal relationships that erode good order, discipline, respect for authority, unit cohesion and, ultimately, mission accomplishment." [Tab K-6, AFI36-2909, p. 12]. Further, "Relationships are unprofessional, whether pursued on or off-duty, when they detract from the authority of superiors or…" [Tab K-6, AFI36-2909, p. 13].

AFI1-1 states, "Your code of ethics must be such that your behavior and motives do not create even the appearance of impropriety." [Tab K-6, AFI1-1, p. 14].

**Analysis for Allegation 2:**

Based on testimony provided, officer and enlisted unit members in Guam began noticing Lt Col SUBJECT1 and Maj SUBJECT2 spending a good deal of time together early in the deployment [Tab F-5, p. 2 of 5; Tab F-7, p. 2 of 10 and p. 5 of 10; Tab F-14, p. 2 of 2]. At first, people did not think much of it. However, over time, people started to gossip and spread their observations of Lt Col SUBJECT1 and Maj SUBJECT2 arriving at work together in the same car. Leaving work together in the car. Coming down in the elevator together or going up to their rooms in the elevator together. Always sitting together and having dinner together [Tab F-5, p. 2 of 5; Tab F-7, p. 5 of 10]. The period of time that seemed the most odd was when Lt Col SUBJECT1's wife, XXXXX, came to visit him in Guam. There were numerous times where Melissa sat alone with other unit members and was later joined by Lt Col SUBJECT1 and Maj SUBJECT2. Melissa was said to be visibly upset any time she was around Lt Col SUBJECT1 and Maj SUBJECT2 [Tab F-5, p. 2 of 5; Tab F-7, p. 5 of 10]. There could have been any number of innocent reasons behind these events but the totality and frequency of observations made the appearance of an inappropriate relationship clear.

Lt Col WITNESS5 was the first to talk with Maj SUBJECT2 and Lt Col SUBJECT1 about these appearances [Tab F-5, p. 2 of 5]. Maj WITNESS7 later talked with Maj SUBJECT2 after witnessing Lt Col WITNESS5 have an emotional talk with both Maj SUBJECT2 and Lt Col SUBJECT1 [Tab F-5, p. 2 of 5; Tab F-7, p. 2 of 10]. Maj WITNESS7 further described some of the events that may be leading people to believe something was happening between herself and Lt Col SUBJECT1. At this point, Maj WITNESS7 was talking with Maj SUBJECT2 at the "bro-level." This means he did not want to get anyone in trouble and he was not actually accusing either Lt Col SUBJECT1 or Maj SUBJECT2 of having an inappropriate relationship together. Instead, he stressed to both the appearance that their actions were creating and how many people were noticing and discussing their actions. He told them how rumors were rampant that they were engaged in an inappropriate relationship [Tab F-7, p. 5-7 of 10]. Maj WITNESS7 expressed his concern to Maj SUBJECT2 that something was wrong with the relationship between Lt Col SUBJECT1 and his wife XXXX and that he may be using Maj SUBJECT2 because she was an attractive female and they were many miles from home [Tab F-7, p. 6 of 10].

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

Maj SUBJECT2 initially denied any relationship whatsoever with Lt Col SUBJECT1 but later in the same conversation admitted that Lt Col SUBJECT1 had been using her as "his shoulder to cry on because his wife was a crazy bitch" [Tab F-7, p. 5-7 of 10]. Maj WITNESS7 acknowledged that it was good she was there for Lt Col SUBJECT1 during his time of need but that she needed to be very careful of appearances as she could very easily get in trouble. He also directly told her that if she was lying to him and it turned out she was actually having an inappropriate relationship with Lt Col SUBJECT1 that Maj WITNESS7 would seek to ruin her military career. He further explained the context of this statement that there was simply no room for inappropriate relationships in any unit. He had seen inappropriate relationships ruin other units and he would not tolerate lying [Tab F-7, p. 8 of 10].

Maj SUBJECT2 repeatedly assured Maj WITNESS7 that she was not having an inappropriate relationship and suggested Maj WITNESS7 should also describe his concerns directly to Lt Col SUBJECT1. Maj WITNESS7 did express his concerns directly to Lt Col SUBJECT1 which upset Lt Col SUBJECT1 considerably. Lt Col SUBJECT1 was upset that anyone would think anything was going on between himself and Maj SUBJECT2. He felt it was ridiculous that a man and woman in the same unit could not be seen together without people around them making assumptions about their motivations [Tab F-7, p. 8 of 10]. Lt Col SUBJECT1 then told Maj WITNESS7 that Maj SUBJECT2 had "gone off the deep end" because of his statements to Maj SUBJECT2. Lt Col SUBJECT1 said Maj SUBJECT2 had begun to document everything and threatened to share information that would "bring down the squadron" if it got out [Tab F-7, p. 8 of 10].

It was at this point that Maj WITNESS7 suspected Maj SUBJECT2 may be twisting his conversations with Maj SUBJECT2 into a context that might implicate him in some sort of wrongdoing [Tab F-7, p. 7 of 10]. This is when Maj WITNESS7 decided to bring his concerns to Lt Col WITNESS5. After initially talking with Lt Col WITNESS5 alone in his room, Lt Col WITNESS5 then insisted they all talk together [Tab F-5, p. 2 of 5; Tab F-7, p. 8 of 10]. After packing and leaving his room, Lt Col WITNESS5 saw Maj SUBJECT2 standing alone and teary-eyed in the hotel lobby. He asked her what was wrong and she expressed a desire to talk. Lt Col WITNESS5 offered to talk with her 1-on-1 but Maj SUBJECT2 recommended they be joined by Maj WITNESS7 and Lt Col SUBJECT1. This is when she made an indirect reference to Maj WITNESS7 being the person who had propositioned her for sex earlier in the deployment [Tab F-5, p. 2 of 5]. Lt Col WITNESS5 remembers all four of them meeting for about 1.5 hours [Tab F-5, p. 3 of 5] where Maj WITNESS7 remembers the meeting complaining closer to 45-minutes or an hour [Tab F-7, p. 2 of 5]. Maj WITNESS7's and Lt Col WITNESS5's testimony regarding this meeting are consistent with each other. In the discussion, Maj WITNESS7 again lays out the indications that are leading people to believe there may be an inappropriate relationship between Lt Col SUBJECT1 and Maj SUBJECT2. Lt Col WITNESS5 directly asked them both if they were engaged in a relationship and both denied it [Tab F-5, p. 2 & 3 of 5]. Maj WITNESS7 apologized to Maj SUBJECT2 for his comment about "destroying her career" should he find out that she was lying to him about any relationship with Lt Col SUBJECT1 [Tab F-5, p. 3 of 5; Tab F-7, p. 9 of 10]. Maj SUBJECT2 seems to accept his apology and requests to speak with Maj WITNESS7 1-on-1 for a few minutes. In this meeting she gets emotional and hugs him. She says she's glad they talked and can move forward [Tab F-7, p. 9 of 10]. Maj SUBJECT2 makes no direct allegation against Maj WITNESS7 in this meeting.

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

Although early in the deployment, Lt Col WITNESS5 suggested to both Lt Col SUBJECT1 and Maj SUBJECT2 "knock off" any behavior that might be perceived by others to show a relationship, he did not give either a direct order to avoid contact with each other [Tab F-5, p. 4 of 5]. Lt Col WITNESS5 felt that while the appearance of a relationship between the two was strong that it could also be explained by the deployment and that everything should return to normal once they returned to home station. At no time did Lt Col WITNESS5 order Lt Col SUBJECT1 and Maj SUBJECT2 to cease contact with each other in Guam.

Maj WITNESS7 also testified to several other incidents that occurred in Guam that suggest questionable judgement by Maj SUBJECT2. Two areas of concern were her disregard for direct orders issued by the deputy deployment commander, Lt Col WITNESS5. In one example, Lt Col WITNESS5 ordered everyone to stop using inappropriate words on social media (words such as gook, chink, homo, fag, etc). Lt Col WITNESS5 gave this order in front of all the officers on the deployment, including Maj SUBJECT2. After departing from the gathering, Maj SUBJECT2 created a GroupMe chat room that included everyone except Lt Col WITNESS2 and Lt Col WITNESS5. She said the chat room was created so people could freely use words like gook, chink, homo, fag, etc. Maj WITNESS7 pulled Maj SUBJECT2 aside that evening and counseled her that her actions were wrong for multiple reasons and suggested she take down the chat room immediately. Maj SUBJECT2 seemed to understand his concern and later that evening the chat room was deleted. [Tab F-7, p. 3-4 of 10]

In another example, Lt Col WITNESS5 told all of the officers the number one thing he wanted everyone to do before getting on the plane to go home the next day was to complete their DTS voucher online. After hearing Lt Col WITNESS5's directive, Maj SUBJECT2 told Maj WITNESS7, "Yeah, I'm not doing that. I'll do it when I get home." Maj WITNESS7 immediately told Maj SUBJECT2 that her statement upset him. He said that not only was she directly undermining her superior officer's valid order but she was going to make her boss (and a good guy) look bad because some of his people had disregarded his order. When Maj WITNESS7 said this to Maj SUBJECT2, she is alleged to have gotten angry with him and then said she was going to, "…go get raped by these Marines." [referring to some Marines she saw wading in the hotel pool.] [Tab F-7, p. 4 of 10]

Additionally, Maj WITNESS7 witnessed two events involving Maj SUBJECT2 at strip clubs that he claims demonstrate her questionable judgement or inability to control her behavior due to alcohol. The first involved Maj SUBJECT2 giving one of the dancers at the strip club a dollar and the stripper then putting her hands inside Maj SUBJECT2's dress and directly fondling her breasts. She made no attempt to stop the dancer. Maj WITNESS7 claims this was witnessed by multiple squadron pilots and several squadron enlisted maintainers. The second, again, involved Maj SUBJECT2 giving a strip club dancer a dollar but this time on a different night and at a different strip club. After receiving the dollar, the dancer pulled Maj SUBJECT2 onto the stage, completely removed her dress, completely removed her underwear, and laid her down on the stage. At this point, the strip club dancer provocatively straddled Maj SUBJECT2 even sitting directly on her face. Again, she made no attempt to stop the dancer. She then got up and got dressed and rejoined the multiple other male pilots in the group. Enlisted are alleged to have also witnessed this event [Tab F-7, p. 3 of 10]. Lt Col SUBJECT1 was present at both strip club

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

events. Finally, Maj WITNESS7 says Maj SUBJECT2 told him about an incident that happened at one of the local dance clubs where she made out with a lesbian that had been hitting on her that night. She told Maj WITNESS7 that she didn't know it at the time but that lesbian turned out to be one of the enlisted maintainers in the squadron [Tab F-7, p. 3 of 10]. I have no corroborating evidence of these claims. I mention these allegations only because they may warrant another CDI. These claims did not weigh on my decision with regard to the allegations of this CDI.

Maj WITNESS7 testified to confronting Maj SUBJECT2 and Lt Col SUBJECT1 with all of these situations in the meeting with Lt Col WITNESS5. Maj SUBJECT2 never denied that these events happened as described by Maj WITNESS7. I chose not to call additional witnesses to corroborate Maj WITNESS7's testimony in order to limit the number of personnel aware of this investigation. I asked both Lt Col SUBJECT1 and Maj SUBJECT2 to give their versions of these incidents but both declined to participate in an interview on advice from their counsel [Tabs F-11 and F-12 respectively]. Maj WITNESS7 did not speak with either Maj SUBJECT2 or Lt Col SUBJECT1 about this event.

At home station, Lt Col WITNESS5 noticed that Lt Col SUBJECT1 and Maj SUBJECT2 continued to have lunch together in the squadron's lunch room and continued to work together as part of Lt Col SUBJECT1's instructor pilot upgrade program. However, Lt Col WITNESS5 did not notice any behavior that warranted further counseling. One day, home from Guam, Maj WITNESS7 noticed Maj SUBJECT2 and Lt Col SUBJECT1 come out of the intel vault briefing room together and thought it was odd considering the phase of flight did not require Intel support [Tab F-7, p. 10 of 10].

I asked most intel personnel and pilots I interviewed whether or not they had ever witnessed COMPLAINANT briefing fighter pilots because I knew if he ever had briefed the pilots it would not have gone well [based on my previous experience with him briefing airlift pilots at the 201AS]. I was trying to establish whether or not this would have given COMPLAINANT any reason to seek retribution. From the statements given to me, COMPLAINANT only briefed fighter intel personnel (not pilots) one time and that was the morning of 5 May 2017 [Tab F-13, p. 3 of 3]. All indications were that he did fine on that brief and was not criticized by anyone in the room.

Another line of questioning I pursued was to try to find out if COMPLAINANT's most recent OPR may have given him a motive to fabricate his testimony regarding the evening of 4 May 2017. In COMPLAINANT's testimony to me, he volunteered that he was not happy with his latest OPR because he did not know Maj SUBJECT2 was going to be his rater until about 30-days prior to the close-out and that Maj SUBJECT2 had "watered down" some of the bullets given him on a Form 77 by the O-6 he works for at Cyber Command. All of this evidence is presented in [Tab G-4, pp. 4-24]. I concluded that this was not a motive for COMPLAINANT because he really didn't make a big deal about it to me or to any of the other people I interviewed. He also did not make a formal complaint when it came time for him to sign and acknowledge his OPR. He never complained to Lt Col WITNESS1 or Maj WITNESS9 that his OPR was inappropriate. He did not complain to Maj SUBJECT2 in any way that I could find. I took his complaint to me as more of an annoyance than something he would want to seek

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

revenge for. He also volunteered his OPR to me which I do not think he would have done had that been his motive for fabricating a situation designed to get Maj SUBJECT2 in trouble. Finally, COMPLAINANT only indicated that he knew anything about questionable behavior in Guam because Col WITNESS10 had mentioned that to him as he was waiting in his office to give Col Magnell a statement.

The biggest detractor from the evidence presented to me was COMPLAINANT's extreme paranoia as expressed by every person who came in contact with COMPLAINANT during the course of listening to his allegations or participating in this investigation. Regardless, even if COMPLAINANT's testimony was discounted, the preponderance of the other evidence collected would still lead me to the same conclusion.

Another detractor was an allegation that Maj WITNESS7 propositioned Maj SUBJECT2 for sex early in the Guam deployment but was rejected. The supposition is that if Maj SUBJECT2 rejected Maj WITNESS7's advances that he might then make up stories about her and Lt Col SUBJECT1 as retribution. However, it does not make sense to me that if Maj WITNESS7 had been rejected after propositioning Maj SUBJECT2 that he would then express so much concern that Maj SUBJECT2 might get in trouble due to the appearance of something going on between her and Lt Col SUBJECT1. Additionally, if he did want to get back at SUBJECT2, he would have given all his info to leadership as opposed trying multiple times to tell this to Maj SUBJECT2 and Lt Col SUBJECT1 at the 'bro-level'.

Besides, even if WITNESS7 did proposition SUBJECT2 (no proof but just for the sake of the argument), I believe his testimony regarding the appearance of an inappropriate relationship between Maj SUBJECT2 and Lt Col SUBJECT1 is still credible. I never get the feeling he wants to get Maj SUBJECT2 or Lt Col SUBJECT1 in trouble. He wanted them to stop looking like they are having a relationship. He only went to leadership after he felt like his words might be twisted and used against him.

Additionally, Maj WITNESS7 had multiple conversations with Maj SUBJECT2 and Lt Col WITNESS5 regarding the "I'll destroy you" comment he admits to making. The context of this statement was that he did not want someone who was actually having inappropriate relationships in his squadron. This would be a very hypocritical conversation to have with Lt Col WITNESS5 and Maj SUBJECT2 had he recently propositioned her for sex himself.

**Conclusion for Allegation 2:**
I applaud COMPLAINANT for coming forward with his initial observations that ultimately led to this CDI. While I could not find a preponderance of evidence that indicated Maj SUBJECT2 and Lt Col SUBJECT1 were having sex at the time COMPLAINANT walked into the vault [**Allegation 1**], it did lead me to discover other evidence that pointed toward an inappropriate relationship and that would prejudice good order and discipline and could reasonably have been expected to bring discredit upon the United States Armed Forces.

The USAF CDI Guide, dated 26 Apr 2010, defines "evidence" as "…testimonial, physical, or circumstantial" [Paragraph 5.2]. The guide further describes "testimonial evidence" as including

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

"…oral statements, written statements and IO summaries of witness interviews" [Paragraph 5.2.1]. The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Paragraph 1.4]

Based on the preponderance of the credible testimony regarding Guam and the circumstantial evidence from COMPLAINANT's observation the night of 4 May 2017, I must conclude that the allegation "Did Lt Col SUBJECT1, a commissioned officer, and Major SUBJECT2, a commissioned officer, knowingly have an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the united states in violation of AFI 1-1 and AFI 36-2909?" is **SUBSTANTIATED**.

The allegation, "…knowingly have an extramarital affair…" is not substantiated for the same reason Allegation 1 is not substantiated. Regardless, while there is no, "Smoking Gun" in the evidence collected, the evidence indicates to me that one position is more probable than the opposing position. The opposing position is that all of these appearances were innocent and could be explained if we knew the entire context. The credible testimony of Lt Col WITNESS5 alone was enough to substantiate the allegation of an inappropriate relationship. Maj WITNESS7's testimony and COMPLAINANT's observations added to the preponderance of evidence. The lack of hard evidence should be considered by Col Magnell should he conclude disciplinary action is warranted.

As stated in 36-2909, "…the senior member (officer or enlisted) in a personal relationship bears primary responsibility for maintaining the professionalism of that relationship…The senior member in a relationship is in the best position to appreciate the effect of that particular relationship on an organization and in the best position to terminate or limit the extent of the relationship. However, all members should expect to be and must be held accountable for the impact of their conduct on the Air Force as an institution." [Tab K-6, AFI36-2909, p. 18, paragraph 6]

Regarding the second part of Allegation 2, "…that has been prejudicial to good order and discipline and was of a nature to bring discredit upon the armed forces of the United States." I believe good order and discipline was sacrificed because neither party acknowledged the counsel of the Guam deployment's Deputy Commander (Lt Col WITNESS5) who clearly told them about the appearance of an unprofessional relationship early in the deployment. Additionally, others in the unit began spreading rumors based on their observations further eroding good order and discipline. Unfortunately, Lt Col WITNESS5 never directly ordered them to cease the inappropriate relationship, but their disregard of his warnings demonstrated their inattention (at a minimum) to good order and discipline. Fortunately, at this time, their actions have not brought discredit upon the armed forces of the United States. However, even the appearance of these types of relationships can destroy families which can cause facts of the deployment to become part of the public record in a civil court case.

*FOR OFFICIAL USE ONLY*

# ENCLOSURE 4



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
**113th Operations Group**
**3029 EAST PERIMETER ROAD**
**JOINT BASE ANDREWS MD 20762-5011**

13 Jun 2017

MEMORANDUM FOR LT COL JENNER TORRENCE

FROM: 113OG/CC

SUBJECT: Letter of Reprimand

References:    (a) AFI 1-1 *Air Force Standards*
              (b) AFI 36-2909 *Professional and Unprofessional Relationships*

1. This letter is to advise you that you are officially being reprimanded for your inappropriate relationship with a fellow officer in the Operations Group.

2. You are hereby reprimanded for displaying poor judgment and failure to fulfill your responsibilities as a Field Grade Officer during the period starting on or about December 2016 and ending on or about May 2017. Your actions during this period created the perception of an inappropriate relationship with another officer, were prejudicial to good order and discipline, and were of a nature to bring discredit upon the Armed Forces of the United States in violation of AFIs 1-1 and 36-2909.

3. This Letter of Reprimand will remain on file in accordance with Air Force Instructions/IG Regulations.

4. PRIVACY ACT. AUTHORITY: 10 U.S.C. 8013. PURPOSE: To obtain any comments or documents you desire to submit (on a voluntary basis) for consideration concerning this action. ROUTINE USES: Provides you an opportunity to submit your comments or documents for consideration. If provided, the comments and documents you submit become a part of the action. DISCLOSURE: Your written acknowledgement of receipt and signature is mandatory. Any other comment or document you provide is voluntary.

5. You will acknowledge receipt and return this letter to me within 3 workdays of your receipt. Your signature on this document is solely for receipt purposes and is not an admission of guilt. Any comments or documents you wish to be considered concerning this LOR must be included with your response.

JOHN E. **VARGAS**, Colonel, ANG
Commander

Attachments:
    1.  Memorandum – Receipt of Letter of Reprimand

046



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
**113th Operations Group**
**3029 EAST PERIMETER ROAD**
**JOINT BASE ANDREWS MD 20762-5011**

13 Jun 2017

MEMORANDUM FOR COMMANDER, 113<sup>TH</sup> OPERATIONS GROUP

FROM:  Lt Col Jenner Torrence

SUBJECT:  Receipt of Letter of Reprimand

I hereby acknowledge receipt and understanding of 113 OG/CC Memorandum, dated 13 Jun 2017.
Subject memo was received on _____ 13 JUN 17 _____.

SIGN: _____
(Name)
1208 5TH ST NE
(Address)
WASHINGTON DC 20002
(City, State, and ZIP Code)
13 JUN 2017
(Date)

This Receipt must be returned within 3 days of receipt of the Memorandum.

2nd Ind., 113 OG/CC                                        Date: 9 JAN 18

MEMORANDUM FOR LT COL JENNER TORRENCE

Member (did) (did not) provide written matters in response to this letter. After consideration of all matters I have decided to (initial one):

\_\_\_\_ (initial if applicable) Withdraw the LOR

\_\_\_\_ (initial if applicable) Downgrade the LOR to a Letter of Admonition/Counseling

\_\_\_\_ (initial if applicable) Maintain the LOR. The LOR will be place in an UIF.

JOHN E. VARGAS
Colonel, USAF
Commander, 113 OG

3rd Ind., LT COL JENNER TORRENCE                          Date: 26 JAN 18

MEMORANDUM FOR 113 OG/CC

I have been informed of the final decision regarding this LOR and establishment of an UIF

JENNER TORRENCE, Lt Col, DC ANG

# ENCLOSURE 5



**DEPARTMENT OF THE AIR FORCE**
121ST FIGHTER SQUADRON (ANG)
3029 EAST PERIMETER ROAD
ANDREWS AFB, MD 20762-5011

13 Dec 2017

MEMORANDUM FOR COLONEL JOHN E.VARGAS

FROM: LT COL JENNER M. TORRENCE

SUBJECT: 13 June 2017 LOR Rebuttal

References:    (a) National Military Strategy 2015
              (b) DoD Diversity and Inclusion Strategic Plan 2012-2017
              (b) DODD 1350.2 *Military Equal Opportunity,* 21 Nov 2003
              (c) AFI 1-1 *Air Force Standards,* 12 Nov 2013
              (d) AFI 36-29 *Military Standards,* 24 Sep 2014
              (e) AFI 36-2909 *Professional and Unprofessional Relationships,* 13 Mar
                  2013
              (f) AFI 36-2706_AFGM2017-01 *Equal Opportunity Program Military
                  and Civilian,* 5 Oct 2010
              (g) AFPD 36-27 *Equal Opportunity,* 9 Apr 2012
              (h) ANGI 36-7 *Personnel,* 25 Apr 2003
              (i) *Commander Directed Investigation (CDI) Guide,* Feb 2016

1.  Thank you for the opportunity to rebut this LOR. I appreciate this command's concern for good order and discipline and am concerned this LOR and the message it sends is prejudicial it. This concern stems from receiving no prior counseling regarding a perceived inappropriate relationship, the associated CDI not being based on the preponderance of the evidence and being prejudiced in nature. For these reasons I believe the LOR should be rescinded. I ask that you read impersonally, objectively, and without explicit or implicit bias.

2.  This rebuttal is based on the limited information provided to me in redacted CDI report. I have been denied access to any information beyond the redacted report, limiting my ability to formulate a comprehensive rebuttal. Therefore, I will base this rebuttal on information in the CDI report, my own personal accounts, and the inferences drawn from that information. I have done my best to ascertain witness identities from my own observations and those of Maj Murphy; however, there are a few I am uncertain of. I have provided a copy of the CDI report with these identities and paragraph numbers in Attachment 5 for ease of reference.

3.  I will be direct in this rebuttal. Please do not misperceive my tone as disrespect or lack of humility. It is meant only to avoid any ambiguity. I recognize that I am as fallible and flawed as the next person.

4.  The IO's extreme familiarity with the complainant dissolves the credibility of the CDI from the outset. He displays this as well as his favor for the complainant in Atch 5

050

paras. 6. and 16. "I have known Capt Richards a long time and do not find his behavior suspicious" and "Capt Richards is a very detail oriented person. He would never have brought the OPR issue to my attention had it been the central impetus behind him looking for an opportunity to catch Lt Col Torrence and Maj Murphy in a compromising position." His level of familiarity alone is disconcerting. The obvious favoritism is absolutely inappropriate.

5. The IO displays multiple failures in logic, objectivity, and assessment of witness credibility in his analysis. This shows either lack of investigative competence or extreme bias towards substantiation. The IO rejects all of the following testimony of negative evidence while endorsing the 2 pieces of testimony making claims of an inappropriate relationship. (1) Lt Col Croker (121 FS/CC & 121 EFS/CC) "avoided speculating about events he did not directly witnessed." (2) Lt Col Wilson (113 OSS/CC) explicitly told the IO he he saw nothing wrong with my relationship with Maj Murphy (based on his personal account to me). (3) SrA Grumbach "specifically denied" knowing Maj Murphy and I "might be engaged in intimate relations after seeing [us] together at Maj Murphy's promotion." (4) MSgt McGee "avoided speculating on things he did not witness." (5) Maj Fromuth, testified "that she had never perceived any inappropriate relationship between Maj Murphy and anyone else." (6) Capt Ringgenberg testified that "Maj Murphy did not confide any inappropriate relationship to her at any time" and she "has no reason to suspect there has been an inappropriate relationship between Lt Col Torrence or anyone else." And finally, (7) WINTESS12 was called to corroborate Maj Doughty's testimony, but denied seeing Lt Col Torrence leaving Maj. Murphy's room late one night. WINTESS12 further "denied perceiving anything unusual" about the time in Guam. Also highly doubtful is an explicit statement by Lt Col Lewis affirming anything inappropriate as he expressed the opposite to me in Guam. Both testimonies attempting to affirm an inappropriate relationship had probable cause and motive for derogatory statements acknowledged and then ignored with prejudice by the IO. Additionally, the affirmative testimonies were likely influenced by each other. This is also noted and subsequently ignored by the IO. The weight of the negative testimony alone should have failed to substantiate the allegations. See Attachment 1.

6. Much of the testimony is either false, inaccurate, misrepresented by the IO, and/or provided or influenced by discredited witnesses. Even if the evidence were credible it is circumstantial and without a common inference. See Attachment 2.

7. CDI notification excluded, at no point during the LOR's stated timeframe did anyone approach me to address a poor perception of my relationship with Maj Murphy, although on 21 Jan and 7 Feb I reached out to Lt Col Lewis and Maj Doughty, respectively, to address a rumor Maj Doughty had been propagating with prejudice. I was denied the information I needed to address him until 5 Feb and believed his derogatory remarks had been mitigated in the early morning hours of 8 Feb. Both times I was made aware of any derogatory opinion (both times through a third party) I proactively addressed it. Additionally, at no point did Lt Col Lewis suggest nor demand Maj Murphy and I "knock off" our social interactions. The CDI report is fallacious in that regard. As is the IO's statement that Lt Col Lewis engaged "with the

individuals early in the deployment" (Atch 5 para. 21.) I was never counseled nor did I fail to take action to mitigate any assertion of inappropriateness any time it was brought to my attention. See Attachment 2 Paragraphs 11., 12., 13., 20., 24., 26., 27., 28., 29., 45., and 46. for a detailed description of these encounters and disparities in the CDI report.

8. The punitive nature of this sanction is discriminatory and in violation of, or discouraging of adherence to DODD 1350.2 paras. 4.2, 4.3.,4.6., 4.7., AFI 1-1 paras. 1.8., 2.1., 2.5., 2.11., 2.11.2., 2.12., 3.3., AFI 36-2706_AFGM2017-01 paras. 1.2.1., 1.2.2., ANGI 36-7 paras. 4.3.1., 4.3.2., National Military Strategy 2015 pg. 14, DoD Diversity and Inclusion Strategic Plan 2012-2017. As such it endangers minorities and women. It leaves members fearful to treat members of the opposite sex, having religious/value or other differences, with equal personal and professional regard as members of the same sex or similar traits, for fear of punitive action. It encourages the isolation and abandonment of opposite gender Airmen and is dangerously in violation of MEO policies. See Attachment 2 paras. 14., 18., 19., 20., 21., 28., 29., 35., 36., 38., and Attachment 3.

9. This LOR not only endorses but executes Maj Doughty's tangential harassment of myself, and more importantly, direct harassment and assault of Maj Murphy. It encourages violation of and is itself violates DODD 1350.2 paras. 4.2, 4.3., 4.6., 4.7., AFI 36-2706_AFGM 2017-01 paras. 1.2.1., 1.2.2., AFPD 36-27 paras. 9., 10., 10.1., 10.2., and ANGI 36-7 para. 4.3.2. See Attachment 2 and Attachment 3.

10. This LOR violates AFI 1-1 paras 2.11, 2.12, and ANGI 36-7 para. 4.2.3. in that it unlawfully imposes and encourages the imposition of others' personal, and likely religious beliefs, about the appropriateness of mixed gender relationships between married people upon me. It is also an unlawful endorsement of Abrahamic Religious norms opposing mixed gender relationships, as reference in Attachment 3. As a Secular Humanist, gender equality, to included treating men and women equally in personal interactions and professional peer relationships, is core to my beliefs. This punitive action against me for displaying such equal treatment violates my deeply held values under the guise of good order and discipline. See Attachment 3.

11. This LOR and the CDI that generated it is discriminatory along lines of AFSC. It nurtures career stovepipes and deters cross-AFSC integration. See Attachment 2 para 40 and Attachment 3 para. 10.

12. This LOR fails to recognize that perceptions are the responsibility of more than the people that those perceptions are levied against. Especially when those perceptions are prejudiced and spread with malice. See Attachment 1 paras. 14. & 15. Attachment 2 paras. 11., 12., 20., 23., 46. & Attachment 3.

13. This LOR fails to recognize the lack of superior/subordinate relationship between myself and Maj Murphy or the fact that were both FGOs and even of equal rank for a good portion of the time in question. It inappropriately uses the open-ended nature

AFI 36-2902 to levy the values of the commander and other unit members on those with different values under the guise of good order and discipline.

14. The CDI was not conducted IAW the CDI Guide paras 3.3., 5.1.2.3., 5.1.2.3.2., 5.1.2.3.3., 5.1.2.3.5., 6.1.3., 6.1.4.1.3., 6.1.4.1.4., or 6.1.4.1.5. See Attachment 4.

15. This LOR draws a false moral equivalency between a perception of an inappropriate relationship between two non-hierarchically related adult FGOs and sexual assault. This is illustrated by Maj Doughty receiving an LOR for Maj Murphy's substantiated claims of unwanted sexual touching by Maj Doughty and other Officers in this organization having received an LOA for attempted assault in a public venue. Frankly, equitable punitive action for a perception of a consensual relationship and sexual assault, or assault of any nature, is offensive. It shows a deep misunderstanding of what offenses are most prejudicial to good order and discipline, shows a lack of moral compass, and endangers every member of this group. I am not arguing for more punitive action against others but simply for moral balance. Regularly reaching out to a member of the opposite sex for personal and professional support, regardless of the nature of the relationship, is never as great an offense as assault of any nature.

16. I have been informed on several occasions by the former OG/CC, current OG/CC, and OSS/CC that I received this LOR because I failed to provide testimony. It is my understanding that lack of testimony on the part of the subject is not a legitimate reason to substantiate allegations. Nonetheless, the primary reasons for my lack of testimony are threefold. First, I find it unlawful and disrespectful to be expected to defend myself against administrative punishment for displaying relationship characteristics, that having been between two members of the same gender or even two unmarried individuals, would not cause any concern. This is, by definition gender discrimination, or if based on marital status it is the imposition of others values and matrimonial norms upon others, and violates my free exercise of religion and associated values (or lack thereof) as protected by AFI 1-1 para. 2.11 other DoD Directives, and Federal Law. Second, I could not adequately defend myself without violating Maj Murphy's right to privacy and control over her own report ing regarding sexual assault and harassment. I would have been required to testify to Maj Doughty's motives. Third, the CDI process is entirely subjective and an easy avenue for further imposition of the IO or commander's values upon myself. If the IO was not prejudice the testimony of others would be sufficient to show lack of substantiation. With a prejudiced IO my own account of displaying similar relationship traits with women as I do with men, and not having been afraid to be seen associating with a female, would not help. It is my strongly held belief that this was in fact the case.

17. This LOR is not IAW AFI 36-2907 paras. 4.5.1.1. or 4.5.1.2. They State "4.5.1. Administer a counseling, admonition, or reprimand, verbally or in writing. If written, the letter states: 4.5.1.1. What the member did or failed to do, citing specific incidents and their dates. 4.5.1.2. What improvement is expected." The current LOR verbiage provides no actionable feedback regarding what events and actions were:

inappropriate and mentions no specific dates or times these events took place. It obfuscates, or fails to state, what was actually done wrong, leaving members scared to interact with each other for fear of punishment, thus leaving members alienated and open to harassment by others who wish to unlawfully impose their own personal values and dictate the behavior of others. It is prejudicial to good order and discipline in that regard. Given any explicit actions I took that were inappropriate, I will proudly rectify these actions and help to act a guidepost to others.

18. This LOR is very aggressive in relation to AFI 36-2909 para. 8. guidance. "If a relationship is prohibited by this instruction or is causing (or if good professional judgment and common sense indicate that a relationship may reasonably result in) a degradation of morale, good order, discipline or unit cohesion, a commander or supervisor should take corrective action. Action should normally be the least severe necessary to terminate the unprofessional aspects of the relationship." If after considering this rebuttal you find the allegation of the perception of an inappropriate relationship to be substantiated, I humbly request leniency and downgrading of the LOR to something lesser, in accordance with this guidance. I would also ask your consideration that this is the first administrative action ever taken against me in over 17 years of service and the first form of counseling I received regarding this concern.


JENNER M. TORRENCE, LtCol, DCANG
113WG/CCZ


6 Attachments:
1. Failures in Witness Credibility and Assessment Thereof
2. Failures in Testimony, Analysis, Rationalization, & Objectivity
3. MEO Implications
4. CDI Guide Departures
5. Numbered CDI Report
6. Legal Support Letter

**Attachment 1: Failures in Witness Credibility and Assessment Thereof**

1.      The IO displays multiple failures in logic, objectivity, and assessment of witness credibility in his analysis. This shows either lack of investigative competence or extreme bias towards substantiation. The IO rejects all of the following testimony of negative evidence while endorsing the 2 pieces of testimony making claims of an inappropriate relationship.  (1) Lt Col Croker (121 FS/CC & 121 EFS/CC) "avoided speculating about events he did not directly witnessed." (2) Lt Col Wilson (113 OSS/CC) explicitly told the IO the he saw nothing wrong with my relationship with Maj Murphy (based on his personal account to me). (3) SrA Grumbach "specifically denied" knowing Maj Murphy and I "might be engaged in intimate relations after seeing them together at Maj Murphy's promotion." (4) MSgt McGee "avoided speculating on things he did not witness." (5) Maj Fromuth, testified "that she had never perceived any inappropriate relationship between Maj Murphy and anyone else." (6) Capt Ringgenberg testified that "Maj Murphy did not confide any inappropriate relationship to her at any time" and she "has no reason to suspect there has been an inappropriate relationship between her and Lt Col Torrence or anyone else." (7) WINTESS12 was called to corroborate Maj Doughty's testimony, but denied seeing Lt Col Torrence leaving Maj. Murphy's room late one night. WINTESS12 further "denied perceiving anything unusual" about the time in Guam. Also highly doubtful is an explicit statement by Lt Col Lewis affirming anything inappropriate as he expressed the opposite to me in Guam. Both testimonies attempting to affirm an inappropriate relationship had probable cause and motive for derogatory statements acknowledged, and then ignored with prejudice by the IO. Additionally, the affirmative testimonies were likely influenced by each other. This is also noted and subsequently ignored by the IO. The weight of the negative testimony alone should have failed to substantiate the allegations.

2.      First, I will address the witnesses claimed to have presented substantiating evidence. The two primary witnesses presenting derogatory information towards myself and Maj Murphy are Capt Tom Richards's and Maj Paul Doughty, neither of whom are credible witnesses and both of whom had probable cause and motive to damage Maj Murphy, and tangentially myself, as I will explain below. Capt Richards's lack of credibility is presented blatantly in the CDI report. Maj Doughy's lack of credibility is apparent as indicated by SAPR related OSI investigation that found sufficient evidence to take administrative action against Maj Doughty. Its existence highlights his frustration over a failed sexual conquest of Maj Murphy and subsequent motive for harassment, assault, and slander. He has actually accomplished much of this through this CDI and resulting administrative action. He has accomplished the same against me due to my friendship with Maj Murphy becoming the means to facilitate his assault.

3.      I will discuss Capt Richards's largely fabricated testimony in Attachment 2. What I want to address here is his lack of credibility and motive to disparage Maj Murphy. Capt Richards's is not a credible witness and his testimony should have been disregarded for two reasons. First, he displays signs of paranoia severe enough to be noted by nearly every individual who interacts with him in the interview process (Atch 5 paras. 5., 22., 26., & 48.). The IO actually calls an O-6 witness simply to corroborate this paranoia (Atch 5 para. 26.). Secondly, he goes so far as to display dismay at Maj Murphy having

diluted some of his OPR bullets, even bringing the OPR along for exhibition (Atch paras. 6. & 47.). This is a blatant display of motive to disparage. Additionally, Capt Richards has made a second false allegation toward a fellow member just within the last few weeks, regarding illegal firearms carry. For any of these reasons alone Capt Richards's testimony should be discounted.

4.      Capt Richards's paranoia is so severe that the IO recommends he seek "professional mental health services" in Atch 5 para. 5. Despite this the IO does the mental gymnastics required to assert that the paranoia is a normal character trait of Capt Richards's and does not affect the validity of his testimony (Atch 5 para. 25.). He bases this validation on having "known the complainant a long time." This shows favoritism and bias towards the complainant (Atch 5 para. 16) in that he is valuing his testimony over others based on inappropriate familiarity. This is a gross misuse of the circumstantial evidence relating to Capt Richards's paranoia. If, as the IO claims, his paranoia is chronic, then he would be chronically likely to use false testimony to assuage his illegitimate worries or assume illegitimate foul play. Based on additional recent false allegations levied by Capt Richards, this is likely the case. There is no logical link between chronic paranoia and legitimate testimony as is asserted by the IO and apparently Col Witness10. Simply stating that his paranoia does not detract from his testimony is not an actual reason for it not to detract. Alternatively, if his paranoia is acute, it could stem from trauma related to providing either legitimate or illegitimate testimony.

5.      There are three possible inferences above. Only one of which points to substantiation. Even if the invalid assumption that chronic paranoia legitimizes testimony is allowed, there are still equal positive and negative inferences. Capt Richards's testimony, at best, can be considered fifty percent likely to be valid and is more realistically 75% likely to be invalid based on his extreme paranoia. After denying that paranoia dilutes the validity of Capt Richards's testimony, the IO actually contradicts himself and states "the biggest detractor from the evidence presented to me was Capt Richards's extreme paranoia as expressed by every person who came in contact with Capt Richards during the course of listening to his allegations or participating in this investigation" (Atch 5 para. 48.), yet the IO goes on to use Capt Richars's testimony towards substantiation of another allegation. It is clear that Capt Richards's mental state should eliminate his testimony from consideration towards substantiation of any allegation in this CDI.

6.      In addition to paranoia, Capt Richards plainly presents a motive to the IO for wanting to disparage Maj Murphy in the form of an OPR he is upset about ( Atch 5 paras. 6. & 47.). Again, the IO shows extreme prejudice in favor of Capt Richards and manages to convince himself that this presentation of motive against Maj Murphy serves to legitimize Capt Richards's testimony instead of detracting from it. In Atch 5 para. 6., the IO attempts an incoherent association between Capt Richards being detail oriented and his never being capable of trying to execute reprisal against Maj Murphy In Atch 5 para. 47. the IO makes another disjointed effort to legitimize Capt Richards's context inappropriate complaints about his OPR. Here he claims Capt Richards "really didn't make a big deal about it," failing to recognize that bringing up an OPR in an attempt to

Atch 1

undermine his supervisor's credibility in context of a CDI is making "a big deal about it." Again, this shows the IO's lack of ability to see the rational inference of circumstantial evidence. There is really only one possible inference here and that is that Capt Richards was upset enough about his OPR to bring it up to the IO. There is no legitimate way to claim that this level concern over his OPR of does not show motive to disparage. The fact that he brought it up in a disparaging way is direct evidence of motive.

7.    Additionally, I witnessed more than one conversation between Maj Murphy and Maj Taylor about this OPR before the CDI began. It was contentious enough that Maj Murphy had asked my advice on the topic at one point and I recommended she obtain an LOE from his operational supervisor to substantiate his OPR draft. This was a topic of significant conversation in the DO office despite Capt Richards downplaying his discontent to the IO. This was one of many points of contention between Maj Murphy and Capt Richards, to include Capt Richards refusing to acknowledge her as his supervisor and consistently circumventing her in favor of Maj Taylor or Lt Col Wilson. She expressed frustration with, what appeared to her, as misogynistic refusal to acknowledge a female officer as his superior. The hostile relationship of Capt Richards towards Maj Murphy was well founded prior to the CDI and provides further motive for Capt Richards's fabricated remarks.

8.    The IO's failure to recognize motive on Capt Richards's part is not only rationally incoherent, but shows an inappropriate level of familiarity and bias toward the complainant on the part of the IO. At this point an astute adjudicator would discard the CDI as invalid based on the IO's demonstrated lack of objective investigative ability and a potential inappropriate relationship between the IO and Capt Richards.

9.    As previously mentioned, Maj Doughty's testimony is also invalid due to his failed sexual exploit, to include sexual pursuit, public harassment, and unwanted sexual touching, of Maj Murphy. His resulting frustration motivated his disingenuous testimony. His hostile intent and portrayal of my relationship with Maj Murphy was motivated by this frustration and exacerbated by the fact that Maj Murphy, the only female officer on the deployment, looked to me for support during this unwanted sexual pursuit. This portrayal was misogynistic and prejudice in nature, playing off of prevalent Judeo-Christian norms regarding mixed-gender association to demonize Maj Murphy and myself unjustly.

10.    The IO, again, recognizes and then disregards this motive for derogatory testimony (Atch 5 para. 49.). He justifies this disregard by claiming that Maj Doughty's real concern was keeping Maj Murphy from getting in trouble. Apparently, this intent, inappropriately presented as fact, comes from Maj Doughty's own testimony. The IO somehow fails to recognize that Maj Doughty's expression of "so much concern that Maj Murphy might get in trouble" would likely be disingenuous if he was in fact distraught over Maj Murphy's rejection of his pursuit or even just his friendship. Simply taking Maj Doughty's claimed intent at face value is naïve and biased. Maj Doughty brings up several events (in a misrepresented or inaccurate way) unrelated to the central question of the CDI, simply to discredit Maj Murphy (Atch 5 paras 41., 42., & 44.), yet the IO

somehow does not recognize this as Maj Doughty's attempt to get Maj Murphy in trouble.

11.    The IO goes on to state, "if he did want to get back at Maj Murphy, he would have given all his info to leadership as opposed trying multiple times to tell this to Maj Murphy and Lt Col Torrence at the 'bro-level'." This is a misrepresentation of testimony. Maj Doughty never tried to tell me anything about accusations until I confronted him regarding his verbal assault and harassment of Maj Murphy which took place on the early morning of 5 Feb. The only two conversations I had with him about it immediately followed this confrontation on the evening 7 Feb and into the morning of 8 Feb. The IO also fails to recognize that Maj Doughty did try to convince leadership that the relationship was inappropriate by attempting to persuade Lt Col Lewis. He attempted to convince Lt Col Lewis of this on many occasions before he lashed out at Maj Murphy at an afterhours club and then was forced to discuss it, by me, as mentioned above. In fact, he persisted in pushing this rumor on Lt Col Lewis to the point that he was told he was beginning to "sound like a scorned lover."

12.    Maj Doughty's extreme emotional concern with Maj Murphy's display of friendship with a male other than himself, on moral grounds, is contrasted by Maj Doughty's own character. Maj Doughty is infamous for spending copious amounts of money at gentlemen's clubs where he pays women, which are not his spouse, to undress, assume overtly sexual postures, and touch him with sexual portions of their body. On one occasion during a New Orleans TDY he got so carried away drinking and enjoying the gentlemen's club that he debilitated himself and was unable to work for most of a week. Additionally, he displayed this same penchant for sexual context and contact with women, other than his spouse, on multiple occasions in Guam. In fact, I am certain that part of his frustration was my having accompanied Maj Murphy, at her request, out of these establishments on more than one occasion after Maj Doughty had led the group there. Simultaneous with his complaints, Maj Doughty was himself pursuing Murphy sexually and on one occasion touched her in an intimate manner against her will. I bring these facts up not to cast personal judgment on Maj Doughty's activities I mention it to highlight the fact that the stark contrast between Maj Doughty's own character and displayed sexual morality, and that which he claims to be projecting on others cannot be overstated. His distress over Maj Murphy's simple social and professional interactions with a male besides himself is disturbing given his own attempt to pursue Maj Murphy and his own overt solicitation of, and engagement in sexual contact with women in gentlemen's clubs. This level of hypocritical anguish can only be explained by some sort of personality disorder, allowing Maj Doughty to believe he can impose a different morality on others than he does on himself, or by simple jealousy and sexual frustration leading to disingenuous propagation of rumors and testimony about others. While the IO may not have had access to information about Maj Doughty's character, his peers do, as does an OSI investigation that found sufficient evidence to take administrative action against Maj Doughty for his pursuit of Maj Murphy.

13.    Maj Doughty's testimony and professed interpretation of events is very obviously tainted by his unrealized pursuit of Maj Murphy. His resulting disdain for her is exhibited further by his voluntary disparaging remarks towards her on unrelated events. His

Atch 1

058

testimony is further delegitimized by the orthogonal moralities he applied to himself vs others. Any derogatory allegations by Maj Doughty towards either Maj Murphy or myself should be disregarded base on his substantiated motive to damage Maj Murphy and brazen hypocrisy. Any consideration of these remarks serves only to assist Maj Doughty in his attempt to seek reprisal against, harass, and assault Maj Murphy, and also myself through association.

14.    Not only are the two primary derogatory witness accounts not credible and motivated by reprisal, but the IO's attempt to legitimize them shows extreme favoritism for the accusers versus the accused. The IO's failure to objectively assess motive and witness credibility calls into question the entire CDI. Based on the prejudicial nature of these testimonies alone, the CDI should be invalidated.

15.    In addition to the lack of credibility, the IO fails to recognize that all of the derogatory testimony likely derives from Maj Doughty's aggressive propagation of his allegation against Maj Murphy and myself. Capt Richards goes so far as to make an excuse for having heard the rumors. The claim is that Col WITNESS10 told him about the rumors (Atch 5 para. 38.) but then he contradicts himself by stating that SrA Grumbach's girlfriend had made a statement about the nature of my relationship with Maj Murphy. One of these statements is a lie because they cannot both be true. It is difficult to fathom that an O-6 would have such a breach of professionalism as to spread rumors to a subordinate about his supervisor while that subordinate was in the process of making an allegation against the very individual. If this is the case, then I believe it warrants investigation and severely detracts from the validity of this CDI. Regardless, Maj Doughty's aggressive evangelizing of the rumor could easily have made its way to Col WITNESS10 and/or Capt Richards and it is entirely possible that Capt Richards seized on this information to support his reprisal. Col WITNESS10 also likely knew of the rumor because Maj Murphy expressed her dismay at Maj Doughty's accusations to Maj Taylor upon returning from Guam (Atch 5 para. 25.), which likely propagated up the chain of command. It's unfortunate that Maj Murphy's reaching out for help to mitigate harassment and rumors resulted in the chain of command assuming guilt on her part. Lt Col Lewis's testimony and actions, which I believe are entirely misrepresented and will discuss later, was also heavily influenced by Maj Doughty using him as his primary outlet of frustration and accusation. The extreme correlation between Maj Doughty's aggressive attempts to proliferate a rumor and others testimony was almost entirely ignored by the IO.

16.    Adding to evidence of the IO's bias, and detracting from any substantiation of an inappropriate relationship, is the fact that he completely disregards all testimony asserting that there was no inappropriate relationship. Both squadron commanders (Atch 5 paras. 18. & 19.), both female intel officers (Atch 5 paras. 24., & 29.), SrA Grumbach, and Witness12 (Atch 5 para. 30) deny any perception of an inappropriate relationship. Witness12 discredits Maj Doughty's testimony further by denying his second-hand allegation that I was seen leaving Maj Murphy's room (Atch 5 para 23.).and SrA Grumbach discredits Capt Richards's allegations that his girlfriend stated anything inappropriate about our interactions at Maj Murphy's promotion party (Atch 5 para. 20). While I do not have access to the raw testimony, I am extremely doubtful that either Lt

Col Lewis or Maj Taylor stated that there was anything inappropriate about my interactions with Maj Murphy, as both of them have stated the opposite to me in follow-on conversations and conversations during the timeframe in question. This leaves at least 6 and likely 8 of 12 witnesses asserting that the perceived the relationship was appropriate and only two or possibly three (if Lt Col Lewis's account to the IO was different than his statements to me) witnesses stating any negative perception. MSgt McGee and Col WITNESS10 do not appear to be in a position to have cast judgement and remained neutral. The weight of testimony even if taken at face value, is massively in favor of no substantiation. Both SQ/CCs and SQ/DOs attributed nothing inappropriate to the relationship and at least two of them explicitly stated this to the IO. The IO completely disregards this, again displaying extreme bias. He even goes so far as to question the honesty of Maj Fromuth's testimony (Atch 5 para. 24) (on a point of no consequence to the CDI) for no apparent reason, which seems fairly misogynistic on the surface, given he rarely questions the sincerity of any of the male testimony despite contradiction.

**Attachment 2: Failures in Testimony, Analysis, Rationalization, & Objectivity**

1.      Much of the testimony is either false, inaccurate, misrepresented by the IO, and/or provided or influenced by discredited witnesses. Even if the evidence were credible it is circumstantial and without a common inference. I will simply address this in the order it is presented in the CDI report. This will not be a comprehensive list of shortcomings as there are too many to discuss, but I will try to discuss ones that directly conflict with substantiation of an inappropriate relationship or the perception of one.

2.      Atch 5 para. 1. is almost entirely fabricated. Maj Murphy and I were in the intel office having a private conversation about a domestic issue in my life which I wanted a female perspective on for a few minutes. Like many officers in this group, she is a friend and has offered me her unique perspective when needed. We also discussed a few issues she had with some of her subordinates. I had closed the door because other members were in the vault and the conversation was of a personal nature. I commonly do this with all of my coworkers if the subject of conversation is private or personal. I have had countless closed-door personal and professional conversations with, Lt Col Wilson, Maj Taylor, Maj Kanewske, Maj Wilson, Lt Col Veal, Lt Col Robinson, Lt Col Camino and many other officers. I do not treat Maj Murphy or anyone else differently because of their gender, sexual orientation, or race. When the door to the vault opened there was no "Hello" and Maj Murphy and I continued our conversation. There was a knock on the office door that Maj Murphy responded to with "One minute," so that I could finish my thought. There was no one blocking the door and the door was never opened from the outside until Maj Murphy answered it about 30 seconds later. It would have been very odd for someone to force the door open after being told to wait a minute. Maj Murphy opened it normally, left it open, and went to find the person who needed her. The lights were never off and I never witnessed who was at the door. I later learned it was Capt Richards from written IO questions. I left the room when I heard Maj Murphy leave the vault and it became apparent she had other things she needed to do besides rejoin the conversation. I went to work on my BSA boards for a brief I had to re-accomplish from an IPUG sortie with Maj Wilson earlier that day. Maj Murphy left for a few minutes and came back and listened to my BSA practice brief for the IPUG re-brief I had the next day with Maj Harbart. During that time SrA Grumbach came back looking for a coffee mug. I thought absolutely nothing of the fact Maj Murphy had to leave the room to address another issue and was very thankful to have an audience for my practice brief. Maj Murphy has been kind enough to do this for me on several occasions.

3.      I was not there to witness the events described in Atch 5 para. 3., but when Maj Murphy left the room she seemed perfectly composed. I am at a loss for words as Capt Richards's statement about a "thin line of moisture by her lip." It is absurd, as is the fact that he made a drawing. His claim to having "smelled sexual activity" emanating from Maj Murphy (Atch 5 para. 9.) is also ridiculous. I have been a sexually active person for over two decades and I have never "smelled sexual activity" on a fully clothed individual outside the room where the activity allegedly occurred. His assertion is irrational and strips him of any credibility as a witness to be considered in any other portion of the CDI.

4.    Additionally, Capt Richards's failure to act IAW AFI 1-1 para. 2.5 Wingman concept is extreme. Capt Richards claims in Atch 5 paras. 2. and 9. that he was worried Maj Murphy was under duress, suffering from extreme emotional stress, could not control her breathing, and trying to regain control of her emotions. If this were actually the case and I came across the same scenario, I would have been desperate to ensure Maj Murphy's safety and the safety of others. I would have asked her if she was ok or if she needed help. I would have immediately investigated the vault to see why there was duress inside of a secure area, and then called security forces if I was still uncertain. Instead of addressing his alleged safety and security concerns Capt Richards decided to continue the conversation about administrative issues, and send an enlisted member into what he claims to be a dangerous situation in order to help substantiate his planned allegation of sexual misconduct. Capt Richards should either be investigated for making a false statement or utter failure to act IAW AFI 1-1 when he though the life or wellbeing of another Airmen was in danger.

5.    I have already addressed the credibility of both Maj Doughty and Capt Richards's testimony as well as the IO's inability to assess the circumstantial evidence related to their credibility. I will not continue to belabor it here aside from to point out where it is false, inaccurate, or misrepresented.

6.    In Atch 5 para. 13. The IO claims "multiple witnesses came forward to tell me about a long series of events that create a strong appearance that Lt Col Torrence and Maj Murphy have been engaged in an unprofessional relationship." Yet at no point does he actually demonstrate evidence of any inappropriate, events, actions, or behaviors. The IO simply asserts this with no evidence and bases this substantiation on his own testimony. According to the CDI report only two witnesses explicitly stated that they believed anything inappropriate had happened. Neither of them are credible witnesses and even they provided no direct evidence or even circumstantial evidence that could reasonably be assumed more likely to point to an inappropriate relationship than not.

7.    In Atch 5 para. 16. The IO says "many other witnesses described various aspects of a suspected unprofessional relationship" and "The allegations included many examples of Maj Murphy and Lt Col Torrence being seen together and in situations where an inappropriate relationship seemed possible." The only two witnesses that he states suspected anything unprofessional were Capt Richard and Maj Doughty. This does not qualify as "many" witnesses. What these witnesses, or any others, "suspected" does not constitute evidence and the fact that Maj Doughty and Capt Richards's alleged perception was self-serving has already been documented. "Being seen together where an inappropriate relationship is possible" is equivalent to saying "being seen together where an appropriate relationship was possible." Both statements are equally credible and neither is evidence of an appropriate or inappropriate relationship. The fact that the IO makes such empty statement, and believes it validates his substantiation, highlights his lack of investigative expertise and further delegitimizes his findings. Maj Murphy and I are/were friends and coworkers. As such we would be likely to be seen together regularly. This in no way substantiates an inappropriate relationship nor should it lead to the perception of one, among non-prejudice reasonable people, especially given that we were lateral peers organizationally in Guam, and in different squadrons at home station.

Atch 2

062

8.      In Atch 5 para. 18. The IO states Lt Col Wilson guessed my name before Capt Richards brought it up. Lt Col Wilson knew Maj Murphy and I are friends and also was familiar with Maj Murphy's concerns over Maj Doughty's threats and accusations from Guam. It's not surprising that he would guess I might be talking to Maj Murphy. This in no way supports a finding of inappropriateness. It simply shows that Lt Col Wilson was aware of previous accusations and associations. What the IO fails to bring up, in a typically biased way, is that Lt Col Wilson told him that he perceived nothing inappropriate about my relationship with Maj Murphy.

9.      Atch 5 para. 20. is an example of the IO not being willing to take witness testimony at face value if it was not incriminating. He entertains the idea of calling in a civilian witness because the second hand account of her statement did not satisfy his will to find guilt and the only reason he did not ask for her testimony is because he had already decided to substantiate the allegations, and her testimony "would not materially change the outcome of the investigation." This indicates that her denial of anything inappropriate would be disregarded as evidence against substantiation because he had already made up his mind. This shows that the IO had no interest in considering perceptions contrary to substantiation toward the preponderance. It is also another example of Capt Richards's testimony being untruthful, yet it is disregarded by the IO once again. The IO's bias is hard to overstate.

10.     I believe Atch. 16 para. 21. Is a substantial misrepresentation of testimony based on the disparity in my own conversations with Lt Col Lewis and what the IO presents. It states "He had been dealing with the appearance of an inappropriate relationship between the two for some time before this investigation was convened." This is inaccurate as far as I have been informed. Lt Col Lewis had been dealing with Maj Doughty's irrationally emphatic allegations about myself and Maj Murphy for some time. He had not been dealing with the appearance of an inappropriate relationship.

11.     The IO goes on to state "Lt Col Lewis was the first to speak to both Maj Murphy and Lt Col Torrence in Guam because he was seeing indications of an inappropriate relationship." This is a misrepresentation of events. Lt Col Lewis spoke to Maj Murphy to let her know an individual (who turned out to be Maj Doughty) was making allegations and spreading rumors about the nature of my relationship with Maj Murphy, not because he himself believed anything was inappropriate. On the evening of 20 January at Shamrocks Irish Bar, Lt Col Lewis, in an inebriated state (off duty of course), mentioned to Maj Murphy that someone had made allegations about the nature of her relationship with me. This elicited an emotional response from Maj Murphy and grave concerns about slander and character assassination. She demanded that Lt Col Lewis tell her who was spreading rumors. Lt Col Lewis had the self-awareness to know he had started a conversation he was not in a state of mind to continue. Maj Murphy persisted in her demands until I eventually separated the two of them and convinced Maj Murphy to ask Lt Col Lewis to lunch or dinner the next day to discuss the matter in a state of sobriety. The next day I reached out to Maj Murphy and Lt Col Lewis to facilitate that discussion. I also invited Lt Col Veal and Maj Needles, who came along. We went to a restaurant called Crust and discussed the situation from the night before, among many other things.

During that portion of the conversation Lt Col Lewis stated that he personally had no issue with the nature of our relationship and felt no reason we need to change it. He said he brought up the third parties allegations just to give us awareness and that "if you aren't doing anything wrong to keep doing what you are doing." Maj Murphy and I both requested that Lt Col Lewis tell us who was spreading the rumors about us but Lt Col Lewis would not reveal their identity. I also asked Lt Col Lewis to tell the individual to confront me directly if he really thought it was a problem, to ask the individual to stop spreading hearsay, and to please not be a party to spreading such rumors. Appropriately, at no point did Lt Col Lewis recommend we "knock off" our very normal social interactions with each other, or suggest any behavior we had displayed were inappropriate. He mentioned that our openness about Maj Murphy and I being open about our friendship was positive and an indication of good intent.

12.     During this conversation Maj Murphy also made Lt Col Lewis aware that there was someone who had been propositioning her but would not reveal who it was (this was Maj Doughty) to avoid causing drama in the unit. My understanding was that Lt Col Lewis believed there was nothing inappropriate about our relationship and that he would handle the perception being spread by the individual, or have the person come forward themselves. I believe this was the right thing to do; however, I do wish he had made me aware that Maj Doughty was the person spreading the rumor so I could have confronted him earlier. I believe Lt Col Lewis was not "too reluctant to act." He simply did not think there was anything to act upon. I felt comfortable the appropriate steps had been taken to mitigate any poor perception at the end of this conversation.

13.     This conversation was on 21 Jan, over a month into the deployment and about two and a half weeks before the end of the deployment. The conversation was initiated by me. Lt Col Veal and Maj Needles were both part of this conversation and neither of them expressed any concern about the nature of our relationship. Maj Murphy and I both spent significant time with both Maj Needles and Lt Col Veal throughout the deployment. No one ever addressed me about the nature of my relationship with Maj Murphy again until the night of 7 Feb when I confronted Maj Doughty about the rumors he had been spreading and his threats and verbal assault on Maj Murphy on 5 Feb.

14.     As discussed, Atch 5 para. 23. is entirely self-serving on the part of Maj Doughty and meant to discredit Maj Murphy for the purposes of self-protection against known documentation of sexual misconduct and also out of vengeance over a failed sexual undertaking. One would expect it to be "the most comprehensive" testimony. The IO is unable or unwilling to put any of this together and finds his testimony credible despite realizing he needed to read Maj Doughty his rights in order to protect him from incriminating himself (for the behavior providing his motive to discredit Maj Murphy). Despite the extensive testimony of Maj Doughty the IO seems to find none of it worthy of mentioning in this section beside the denied claim that WITNESS12 saw me leaving Maj Murphy's room late one evening (which is gender discriminatory in itself, as I have left many male officers hotel rooms late at night after socializing and never been questioned). He also decides to mention some irrelevant testimony about Maj Doughty's frustration with ineptitude in the intel shop. There is nothing substantive in this paragraph in regard to substantiated findings. The IO's bias is clarified once more with his emphatic

statement that "I have no reason to doubt any of Maj Doughty's extensive testimony," despite clear motive for slander and contradiction to his testimony by WITNESS12 a few sentences earlier.

15.     Atch 5 para. 24. is another example of disregarded testimony counters substantiation. It is indicative of the IO's bias toward guilt and insulting demeanor toward Maj Fromuth's character. The IO seems misogynistic, especially due to his referral to a woman simply as "the lesbian" later in the CDI report. He hesitates to discredit any male's testimony.

16.     Atch 5 para. 24. also has what I believe to be misrepresentation of testimony. In my conversations with Maj Taylor, he explained that he stopped Maj Murphy before she could put together a cohesive verbal narrative of the events around her being sexually assaulted by Maj Doughty because he knew this would force him to file a SAPR report. Instead he stopped her and encouraged her to report on her own if a sexual assault had actually occurred. He did this to preserve her privacy and control over the reporting process, not because she could not put together a coherent narrative. The IO himself seems to be attempting to discredit Maj Murphy here. This seems extremely biased and inappropriate. Also extremely biased, is the IO recognizing Maj Tayor as a skilled investigator yet disregarding his concerns over Capt Richard's outlandish claims due to the IO's own familiarity with Capt Richards, the complainant. IO alludes to his extreme familiarity with Capt Richards at the end of this paragraph and highlights a dramatic reason the LOR should be removed. The IO has a clearly inappropriate level of familiarity and bias toward the complainant. He brazenly displays that familiarity and bias in the statement "I understand Maj Taylor's reservations about Capt Richards but I have known Capt Richards a long time and do not find his behavior suspicious." The IO's gross conflict of interest and favoritism for the complainant is on full display here.

17.     Atch 5 paras. 29. & 30. Are both strong evidence against substantiation and both were ignored.

18.     In Atch 5 para. 35. The IO claims "officer and enlisted unit members in Guam began noticing Lt Torrence and Maj Murphy spending a good deal of time together early in the deployment." SrA Grumbach was not in Guam and I don't see any other enlisted witnesses that could have provided this account. I believe this is another misrepresentation of testimony, or a treatment of second hand testimony as fact. The IO goes on to state "However, over time, people started to gossip and spread their observations of Lt Col Torrence and Maj Murphy arriving at work together in the same car. Leaving work together in the car. Coming down in the elevator together or going up to their rooms in the elevator together. Always sitting together and having dinner together [Tab F-5, p. 2 of 5; Tab F-7, p. 5 of 10]." I do not have access to the referenced testimony but would be surprised if the majority of this did not come from Maj Doughty. Again, this is not an accurate representation of the facts. Maj Murphy and I did tend to associate with the same group of people throughout the deployment which put us in the same elevators, cars, and restaurants frequently, as well as with the other people we were close to. This is in no way unusual and should not be interpreted in a nefarious way by mature non-gender discriminatory adults.

Atch 2

19.    An example of the kind of event Maj Doughty found offensive, and is providing as evidence, was a scenario he used in my discussion with him on the evening of 7 Feb to exemplify my "inappropriate relationship" with Maj Murphy. Prior to that discussion I had come up to commander's call in an elevator with about 12 people because we were coming from a different meeting. Maj Murphy happened to be among those dozen people. Maj Doughty found it offensive that we were both in the same group coming up the elevator and suggested that I should have waited for the next elevator so as not to be in proximity to Maj Murphy. This is the kind of event being used to suggest we were "arriving at work together in the same car. Leaving work together in the car. Coming down in the elevator together or going up to their rooms in the elevator together. Always sitting together and having dinner together." There were a couple of occasions when Maj Murphy and I rode alone in the car to work or an elevator, this was not the norm by any means and even if it had been, is not in any way indicative of inappropriateness from a non-discriminatory perspective. I just as frequently rode alone in the car or elevator with other members, to no suspicion. These are mischaracterizations and not valid examples of anything indicative of an inappropriate relationship.

20.    With Maj Doughty proliferating rumors in the background it would not surprise me if there was more gossip than usual, but at no point did anyone mention to me that there was anyone besides a select individual who had been making derogatory comments about Maj Murphy and myself. I have been on countless TDYs where members of the same gender spent similar amounts of time together and were in similar proximity to each other as Maj Murphy and I were in Guam. This never raised a concern. Maj Doughty's targeted attempt to slander my relationship with Maj Murphy, and the difference in our genders, was primary reason anyone would have taken note of our friendship. There is nothing in the CDI report that demonstrates anything that should be viewed as inappropriate. During a TDY to Nellis a few summers ago Capt Murphy (at the time) and 1LT Fredrick went almost everywhere together. They ate together, rode in the car together, went out together, and this was often just the two of them. No one ever questioned the nature of their relationship. My proximity to Maj Murphy in Guam was not nearly as frequent. To not grant Maj Murphy and myself the same respect as Lt Fredrick and Capt Murphy were granted is objectively discriminatory. Adult people have the right to pick their friends and confidants without being slandered, harassed, or investigated.

21.    Even if this was a group perception it is a discriminatory one. I will address the bigoted nature of these types of perceptions, based purely on the association of two people of mixed gender, in another attachment, but regardless of the size of the perception it is unlawful to expect the victims of this type of perception to mitigate the perception or be coerced to alter their behavior because of them. To do so is gender discrimination, a violation of the free exercise of religion (or lack thereof), and harassment.

22.    Almost as disturbing as the overt gender discrimination exhibited by the IO and possibly other members, is the imposition of judgment on my relationship with my significant other by the IO. The presumption by the IO that he has the right to judge the

Atch 2

interactions between myself and my partner or her demeanor, and then recommend administrative action against me based upon it is one of the most disrespectful things I have experienced in my 17-year career. He states "the period of time that seemed the most odd was when Lt Col Torrence's wife, Melissa, came to visit him in Guam. There were numerous times where Melissa sat alone with other unit members and was later joined by Lt Col Torrence and Maj Murphy. Melissa was said to be visibly upset any time she was around Lt Col Torrence and Maj Murphy." Aside from the offensiveness of the IO's judgment on my personal relationship, and in a complete vacuum of knowledge of her emotional wellbeing due to entirely different contexts, it is a ridiculous misinterpretation of events and I am more than a little infuriated that I am forced to divulge intimate details about the emotions of my partner to defend myself. Regardless, the times Melissa was alone were times I was working. The IO is using the fact that I was not AWOL as evidence against me in a CDI. This is entirely inappropriate. When Melissa arrived, I was not on vacation but on a working deployment. I continued to work after she arrived which meant she spent some time alone. This is in no way indicative of an inappropriate relationship with Maj Murphy. In fact, it has absolutely nothing to do with Maj Murphy. I cannot even make a rational bridge between these two things for the IO to stumble across. The only relationship between Maj Murphy and this fact is that she was kind enough to use the intel car to give me a ride back to the hotel on a few occasions, to spend time with Melissa, when the pilot vehicles were not available. Additionally, there was never a time when Maj Murphy and I joined Melissa when she was alone. There were a few times when Melissa and I joined Maj Murphy for food and drink or when Maj Murphy joined us with a group of people.

23.    The proclamation that Melissa was visibly upset around Maj Murphy is also ridiculous. We both enjoyed Maj Murphy's company and went out together with her and others on several occasions. The only time Melissa was upset around Maj Murphy was after Maj Murphy, somewhat unwittingly, told her about Maj Doughty's habit of spending copious amounts of money at gentlemen's clubs. Maj Doughty was standing behind Melissa shortly after Maj Murphy made this revelation and Melissa was upset enough that she changed her mind temporarily about going out with the group that evening. Eventually she got over it, but Maj Doughty witnessed her being upset and attempted to use this as evidence of something inappropriate about my relationship with Maj Murphy when I addressed him on the night of 7 Feb. The irony of Maj Doughy's misinterpretation of events would be humorous if it was not leading to punitive action, and is unfortunately indicative of the "standard of evidence" being considered legitimate in this CDI.

24.    In Atch 5 para. 36. describes what was in fact a verbal assault on Maj Murphy as "counseling" by Maj Doughty. This altercation occurred in the early morning hours of 5 Feb at an afterhours club when Maj Doughty managed to corner Maj Murphy and make threats against her career and personal life based on my association with her. I was witness to this event via distraught text messages sent to me periodically throughout the altercation from Maj Murphy and Lt Col Veal. Fortunately, I knew Lt Col Veal was at the same venue and within sight of Maj Doughty and Maj Murphy so I did not feel I needed to go to the establishment to make sure Maj Murphy was physically safe. The altercation constituted coercion and harassment by Maj Doughty on Maj Murphy and likely warrants

investigation. The "emotional talk" referenced by Maj Doughty here is the interaction on 20 Jan with Lt Col Lewis at Shamrocks I referenced earlier. Maj Doughty claims his "talk" with Maj Murphy was a reaction to that interaction, but it was 15 days after the interaction, just before the end of the deployment. This is disingenuous. As is the trend in Maj Doughty's testimony, he projects his manufactured perception onto the group at large and attempts to control Maj Murphy with it. This conversation was entirely self-serving on Maj Doughty's part, knowing he had publicly sexually harassed Maj Murphy throughout the deployment, touched her inappropriately and sexually pursued her, he was threatening her out of frustration and coercing her to make clear that any derogatory remarks made against him would be met with vengeance. Maj Doughty's assertion that there was something wrong with my relationship with my significant other is offensive, and something Maj Doughty would have no knowledge of. It is simply fabricated.

25.    Atch 5 para. 37. is a narrative where Maj Doughty encourages Maj Murphy to abandon her peer who had asked her for personal advice in favor of worrying about prejudice perception he had be architecting. This is dangerous advice, which the IO apparently swallows whole. His directly telling her that he would seek to ruin her military career absolutely contradicts the IO's assertion that he was not trying to get her in trouble. The nature of this assertion left such emotional impact on Maj Murphy that she still brings it up frequently today and it has made her concerned for her own safety in the presence of Maj Doughty. The quote she used to describe his threats against her career were similar to [I will fucking destroy you!] and [When I'm done with you, your career will be the last thing you have to worry about!] I think this clearly shows lack of positive intent on Maj Doughty's part, negates the rest of his testimony, and warrants investigation for harassment. Maj Doughty acting as the Squadron's Sharia Police is inappropriate in any context but especially so given his own character. It is overt harassment. The entire conversation was a desperate attempt to separate Maj Murphy from her support network and the other officer she had chosen to lean on, as the sole female in a hostile social and work environment, created primarily by Maj Doughty. The IO's suggestion that this was a form of counseling is terrifying.

26.    Atch 5 para. 38. also misrepresents facts. I required Maj Doughty to have a conversation with me about his threats to Maj Murphy and the allegations he was professing. This is the only reason he addressed me about it. At no point did he approach me or act oddly in my presence until I confronted him. This is clear evidence of his preoccupation with Maj Murphy for self-serving reasons, as I worked and flew with Maj Doughty much more frequently than Maj Murphy and feel as I would have been his natural avenue to effect anything he thought was actually inappropriate. This was an attempt to mitigate the perception that Maj Doughty claimed to have, and address my concern with his hostile acts toward Maj Murphy. I also encouraged him to make amends with Maj Murphy and let him know that she felt so threatened by him that she had started documenting some of his behaviors. I knew from a few confidential conversations with Maj Murphy throughout the deployment that Maj Doughty had touched her inappropriately and pursued her at times. I did not divulge this to Maj Doughty but simply suggested that he disarm the situation through kindness. The worry I expressed to Maj Doughty was not about damage to the squadron but about damage to his own career.

27.    Lt Col Veal, Maj Murphy, and I had spent a good part of the day prior to this conferring over how to best deal with Maj Doughty's hostility, harassment, and accusations. We agreed that if Maj Doughty was not courageous to directly confront me with his allegations that I should approach him that evening before the group left Guam the next day. This is what I did and was an overt attempt to stop his hostility and mitigate the perception he was attempting to manufacture. The conversation took place on the evening of 7 Feb.

28.    Atch 5 para. 39. is somewhat consistent with my recollection of events with some minor disparities. I believe Maj Doughty was not worried about twisted words but documentation of actual incriminating facts. Maj Doughty's examples of things that might be misconstrued as inappropriate were illustrations such as his elevator example I highlighted earlier, or having ridden to work in the same car on a few occasions. None of these examples pointed to anything inappropriate more than they pointed to a healthy relationship between two officers. When among a non-gender discriminatory group, it would have been impossible for these events to be viewed as inappropriate. I explained this to Maj Doughty but he was not interested in any discussion on the matter as he had his own motives for his allegations. I do not recall Maj Doughty ever making an apology to Maj Murphy but I was not there for a portion of the conversation when Maj Doughty and Maj Murphy were alone. At the end of the meeting I still felt as if the only person who was truly worried about my relationship with Maj Murphy was Maj Doughty and I had made every attempt, outside of being coerced to abandon a fellow officer and friend, to mitigate his perception, now that I finally knew who the offended party was. This conversation ended on the early morning of 8 Feb an hour before the group departed Guam.

29.    Atch 5 para. 40. States that Lt Col Lewis suggested Maj Murphy and I "knock off" any behavior that might be perceived by others to show a relationship. This never happened. Again, the advice I recall was "if you aren't doing anything wrong keep doing what you are doing." Suggesting two peers should not to have a close relationship simply because of gender differences would have been ridiculous. Strong healthy relationships between all members should be encouraged regardless of gender, race, sexuality, gender identity, or religion. This culture of trust among members is exactly what is broken in this organization. At no time, until this CDI began, was I given any suggestion to alter my relationship with Maj Murphy. Had this happened, I would have highlighted the blatant gender discriminatory and religious freedom MEO implications of such a suggestion to that individual and attempted to rectify their perception. I have never been shy about these types of conversations.

30.    Atch 5 41., 42., and 43. Have nothing to do with the CDI allegations and are a clear example of Maj Doughty's will do disparage Maj Murphy voluntarily. This is quite the opposite of the IO's assertion that Maj Doughty is looking out for Maj Murphy's best interests. There is no reason he should have brought up these events aside from an attempt to damage her reputation and credibility. I will not comment on the validity of Atch para. 41. & 42. As I did not witness them, but I did witness a lot of aggression by Maj Doughty towards Maj Murphy via group text over the period surrounding Atch 5 para. 42.

Atch 2

069

31.    Atch 5 para 43. is grossly misrepresented or a false statement. I witnessed this event. I do not believe there were any enlisted members there. There was a dancer that attempted to pull down Maj Murphy's dress top. She immediately stopped the dancer by crossing her arms over her chest and did not allow the dancer to continue to touch her. Maj Doughty rejoiced at this event throughout the rest of the TDY and nicknamed Maj Murphy's nipples "Chis' Nips." He continued to use this phrase jovially among the pilots in front of Maj Murphy. At one-point Maj Murphy confided in me that it embarrassed her but she did not want to cause trouble or make a big deal out of it. I am fairly certain Maj Doughty funded the dancer's activities.

32.    Additionally, during this same event. Maj Doughty got on stage and a stripper pulled his pants down and paddled him with a belt. His failure to recognize his own actions as poor judgment, but pointing out Maj Murphy's actions as egregious, is embarrassingly sexist and hypocritical. That alone should be enough to discount the rest of his testimony. To be clear, at no point during the TDY did I spend money on anything besides drinks or get on stage at a gentlemen's club.

33.    The second gentlemen's club event (27 Jan) described here was of Maj Doughty's design and is an absolute misrepresentation of the events. Maj Doughty was the instigator in this event and actually took Maj Murphy to the gentlemen's club from the Irish pub where most of the squadron was socializing. I entered the same club a while later after socializing at a bar in the same building. I noticed one of the dancers pull Maj Murphy onto the stage for a moment and paddle her. This was benign. Several men in the group had this same action taken on them on this occasion and during other occasions during the TDY, to include Maj Doughty.  She was sitting next to Maj Doughty before and after this encounter. Due to what had happed on the other occasion Maj Murphy was approached by a dancer this made me unconformable. I returned to the bar next door to retrieve my credit card, with the intent to come back and escort Maj Murphy out of the club. Unfortunately, this took slightly longer than I anticipated. When I returned Maj Murphy had been pulled back up on the stage by a dancer. She was still fully clothed. The dancer did assume a "69" type of position for a moment. It did not appear that there was any actual intimate physical contact but I was not near the stage at this point. This obviously worried me and I paced near the bar for a moment trying to think of a graceful way to extricate her from the stage. Before I could act, and in fairly short order, the dancer pulled Maj Murphy's dress up over her head and removed her bra and underwear. This in no way appear consensual to me and did not occur voluntarily, the way it was depicted by Maj Doughty. Maj Murphy fairly quickly pulled her dress down and quickly hurried off the stage, obviously embarrassed and sat next to Maj Doughty again. I immediately went over to Maj Murphy and asked her if she was okay. She said "That was bad huh?" I confirmed that it was unfortunate and told her she needed to leave. She said she did not want to act like it was a big deal and make things more even more dramatic. I let her sit there for a moment and then insisted she leave. After she left the dance club she revealed to me that Maj Doughty had "grabbed my ass and ran his hand up my thigh" as she exited the stage and that Maj Doughty had instigate the event.  I asked if she was ok and she said she didn't want to get anyone in trouble. She also said he stopped after she pushed his hand away.

34.     She did not rejoin multiple other pilots. The IO's implication that they were "male pilots" is irrelevant and show prejudice toward females' interactions with males. Maj Doughty was the only other pilot she sat next to after leaving this stage until I sat down to see if she was ok.

35.     I obviously wish I had not worried about being graceful and had just pulled Maj Murphy off of the stage immediately. That I did not act more quickly is regretful. What, embarrassingly, caused my brief hesitation, was my worry of furthering the individual's perception that Lt Col Lewis had mentioned on 21 Jan. I did not want to seem concerned when no one else was. In that moment I was weak and worried about bigoted perceptions and it caused me to make the wrong decision. This CDI reinforces those worries and further endangers members. In retrospect, had I acted faster, it would likely have further enraged Maj Doughty, as he was the one who encouraged Maj Murphy to get on stage. If I had done this his testimony and assaults on Maj Murphy would likely have been even more hostile and this CDI would have been even further "substantiated" by his hostile testimony.

36.     This is exactly the reason this CDI is misguided and prejudice. It discourages wingman-ship between men and women. Makes them afraid to rely on each other in difficult situations for fear of perception and subsequent professional retribution. These finding are grossly misguided and endanger every Airmen in this organization by incentivizing discriminatory retribution and discouraging Airmen from supporting each other, regardless of the perception it may create among members who do not understand the concept of equality and mutual support for all Airman regardless of sex, sexual identity, sexual preference, race, religion, or closely held values.

37.     The day after this event Maj Doughty made several comments similar to "I had so much fun last night" and even invented an alternative history "before Chi got naked at the strip club and after Chi got naked at the strip club." He also continued to make comments about "Chi's nips" and compared Maj Murphy's vagina to the glowing briefcase from the movie "Pulp Fiction." These comments were made in front of Maj Murphy in the presence of other squadron members. I made a few comments about how I thought we let Maj Murphy down but did not push too hard again, shamefully, for fear of perception. When I made the comment that we let her down to Maj Doughty, he became very hostile and insisted that she was an adult and was solely responsible for what happened.

38.     This CDI and its fixation on perceptions of a sexist few, trumping concern over sending the wrong message about wingman-ship, is upsetting and shows negligent disregard for what actually causes a breakdown in good order and discipline and safety. Discouraging airman from building strong defensive relationships due to their differences is an abomination against AFI 1-1 para. 2.5 Wingman Concept.

39.     Additionally, in this paragraph, Maj Doughty's second hand account of an encounter Maj Murphy had with another female is entirely misconstrued. The female in question was the aggressor and Maj Murphy dissuaded the other woman's attempts at sexual pursuit. At no point during the encounter did she "make out" with the other

female. The IO referral to the other female as "the lesbian" is fairly derogatory and presumptuous.

40.    Atch 5 para. 45. highlights the IO's fixation on demonizing normal behavior simply because of gender differences, as well as AFSC discrimination. I commonly have lunch with whomever is in the Heritage room, which at times is Maj Murphy. Additionally, as mentioned earlier, Maj Murphy has frequently listened to my IPUG practice briefs. I find that her familiarity with the mission, but limited exposure makes her a good gauge of brief quality and coherency. Additionally, she becomes a lot more familiar with F-16 tactics and procedures. I believe this is especially valuable, given she has mentioned to me that she feels much more detached from the operational side of F-16 mission then she did supporting other MDSs. The morning Maj Doughty mentions here was immediately prior to a BFM IPUG upgrade with Maj Doughty. Maj Murphy came in early to act as an audience. Seeing no reason to include outside AFSCs in all mission sets is somewhat narrowminded and discriminatory. I followed up my practice briefing with Maj Murphy with another practice brief to Maj Doughty, as our flight that morning was canceled. This seems a perfectly professional interaction and implying it is inappropriate discourages inter AFSC cooperation and learning. Lt Col Wilson has actually expressed to me that the cross-AFSC relationship in this organization is so poor that he advises his troops to stay away from pilots because nothing good will happen. While I appreciate his pragmatic approach to safeguarding his Airman, this advice from a commander is highly indicative of a broken organization, which this CDI and LOR tears further apart.

41.    The supposition made in Atch 5 paras 49. And 50. Maj Doughty's did pursue and harass Maj Murphy, it is clearly evident and resulted in an OSI investigation. His testimony itself is evidence that he was not trying to keep Maj Murphy out of trouble, and was only interested in furthering his harassment of her and his assault in his career. Maj Doughty did go to leadership making the entire line of logic here a misrepresentation of testimony. While Maj Doughty did want to force the alienation of Maj Murphy, it was for entirely self-serving reasons, not out of professional or moral offence. The Maj Doughty's testimony and the IO's inference should both be discounted.

42.    In Atch 5 para. 51. Maj Doughty tries to square threatening to "destroy" someone with talking to them as a friend "at the bro level," and looking out for the best interest of the unit. This is an overt threat on another officer and in no way, can be viewed as constructive or appropriate. Maj Doughty has attempted to follow up on this threat during the course of this CDI by providing as much derogatory testimony as possible against Maj Murphy, even when it had no bearing on the allegations. His testimony as evidenced by this CDI report, is not objective. It is inaccurate, prejudice, and provided with a motive. His hostile intent towards Maj Murphy is evidenced by his testimony itself.

43.    In Atch 5 para. 52. the IO fails to present any actual evidence beyond suspicions on Maj Doughty's part.

44.    In Atch 5 para. 54. The credibility of the two primary witnesses (Maj Doughty and Capt Richards) is vitally jeopardized and should negate their testimony. Even in the absence of this, the weight of the evidence is against an inappropriate relationship

quantified by no less than six, and possibly eight, witnesses stating that they did not believe or observe that there was anything inappropriate about the relationship.

45.    In Atch 5 para. 55. The IO states "The credible testimony of Lt Col Lewis alone was enough to substantiate the allegation of an inappropriate relationship." At no point in the CDI report is Lt Col Lewis claimed to have directly stated he thought there was anything inappropriate about the relationship. If he had, I would presume he would not have been reluctant to take further action. Lt Col Lewis was very frequently present during my interactions with Maj Murphy and he has never alluded to me that he thought they were inappropriate or suggested they should be curtailed. I believe this is a misrepresentation of his testimony to enable the IO's will to find guilt. The "substantiation" is largely based on the IO's own testimony.

46.    In Atch 5 para. 57. The IO states "neither party acknowledged the counsel of the Guam deployment's Deputy Commander (Lt Col Lewis) who clearly told them about the appearance of an unprofessional relationship early in the deployment." This is absolutely inaccurate. Lt Col Lewis never stated that there was an appearance of an inappropriate relationship. He simply informed me that an individual was attempting to spread that perception and would not give me the name of the individual. He stated that "if you aren't doing anything wrong then keep dong what you are doing." He never recommended that we change our behavior. If he had thought there was actually an inappropriate relationship this would have been evidenced by him asking us to curtail the inappropriate behavior. The fact that he did not, is evidence against substantiation. The IO goes on to state "Additionally, others in the unit began spreading rumors based on their observations further eroding good order and discipline," but fails to recognize that the erosion of good order and discipline is being carried out by those spreading prejudice rumors, largely Maj Doughty. It is this discriminatory propagation of perceptions, especially by those with self-serving interests that can "destroy families."

**Attachment 3: MEO Implications**

1.    The punitive nature of this sanction is discriminatory and in violation of, or discouraging of adherence to DODD 1350.2 paras. 4.2, 4.3.,4.6., 4.7., AFI 1-1 paras. 1.8., 2.1., 2.5., 2.11., 2.11.2., 2.12., 3.3., AFI 36-2706_AFGM2017-01 paras 1.1.1., 1.2.1., 1.2.2., ANGI 36-7 paras. 4.2.3., 4.3.1., 4.3.2., National Military Strategy 2015 pg. 14, DoD Diversity and Inclusion Strategic Plan 2012-2017.

2.    I am an atheist and Secular Humanist. This is well known among my peers. As such I do not hold the traditional Abrahamic values regarding segregation of men and women based purely on gender, or based on gender and matrimonial status[1] as explicitly stated in Jewish[2] and Muslim[3] texts and implied by the preoccupation of avoiding lust in the Christian Bible[4]. To the contrary I believe strongly that men and women should treat each other as absolute equals in the workplace and in personal matters. This focus on equality should supersede personal apprehension about working or socializing with the opposite sex and the perceptions of others on such matters. The only exceptions are to honor the beliefs and privacy of the counterparty involved in a relationship, IE a person cannot force another to engage in a relationship of a nature they do not desire, nor can a person deny a request for privacy based on gender or other characteristic of the person requesting that privacy. There are some public places where that request for privacy is implied. For example, public restrooms and locker-rooms, where segregation based on gender identity is required to honor that implied privacy. I strongly believe it is shameful to shy away from professional and personal relationships with members of the opposite sex because of the gender difference, just as it is shameful to shy away from a relationship based on race, national origin, religion, physical disability, gender identity, or sexual preference.

3.    I am not one to play the discrimination card and have never before felt compelled to do so, but I am going to here because the level of discrimination displayed in this administrative action is extreme. This is the first time in over 41 years of life that I feel I have been discriminated against for my own firmly held beliefs, and worse yet, my refusal to discriminate against others, in this case women.

4.    The LOR I am rebutting was issued for the "perception of an inappropriate relationship." I strongly assert that this perception is based on displayed characteristics that among two men or two women, married or not, would have never caused a perception of inappropriateness. In an organization free of explicit, implicit, and organizational biases this perception would never exist. As such, the perception itself, if it truly prolific, is gender discriminatory and also prejudice along the lines of closely held values relating to what constitutes an appropriate relationship between men and women. It is no different than forcing members of a minority race to avoid too much social contact with each other because the group does not trust members of that race not to commit nefarious acts when together.

5.    It is also discriminatory along lines of strongly held beliefs about what constitutes an appropriate relationship between married people. The CDI was very much focused on

behavior within the context of matrimonial status. The appropriateness of behavior in this context is also very much based a personal closely held values which cannot be forced on another individual through administrative action. While some people may believe that two married people of opposite gender should not regularly ride in a car or elevator, be in the same crowd at dinner or have dinner alone together, lean on each other for emotional support, ask each other for advice, or any other of the behaviors explicitly mentioned in this CDI, I do not believe these things. I am not obligated to believe these things or conduct myself in a way to pacify others who are distressed by these behaviors. The right to conduct oneself in accordance with ones' own values is protected under free exercise of religion. Expecting or forcing the victim of a prejudiced perception to mitigate that perception, especially by alteration of behavior is unlawful and not in accordance with DoD or AFI guidance as illustrated below.

6.    DODD 1350.2 states "4.2... It is DoD policy to: ... Promote an environment free from personal, social, or institutional barriers ... Unlawful discrimination against persons or groups based on race, color, religion, sex, or national origin is contrary to good order and discipline... Unlawful discrimination shall not be condoned." I have illustrated above how this CDI and resultant LOR is discriminatory in regard to my freedom of "E2.1.13. religion [or] personal set ... of attitudes, moral or ethical beliefs, and practices."

7.    "4.3. The chain of command is the primary and preferred channel for identifying and correcting discriminatory practices." In this case the chain of command is supporting the discriminatory practices.

8.    "4.6. ... Provide for an environment that is free from unlawful discrimination and sexual harassment." This LOR acts as a mechanism for the execution of Maj Doughty's proliferation of discriminatory perceptions and supports his habitual sexual harassment of Maj Murphy acting punitively against a member whom she came to for protection and support.

9.    "4.7. Ensure that all on-base activities and, to the extent of the ability of the Department of Defense, any off-base activities available to military personnel are open to all military personnel and their family members regardless of race, color, religion, age, physical or mental disability, sex, or national origin." This administrative action encourages alienation of the Maj Murphy based on her gender, since she and I being in the same place at the same time is deemed "inappropriate.

10.    AFI 1-1 states the following "1.8 Diversity. Diversity is a military necessity." This administrative action encourages uniformity in social and professional interactions a with respect to AFSC and gender. It discourages diversity.

11.    "2.1 ... Each Airman is entitled to fair, scrupulous, and unbiased treatment, and each Airman has the obligation to care for, teach, and lead others." This administrative action is itself biased and discourages caring for airmen that are not the same gender.

12.    "2.5. Wingmen. Airmen at all levels of command have a role as wingmen. The Air Force culture is centered on the idea that a wingman will always safeguard his or her

Atch 3

lead, and it adheres to the belief that a lead never lets his or her wingman stray into danger. All Airmen are encouraged to be good wingmen. Being a good wingman means taking care of fellow Airmen— and taking action when signs of trouble are observed, especially in situations where Airmen appear as if they are about to make a poor decision, are in despair or show signs of hurting." This sanction discourages wingman concept between men and women. This is especially dangerous in light of the fact that Maj Murphy was the only female officer from the 113OG in Guam. The idea that she should be segregated is alienation.

13.    "2.11. Free Exercise of Religion and Religious Accommodation. Every Airman is free to practice the religion of their choice or subscribe to no religious belief at all. You should confidently practice your own beliefs while respecting others whose viewpoints differ from your own. Every Airman also has the right to individual expressions of sincerely held beliefs, to AFI1-1 7 AUGUST 2012 19 include conscience, moral principles or religious beliefs, unless those expressions would have an adverse impact on military readiness, unit cohesion, good order, discipline." "2.11.2. If it is necessary to deny free exercise of religion or an accommodation request, the decision must be based on the facts presented, must directly relate to the compelling government interest of military readiness, unit cohesion, good order, discipline, health and safety, or mission accomplishment, and must be by the least restrictive means necessary to avoid the cited adverse impact." This sanction is levied against me for confidently practicing my own beliefs. Using "unit cohesion" or "good order and discipline" as justification of administrative action here is the same prejudiced historical camouflage used to justify denial of military opportunities to women, minorities, transgender people, and homosexuals.

14.    "2.12. ... Leaders at all levels must balance constitutional protections for their own free exercise of religion, including individual expressions of religious beliefs, and the constitutional prohibition against governmental establishment of religion. They must ensure their words and actions cannot reasonably be construed to be officially endorsing or disapproving of, or extending preferential treatment for any faith, belief, or absence of belief." I feel strongly that this LOR is disapproving of my belief that I should treat women with the same regard as men in social interactions and choose to confide in and spend time with whom I wish regardless of gender.

15.    "3.3. ... close friendships between men and women are subject to the same policy considerations as are other relationships." Had my relationship been a close friendship with another male, there would be nothing to write a rebuttal about.

16.    AFI36-2706_AFGM2017-01 states the following "1.2.1. ... Unlawful harassment also includes creating an intimidating, hostile working environment" and "1.2.2. Commanders and supervisors at every level should take steps to prevent sexual harassment from occurring." Forcing the alienation of a female who is being sexually harassed is not a preventative measure for sexual harassment and encourages a hostile workplace.

17.    This administrative action violates ANGI 36-7 paras. 4.2.3., 4.3.1., 4.3.2., National Military Strategy 2015 pg. 14, DoD Diversity and Inclusion Strategic Plan 2012-2017 for similar reasons to its violation of the above guidance and regulations.

[1]**Humanism – Humanist Manifesto II** – Eleventh Principle: The principle of moral equality must be furthered through elimination of all discrimination based upon race, religion, sex, age, or national origin.

[2]**Jewish - Shulchan Aruch: EH 22:1-2** - It is forbidden to be secluded with a person with whom sexual relations are forbidden, whether elderly or young. This action leads to uncovering of nakedness.

[3]**Sunni Muslim - Saheeh Muslim** - Never is a man alone with a woman except that Satan is the third party with them.

[4]**Christian – Bible: Matthew 5:28** - But I say unto you, That whosoever looketh on a woman to lust after her hath committed adultery with her already in his heart.

[4]**Christian – Bible: James 1:14-15**– But every man is tempted, when he is drawn away of his own lust, and enticed. [15] Then when lust hath conceived, it bringeth forth sin: and sin, when it is finished, bringeth forth death.

[4]**Christian – Bible: Matthew 5:28** – Dearly beloved, I beseech you as strangers and pilgrims, abstain from fleshly lusts, which war against the soul

**Attachment 4: CDI Guide Departures**

1.    The CDI was not conducted IAW the CDI Guide paras 3.3., 5.1.2.3., 5.1.2.3.2., 5.1.2.3.3., 5.1.2.3.5., 6.1.3., 6.1.4.1.3., 6.1.4.1.4., or 6.1.4.1.5.

2.    The CDI was not IAW *The CDI Guide* para 3.3 in that the IO was not "unhampered by ... separation and retirement. He retired or went on terminal leave within days of the CDI completion. Additionally, and perhaps most disturbingly the IO was not selected to provide a "fair and impartial investigation." In fact he mentions on several occasions how his familiarity with the complainant causes him to lend credibility to the complainant's testimony. He does this in statements like "I have known Capt Richards a long time and do not find his behavior suspicious" and "Capt Richards is a very detail oriented person. He would never have brought the OPR issue to my attention had it been the central impetus behind him looking for an opportunity to catch Lt Torrence and Maj Murphy in a compromising position." This clearly indicates extreme familiarity between the IO and complainant and a clearly inappropriate relationship between the IO and complainant with regard to the investigation. This calls for the retraction of this administrative action.

3.    The CDI was not conducted IAW *The CDI Guide* paras. 5.1.2.3., 5.1.2.3.2., 5.1.2.3.3., and 5.1.2.3.5. The IO fails to acknowledge clear motive among the witnesses and complainant and does not "determine or recognize...the basis for witness opinion." This is discussed at length in Attachment 2 and 3. The IO bases his substantiation primarily on the testimony of Maj Doughty and does not "find the source of second-hand information." The IO asserts a conclusion of an inappropriate relationship, without any direct evidence or properly evaluated circumstantial evidence to back up his claim. These requirements are laid out in the CDI paragraphs referenced above.

4.    The CDI report was written IAW *The CDI Guide* paras. 6.1.3., 6.1.4.1.3., or 6.1.4.1.4. The IO does not "present both sides of the case" or present the facts that do not "support his ultimate conclusion." He never addresses why he disregards the majority of the witnesses' testimony that there was nothing inappropriate about my relationship with Maj Murphy. Additionally the IO never explicitly states what actions were in violation of AFI 1-1 or AFI 36-2909. He incorrectly states that I did not acknowledge the council Lt Col Lewis; however, Lt Col Lewis never advised me that he thought anything was inappropriate or should be curtailed. If he thought there was something inappropriate I would assume he would have given such advice and likely documented it. Also, as illustrated in attachments 2 and 3 the IO does not put together an argument for his conclusion that can be followed by an analytical reader. He relies on the few witnesses who claimed a perception of something inappropriate, and fails to assess their credibility, or corroborate and circumstantial evidence with other witnesses, or clarify contradictions from other witnesses.

**Attachment 5: Numbered CDI Report**
**Findings, Analysis and Conclusions:**

1. **Allegation 1**: On 4 May 2017, in the vault of building 3029, Joint Base Andrews, did Lt Col SUBJECT1, a married man, and Maj SUBJECT2, a married woman, wrongfully have sexual intercourse, to the prejudice of good order and discipline within the armed forces and of a nature to bring discredit upon the armed forces of the united states?

**Facts for Allegation 1:**

2. On 4 May 2017 around 1900L, COMPLAINANT testified to entering the intelligence (intel) vault located in Bldg 3029, Joint Base Andrews MD [Tab F-1, pp 2-7 of 7]. When he walked in, he did not see anyone inside the vault and thought the vault might be unoccupied which could be a security violation. He shouted, "Hello" and began looking in the various rooms in the vault. No one answered his initial shout but as he attempted to push open the door to the intelligence office in the vault, he found it blocked and then pushed closed against him. He then heard Maj SUBJECT2's voice inside the room say, "Just a minute." He stepped away from the door but was worried Maj SUBJECT2 may be under duress. When Maj SUBJECT2 came out of the intelligence office a few minutes later, he stated that the lights in the room were turned off (evidenced by no light coming from the crack in the door as it opened) and that she barely opened the door and squeezed herself through as if not wanting anyone to see inside that room.

3. She came out and asked what COMPLAINANT wanted. COMPLAINANT said he needed to talk about TSgt XXXXX, who had been in some administrative trouble earlier in the day. Maj SUBJECT2 then looked relieved and pulled COMPLAINANT by the shirt sleeve outside the vault to SMSgt XXXXXX office down the hall. As she sat down in SMSgt Scott's office, COMPLAINANT testified that she was visibly distraught, having a hard time controlling her breathing, leaned her head down on the table like she was trying to regain control of her emotions, and brought her hands over her eyes and then slid them down her face as she gathered her thoughts. COMPLAINANT also noticed a thin line of moisture by her lip that seemed to glisten [Tab F-1, p. 2 of 7, p. 5 of 7 and Tab G-2 for a rough sketch showing this area on her face]. He did not ask her about the moisture. Instead, they talked about TSgt Landis and agreed on some administrative action for his earlier insubordinate behavior.

4. COMPLAINANT thought it strange that she agreed with COMPLAINANT's suggested punishment, which was rather harsh, without even a discussion. At this point, Maj SUBJECT2 excused herself to go to the restroom and COMPLAINANT went into the old command post vault where he found SrA WITNESS4 working on one of the computers. He gave SrA WITNESS4 a "confidential order" to observe and report to him the next person to leave the intel vault. COMPLAINANT then returned to speak with Maj SUBJECT2. At this point, SrA WITNESS4 left the command post vault and enter the intel vault to see who was inside. In the back right

briefing room of the vault, SrA WITNESS4 found Lt Col SUBJECT1 sitting alone and working on his upcoming instructor pilot upgrade sortie. SrA WITNESS4 left the intel vault, reported his finding to COMPLAINANT, and returned to working inside the old command post vault.

5. I found the testimony of COMPLAINANT to be straight forward and exceedingly thorough. Throughout this investigation and in the events related to this investigation, COMPLAINANT exhibited some concerning behavior. Command should consider options to address this behavior to include professional mental health services.

6. In our initial meeting, toward the end of the interview, COMPLAINANT produced a copy of his most recent Officer Performance Report (OPR) and showed me how his rater (Maj SUBJECT2) had changed several of the bullets provided on a Form 77 from his supervisor at Cyber Command to reduce their impact [Tab G-4-3]. He also told me that Maj SUBJECT2 became his rater near the end of his rating period. He stated that he did not know who his previous rater was and he had not received any initial or mid-term feedback prior to the OPR. The OPR did not contain derogatory information and I did not perceive that COMPLAINANT would make an allegation of Maj SUBJECT2 having an inappropriate relationship as any kind of retribution for the OPR. Additionally, in our final meeting to obtain COMPLAINANT's signed testimony, he presented even more evidence regarding grievances he had with his OPR. He stressed to me that he was not seeking to change his OPR, he just thought it was unprofessional how Maj SUBJECT2 handled it. To me, this was further evidence that COMPLAINANT did NOT fabricate an allegation as retribution for his OPR. COMPLAINANT is a very detail oriented person. He would never have brought the OPR issue to my attention had it been the central impetus behind him looking for an opportunity to catch Lt Col SUBJECT1 and Maj SUBJECT2 in a compromising position.

7. However, there are no direct witnesses to any sexual act or inappropriate relationship occurring in the vault that night. Although the circumstantial evidence was strong, I could not find a preponderance of evidence showing that Lt Col SUBJECT1, a married man, and Maj SUBJECT2, a married woman, wrongfully had sexual intercourse on the evening of 4 May 2017 in the intel vault of Bldg 3029.

**Applicable Rules for Allegation 1:**

8. UCMJ Articles 92, 133, and 134 could apply to a case of alleged adultery. However, at the time this incident was alleged to have occurred, both Lt Col SUBJECT1 and Maj SUBJECT2 were Active Guard and Reserve (AGR) members in a Title 32 status in the District of Columbia Air National Guard. As such, they are not subject to the UCMJ nor is there District code that reflects provisions similar to the UCMJ as in most other states. Instead, Lt Col SUBJECT1 and Maj SUBJECT2 are accused of violating AFI 1-1, paragraphs 2.2.1, 2.2.2, and 2.3.6 and AFI 36-2909 paragraphs 4 and 8 and 8.1.

Atch 5

**Analysis for Allegation 1:**

9. COMPLAINANT entered the intel vault in Bldg 3029 late on a Thursday evening, 4 May 2017 and witnessed what he considered to be odd behavior from Maj SUBJECT2 as she exited the dark intelligence office and later talked with him outside the vault. He saw what he believes to be evidence of sexual activity (semen or saliva) near Maj SUBJECT2's lip. He smelled what he believes to be sexual activity as he walked with Maj SUBJECT2 out of the vault. He was told by SrA WITNESS4, who entered the vault some minutes after Maj SUBJECT2 had exited the vault, and found Lt Col SUBJECT1 sitting alone in the vault. COMPLAINANT saw evidence of what he considers extreme emotional stress in Maj SUBJECT2 as he sat and talked with her just outside the vault. This leads COMPLAINANT to suspect that Maj SUBJECT2 was having sex with Lt Col SUBJECT1 when he walked into the vault that evening. He debated with himself whether or not to report this incident to higher authorities and ultimately decided this indeed warranted reporting.

**Conclusion for Allegation 1:**

10. Although I applaud COMPLAINANT for coming forward with this information, I cannot find enough evidence to say for certain Maj SUBJECT2 and Lt Col SUBJECT1 were having sex at the time COMPLAINANT walked into the vault. There is a lot of circumstantial evidence that they might have been having sex but I can easily speculate about any number of events that would cause the same appearance yet be perfectly innocent. Both Lt Col SUBJECT1 and Maj SUBJECT2 declined to answer my questions related to the evening in question on advice from their respective counsels.

11. The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Tab K-6, CDI-Guide, Paragraph 1.4] I simply do not have enough evidence to warrant the claim that sexual activity is more probably than an innocent encounter. I conclude this allegation is **UNSUBSTANTIATED.**

12. **Allegation 2**: Did Lt Col SUBJECT1, a commissioned officer, and Maj SUBJECT2, a commissioned officer, knowingly have an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the united states in violation of AFI 1-1 and AFI 36-2909?

**Facts for Allegation 2:**

Atch 5

13. In the course of investigating the observations made by COMPLAINANT on the evening on 4 May 2017 around 1900 local time [Tab F-1, pp. 2-7 of 7], multiple witnesses came forward to tell me about a long series of events that create a strong appearance that Lt Col SUBJECT1 and Maj SUBJECT2 have been engaged in an unprofessional relationship (at a minimum) that has been prejudicial to good order and discipline and was of a nature to potentially bring discredit upon the armed forces of the united states. The event described by COMPLAINANT on 4 May 2017 is just one of several examples where an inappropriate relationship is apparent.

14. In researching the claim of alleged sexual activity/inappropriate relationship between Lt Col SUBJECT1 and Maj SUBJECT2, I interviewed the following witnesses (in order). Their testimony can be found in the respective binder tab:

15. Tab Witness/Subject
   F-1. COMPLAINANT – Capt Richards
   F-2. Lt Col WITNESS1 – Lt Col Wilson
   F-3. Lt Col WITNESS2 – Lt Col Croker
   F-4. SrA WITNESS4 – SrA Grumbach
   F-5. Lt Col WITNESS5 – Lt Col Lewis
   F-6. MSgt WITNESS6 – MSgt McGee
   F-7. Maj WITNESS7 – Maj Doughty
   F-8. Maj WITNESS8 – Fromuth
   F-9. Maj WITNESS9 – Maj Taylor
   F-10. Col WITNESS10 – Unknown
   F-11. Lt Col SUBJECT1 – Lt Col Torrence
   F-12. Maj SUBJECT2 – Maj Murphy
   F-13. WITNESS11 – Capt Ringgenberg
   F-14. WITNESS12 – Unknown

16. Although COMPLAINANT only provided a detailed observation regarding his encounter with Maj SUBJECT2 in the vault on the evening of 4 May 2017, many of the other witnesses described various aspects of a suspected unprofessional relationship between Maj SUBJECT2 and Lt Col SUBJECT1 that had been witnessed since these individuals deployed to Guam from 22 Dec 2016 through 8 Feb 2017. The allegations included many examples of Maj SUBJECT2 and Lt Col SUBJECT1 being seen together and in situations where an inappropriate relationship seemed possible.

17. I found the testimony of COMPLAINANT [Tab F-1, pp. 2-7 of 7] to be straight forward and exceedingly thorough. Please see my statement in the **Facts** section of **Allegation 1** for further comments related COMPLAINANT.

18. Lt Col WITNESS1's testimony [Tab F-2] was calm and straight forward. He had taken COMPLAINANT's allegations seriously from the beginning and had actually guessed Lt Col SUBJECT1's name before COMPLAINANT even said Lt Col SUBJECT1's name [Tabs F-1, p. 3 of 7; F-2, p. 2 of 8; F-6, p. 2 of 6].

19. Lt Col WITNESS2's testimony [Tab F-3] was unemotional and avoided speculating about events he did not directly witness. He did not believe Lt Col SUBJECT1 and Maj SUBJECT2 were engaged in an inappropriate relationship in Guam or home station. He does not want to speculate on appearances but assumes "positive intent" until proven otherwise.

20. SrA WITNESS4 was very poised and well-spoken during his testimony [Tab F-4]. I could plainly see that he was uncomfortable testifying because he did not want to be caught in the middle of something that might affect his future with the unit. I assured him that his leadership understands how important it is to protect both the accuser, witnesses, and subjects of an investigation and Col Magnell would not allow any retribution due to any testimony in the case. SrA WITNESS4 specifically denied that his girlfriend told him Lt Col SUBJECT1 and Maj SUBJECT2 might be engaged in intimate relations after seeing them together at Maj SUBJECT2's promotion party which was alleged by COMPLAINANT [Tab F-1, p. 2 of 7]. I decided not to invite SrA WITNESS4's girlfriend as a witness as her answer either way would not materially change the outcome of this investigation.

21. Lt Col WITNESS5 was the leader with the most direct contact with Lt Col SUBJECT1 and Maj SUBJECT2 throughout the Guam deployment and after returning to home station. He had been dealing with the appearance of an inappropriate relationship between the two for some time before this investigation was convened. Lt Col WITNESS5's testimony [Tab F-5] seemed honest and straight forward. Lt Col WITNESS5 was the first to speak to both Maj SUBJECT2 and Lt Col SUBJECT1 in Guam because he was seeing indications of an inappropriate relationship [Tab F-5, p. 2 of 5]. Although Lt Col WITNESS5 should be commended for engaging with the individuals early in the deployment, he nonetheless struck me as too reluctant to take action regarding events he was witnessing in Guam. This may have led him to allow this behavior to continue longer than it should have.

22. MSgt WITNESS6 was very matter of fact and credible during our interview [Tab F-6]. He was the first person to hear COMPLAINANT recount his observations from 4 May 2017. MSgt WITNESS6 avoided speculating on things he did not witness. He was very knowledgeable about vault security and fully explained why the badging system was not tracking entry and exit of the vault that evening. He also commented on COMPLAINANT's paranoid behavior [Tab F-6, p. 2 of 4] but was empathetic about his stress and believed his allegations were not fabricated.

23. Maj WITNESS7 had the most comprehensive and direct accounts of all the witnesses called [Tab F-7, pp 2-10 of 10]. I found all of his descriptions to be credible. I called Maj WITNESS7 to testify a second time to answer some follow-up questions I had [Tab F-7, p. 2-5 of 5]. During this interview, I needed to read Maj WITNESS7 his rights because I was going to ask him potentially self-incriminating questions regarding an allegation made against him by Maj SUBJECT2 to both Lt Col WITNESS5 and Maj WITNESS9 [Tabs F-5, p. 3 of 5 and F9, p. 2 of 4 respectively]. Despite being read his rights, he freely answered all questions and

Atch 5

categorically denied ever propositioning Maj SUBJECT2 for sex at any time [Tab F-7, p. 3 of 5]. Maj WITNESS7 presented some testimony regarding a witness seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room late one night [Tab F-7, p. 5 of 10 and Tab F-7 p. 5 of 5] which was contradicted by the witness he named [Tab F-14, p. 2 of 2]. Because these events took place some time ago and no one was writing down any specifics as events happened, it seems reasonable to me that either Maj WITNESS7 or WITNESS12 was mistaken about having made this statement. Maj WITNESS7 was visibly upset toward the end of his first testimony when he expressed his frustration about not being able to help correct some of the ineptitude he sees in the intel shop because his criticism might be seen as retribution now that there is an investigation underway [Tab F-7, p. 9 of 10]. He was also quite upset with Lt Col WITNESS5 for allowing him to fly to the sims recently with Lt Col SUBJECT1 and one other junior squadron member. Maj WITNESS7 said being professional and teaching Lt Col SUBJECT1 as if nothing was going on was one of the most difficult things he has ever done. He believes Lt Col WITNESS5 should not have put him in that position [Tab F-7, p. 10 of 10]. I have no reason to doubt any of Maj WITNESS7's extensive testimony.

24. Maj WITNESS8's interview [Tab F-8] was short and to the point. She did not deploy to Guam and was quite surprised by the nature of my questioning. She had never perceived any inappropriate relationship between Maj SUBJECT2 and anyone else. She said Maj SUBJECT2 had never confided in her about any kind of inappropriate relationship. My gut tells me Maj WITNESS8 was not telling the entire truth regarding Maj SUBJECT2 making unprofessional statements at Red Flag 2016. However, it is possible she simply doesn't remember and I have no evidence that she wasn't being truthful. Her testimony simply conflicts with Maj WITNESS7's on this point [Tab F-7, p. 3 of 10].

25. Maj WITNESS9 provided extremely professional and engaging testimony. Maj SUBJECT2 had told Maj WITNESS9 that Maj WITNESS7 propositioned her for sex early in the Guam deployment [Tab F-9, p. 2 of 4]. As a former Secret Service agent, it was clear that Maj WITNESS9 had a lot of experience with investigations. He directly told Maj SUBJECT2 that her oral description of the events in Guam were too disjointed to be credible. [Tab F-9, p. 2 of 4]. Maj WITNESS9 begged her to write down a full account so he could take action but she failed to provide any further details [Tab F-9, p. 3 of 4]. Maj WITNESS9 expressed grave doubts about COMPLAINANT's allegations due to some outlandish claims he made to MSgt WITNESS6 [Tab F-9, p. 4 of 4]. I understand Maj WITNESS9's reservations about COMPLAINANT but I have known COMPLAINANT a long time and do not find his behavior suspicious. Unless a separate CDI concludes COMPLAINANT made his statement as retribution for some interpersonal issue he was having with Maj SUBJECT2, I believe COMPLAINANT was justified in bringing his observations forward.

26. Col WITNESS10 was only called to testify regarding COMPLAINANT's demeanor during the approximately 1.5 hours COMPLAINANT waited in Col WITNESS10's office and the lobby area of the WG/CC's office the afternoon of 5 May 2017 [Tab

F-10]. Col WITNESS10 also noted COMPLAINANT's paranoia but validated that his established personality gave context to his unease and did not detract from his stated observation [Tab F-10, p. 2 of 2]

27. Lt Col Blue sent Lt Col SUBJECT1's counsel a list of my CDI related questions of him. Lt Col SUBJECT1 indicated through counsel that he would not respond to any of my questions [Tab F-11].

28. Lt Col Blue sent Maj SUBJECT2's counsel a list of my CDI related questions of her. Maj SUBJECT2 indicated through counsel that she would not respond to any of my questions [Tab F-12].

29. WITNESS11 was called to testify based on Maj WITNESS9's suggestion that she and Maj SUBJECT2 were very good friends and Maj SUBJECT2 may have confided the affair to WITNESS11 if it had happened [Testimony given to Col Campbell during Maj WITNESS9's interview but not recorded in his sworn statement.]. WITNESS11 had not been in the DCANG very long but it was clear that she was a seasoned intelligence officer. Her testimony was unemotional and unequivocal [Tab F-13, p.2-3 of 3]. She indicated that Maj SUBJECT2 did not confide any inappropriate relationship to her at any time. WITNESS11 has no reason to suspect there has been an inappropriate relationship with Lt Col SUBJECT1 or anyone else. WITNESS11 and Maj SUBJECT2 worked together in a previous unit and WITNESS11 is aware of no allegations of Maj SUBJECT2 having any inappropriate relationships in her previous unit [Tab F-13, p. 3 of 3].

30. WITNESS12 was called to corroborate Maj WITNESS7's testimony regarding seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room late one night [Tab F-7, p. 5 of 10 and Tab F-7 p. 5 of 5]. He denied seeing Lt Col SUBJECT1 leaving Maj SUBJECT2's room. WITNESS12's testimony was unemotional yet he was surprised there was an investigation going on. He denied perceiving anything unusual about the time Lt Col SUBJECT1 and Maj SUBJECT2 spent together in Guam. He did not think they were engaging in an inappropriate relationship [Tab F-14, p. 2 of 2]. Of note is the fact that WITNESS12 is a Title 10 Active Duty officer assigned to the 121st Fighter Squadron. He falls outside the DCANG chain of command in terms of anything administrative in nature.

**Applicable Rules for Allegation 2:**

31. UCMJ Articles 92, 133, and 134 could apply to a case of alleged adultery. At the time the incident which initiated this investigation occurred, both Lt Col SUBJECT1 and Maj SUBJECT2 were Active Guard and Reserve (AGR) members in a Title 32 status in the District of Columbia Air National Guard. However, testimony from various witnesses introduced evidence of events that happened during the Dec 2016 – Feb 2017 timeframe when both individuals had been participating in an overseas Theater Support Package (TSP) under Title 10 status. As such, they are subject to UCMJ during portions of this investigation and not subject to the UCMJ during

other portions. However, in order to assert any violation of the UCMJ, it might be required to transfer the CDI to the 201st MSS for a Title 10 officer to conduct the investigation. Regardless, when not subject to the UCMJ, the District of Columbia does not have any provisions of their code similar to the UCMJ. During UCMJ and non-UCMJ periods, Lt Col SUBJECT1 and Maj SUBJECT2 are accused of violating AFI 1-1, paragraphs 2.2.1, 2.2.2, and 2.3.6 and AFI 36-2909 paragraphs 4 and 8 and 8.1. During periods of time they are subject to the UCMJ, they are also accused of violating UCMJ Articles 92, 133, and 134.

32. The existence of an extramarital affair is open for debate and not substantiated in this report. However, AFI 36-2909 defines Unprofessional Relationships as:

33. "...those interpersonal relationships that erode good order, discipline, respect for authority, unit cohesion and, ultimately, mission accomplishment." [Tab K-6, AFI36-2909, p. 12]. Further, "Relationships are unprofessional, whether pursued on or off-duty, when they detract from the authority of superiors or..." [Tab K-6, AFI36-2909, p. 13].

34. AFI1-1 states, "Your code of ethics must be such that your behavior and motives do not create even the appearance of impropriety." [Tab K-6, AFI1-1, p. 14].

**Analysis for Allegation 2:**

35. Based on testimony provided, officer and enlisted unit members in Guam began noticing Lt Col SUBJECT1 and Maj SUBJECT2 spending a good deal of time together early in the deployment [Tab F-5, p. 2 of 5; Tab F-7, p. 2 of 10 and p. 5 of 10; Tab F-14, p. 2 of 2]. At first, people did not think much of it. However, over time, people started to gossip and spread their observations of Lt Col SUBJECT1 and Maj SUBJECT2 arriving at work together in the same car. Leaving work together in the car. Coming down in the elevator together or going up to their rooms in the elevator together. Always sitting together and having dinner together [Tab F-5, p. 2 of 5; Tab F-7, p. 5 of 10]. The period of time that seemed the most odd was when Lt Col SUBJECT1's wife, XXXXX, came to visit him in Guam. There were numerous times where Melissa sat alone with other unit members and was later joined by Lt Col SUBJECT1 and Maj SUBJECT2. Melissa was said to be visibly upset any time she was around Lt Col SUBJECT1 and Maj SUBJECT2 [Tab F-5, p. 2 of 5; Tab F-7, p. 5 of 10]. There could have been any number of innocent reasons behind these events but the totality and frequency of observations made the appearance of an inappropriate relationship clear.

36. Lt Col WITNESS5 was the first to talk with Maj SUBJECT2 and Lt Col SUBJECT1 about these appearances [Tab F-5, p. 2 of 5]. Maj WITNESS7 later talked with Maj SUBJECT2 after witnessing Lt Col WITNESS5 have an emotional talk with both Maj SUBJECT2 and Lt Col SUBJECT1 [Tab F-5, p. 2 of 5; Tab F-7, p. 2 of 10]. Maj WITNESS7 further described some of the events that may be leading people to believe something was happening between herself and Lt Col SUBJECT1. At this

point, Maj WITNESS7 was talking with Maj SUBJECT2 at the "bro-level." This means he did not want to get anyone in trouble and he was not actually accusing either Lt Col SUBJECT1 or Maj SUBJECT2 of having an inappropriate relationship together. Instead, he stressed to both the appearance that their actions were creating and how many people were noticing and discussing their actions. He told them how rumors were rampant that they were engaged in an inappropriate relationship [Tab F-7, p. 5-7 of 10]. Maj WITNESS7 expressed his concern to Maj SUBJECT2 that something was wrong with the relationship between Lt Col SUBJECT1 and his wife XXXX and that he may be using Maj SUBJECT2 because she was an attractive female and they were many miles from home [Tab F-7, p. 6 of 10].

37. Maj SUBJECT2 initially denied any relationship whatsoever with Lt Col SUBJECT1 but later in the same conversation admitted that Lt Col SUBJECT1 had been using her as "his shoulder to cry on because his wife was a crazy bitch" [Tab F-7, p. 5-7 of 10]. Maj WITNESS7 acknowledged that it was good she was there for Lt Col SUBJECT1 during his time of need but that she needed to be very careful of appearances as she could very easily get in trouble. He also directly told her that if she was lying to him and it turned out she was actually having an inappropriate relationship with Lt Col SUBJECT1 that Maj WITNESS7 would seek to ruin her military career. He further explained the context of this statement that there was simply no room for inappropriate relationships in any unit. He had seen inappropriate relationships ruin other units and he would not tolerate lying [Tab F-7, p. 8 of 10].

38. Maj SUBJECT2 repeatedly assured Maj WITNESS7 that she was not having an inappropriate relationship and suggested Maj WITNESS7 should also describe his concerns directly to Lt Col SUBJECT1. Maj WITNESS7 did express his concerns directly to Lt Col SUBJECT1 which upset Lt Col SUBJECT1 considerably. Lt Col SUBJECT1 was upset that anyone would think anything was going on between himself and Maj SUBJECT2. He felt it was ridiculous that a man and woman in the same unit could not be seen together without people around them making assumptions about their motivations [Tab F-7, p. 8 of 10]. Lt Col SUBJECT1 then told Maj WITNESS7 that Maj SUBJECT2 had "gone off the deep end" because of his statements to Maj SUBJECT2. Lt Col SUBJECT1 said Maj SUBJECT2 had begun to document everything and threatened to share information that would "bring down the squadron" if it got out [Tab F-7, p. 8 of 10].

39. It was at this point that Maj WITNESS7 suspected Maj SUBJECT2 may be twisting his conversations with Maj SUBJECT2 into a context that might implicate him in some sort of wrongdoing [Tab F-7, p. 7 of 10]. This is when Maj WITNESS7 decided to bring his concerns to Lt Col WITNESS5. After initially talking with Lt Col WITNESS5 alone in his room, Lt Col WITNESS5 then insisted they all talk together [Tab F-5, p. 2 of 5; Tab F-7, p. 8 of 10]. After packing and leaving his room, Lt Col WITNESS5 saw Maj SUBJECT2 standing alone and teary-eyed in the hotel lobby. He asked her what was wrong and she expressed a desire to talk. Lt Col WITNESS5 offered to talk with her 1-on-1 but Maj SUBJECT2 recommended they

be joined by Maj WITNESS7 and Lt Col SUBJECT1. This is when she made an indirect reference to Maj WITNESS7 being the person who had propositioned her for sex earlier in the deployment [Tab F-5, p. 2 of 5]. Lt Col WITNESS5 remembers all four of them meeting for about 1.5 hours [Tab F-5, p. 3 of 5] where Maj WITNESS7 remembers the meeting complaining closer to 45-minutes or an hour [Tab F-7, p. 2 of 5]. Maj WITNESS7's and Lt Col WITNESS5's testimony regarding this meeting are consistent with each other. In the discussion, Maj WITNESS7 again lays out the indications that are leading people to believe there may be an inappropriate relationship between Lt Col SUBJECT1 and Maj SUBJECT2. Lt Col WITNESS5 directly asked them both if they were engaged in a relationship and both denied it [Tab F-5, p. 2 & 3 of 5]. Maj WITNESS7 apologized to Maj SUBJECT2 for his comment about "destroying her career" should he find out that she was lying to him about any relationship with Lt Col SUBJECT1 [Tab F-5, p. 3 of 5; Tab F-7, p. 9 of 10]. Maj SUBJECT2 seems to accept his apology and requests to speak with Maj WITNESS7 1-on-1 for a few minutes. In this meeting she gets emotional and hugs him. She says she's glad they talked and can move forward [Tab F-7, p. 9 of 10]. Maj SUBJECT2 makes no direct allegation against Maj WITNESS7 in this meeting.

40. Although early in the deployment, Lt Col WITNESS5 suggested to both Lt Col SUBJECT1 and Maj SUBJECT2 "knock off" any behavior that might be perceived by others to show a relationship, he did not give either a direct order to avoid contact with each other [Tab F-5, p. 4 of 5]. Lt Col WITNESS5 felt that while the appearance of a relationship between the two was strong that it could also be explained by the deployment and that everything should return to normal once they returned to home station. At no time did Lt Col WITNESS5 order Lt Col SUBJECT1 and Maj SUBJECT2 to cease contact with each other in Guam.

41. Maj WITNESS7 also testified to several other incidents that occurred in Guam that suggest questionable judgement by Maj SUBJECT2. Two areas of concern were her disregard for direct orders issued by the deputy deployment commander, Lt Col WITNESS5. In one example, Lt Col WITNESS5 ordered everyone to stop using inappropriate words on social media (words such as gook, chink, homo, fag, etc). Lt Col WITNESS5 gave this order in front of all the officers on the deployment, including Maj SUBJECT2. After departing from the gathering, Maj SUBJECT2 created a GroupMe chat room that included everyone except Lt Col WITNESS2 and Lt Col WITNESS5. She said the chat room was created so people could freely use words like gook, chink, homo, fag, etc. Maj WITNESS7 pulled Maj SUBJECT2 aside that evening and counseled her that her actions were wrong for multiple reasons and suggested she take down the chat room immediately. Maj SUBJECT2 seemed to understand his concern and later that evening the chat room was deleted. [Tab F-7, p. 3-4 of 10]

42. In another example, Lt Col WITNESS5 told all of the officers the number one thing he wanted everyone to do before getting on the plane to go home the next day was to complete their DTS voucher online. After hearing Lt Col WITNESS5's directive, Maj SUBJECT2 told Maj WITNESS7, "Yeah, I'm not doing that. I'll do it when I

Atch 5

get home." Maj WITNESS7 immediately told Maj SUBJECT2 that her statement upset him. He said that not only was she directly undermining her superior officer's valid order but she was going to make her boss (and a good guy) look bad because some of his people had disregarded his order. When Maj WITNESS7 said this to Maj SUBJECT2, she is alleged to have gotten angry with him and then said she was going to, "…go get raped by these Marines." [referring to some Marines she saw wading in the hotel pool.] [Tab F-7, p. 4 of 10]

43. Additionally, Maj WITNESS7 witnessed two events involving Maj SUBJECT2 at strip clubs that he claims demonstrate her questionable judgement or inability to control her behavior due to alcohol. The first involved Maj SUBJECT2 giving one of the dancers at the strip club a dollar and the stripper then putting her hands inside Maj SUBJECT2's dress and directly fondling her breasts. She made no attempt to stop the dancer. Maj WITNESS7 claims this was witnessed by multiple squadron pilots and several squadron enlisted maintainers. The second, again, involved Maj SUBJECT2 giving a strip club dancer a dollar but this time on a different night and at a different strip club. After receiving the dollar, the dancer pulled Maj SUBJECT2 onto the stage, completely removed her dress, completely removed her underwear, and laid her down on the stage. At this point, the strip club dancer provocatively straddled Maj SUBJECT2 even sitting directly on her face. Again, she made no attempt to stop the dancer. She then got up and got dressed and rejoined the multiple other male pilots in the group. Enlisted are alleged to have also witnessed this event [Tab F-7, p. 3 of 10]. Lt Col SUBJECT1 was present at both strip club events. Finally, Maj WITNESS7 says Maj SUBJECT2 told him about an incident that happened at one of the local dance clubs where she made out with a lesbian that had been hitting on her that night. She told Maj WITNESS7 that she didn't know it at the time but that lesbian turned out to be one of the enlisted maintainers in the squadron [Tab F-7, p. 3 of 10]. I have no corroborating evidence of these claims. I mention these allegations only because they may warrant another CDI. These claims did not weigh on my decision with regard to the allegations of this CDI.

44. Maj WITNESS7 testified to confronting Maj SUBJECT2 and Lt Col SUBJECT1 with all of these situations in the meeting with Lt Col WITNESS5. Maj SUBJECT2 never denied that these events happened as described by Maj WITNESS7. I chose not to call additional witnesses to corroborate Maj WITNESS7's testimony in order to limit the number of personnel aware of this investigation. I asked both Lt Col SUBJECT1 and Maj SUBJECT2 to give their versions of these incidents but both declined to participate in an interview on advice from their counsel [Tabs F-11 and F-12 respectively]. Maj WITNESS7 did not speak with either Maj SUBJECT2 or Lt Col SUBJECT1 about this event.

45. At home station, Lt Col WITNESS5 noticed that Lt Col SUBJECT1 and Maj SUBJECT2 continued to have lunch together in the squadron's lunch room and continued to work together as part of Lt Col SUBJECT1's instructor pilot upgrade program. However, Lt Col WITNESS5 did not notice any behavior that warranted

Atch 5

further counseling. One day, home from Guam, Maj WITNESS7 noticed Maj SUBJECT2 and Lt Col SUBJECT1 come out of the intel vault briefing room together and thought it was odd considering the phase of flight did not require Intel support [Tab F-7, p. 10 of 10].

46. I asked most intel personnel and pilots I interviewed whether or not they had ever witnessed COMPLAINANT briefing fighter pilots because I knew if he ever had briefed the pilots it would not have gone well [based on my previous experience with him briefing airlift pilots at the 201AS]. I was trying to establish whether or not this would have given COMPLAINANT any reason to seek retribution. From the statements given to me, COMPLAINANT only briefed fighter intel personnel (not pilots) one time and that was the morning of 5 May 2017 [Tab F-13, p. 3 of 3]. All indications were that he did fine on that brief and was not criticized by anyone in the room.

47. Another line of questioning I pursued was to try to find out if COMPLAINANT's most recent OPR may have given him a motive to fabricate his testimony regarding the evening of 4 May 2017. In COMPLAINANT's testimony to me, he volunteered that he was not happy with his latest OPR because he did not know Maj SUBJECT2 was going to be his rater until about 30-days prior to the close-out and that Maj SUBJECT2 had "watered down" some of the bullets given him on a Form 77 by the O-6 he works for at Cyber Command. All of this evidence is presented in [Tab G-4, pp. 4-24]. I concluded that this was not a motive for COMPLAINANT because he really didn't make a big deal about it to me or to any of the other people I interviewed. He also did not make a formal complaint when it came time for him to sign and acknowledge his OPR. He never complained to Lt Col WITNESS1 or Maj WITNESS9 that his OPR was inappropriate. He did not complain to Maj SUBJECT2 in any way that I could find. I took his complaint to me as more of an annoyance than something he would want to seek revenge for. He also volunteered his OPR to me which I do not think he would have done had that been his motive for fabricating a situation designed to get Maj SUBJECT2 in trouble. Finally, COMPLAINANT only indicated that he knew anything about questionable behavior in Guam because Col WITNESS10 had mentioned that to him as he was waiting in his office to give Col Magnell a statement.

48. The biggest detractor from the evidence presented to me was COMPLAINANT's extreme paranoia as expressed by every person who came in contact with COMPLAINANT during the course of listening to his allegations or participating in this investigation. Regardless, even if COMPLAINANT's testimony was discounted, the preponderance of the other evidence collected would still lead me to the same conclusion.

49. Another detractor was an allegation that Maj WITNESS7 propositioned Maj SUBJECT2 for sex early in the Guam deployment but was rejected. The supposition

is that if Maj SUBJECT2 rejected Maj WITNESS7's advances that he might then make up stories about her and Lt Col SUBJECT1 as retribution. However, it does not make sense to me that if Maj WITNESS7 had been rejected after propositioning Maj SUBJECT2 that he would then express so much concern that Maj SUBJECT2 might get in trouble due to the appearance of something going on between her and Lt Col SUBJECT1. Additionally, if he did want to get back at SUBJECT2, he would have given all his info to leadership as opposed trying multiple times to tell this to Maj SUBJECT2 and Lt Col SUBJECT1 at the 'bro-level'.

50. Besides, even if WITNESS7 did proposition SUBJECT2 (no proof but just for the sake of the argument), I believe his testimony regarding the appearance of an inappropriate relationship between Maj SUBJECT2 and Lt Col SUBJECT1 is still credible. I never get the feeling he wants to get Maj SUBJECT2 or Lt Col SUBJECT1 in trouble. He wanted them to stop looking like they are having a relationship. He only went to leadership after he felt like his words might be twisted and used against him.

51. Additionally, Maj WITNESS7 had multiple conversations with Maj SUBJECT2 and Lt Col WITNESS5 regarding the "I'll destroy you" comment he admits to making. The context of this statement was that he did not want someone who was actually having inappropriate relationships in his squadron. This would be a very hypocritical conversation to have with Lt Col WITNESS5 and Maj SUBJECT2 had he recently propositioned her for sex himself.

**Conclusion for Allegation 2:**

52. I applaud COMPLAINANT for coming forward with his initial observations that ultimately led to this CDI. While I could not find a preponderance of evidence that indicated Maj SUBJECT2 and Lt Col SUBJECT1 were having sex at the time COMPLAINANT walked into the vault **[Allegation 1]**, it did lead me to discover other evidence that pointed toward an inappropriate relationship and that would prejudice good order and discipline and could reasonably have been expected to bring discredit upon the United States Armed Forces.

53. The USAF CDI Guide, dated 26 Apr 2010, defines "evidence" as "…testimonial, physical, or circumstantial" [Paragraph 5.2]. The guide further describes "testimonial evidence" as including "…oral statements, written statements and IO summaries of witness interviews" [Paragraph 5.2.1]. The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Paragraph 1.4]

54. Based on the preponderance of the credible testimony regarding Guam and the circumstantial evidence from COMPLAINANT's observation the night of 4 May 2017, I must conclude that the allegation "Did Lt Col SUBJECT1, a commissioned officer, and Maj SUBJECT2, a commissioned officer, knowingly have an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the united states in violation of AFI 1-1 and AFI 36-2909?" is **SUBSTANTIATED**.

55. The allegation, "…knowingly have an extramarital affair…" is not substantiated for the same reason Allegation 1 is not substantiated. Regardless, while there is no, "Smoking Gun" in the evidence collected, the evidence indicates to me that one position is more probable than the opposing position. The opposing position is that all of these appearances were innocent and could be explained if we knew the entire context. The credible testimony of Lt Col WITNESS5 alone was enough to substantiate the allegation of an inappropriate relationship. Maj WITNESS7's testimony and COMPLAINANT's observations added to the preponderance of evidence. The lack of hard evidence should be considered by Col Magnell should he conclude disciplinary action is warranted.

56. As stated in 36-2909, "…the senior member (officer or enlisted) in a personal relationship bears primary responsibility for maintaining the professionalism of that relationship…The senior member in a relationship is in the best position to appreciate the effect of that particular relationship on an organization and in the best position to terminate or limit the extent of the relationship. However, all members should expect to be and must be held accountable for the impact of their conduct on the Air Force as an institution." [Tab K-6, AFI36-2909, p. 18, paragraph 6]

57. Regarding the second part of Allegation 2, "…that has been prejudicial to good order and discipline and was of a nature to bring discredit upon the armed forces of the United States." I believe good order and discipline was sacrificed because neither party acknowledged the counsel of the Guam deployment's Deputy Commander (Lt Col WITNESS5) who clearly told them about the appearance of an unprofessional relationship early in the deployment. Additionally, others in the unit began spreading rumors based on their observations further eroding good order and discipline. Unfortunately, Lt Col WITNESS5 never directly ordered them to cease the inappropriate relationship, but their disregard of his warnings demonstrated their inattention (at a minimum) to good order and discipline. Fortunately, at this time, their actions have not brought discredit upon the armed forces of the United States. However, even the appearance of these types of relationships can destroy families which can cause facts of the deployment to become part of the public record in a civil court case.

Atch 5


MILITARY TRIAL
DEFENDERS

290 N. Meyer Ave.
Tucson, AZ 85701
www.militarytrialdefenders.com
warrior@mtdjustice.com
1-855-959-2774

December 13, 2017

Memorandum for All Reviewing Authorities

From: Christopher David Cazares (Attorney)

Subject: Response to Letter of Reprimand, Lt Col Jenner Torrence

1. My name is Christopher David Cazares and I represent Lt Col Torrence. The letter of reprimand is without merit. We respectfully request you rescind the Letter of Reprimand.

2. The factual basis for the Letter of Reprimand is both innuendo and suggestion. If these interactions were same-sex, there simply would be no disciplinary action against either. The basis for the pending accusation is based solely on the gender of Lt Col Torrence and Major Murphy. Simply put, no one would turn a head if these were male pilots or two female field grade officers.

3. The evidence that is the basis for the pending action does not show, *at any time*, where and when any action on the part of Lt Col Torrence would have created the impression of an inappropriate relationship between two officers. Moreover, there is no evidence that peer interaction ever impacted good order and discipline. It is only in retrospect by complaints from two non-credible sources that became the basis for tarnishing a the reputation of an esteemed pilot and officer.

4. If I can be of assistance in your decision making process please contact me at either (915)539-2287 or christopher@mtdjustice.com.

Sincerely,

Christopher David Cazares

Atch 6

# ENCLOSURE 6



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
**113th Operations Support Squadron (ACC)**
**3029 East Perimeter Road**
**Joint Base Andrews AFB MD 20762**

21 November 2017

MEMORANDUM FOR LT COL JENNER TOREENCE

FROM: 113 OG/CC

SUBJECT: Initiation of Commander Directed Investigation

1. This letter is to advise you that a Commander Directed Investigation (CDI) has been initiated to investigate the events which occurred on 16 October 2017 involving an altercation between yourself and Maj Paul Doughty while on temporary duty to Tucson, AZ.

2. Col Tracy Smith, 113 MSG/CC will conduct the investigation and look into the following allegation: (1) on or about 16 Oct 17, Maj Paul Doughty caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1 and elsewhere; (2) on or about 16 Oct 17, Lt Col Jenner Torrence caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1 and elsewhere; (3) on or about 16 Oct 17 did Lt Col Jenner Torrence engage in an unprofessional relationship (fraternization) as that term is defined in AFI 36-2090 and AFI 1-1; (4) from on or about 16 Oct 17 to present, Maj Paul Doughty made false statements concerning the 16 Oct 17 allegations; (5) from on or about 16 Oct 17 to present, Lt Col Jenner Torrence made false statements concerning the 16 Oct 17 allegations; (6) from on or about 16 Oct 17 to present, Maj Paul Doughty made threatening statements to Lt Col Jenner Torrence concerning an ongoing OSI investigation; (7) from on or about 16 Oct 17 to present, Lt Col Jenner Torrence made threatening statements to Maj Paul Doughty concerning an ongoing OSI investigation.

3. The investigation will conclude no later than 20 December 2017 at which point a report will be provided to the 113 OG/CC for consideration.

4. You will acknowledge receipt of this memorandum. Your acknowledgement signature is solely for receipt purposes and is not an admission of guilt. Any comments or documents you wish to be considered concerning the allegations being examined in this CDI must be included in your interview and/or correspondence with the CDI Investigator.

JOHN E. VARGAS, Colonel, ANC
Commander

095



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
**113th Operations Support Squadron (ACC)**
**3029 East Perimeter Road**
**Joint Base Andrews AFB MD 20762**

21 November 2017

MEMORANDUM FOR COMMANDER, 113th OPERATIONS GROUP

FROM: Lt Col Jenner Torrence

SUBJECT: Notification of Commander Directed Investigation Initiation.

1. This letter is to advise you that a Commander Directed Investigation (CDI) has been initiated to investigate the events which occurred on 16 October 2017 involving an altercation between yourself and Maj Paul Doughty while on temporary duty to Tucson, AZ.

I hereby acknowledge notification and understanding of 113 OG/CC Memorandum, dated 21 Nov 2017. Subject memo was received on ²⁷ ᴺᴼᵛ ¹⁷.

SIGN: _____
(Name)

1200 57M 57 NE
(Address)

WASH. PC  20002
(City, State, and ZIP Code)

27 NOV 57
(Date)

# ENCLOSURE 7

*FOR OFFICIAL USE ONLY*

Commander Directed
REPORT OF INVESTIGATION
*FOR OFFICIAL USE ONLY*
COMMANDER DIRECTED
REPORT OF INVESTIGATION
PREPARED BY
Colonel Tracy D. Smith
INVESTIGATING OFFICER
CONCERNING
ABUSE OF AUTHORITY & OTHER MISCONDUCT
January 2018

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

**Tab A:**  Appointment and Tasking Letters

**Tab B:**  Authority and Scope

**Tab C:**  Background

**Tab E:**  Recommendations (if applicable)

**Tab F:**  Testimony
    Index of Witnesses:
Tab E-1: Lt Col ████████████████████ Witness)
Tab E-2: Lt Col ████████████████ - Witness)
Tab E-3: Maj ████████████████████████████
Tab E-4: Lt Col Jenner M. Torrence (121 ES/Pilot – Subject)
Tab E-5: MSgt ████████████████████████
Tab E-6: Chief ██████████████████████████
Tab E-7: Maj ████████████████████
Tab E-8: Written Testimony to Mr. Greiner (Lt Col Torrence's lawyer)

**Tab G:**  Evidence
    Index of Exhibits:
Tab G-1: Disk with Video and Photos
Tab G-2: Photo of Services Team from MSgt Mueller
Tab G-3: CDI Guide

**Tab H:**  Technical Reviews (Not applicable)

**Tab I:**  Legal Review

**Tab J:**  Appointing Authority Approval and Actions

**Tab K:**  Administrative Documents (None)

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

Tab A:  Appointment and Tasking Letters

*FOR OFFICIAL USE ONLY*

Tab B: Authority and Scope

19 January 2018

MEMORANDUM FOR OG/CC

FROM: MSG/CC

SUBJECT: Authority and Scope of Commander Directed Investigation

1. I have been appointed by Col John Vargas to perform a Commander Directed Investigation (CDI) of the Events Occurred on 16 October 2017.

2. The purpose of the CDI is to look into the events that occurred involving an altercation between Lt Col Jenner Torrence and Major ██████████ while they were on temporary duty to Tucson Arizona.

3. The allegations investigated were as follows:

(1) on or about 16 Oct 17, Maj ██████████ caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1 and elsewhere;
(2) on or about 16 Oct 17, Lt Col Jenner Torrence caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1 and elsewhere;
(3) on or about 16 Oct 17 did Lt Col Jenner Torrence engage in an unprofessional relationship (fraternization) as that term is defined in AFI 36-2090 and AFI 1-1;
(4) from on or about 16 Oct 17 to present, Maj ██████████ ty made false statements concerning the 16 Oct 17 allegations;
(5) from on or about 16 Oct 17 to present, Lt Col Jenner Torrence made false statements concerning the 16 Oct 17 allegations;
(6) from on or about 16 Oct 17 to present, Maj ██████████ y made threatening statements to Lt Col Jenner Torrence concerning an ongoing OSI investigation;
(7) from on or about 16 Oct 17 to present, Lt Col Jenner Torrence made threatening statements to Maj Paul Doughty concerning an ongoing OSI investigation.

SMITH.TRACY.D.1035
650683

Digitally signed by SMITH.TRACY.D.1035650683
DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USAF, cn=SMITH.TRACY.D.1035650683
Date: 2018.01.26 12:19:25 -05'00'

TRACY D. SMITH, Colonel, ANG
Mission Support Group Commander

*FOR OFFICIAL USE ONLY*

FOR OFFICIAL USE ONLY

Tab C: Background

January 2018

MEMORANDUM FOR OG/CC

FROM: MSG/CC

SUBJECT: Factual Background

1. The CDI is a result of an alleged altercation between Lt Col Torrence and Maj███████who were TDY to WEPTAC in Arizona. Both individuals went to the bar, Finnegans, in the Doubletree Hotel after the events of industry day.

2. There are contributing factors that led to the altercation at WEPTAC between Lt Col Torrence and Maj█████ Primarily, those contributing factors resulted from a previous CDI involving Maj████and Lt Col Torrence with Maj█████identified as a key witnesses.

SMITH.TRACY.D. 1035650683

Digitally signed by SMITH.TRACY.D.1035650683
DN: c=US, o=U.S. Government, ou=DoD,
ou=PKI, ou=USAF,
cn=SMITH.TRACY.D.1035650683
Date: 2018.01.26 12:20:18-05'00'

TRACY D. SMITH, Colonel, ANG
Mission Support Group Commander

FOR OFFICIAL USE ONLY

*FOR OFFICIAL USE ONLY*

**Findings, Analysis and Conclusions:**

**Allegation 1:**

On or about 16 Oct 17, Maj ▮▮▮▮▮▮▮ caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1, Air Force Standards and elsewhere.

**Facts for Allegation 1:**

On 16 Oct 17, Maj ▮▮▮▮ and Lt Col Torrence were TDY at WEPTAC and interacted at Finnegans, the pub/bar inside of the Doubletree Hotel. Lt Col Torrence in his written statement, dated 4 Nov 17, [Tab E-4], stated, "he never felt physically threatened during the conversation. Major Doughty never assumed a threatening body posture nor did he make the statement in a tone that led me to believe he meant it to be taken literally."

**Applicable Rules for Allegation 1:**

Standards for officer conduct as found in AFI 1-1.

**Analysis for Allegation 1:**

Analysis of Video, witness and subject statements.

**Conclusion for Allegation 1:**

The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Tab G-3, CDI-Guide, Paragraph 1.4] In reviewing the evidence, there is not sufficient evidence to warrant the claim that Maj ▮▮▮▮ caused an altercation to occur. Lt Col Torrence stated, "he never felt physically threatened" and that Major Doughty "never assumed a threatening body posture," [Tab E-4] The video only shows a verbal exchange between the two individuals. It is also worth noting that alcohol and tensions related to previous investigations affected both parties recollection of the incident. Accordingly, I conclude this allegation is **UNSUBSTANTIATED.**

**Allegation 2:**

On or about 16 Oct 17, Lt Col Jenner Torrence caused an altercation to occur that would be considered a violation of the Air Force's standards for officer conduct as found in AFI 1-1 and elsewhere.

**Facts for Allegation 2:**

On 16 Oct 17, Maj ▮▮▮▮ and Lt Col Torrence were TDY at WEPTAC and interacted at

*FOR OFFICIAL USE ONLY*

FOR OFFICIAL USE ONLY

Finnegans, the bar inside of the Doubletree Hotel. Major ████ 4 Nov 17 written statement [Tab E-3], notes "At this point I decided to take a photograph with my phone since I was concerned that I may once again have to testify as to what I saw when someone was acting inappropriate and wanted to protect myself. As I took the photo, Lt Col Torrence saw me and started to move towards me. I tried to walk away and he pursued me aggressively. He made a motion to grab my phone and I put it in my pocket and kept walking, then he attempted to grab my arm. I moved it away and continued to try to remove myself from the area. I felt threatened since he was continuing to pursue me so I walked up to a friend in the vicinity- Maj ████████ and asked him to step in and make sure Lt Col Torrence didn't touch me. Maj ██████ stepped in and asked what was going on, at which point Lt Col Torrence started saying things such as 'Ripper I've never done anything to you and I've been nothing but an advocate for you.' At this time I realized that he was making a scene so to calm things down I decided to stand there and listen to him since I felt like we were in a public place and Maj ██████ was standing right there." [Tab E-3]

### Applicable Rules for Allegation 2:

Standards for officer conduct as found in AFI 1-1.

### Analysis for Allegation 2:

Analysis of Video, witness and subject statements.

### Conclusion for Allegation 2:

In reviewing the evidence, there is not sufficient evidence to warrant the claim that Lt Col Torrence caused an altercation to occur. Lt Col Torrence stated, "he never felt physically threatened" and Maj ██████ "never assumed a threatening body posture." The video only shows a verbal exchange between the two individuals. It is also worth noting that alcohol and tension related to ongoing investigations affected both parties recollection of the incident. Accordingly, I conclude this allegation is **UNSUBSTANTIATED.**

### Allegation 3:

On or about 16 Oct 17 did Lt Col Jenner Torrence engaged in an unprofessional relationship (fraternization) as that term is defined in AFI 36-2909, Professional and Unprofessional Relationships, and AFI 1-1.

### Facts for Allegation 3:

The video shows Lt Col Torrence and a blonde female at the bar talking while in very close contact with her back against his body and his hands on her body. [Tab G-1] The video and photos also depicts Lt Col Torrence speaking closely into the ear of the female while she stood in between his legs. The clock on the wall in the bar shows the two individuals interacting from approximately 2215 on 16 Oct 2017 to 0010 on 17 Oct 17. Lt Col Torrence was wearing his flight suit throughout the video. The blonde female was wearing civilian clothes.
Maj ██████, Chief ██████ and MSgt ██████ each reviewed screenshots from the video. After reviewing the screenshots, each stated that the blonde female with Lt Col Torrence at the bar was an enlisted services team members from the Toledo Ohio ANG. Major ██████ in his statement, Tab E-7, stated that the woman pictured with Lt Col Torrence was part of the services team from

FOR OFFICIAL USE ONLY

*FOR OFFICIAL USE ONLY*

the Toledo ●hio Unit. He stated that the services team members would hang out after the WEPTAC event at the bar. He wasn't sure of the individual's names; however, he stated there was a group of three of them that hung out together. I asked if it was reasonable to recognize them as the services team that assisted at WEPTAC. He replied that you would see the services team members on breaks at the cooler and in the Viper Break out room in the auditorium. The services team would fill coolers, etc. and are in uniform during the day. He stated that they obviously changed before the evening event. I asked if he felt that Lt Col Torrence would know that the women at the bar that night were the enlisted services females working WEPTAG. He stated, "I would think anyone would know that the women at the bar were the enlisted services women working refreshments at WEPTAC." He went on to say that "anyone with observation skills would put 2 and 2 together and determine what it is."

I followed up with Chie███████ he Force Support Squadron Superintendent to see if she could identify the members in the photos. She stated that the women who were at the bar were most likely her three youngest services team members. She said she was meeting with them for lunch the next day and could ask some questions indirectly about how the event went. I followed up with her again via e-mail to see if she had any further information and she stated the women were most likely SrA███████ ████████ and or A1C███████ She provided their phone numbers to me so that I could contact them. [Tab E-6]

I contacted SrA████ n 24 Jan 18, [Tab E-10], and asked her if she was at WEPTAC and she stated yes. I asked her if she was at the Hotel Doubletree bar, Finnegans, with a pilot. She stated she was but the bar was full of pilots since there was a lot of vendor stuff going on. She stated they had drinks and then went back to the hotel across the street from the Doubletree, but nothing was too out of the ordinary. I asked her if she made it home safe and she stated she did and there were no issues. She told me she was not at work at the moment but she would be into work the next day. I asked her to call me when she came in so I could show her a picture to identify the personnel in the picture.

I followed up the next day, 25 Jan 18 at 1028 with SrA███████ [Tab E-10] I sent her screen shots of the video and asked her if she could identify the personnel in the photo. I also asked her who else was at the bar with her. She stated ███████ and ███████ She stated there weren't too many females in the bar that night. After looking at the second photo I e-mailed, with her back towards Lt Col Torrence, with his hands on her waist, she said she believed it was her with the pink shirt and brown purse as she was wearing a pink blouse that night and had a brown purse. I asked her who the girl was directly beside her at the bar and she stated she believed it was ███████ I asked her again if they were okay and if they made it home safe. She stated they went safely back to the hotel across the street, the Palms.

As confirmed in MILPDS via RRRIP, Tab E-4, Lt Col Torrence is married to someone other than ███████.

**Applicable Rules for Allegation 3:**

AFI 36-2909 and AFI 1-1 apply to a case of conduct unbecoming an officer and an unprofessional relationship (fraternization). Paragraph 2.4.1 as defined by the Manual for Courts Martial, is a personal relationship between an officer and an enlisted member that violates the customary

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

bounds of acceptable behavior in the Air Force and prejudices good order and discipline, discredits the armed services, or operates to the personal disgrace or dishonor of the officer involved. The custom recognizes that officers will not form personal relationships with enlisted members on terms of military equality, whether on or off-duty. " At the time this incident was alleged to have occurred, Lt Col Torrence was Active Guard and Reserve (AGR), in a Title 32 status in the District of Columbia Air National Guard while TDY to Arizona. As such, he is not subject to the UCMJ nor is there a District code that reflects provisions similar to the UCMJ as in most other states. During non-UCMJ periods, Lt Col Torrence is accused of violating Air Force Standards as in AFI 1-1, paragraphs 2.2, 2.2.1, 2.2.2, 2.2.3. 2.2.4 and AFI 36-2909 paragraphs 2, 3, 4, 5 and 6 as his actions may have impacted good order and discipline and were not in alignment with conduct becoming of an officer.

**Analysis for Allegation 3:**

Analysis of Video, witness and subject statements.

| Tab | Witness/Subject |
|------|------|
| E-1. | Lt Col ▇▇▇▇▇ – Witness) |
| E-2. | Lt Col ▇▇▇▇▇ – Witness) |
| E-3. | Maj ▇▇▇▇▇ |
| E-4. | Lt Col Jenner M. Torrence (121 FS/Pilot – Subject) |
| E-5. | MSgt ▇▇▇▇▇ |
| E-6. | Chief ▇▇▇▇▇ |
| E-7. | Maj ▇▇▇▇▇ |
| E-8. | Written Testimony to Mr. Greiner (Lt Col Torrence's lawyer) |
| E-9. | Maj ▇▇▇▇▇ |
| E-10. | SrA ▇▇▇▇▇ |

**Conclusion for Allegation 3:**

A preponderance of the evidence reflects that Lt Col Torrence engaged in an unprofessional relationship - Fraternization - with a female enlisted member on 16 Oct 17 through17 Oct 17 at Finnegans the bar in the Doubletree Hotel. The video clearly show that Lt Col Torrence, while in uniform, is engaging in an unprofessional manner with a female. SrA ▇▇▇▇ an enlisted member of the Toledo ANG, identified herself as the female with Lt Col Torrence at the bar. [Tab E-10] Four witnesses, Maj ▇▇▇▇, MSgt ▇▇▇ Chief ▇▇▇▇ and Maj ▇▇▇▇, each corroborate SrA ▇▇▇▇ presence at the bar on the night of 16 Oct 17. [Tabs E-3, E-5, E-6, E-7] The evidence supports the conclusion that the female is an enlisted member of the Toledo ANG. I conclude this allegation is **SUBSTANTIATED.**

**Allegation 4:**

On or about 16 Oct 17 to present, Maj ▇▇▇▇▇ **made false statements** concerning the 16 Oct 17 allegations;

**Facts for Allegation 4:**

On 16 Oct 17, Maj ▇▇▇▇ and Lt Col Torrence were TDY at WEPTAC and interacted at Finnegans, the pub/bar inside of the Doubletree Hotel.

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

**Applicable Rules for Allegation 4:**

**Analysis for Allegation 4:**

Analysis of Witness Statements, of Subjects and Video. Because the video does not have sound, there is no way to confirm the validity of the statements other than to compare the various statements of the witnesses. There are inconsistencies in the witness statements that I would attribute to memory.

**Conclusion for Allegation 4:**

The CDI guide describes that, "The standard of proof for a CDI is a preponderance of the evidence. A preponderance of the evidence is defined as 'the greater weight and quality of the credible evidence,' meaning the evidence indicates that one position is more probable than the opposing position. After weighing all the evidence, the IO may substantiate a finding when the greater weight or quality of the evidence points to a particular conclusion as more credible and probable than the reverse." [Tab K-6, CDI-Guide, Paragraph 1.4  I simply do not have enough evidence to confirm who said what and which statements were truly made on the night of the alleged altercation in Flannigan's on 16 Oct 17 in Arizona. The claim that Maj Doughty made false statements is not clearly more probable than the opposing position.
I conclude this allegation is **UNSUBSTANTIATED.**

**Allegation 5:**
From on or about 16 Oct 17 to present, Lt Col Jenner Torrence made false statements concerning the 16 Oct 17 allegations;

**Facts for Allegation 5:**

On 16 Oct 17, Maj ███████ and Lt Col Torrence were TDY at WEPTAC and interacted at Finnegans, the pub/bar inside of the Doubletree Hotel. Based off of witness testimony there are inconsistencies in the statements made by Lt Colonel Torrence italicized below:

> **4 November 2017 Written MFR from Lt Col Torrence, Tab E-4:**
> Note 4 of the MFR. *I was socializing with a group of individuals while sitting at the bar, which was fairly crowded. One of the members in group I was conversing with departed the group momentarily freeing up space for me to rotate myself in the direction of the group to continue the conversation, as opposed to facing straight toward the bar as I was previously. When the individual returned they assumed a posture in front of me but facing the group. This left the individual close enough to me that there was some physical contact between the two of us, or at least nearly so.* In retrospect, I would like to have created a little more distance between myself and the individual sooner. However what drove me to become acutely aware of the individual's proximity was Major ███████ furtively taking a photo of me in my peripheral vision.
>
> **On 29 November at 1300 and 1 December at 1100** ███████████ was interviewed by me regarding Events occurring on 16 Oct 17. Specific to the events at WEPTAC:
> Lt Col ███████ received a call from Lt Col Torrence on 18 October 2017 that there was an altercation and that *he was with a group of many people having a*

*FOR OFFICIAL USE ONLY*

Page 11 of 16

108

*conversation. Across the bar saw Maj Doughty. He stated girl gets up goes to the bathroom, when she comes back leans back against me caught me by surprise and I pushed her away. Maj* ▓▓▓▓ *akes a photo and they had a conversation.*

**23 Oct 17, Notes of Conversation, per Lt Col** ▓▓▓▓
Spoke with Lt Col ▓▓▓▓ about a phone call he had with me on 18 Oct where he told me he had a conversation at a bar with Maj ▓▓▓▓ *He told me that Maj* ▓▓▓▓ *took a picture of him with an unknown girl who had "straddled" him,* he said he then approached Maj ▓▓▓▓ about the picture and in that conversation he said Maj ▓▓▓▓ said "he should kick his ass".

**On 30 November 2017** I interviewed Lieutenant Colonel ▓▓▓▓

Lt Colonel ▓▓▓▓ received a call from Lt Col Torrence., He was aware that Monday 16 Oct 2017, late in the evening at the bar there was an incident and he stated that Lt Col Torrence *said there was an altercation. He said there was a group of many people having a conversation and across the bar when he saw Major* ▓▓▓▓ *He mentioned that there was a girl that got up and as he went to the bathroom and the girl leaned back against him. This caught him by surprise and he pushed her away. At that time Maj* ▓▓▓▓ *took the photo.*

**On 18 December at 1530 I interviewed Lt Col Torrence, his lawyer, Mr. Greiner was present.**

During the interview, I asked if he knew the girl at the bar:
*He stated at the time at the time there was no knowledge if she was even a female enlisted member or even in the military at all.* He then spoke about the previous CDI and the prejudices extreme prejudices of cross gender relationships and discussion on that topic is an endorsement of coercion blackmail or reprisal and he's not going to entertain the sponsorship by command on the subjects. He then invoked his right to remain silent.

And then Mr. Greiner, the lawyer, spoke up as well on that subject and stated specifically he invokes the right to remain silent on the female and fraternization issue.

**20 Oct 17, Notes of Text Conversation with Lt Col Torrence, per Maj** ▓▓▓▓ **that she sent to her SVC, Tab E-9:**
Date: October 17, 2017 at 1:16:16 PM EDT
To:
Caution-mailto ▓▓▓▓ l.mil >
Subject: Text Messages

Msg from LtCol Jenner Torrence at approx. 1000 today.

I ended up having a run in with Ripper last night. I was talking to a girl and a guy next to me at the bar next to me at industry night. At one point I turn my barstool towards them to get up and go to the restroom. *As I do that the girl is kind of up against me because the bar is jammed and I have move one leg around her at a time to get faced away from the bar.* Just as I'm doing that Ripper snaps a picture of me. Obviously trying to catch me at the most awkward moment. So instead of walking to the restroom I walk up to him and say what the fuck was that?

*FOR OFFICIAL USE ONLY*

------------------------------------------------------------------------

**22 Dec 2017, Sworn Declaration signed by Lt Col Jenner Torrence and submitted by Mr. Greiner, Torrence's Lawyer, Tab E-8**

## SWORN DECLARATION OF LT COL JENNER TORRENCE

Pursuant to 28 U.S.C. § 1746, I, Lt Col Jenner Torrence, hereby swear or affirm under penalty of perjury under the laws of the United States of America, that the following statements are true and correct to the best of personal knowledge, information, and belief. I provide this Sworn Declaration in response to supplement the oral statement made to Col Tracy Smith on December 18, 2017:

      I am concerned that the Command has initiated this CDI with many non-cohesive allegations and that these detract from its core purpose of discovering interference in a potentially criminal proceeding. I do however, respectfully acknowledge the CDI's necessity due to the current Command climate and the need for unadulterated justice. Additionally, it is of great concern that these allegations have been weighted against me (the reporter of the event in question), but neglect the grave concerns of potential stalking, first or third-party surveillance, coercion, reprisal, and harassment by Major ████████. This seems to continue a tradition of favoritism biased to Major ████████'s benefit; however, I *have been honest throughout the process* and will continue cooperating with all matters pertaining to settling any discord potentially **caused by my** actions. I must reiterate that I provided the 4 Nov 2017 statement to Lt ████████████ about the occurrences on 16 Oct 2017 to make the record clear and to improve morale. I am committed to reaching that goal, but will also adamantly defend myself. I respectfully believe that Major ████████ acted inappropriately on 16 Oct 2017 with the specific intent of intimidating me **from further** cooperation in an investigative, administrative, or judicial proceeding against him. *I believe he created a situation to use against me, and to discredit my character. I assert that he was also acting out of reprisal due to my previous cooperation in an investigation against him and coercion to prevent my further cooperation. In spite of his provocative actions, I did my best to deescalate the situation and did nothing to antagonize or continue things.* I believe that Maj ████████ has made poor choices, and has put the Command at risk due to his continuing negative behaviors. I am not the only person who believes that it has created problems that need to be addressed.

On 16 Oct 17, Maj ████████ caused an altercation that could be considered a violation the Air Force standards related to officer conduct. I am unsure whether Maj ████████ has made false statements regarding what happened on that night, but if he has, it corresponds to a continued pattern of questionable conduct and hostile acts against myself and others. I believe he made comments meant to intimidate me from telling the truth about his actions, and purposely took actions intended to discredit me as retaliation, and as a way to mute me.

On 16 Oct 17, I did not cause an altercation that could be could be considered a violation the Air Force standards related to officer conduct. I was the victim of that behavior. *I have not made false statements regarding what happened on that night,* and have certainly not made threatening statements to Maj ████████ I further state that *on 16 Oct 17 I did not engage in fraternization. Furthermore, none of my actions compromised the chain of*

*FOR OFFICIAL USE ONLY*

*FOR OFFICIAL USE ONLY*

*command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, or morale.*

I ask that this Commander Directed Investigation find no evidence supporting any of the allegations related to either me or Maj ██████ I believe that any adverse findings could only serve to further damage the morale of the Command. I am willing to put this unfortunate circumstance behind me and sincerely hope that Maj ██████ can do the same.

I, Lt Col Jenner Torrence, provide this Sworn Declaration, which consists of one typed page. *I hereby affirm under penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge, information, and belief.*

**Applicable Rules for Allegation 5:**

AFI 1-1.

**Analysis for Allegation 5:**

Analysis of written statements, the Video, the statement provided by his lawyer as well as interviews.

**Conclusion for Allegation 5:**

After reviewing the various witness testimonies as well as during Lt Col Torrence's interview with his lawyer present, he stated he could not remember all of the events. Despite this, his statements to Lt Col ██████ Tab E-1, and Lt Col ██████ Tab E-2, and texts to Maj ██████ Tab E-9, where he stated the female at the bar fell into his crotch and or straddled him and or he turned his barstool towards them to get up and go to the restroom and a girl is up against him because the bar is jammed and I have to move one leg around here at a time to get faced away from the bar, then he pushed her away, neither statements are supported by the video. The video shows from 2315 to 2345 Lt Col Torrence and a female in very close contact with continued contact until 0010 on 17 Oct 17 when they both leave the bar. The video, [Tab G-1], also shows them in very close contact. Additionally the photographs and video show Lt Col Torrence's hands around the female's waist for a period of time. I cannot confirm exactly what was said on the evening of 16 Oct 17 to current witness statements; however, the inconsistencies between the witness statements, sworn statement submitted to his lawyer, 4 Nov 17 MFR submitted by Lt Col Torrence. Tab E-4, Texts to Maj ██████ ██████ Tab E-9, and the video, Tab G-1, provide sufficient evidence to show that false statements were made by Lt Col Torrence about what occurred on the night of 16 Oct 17 in regards to the female who was at the bar. **SUBSTANTIATED.**

**Allegation 6:**

From on or about 16 Oct 17 to present, Maj ██████ made threatening statements to Lt Col Jenner Torrence concerning an ongoing OSI investigation;

*FOR OFFICIAL USE ONLY*

**Facts for Allegation 6:**

Maj ▇▇▇ in his interview to me on 18 December, Tab E-3, stated the only thing he could assume was threatening was when he told Lt Col Torrence "don't touch me again and if you do I'm going to kick your ass". He stated this statement didn't occur until after being grabbed or touched several times by Lt Col Torrence which is displayed in the video, [Tab G-1]. His written statement, dated 4 Nov 17, [Tab E-3], does not mention this threatening statement.

In the 4 November 2017 MFR submitted by Lt Col Torrence to Lt Col ▇▇▇▇ [Tab E-4], para 8, he states "There was a point in the conversation when Major ▇▇▇ made the statement 'I should kick your ass'. While I think this is worth noting, I never felt physically threatened during the conversation. Major ▇▇▇ never assumed a threatening body posture nor did he make the statement in a tone that led me to believe he meant it to be taken literally. I believe this was simply poorly articulated frustration towards me from Major ▇▇▇"

In my 19 Dec 17 interview with Lt Col Torrence and in the sworn statement with his lawyer, [Tab E-4], Lt Col Torrence accuses Maj ▇▇▇ for making threatening/provocative statements. He also stated this corresponds to a continued pattern of questionable conduct and hostile acts against myself and others. I believe he made comments meant to intimidate me from telling the truth about his actions, and purposely took actions intended to discredit me as retaliation, and as a way to mute me.

**Applicable Rules for Allegation 6:**

AFI 1-1.

**Analysis for Allegation 6:**

Analysis of Witness Statements and Video.

**Conclusion for Allegation 6:**

Maj ▇▇▇ admitted to making a threatening statement to Lt Col Torrence; however, in the MFR submitted by Lt Col Torrence to Lt Col ▇▇▇▇ Tab E-4, para 8, he states "There was a point in the conversation when Major ▇▇▇ made the statement 'I should kick your ass.' While I think this is worth noting, I never felt physically threatened during the conversation. Major ▇▇▇ never assumed a threatening body posture nor did he make the statement in a tone that led me to believe he meant it to be taken literally. I believe this was simply poorly articulated frustration towards me from Major ▇▇▇" The threatening statement made by Maj ▇▇▇ to Lt Col Torrence does not seem directly related to the OSI investigation. It seems to be Lt Col Torrence physically touching or grabbing Maj ▇▇▇ as alleged in Maj ▇▇▇'s 4 Nov 17 submitted statement, [Tab E-3]. Previous factors resulting from the OSI investigation and former incidents contributed to the events that occurred on 16 Oct 17 as this event was not in isolation of the earlier events. Lt Col Torrence clearly stated in his 4 Nov 17 MFR, [Tab E-4], that he "never felt physically threatened". **UNSUBSTANTIATED.**

**Allegation 7:**

From on or about 16 Oct 17 to present, Lt Col Jenner Torrence made threatening statements to Maj ▇▇▇ concerning an ongoing OSI investigation.

*FOR OFFICIAL USE ONLY*

**Facts for Allegation 7:**

Maj ▆▆▆▆ written statement dated 4 Nov 2017, [Tab E-3], states that Lt Col Torrence said several times that "you just need to apologize to ▆▆▆ to which I said "oh really" and he replied "yes, if you don't than this is going to go to court-martial and you are going to be done". He said this several times as well. He then said ▆▆▆▆ think you're an asset to the Air Force and I told Vegas that I was scared of what she might do." He told me over and over again to ask Col Vargas about that."

**Applicable Rules for Allegation 7:**

AFI 1-1.

**Analysis for Allegation 7:**

Witness Statements.

**Conclusion for Allegation 7:**

Previous contributing factors, from the earlier OSI investigation and former incidents contributed to the events that occurred on 16 Oct 17 as this event was not in isolation of the former events. The statement "you just need to apologize to ▆▆ to which I said "oh really" and he replied "yes, if you don't' than this is going to go to court martial and you are going to be done". Could have been perceived as threatening but I do not have any other witness statements supporting this allegation. I do not have sufficient corroborating evidence from additional witnesses to support the allegation that a threatening statement was made by Lt Col Torrence to Major ▆▆▆▆. **UNSUBSTANTIATED.**

# ENCLOSURE 8



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
113th Operations Group (ACC)
3029 East Perimeter Road
Joint Base Andrews AFB MD 20762

26 January 2018

MEMORANDUM FOR LT COL JENNER TORRENCE

FROM: 113th OG/CC

SUBJECT: Letter of Reprimand

References:   (a) AFI 1-1 *Air Force Standards*
(b) AFI 36-2909 *Professional and Unprofessional Relationships*

1. An investigation disclosed that on or about 16 October 2017, while on a temporary duty assignment to Tucson, Arizona, you compromised your standing as a field grade officer while at the Hilton Doubletree Bar. On this day you, while in uniform, fraternized with an enlisted member and engaged in unprofessional behavior; a discredit to an officer of your rank, the Air Force, and the Armed Forces. Additionally, you were untruthful to your chain of command concerning the 16 October 2017 encounter; choosing to make false verbal and written statements about the allegations on a number of occasions. Your actions on this evening and your false statements about the same were prejudicial to good order and discipline, contrary to the core values of the United States Air Force, unbecoming of a field grade officer in the United States Air Force, and were of a nature to bring discredit upon the Armed Forces of the United States; in violation of AFIs 1-1 and 36-2909.

2. You are hereby reprimanded! This conduct is inexcusable. As a field grade officer, you are expected to meet high standards of leadership and to exhibit exemplary behavior. Commissioned officers serve in positions of trust and are expected to assume continuing leadership responsibilities. Your lack of judgement, professionalism, and maturity leads me to seriously question your suitability for future commissioned military service.

3. The following information required by Privacy Act is provided for your information. AUTHORITY: 10 U.S.C. 8013. PURPOSE: To obtain any comments or documents you desire to submit (on a voluntary basis) for consideration concerning this action. ROUTINE USES: Provides you an opportunity to submit comments or documents for consideration. If provided, the comments and documents you submit become a part of the action. DISCLOSURE: Your written acknowledgment of receipt and signature are mandatory. Any other comments or documents you provide are voluntary.

4. You will acknowledge receipt of this Letter or Reprimand (LOR) immediately by signing the acknowledgement in the 1st Indorsement; you will return this LOR to the 113 OG/CC with your response for our review, if any, within three (3) calendar days of your receipt and will sign the 2nd Indorsement at that time. Any comments or documents you wish to be considered in

response to this LOR must be submitted at that time. If this LOR is maintained, per AFI 36-2907, *Unfavorable Information File Program*, paragraph 2.3.1, it must be placed in and Unfavorable Information File (UIF). The 121 FS/CC will establish an UIF if the LOR is sustained. Your signature on this letter is for receipt purposes only and does not signify concurrence or admission of guilt.

JOHN E. VARGAS, Colonel, ANG
Commander

1st Ind., LT COL JENNER TORRENCE

MEMORANDUM FOR 113 OG/CC

I acknowledge receipt of this LOR on ___2 6 V JAN 17 K01___ I understand I have 3 duty days
                                         (date/time)

from the date/time I received this LOR to provide a response. I acknowledge that I must include in my response any comments or documents I wish to be considered concerning this LOR. I understand I will be informed of the final decision regarding any comments I submit. My response is due by ___31 JAN 17 (466___
                            (date/time)

JENNER TORRENCE, Lt Col, DC ANG

2nd Ind., LT COL JENNER TORRENCE                                    Date: ___26 JAN 18___

MEMORANDUM FOR 113 OG/CC

I (do) (do not) choose to respond to this LOR.

JENNER TORRENCE, Lt Col, DC ANG

116

3rd Ind., 113 OG/CC                                                    Date:  6  FEB  18

MEMORANDUM FOR LT COL JENNER TORRENCE

Member (did) (did not) provide written matters in response to this letter. After consideration of all matters I have decided to (initial one):

_____ (initial if applicable) Withdraw the LOR

_____ (initial if applicable) Downgrade the LOR to a Letter of Admonition/Counseling

_____ (initial if applicable) Maintain the LOR. The LOR will be place in an UIF.

JOHN E. VARGAS, Colonel, ANG
Commander

4th Ind., LT COL JENNER TORRENCE                                      Date:  8  Feb  2018

MEMORANDUM FOR 113 OG/CC

I have been informed of the final decision regarding this LOR and establishment of an UIF.

JENNER TORRENCE, Lt Col, DC ANG

ENCLOSURE 9



**TULLY RINCKEY** PLLC
ATTORNEYS & COUNSELORS AT LAW

815 CONNECTICUT AVE NW, SUITE 720
WASHINGTON, DC 20006
PHONE: (202) 787-1900
WWW.FEDATTORNEY.COM
EMAIL: INFO@FEDATTORNEY.COM

February 5, 2018

*Sent via email to: john.e.vargas.mil@mail.mil*

John E. Vargas, Colonel, ANG
Commander

SUBJECT: Rebuttal to Letter of Reprimand (LOR) Dated 26 January 2018

Colonel Vargas:

Please be advised that the law firm of Tully Rinckey PLLC has been retained to assist Lieutenant Colonel Jenner Torrence with respect to a pattern of abuses of authority at the District of Columbia Air National Guard, and this rebuttal to the LOR dated 26 January 2018. Enclosed, please find a Power of Attorney, which includes a Privacy Act waiver executed in favor of this firm by Lieutenant Colonel Torrence. (*See* Power of Attorney, Encl. 1). We ask that you withdraw the LOR and remove any reference to it in Lieutenant Colonel Torrence's military record. Lieutenant Colonel Torrence witnessed instances of misconduct perpetrated by Major Paul Doughty, and is now being punished as a reprisal for his role in supporting investigations against Major Doughty.

We respectfully disagree with how the LOR characterizes what happened on 16 October 2017. Please recognize that the video "evidence" noted in the CDI was gathered by Major Doughty in an attempt to slander Lieutenant Colonel Torrence. Simply put, there is no evidence that Lieutenant Colonel Torrence fraternized with an enlisted member. Fraternization requires the element of knowledge. If you believe that Lieutenant Colonel Torrence socialized with an enlisted member, you must also show that he "knew" that the subject was an enlisted member. There is no evidence in the CDI that supports such a claim.

Furthermore, there is absolutely no evidence to support that he was untruthful to his chain of command. To show that a false statement occurred, you must show that Lieutenant Colonel Torrence made statements with the "intent to deceive" in an attempt to cause another to believe as true, that which is false. None of the witnesses in the DCI support that Lieutenant Colonel Torrence's statements were deceptive. That was a wrongful conclusion made by the Investigative Officer. To the contrary, he has taken affirmative actions to report all of the events. He also met with the Investigative Officer to clarify the record, and even provided a sworn statement outlining his concerns. Under the circumstances, it is absurd to assert that he was untruthful.

Lieutenant Colonel Jenner Torrence
Rebuttal to Letter of Reprimand
February 5, 2018

It is obvious to any objective person that the Command is purposely orchestrating actions to slander Lieutenant Colonel Torrence's name, ruin his career, and protect Major Doughty from further scrutiny regarding his unlawful and discriminatory behaviors. The LOR reflects a willingness to condone sexual harassment and false claims, and is an abuse of authority.

As is well-documented, Lieutenant Colonel Torrence was intentionally targeted by Major Doughty after he sexually assaulted Major Ahn-Chi Murphy. Major Doughty became infatuated with Major Murphy during the Guam deployment. He commented publicly about her breasts on several occasions, and sent her unsolicited private messages asking her to join him in his hotel room. Sadly, the infatuation has turned into something more sinister and frightening for Major Murphy. Out of jealousy, and to control her actions, Major Doughty wrongfully accused Major Murphy of an inappropriate relationship with Lieutenant Colonel Torrence, and told her that he would "destroy" her. Along with his attempts to destroy her, he has targeted Lieutenant Colonel Torrence in an attempt to silence them both. This LOR is a continuation of that process of intimidation.

Sir, we believe that the Command has made poor decisions in attempt to protect Major Doughty. We assert that the Command should not make matters worse, and allow this matter to calm down. Please remember that rational observers see exactly what is happening. Further incidents of reprisal will only serve to harm the morale of the officers, and effect the mission of your Command. Please be assured that if this LOR is put in Lieutenant Colonel Torrence's official record, you will be receiving calls from Congressional offices and the Office of the Inspector General. You have the power to show that you do not condone unlawful reprisals based upon sexual harassment. Please adjust your tactics.

We ask that you consider Lieutenant Colonel Torrence's positive service record, and humbly request that you exercise judgment in favor or justice and leniency. We respectfully ask that you rescind the LOR. Alternatively, we request that it only be filed in his local file, and not in his official military record. Thank you for considering Lieutenant Colonel Torrence's response.

I can be reached directly at ggreiner@fedattorney.com and (202) 375-2240.

Gregory F. Greiner
Partner
Tully Rinckey PLLC
815 Connecticut Avenue NW
Suite 720
Washington, D.C. 20006
Telephone: (202) 375-2240
E-mail: ggreiner@fedattorney.com

2

Lieutenant Colonel Jenner Torrence
Rebuttal to Letter of Reprimand
February 5, 2018

Enclosures

1. Power of Attorney (1 page);
2. Lieutenant Colonel Jenner statement (5 pages);
3. Memorandum from Melissa Torrence (1 page);
4. Major Murphy's Response to Command (6 pages).

3

Enclosure 1



# TULLY RINCKEY PLLC

## ATTORNEYS & COUNSELORS AT LAW

| | |
|---|---|
| 441 New Karner Rd.<br>Albany, NY 12205 | 815 Connecticut Ave. NW Suite 720<br>Washington, DC 20006 |
| 400 Linden Oaks, Suite 110<br>Rochester, NY 14625 | 501 West Broadway, Suite 800<br>San Diego, CA 92101 |
| 507 Plum St. Suite 103<br>Syracuse, NY 13204 | 4100 Vestal Rd. Suite 104<br>Vestal, NY 13850 |
| 5488 Sheridan Dr. Suite 500<br>205 Buffalo, NY 14221 | 3724 Executive Center Drive Suite<br>Austin, TX 78731 |
| 3200 Southwest Freeway, Suite 3300<br>Houston, TX 77027 | 777 Third Avenue, 22rd Floor<br>New York, NY 10017 |

## POWER OF ATTORNEY

I,

---

Jenner Torrence

---

1208 5th St. NE

---

Washington, DC  20002

---

202-876-4020

---

hereby designate the law firm of TULLY RINCKEY, PLLC to serve as my attorneys in all matters relating to and/or arising out of my employment by the federal government of the United States of America.  I authorize all branches, agencies, appointees, officials, and employees of the federal government of the United States of America, as well as of the governments of any State, County, or Municipality in the United States, to fully communicate with and release to my herein designated attorneys any and all information related to me and my employment by the federal government as deemed necessary, as a waiver of my rights under the Privacy Act, 5 U.S.C. § 552a.  This Power of Attorney will remain in effect until withdrawn by me and/or my designated attorneys.

Date: 5 DEC 20:7

Signature

123

Enclosure 2



**DEPARTMENT OF THE AIR FORCE**
121ˢᵗ FIGHTER SQUADRON (ANG)
3029 EAST PERIMETER ROAD
ANDREWS AFB, MD 20762-5011

5 Feb 2018

MEMORANDUM FOR COLONEL JOHN E. VARGAS

FROM: LT COL JENNER M. TORRENCE

SUBJECT: 26 January 2018 LOR Rebuttal

References:    (a) *Manual for Courts-Martial United States, 2016 Edition*

1.      First, thank you for the opportunity to provide a rebuttal to this LOR regarding the events that took place the evening of 16 Oct 2017. I want to assure you that I will not let events such as this occur again in the future, and that I am not guilty of fraternization or making any intentionally false statements.

2.      With regard to false statements, *The Manual for Courts-Martial United States, 2016 Edition,* Article 107, states Elements "(1) That the accused signed a certain official document or made a certain official statement; (2) That the document or statement was false in certain particulars; (3) That the accused knew it to be false at the time of signing it or making it; and (4) That the false document or statement was made with the intent to deceive." For nearly all of my statements elements 1 and 2 do not apply. For absolutely all of my statements, official or not, elements 3 and 4 do not apply. I remained silent on certain details in accordance with my rights, but I did not intentionally convey anything false. I did my best to clarify any ambiguity that I knew existed in my statements. I explicitly stated to Col Smith during the CDI interview, that after Maj Murphy re-sent me my own SMS about the evening of 16 Oct, I did not recall the event the same way it was portrayed in my own SMS to her. I also mentioned this to Maj Murphy, and I tried to make clear that my written account of the event was what I believed to be the most accurate of any. At the time I sent Maj Murphy the text I was still trying to mentally reconstruct the details of the event myself and was most concerned with communicating a possible fire at to her safety and legal process. I am disappointed Col Smith did not include my clarification of this matter in the CDI report. I stand by my written statement as my own recollection of the events, and while it leaves some details to be filled in, I do not feel it substantively contradicts any video evidence. Upon video review, I struggled to see any practical disparity between my written and verbal accounts, and the video. Additionally, I clearly mentioned both verbally and in writing that my ability to recall exact details of the event was somewhat limited, especially happenings prior to the conversation with Maj Doughty. The conversation was a significant emotional event, and I was trying to reconstruct the scenario for myself while describing it. I made clear that there could be some inaccuracies in both my written and verbal account to the IO. If there is any contradiction it is purely due to the limits of my recall or communication ability, not any intent to deceive. Please see Attachment 1 for more discussion.

3.      During my communications after the event on 16 Oct 17, my primary focus was in describing the event to all parties, was to express the conflict of interest in having Maj Doughty and myself in close proximity, and to highlight potential illegal and dangerous surveillance, interference with an ongoing administrative or criminal proceeding, coercion, reprisal, and blackmail. I was hopeful this would provide vital information to the command so that the concerns could be mitigated at the lowest level. I was much more concerned with communicating these activities than my interaction with the individual while sitting at the bar, and at no point did I intentionally say or write anything false. I was not asked to clarify any ambiguities that the IO knew existed. I was also not made aware that there was a video or photos available to review and assist in making my statement more accurate.

4.    Regarding the allegation of fraternization, *The Manual for Courts-Martial United States, 2016 Edition*, Article 134, states Element (3) of Fraternization as "That the accused then knew the person(s) to be (an) enlisted member(s)." I was not previously acquainted with the individual and I did not know she was enlisted. This was the first day of the event and I intentionally avoided the meetings that Maj Doughty attended at WEPTAC; therefore, I would not have been familiar with the individuals working concessions at those venues. The event was attended by many civilians and occurred in a civilian establishment. You can see several civilian males and females in the video. Additionally, there were many field grade officers present. I would assume that, had it been at all obvious that I was socializing with someone inappropriate or enlisted, at least some of them would have me notified me. In accordance with AFI 1-1 "Wingman Concept," had Maj Doughty been truly concerned, I believe he would have simply notified me or had someone else tell me. Instead he waited for the most questionable moment of the previous hour to take photographs of me.

5.    I understand why some may view the interaction immediately surrounding Maj Doughty's photographs as questionable; however, had this interaction occurred between two people known to be significant others, I do not believe anyone would question it. The appropriateness of non-intimate interactions between two individuals base on matrimonial or other romantic status is entirely subjective and personal, and not legitimate grounds to assess appropriateness from a governmental perspective. Doing so is an imposition of ones strongly held personal values on others, and is unlawful. I believe the IO having taken note of my marital status to be inconsequential to the CDI and somewhat inappropriate. Additionally, in my own recollection, and as portrayed by the video evidence, I did nothing lude or indecent during the encounter sitting at the Finnigan's bar. I also do not believe any of my actions compromised the chain of command or good order and discipline in any way. I will assure this type of interaction does not occurs again in the future. I do wish I had terminated the interaction much more quickly, but I do not believe it constituted an inappropriate relationship.

6.    Additionally, I noted that there appears to be no testimony from LtCol Kanewske whom I gave as a potential witness to my account. Maj Murphy provided an email but was also apparently not verbally interviewed. This seems somewhat biased.

7.    I greatly regret if this situation has caused any discord and I will ensure nothing similar occurs again in the future. I ask that you consider I came forward to report this event voluntarily out of consideration for physical and organizational health. I respectfully ask for your reconsideration of the CDI findings, for leniency, and that you downgrade or rescind this LOR.

TORRENCE.JENNER.MI
CHAEL.1078498850

Digitally signed by
TORRENCE.JENNER.MICHAEL.1078498850
Date: 2018.02.05 01:33:51 -05'00'

JENNER M. TORRENCE, LtCol, DCANG
113WG/CCZ

1 Attachment:
1. Comments in Regard to Noted Inconsistencies
2. Melissa R. Torrence Letter to Col John E. Vargas

**Attachment 1: Comments in Regard to Noted Inconsistencies:**

I want to be very explicit that my accounts below are the best of my recollection based on what I can reconstruct after looking at the video evidence. It has been over three months since this event and there was some alcohol involved. This is in no was meant to be a precise recollection of what happened, but simply a recount of where I believe my earlier (also documented as only my best recollection) originated and why it is consistent with the video and photographic evidence.

LtCol Torrence's Written Account: *I was socializing with a group of individuals while sitting at the bar, which was fairly crowded. One of the members in group I was conversing with departed the group momentarily freeing up space for me to rotate myself in the direction of the group to continue the conversation, as opposed to facing straight toward the bar as I was previously. When the individual returned they assumed a posture in front of me but facing the group. This left the individual close enough to me that there was some physical contact between the two of us, or at least nearly so.*

Comment: Most of the rest of the group is out of frame to the left (viewers perspective). From 10:19:00 through most of the video you can see at least one other individual in the frame to the left. This is the group I am referring to. You can see me speaking with them throughout the video but especially in the minutes leading up to Maj Doughty's photo. The bar is fairly crowded. The barstools (if I am recalling the layout correctly) on both sides of me is occupied the majority of the time with individuals standing between the barstools for a good potion of the time as well (10:34:37 through most of the rest of the footage). There are also many other people out of frame to the left were intermittently in the conversation. Around 10:53:30 the individual leaves (possibly to the restroom). I believe this may have been when I turned my lower torso to my right, intending to eventually get up and go to the restroom now that there was some space. Before this I felt I was facing more straight toward the bar. At 11:06:16, after returning, the individual is periodically facing away from me while conversing with the individuals in front of her and I do not believe in any intentional or persistent contact with me. At 11:07:07 the individual leans back against me fairly aggressively to converse with me and I do not extricate myself from the situation fast enough. I believe I remember this surprising me slightly. This left her in contact with me and facing away talking to the group as I have stated. The statement "there was some physical contact between the two of us, or at least nearly so," was meant to convey this situation. I believe it does this fairly accurately upon video review. I believe I reflexively put my hand on her waist as she leaned back to say something, but cannot claim to actually recall putting my hand on her waist. 85 seconds later at 11:08:33 I see Maj Doughty taking pictures. At 11:08:37 I move her away slightly and then at 11:08:50 I move her further always so that I can stand up and talk to Maj Doughty. I think my delay, even after seeing Maj Doughty, is indicative that my reaction time was less then optimal at the time, which may have led to my delay in mitigating the proximity earlier. I see no disparity between the video and my written account. There is certainly nothing intentionally false in the statement.

Lt Col Wilsons (assumed) Account: *he was with a group of many people having a conversation. Across the bar saw Maj Doughty. He stated girl gets up goes to the bathroom, when she comes back leans back against me caught me by surprise and I pushed her away. Maj Doughty takes a photo and they had a conversation*

Lt Col Wilson's (assumed) Account: *He told me that Maj Doughty took a picture with an unknown girl who a "straddled" him*

The above account seems in accordance with my above discussion regarding my written account and the video. There was a group of people (I don't remember using the adjective many, but I do not believe it would be inaccurate). I don't recall saying I saw Maj Doughty across the bar but this is possible. I do believe I was a bit surprised by the aggressive way the other individual initially leaned back into me at

11:07:07. I do not remember saying I "pushed" anyone, but perhaps this was my poor communication of my attempt to move the individual away at 11:08:37 – 11:08:50. I definitely did not intend to communicate having pushed her away immediately as this would not have been coherent with Maj Doughty being able to take a picture and cause the follow-on conversation, which was the reason I called to talk to Lt Col Wilson. I have absolutely no comprehension of where the "straddled" comment could have come from. I believe it was a misconception or misunderstanding. I am quite certain I never alluded to anyone "straddling" me. This is a good example of how wildly inaccurate after the fact recollection of a conversation can be. I think at one point I did say to someone that the individual "saddled up to my barstool." I am not sure if this could have been where the misconception arose, but I would have thought I would have been asked for clarification if I told someone I was "straddled."

LtCol McDonough's (assumed) Account: *Lt Col Torrence said there was an altercation. He said there was group of many people, having a conversation and across the bar when he saw Major Doughty. He mentioned that there was a girl that got up and as he went to the bathroom and the girl leaned against him. This caught him by surprise and he pushed her away. At that time of the photo.*

Comments: I'm a bit confused as to this paragraph. It seems to be a repeat of Lt Col Wilson's account but perhaps not. As such, the above discussion is appropriate to this paragraph as well. I did feel the event was a bit of an altercation but not of a physically or verbally inappropriate nature. I believe I was trying to convey that I thought the other individual had left for the restroom, not myself.

CDI Interview: *He stated at the time at the time there was no knowledge if she was even a female enlisted member or even in the military at all.*

Comment: I made this statement and it is true.

Text to Maj Murphy: *As I do that the girl is kind of up against me because the bar is jammed and I have move one leg around her at a time to get faced away from the bar.*

Comment: This is admittedly inaccurate but not intentionally so. This was my first communication regarding the event. It was my next morning attempt to reconstruct what happened and meant to expediently convey to Maj Murphy my concern about surveillance, stalking, coercion, blackmail, and reprisal surrounding her ongoing SAPR process, not details of the interaction with the other individual. I think the account is mostly my recollection of attempting to get up from the barstool to address Maj Doughty after having initially turned to the side, with the intent to go to the restroom, but then being engaged in conversation again. I realized this inaccuracy after Maj Murphy had forwarded my own SMS message back to me for review. I immediately clarified to Maj Murphy that the SMS was not in accordance with my current recollection of the event. I spoke explicitly with the IO about this during the interview when I encouraged her to reach out to Maj Murphy for emails to her SVC and interview. I also explicitly told the IO that I believed my written account of events to be the most accurate and to rely on that rather than the SMS. This was not an intentional inaccuracy and I did my best to point it out and clarify it to anyone who had seen it, to include the IO.

Follow-up Written Declaration: *I have been honest throughout the process*

Comment: This is true.

*I believe he created a situation to use against me, and to discredit my character. I assert that he was also acting out of reprisal due to my previous cooperation in an investigation against him and coercion to prevent my further cooperation. In spite of his provocative actions, I did my best to-lee scalate t e situation and did nothing to antagonize or continue things.*

Atch 1

Comment: This is true. If Maj Doughty had truly been concerned about something besides reprisal he would have simply told me his concerns or had someone else do it IAW AFI 1-1 Wingman Concept. Instead he elected to take 39 photographs and walk away without addressing me. Even if he felt compelled to protect himself with a photograph this did not absolve him of intervening if he believed the situation to be inappropriate. He did not do that. Given the ongoing (at the time) SAPR processes against him, me being a primary witness and having executed bystander intervention, I still see no possible motive for Maj Doughty's photographs besides reprisal, coercion or blackmail. I still believe that to be the case and I still believe this CDI and LOR to be the execution of that reprisal. I did approach Maj Doughty to attempt to deescalate the overall scenario. I did this by consistently communicating to him that I had no ill will towards him and had actually taken steps to protect him in the past. While I did insist on having a conversation, at no point do I feel I was antagonistic. This statement is true.

*I have not made false statements regarding happened on that night,*

Comment: This is true. I have said nothing intentionally false.

*I did not engage in fraternization. Furthermore, none of my actions compromised the chain of command, resulted in the appearance of partiality, or otherwise undermined good order, discipline, or morale.*

Comment: This is also true. When the event occurred, I had no knowledge of the other individual's military association and none of the multiple other officers at the bar expressed any concern over the social interaction. Given the Air Force culture of Wingmanship, I assume they would have, had the individuals rank been easily ascertained.

*I hereby affirm under penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge, information, and belief.*

This is true. The statements were true and correct to the best of my personal knowledge, information, and belief.

# Enclosure 3

4 February 2018

For: Colonel John E. Vargas

From: Melissa Torrence

Subject: Your Inappropriate Imposition of Personal Values on My Family

John,

I'm writing to ask you to cease imposing your own strongly held values with respect to matrimony and cross gender relationships on Jenner or anyone else with whom he chooses to associate. I understand that while on Title 10 orders Jenner is subject to certain laws regarding the nature of relationships, due to our holding a marriage license. I also understand that there are limitations on relationships with personnel that he knows to be enlisted. Outside of these constraints, the nature of his relationships with others, regardless of gender, are a concern only between him and me. It is not the US Government's concern, it is not the concern of the United States Air Force, and it is certainly not your concern.

Your judgment of "appropriateness" regarding any cross gendered relationship of Jenner's, to include his relationship with Anh-Chi Murphy, is clearly based on your own personal matrimonial values and on no professional standard. You would never deem similar relationships between single people or two like gendered individuals "inappropriate." I have witnessed many such relationships that garnered no attention. Please cease imposing your personal values on my family though administrative action against Jenner.

As a female and fellow victim of sexual harassment and assault, I find your retaliatory imposition of these values against men who offer advocacy, intervention, and comradery to women whom have suffered assault and harassment unconscionable. Your encouragement of other gender alienation is dangerous. In your fixation on potential sexual transgressions, you have neglected the safety of the women under your command. It seems your history not only precedes you but accompanies you.

Your habitual use of authority to force your own values on others is perilous and stands in stark contrast to the American freedoms you are sworn to uphold. Please stop.

Sincerely,

Melissa R. Torrence
113 OG Family Member

Atch 2

# Enclosure 4



# TULLY RINCKEY PLLC

## ATTORNEYS & COUNSELORS AT LAW

815 CONNECTICUT AVE NW, SUITE 720
WASHINGTON, DC 20006
PHONE: (202) 787-1900
WWW.FEDATTORNEY.COM
EMAIL: INFO@FEDATTORNEY.COM

January 22, 2018

*Sent via email to: Steven.s.nordhaus.mil@mail.mil; Jeffrey.c.bozard.mil@mail.mil; matthew.f.blue.mil@mail.mil; keith.c.wilson2.mil@mail.mil; javier.c.lopezcovas.mil@mail.mil*

**Through:**

Brigadier General Jeffrey C. Bozard
Commander, 113 WG

**For:**

Brigadier General Steven S. Norhaus
Commander, ANGRC

SUBJECT: Rebuttal to Joint Letter of Reprimand (LOR) Rebuttal Dated 4 December 2017

Commander:

Please be advised that the law firm of Tully Rinckey PLLC has been retained to assist Major Ahn-Chi Murphy with respect to on-going instances of sexual harassment and this rebuttal to the LOR dated 4 December 2017. Enclosed, please find a Power of Attorney, which includes a Privacy Act waiver executed in favor of this firm by Major Murphy. (*See* Power of Attorney, Encl. 1).

We ask that you withdraw the LOR and remove any reference to it in Major Murphy's military record. Major Murphy is the victim of two instances of sexual assault, and is now being punished as a reprisal for reporting one of the assaults perpetrated by Major Paul Doughty. We respectfully disagree with how the LOR characterizes what happened 27 January 2017, and believe that the LOR is an inappropriate continuation of discriminatory sexual harassment that has been promoted by the Command. The LOR action also reflects a wrongful double-standard between the treatment of male and female officers in the District of Columbia Air National Guard.

There is no evidence the Major Murphy fraternized with 113 WG enlisted personnel, and she certainly did not *allow* a stripper to completely undress her in front of fellow officers and enlisted members. The instance at issue was meant to be a playful situation, the same type of playful situation done by other male officers during the deployment (including Major Doughty),

133

Major Ahn-Chi Murphy
Rebuttal to Letter of Reprimand
January 22, 2018

and turned into something unintended and extremely embarrassing for Major Murphy. After escaping an assault by a nightclub employee, she was then assault by Major Doughty.

It is well-documented that Major Doughty became infatuated with Major Murphy during the Guam deployment. He commented publicly about her breasts on several occasions, and sent her unsolicited private messages asking her to join him in his hotel room. Sadly, the infatuation has turned into something more sinister and frightening for Major Murphy. Out of jealousy, and to control her actions, he wrongfully accused Major Murphy of an inappropriate relationship with another officer and told her that he would "destroy" her. In spite of a lawful military protective order, Major Doughty has purposely violated its requirements in an attempt to intimidate Major Murphy. Shockingly, the Command has allowed it to happen.

We assert that the Command is promoting unlawful sexual discrimination. Adding proof to support that assertion, her victims' advocate, Major Lopez, received assurances that she was not the subject of any adverse investigation. Under the belief that she was protected by an umbrella of legally required protection, Major Murphy provided a statement to investigators about the Guam incidents. Even the sexual assault prevention office assured her there would be no reprisal. However, it is now known that the Command Staff Judge Advocate purposely kept quiet about the Command's intent to give her the LOR until after she made statements. We believe that these actions violate military regulations and doctrine.

In 2015, the Air Force released a five-year Sexual Assault Prevention and Response Strategy mean to prevent sex assault and harassment. In support of the strategy, Secretary of the Air Force Deborah Lee James stated, "Sexual assault prevention is critical to the health, morale and welfare of Airmen and ultimately essential to Air Force readiness." The Sexual Assault Prevention Strategy promulgates the important sexual assault prevention tenets: preventing violence before it occurs; promoting prevention at every level; and providing ongoing prevention activities that reflect the roles and development of each Airman. The strategy explains factors that put an individual at risk, including unhealthy experiences and risk factors in every setting. Please see the attached strategy memorandum. We assert that this LOR, along with other actions of the Command, directly contradicts the spirit of what the Secretary of the Air Force is trying to establish. Simply put, the LOR is punishing the victim for coming forward with her complaints.

When considering what has happened, a few questions come to mind:

• Who chose to send a female officer alone on a deployment with only men?

• Why is Major Murphy being given a LOR when she is the victim of sexual assaults?

• Who is preventing reprisals against reporting victims of sexual assist in the District of Columbia National Guard?

Sir, we believe that the Command has made poor decisions regarding the treatment Major Murphy, and this LOR is an unfortunate continuation of those poor decisions. It is outrageous to

2

Major Ahn-Chi Murphy
Rebuttal to Letter of Reprimand
January 22, 2018

see that a female officer could be assaulted and intimidated by a fellow officer, and that those actions are seemingly condoned. It is simply not appropriate to punish the victim, and you need to ensure that isn't happening. All of the signs point to Command mismanagement of these incidents, and we believe that only you can prevent any further reprisals against Major Murphy. The first step is to destroy this LOR, and send a strong message that reprisals will not be tolerated.

We ask that you consider Major Murphy's positive service record. Since being awarded an ROTC commission, she has dutifully served the United States Air Force and developed into a skilled intelligence analyst and officer. We humbly ask for your leniency, and further ask that you use your discretion to do what is right by stopping sexual assault and its residual victimization. Sir, we ask that you intervene and stop this unjust action, and allow Major Murphy to continue serving without the fear of further retribution or reprisal. The LOR only serves to embolden further unlawful behaviors and ruin of the career of an excellent female officer.

We respectfully ask that you rescind the LOR. Alternatively, we request that it only be filed in her local file, and not in her official military record. Thank you for your consideration of Major Murphy's response.

Gregory F. Greiner
Partner
Tully Rinckey PLLC
815 Connecticut Avenue NW
Suite 720
Washington, D.C. 20006
Telephone: (202) 375-2240
E-mail: ggreiner@fedattorney.com

Enclosures

1. Power of Attorney (1 page);
2. Major Murphy's statement (3 pages);
3. USAF Sexual Assault Prevention and Response Strategy (13 pages);
4. Major Murphy Service Profile (7 pages);
5. Major Murphy Resume (4 pages);
6. OPRs (12 pages);
7. Awards (3 pages);
8. Military Protective Order and Associated Memoranda (4 pages);
9. Memorandum exhibiting further inappropriate behavior by Major Doughty (3 pages);
10. Letter of Recommendation (3 pages).

3



**DISTRICT OF COLUMBIA AIR NATIONAL GUARD**
113TH OPERATIONS SUPPORT SQUADRON (ACC)
JOINT BASE ANDREWS MARYLAND 20762-5157

22 January 2018

MEMORANDUM THRU Brigadier General Jeffrey C. Bozard, Commander, 113th

WG FOR Brigadier General Steven S. Norhaus, Commander, ANGRC

FROM: MAJOR ANH-CHI MURPHY, 113th OSS/IN

SUBJECT: Joint Letter of Reprimand (LOR) Rebuttal Dated 4 December 2017

I hereby swear or affirm under penalty of perjury under the laws of the United States of America, that the following statements are true and correct to the best of personal knowledge, information, and belief.

1. **Opening:**

Thank you for the opportunity to address the LOR dated 4 December 2017. I ask that you withdraw the LOR and remove any reference to it in my military record. I respectfully disagree with the characterization of what happened 27 January 2017, and believe that the LOR is an inappropriate continuation of discriminatory sexual harassment that has been promoted by the Command. I am the victim of two instances of inappropriate sexual contact. I reported the instances of inappropriate sexual contact, and assert that the LOR is in reprisal of my reporting the accusations. Furthermore, the LOR action reflects a wrongful double-standard between the treatment of male and female officers in the District of Columbia Air National Guard.

2. **Relevant Facts:**

*a. I deny the factual accusations –*

I did not fraternize with 113 WG personnel, and did not allow a stripper to completely undress me in front of fellow officers and enlisted members.

*b. I am the victim of sexual assault –*

Near the end of a deployment in Guam on 27 January 2017, I went to a Irish bar with a group of male Air Force officers. It was a celebratory event, and afterwards the group continued socializing at a nearby nightclub. I did not go to the nightclub with enlisted members, and did not communicate or socialize with them.

Shortly after arriving at the club, I was encouraged by others to go on the dance stage. I had witnessed other male officers do the same thing, to include Maj Doughty on a previous night.

and believed I was going to participate in a harmless dance. Unfortunately, it quickly turned into something unintended and extremely embarrassing. After going onto the stage, the nightclub dancer became very aggressive with me and pinned me to the floor of the stage. I think this happened because I was a petite female, not because I asked for it or was a willing participant. I was wearing a casual dress, and before I could stop it the dancer partially disrobed me against my will. As soon as she released me, and I was able, I hurried off the stage. After escaping that assault, when pulling myself together off-stage, Major Paul Doughty groped me. I was very embarrassed and was horribly violated by the club dancer and Major Doughty. After returning to the United States I reported the assaults to the Air Force Sexual Assault Prevention and Response office, and was provided the assistance of Special Victims' Counsel, Major Javier Lopez.

   c.  *Major Doughty harassed me during, and after, the TDY—*

During the deployment, Major Doughty acted like he was infatuated with me. He commented publicly about my breasts on several occasions and sent me private messages asking me to join him in his room. Since then, out of jealousy, he accused me of an inappropriate relationship with another officer, and told me that he would "destroy me" and use the nightclub incident as blackmail, if I did not disclose to him, what he believed was the truth. There is a military protective order put in place in June of 2017, which he has purposely violated. I believe that the Command has allowed him to violate the order, as he was accompanied by two commanders' (both aware of the MPO) during the violation. It is well-known that these commanders are companions of Major Doughty, have similar military backgrounds, and live in close proximity to him. I believe that these actions were meant to intimidate me. He has continued his harassment through third parties, even after his MPO was issued. This harassment has occurred as recently as 19 January 2018 as illustrated in the supporting documents. I am frightened of Major Doughty, and assert that the Command is taking reprisal against me for making a complaint against him.

   d.  *The Command is Promoting Unlawful Discrimination—*

It was my original intent to keep the complaint against Major Doughty restricted. However, due to a previous LOR (caused largely by Major Doughty's accusations) I was forced to release the sexual assault report in order to document the truth. My victims' advocate, Major Lopez, received assurances that I was not the subject of any adverse investigation, and therefore I made a statement to investigators about what happened in Guam. I was also assured by personnel at the sexual assault prevention office that I could not be reprised against due to reporting what happened. According to Major Lopez, the Command Staff Judge Advocate purposely kept quiet about the Command's intent to give me the LOR until after I made statements. I was never advised to seek nor provided any legal defense counsel and have had to seek private legal assistance retroactively, at great expense to me and my family. While I am pleased that my truthful version of the events is part of the official record, I believe their actions provide supportive evidence of the reprisal and unfair handling of this situation.

2

### 3. History of Excellent Service and Acceptance of Responsibility:

Please consider my positive service record. I joined the Air Force in 2005 after obtaining an ROTC commission from the University of Virginia, and was awarded "Operations Group CGO of the half" in 2016, shortly after joining the 113th OSS. I have also received multiple service awards throughout my active duty and Air National Guard career. I am a skilled intelligence analyst, and have served as the Senior Intelligence Officer for the 113W. In hindsight, as the sole female officer deployed to Guam, I would have isolated myself from the other officers to prevent the harassment. However, I should be entitled to the support of my peers and should not expect my fellow officers to treat me differently because of my gender.

### 4. Conclusion:

I respectfully ask for your leniency, and I humbly ask to please set aside this action and destroy the LOR. I am not making excuses for my actions, but I am the victim of these events. I would never purposely humiliate myself as noted in the LOR, and any accusation to the contrary is simply rubber-stamping the inappropriate conduct of others. Sir, I ask that you intervene and stop this unjust action. I want to continue serving the Command and the Air Force without the fear of further retribution or reprisal.

The POC for this memorandum is the undersigned at anh-chi.p.murphy.mil@mail.mil or at (804) 869-8840.

I hereby affirm under penalty of perjury that the foregoing statements are true and correct to the best of my personal knowledge, information, and belief.

MURPHY.ANH-CHI.PHAN.1270104173
Digitally signed by MURPHY.ANH-CHI.PHAN.1270104173
Date: 2018.01.22 13:56:30 -05'00'

ANH-CHI P. MURPHY, Maj, ANG
Chief of Squadron Intelligence

3

# ENCLOSURE 10



**DEPARTMENT OF THE AIR FORCE**
113TH WING (ANG)
JOINT BASE ANDREWS MD

31 May 2019

MEMORANDUM FOR LT COL JENNER M. TORRENCE 113 OSS

FROM: 113 OSS/CC
3029 E. Perimeter Rd
JBA, MD 20762

SUBJECT: Referral Officer Performance Report

1.  I am referring the attached Officer Performance Report to you according to AFI 36-2406, para 1.10. It contains comments/ratings that make the evaluation a referral as defined by AFI 36-2406, paragraph 1.10.

2.  Acknowledge receipt of this correspondence by digitally signing and dating. Your signature on this memo merely acknowledges that a referral evaluation has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the evaluation. Once this memo is signed, you are entitled to copy. You may submit comments to rebut the evaluation and address any concerns pertaining to the evaluation. Send your comments to Col John Vargas no later than 3 duty days from the date you receive this memorandum. You may submit attachments limited to a total of 10 pages (5 pages front and back); but they must directly relate to the reason the evaluation was referred. Pertinent attachments not maintained elsewhere in the official record will remain attached to the evaluation for filling in your official personnel record. Copies of previous evaluations, etc. submitted as attachments, will be removed from your rebuttal package prior to filing the referral evaluation since these documents are already filed in your official records. Contact your MPS/CSS/HR Specialist if you require any assistance in preparing your reply to the referral evaluation.

LEWIS.CHAD.GREG Digitally signed by
ORY.1140655690  LEWIS.CHAD.GREGORY.11406556
              90
              Date: 2019.05.31 10.53.48 -04'00'
CHAD G. LEWIS. Lt Col, ANG
Commander, 113 OSS

Attachment:
AF Form 707, 8 Mar 2018

Cc:    113 OG/CC, Col John E. Vargas

1st Ind, Lt Col Jenner Torrence

MEMORANDUM FOR 113 OG/CC Col John E. Vargas

# ENCLOSURE 11

## OFFICER PERFORMANCE REPORT  *(Lt thru Col)*

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2406 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. RANK | 4. DAFSC | 5. REASON FOR REPORT | 6. PAS CODE |
|---|---|---|---|---|---|
| TORRENCE, JENNER M. | 4487 | Lt Col | 11F3H | Annual | B91CFL80 |

| 7. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 8. PERIOD OF REPORT | 9. NO. DAYS SUPV. |
|---|---|---|
| 113 Operations Support Squadron (ACC) <br> Joint Base Andrews MD (AGR) | FROM  2 Nov 2017 <br> THRU  1 Nov 2018 | 365 <br> NO. DAYS NON-RATED <br> 0 |

**II. JOB DESCRIPTION** *(Limit text to 4 lines)*

DUTY TITLE  F-16 Flight Lead

10. SRID  11113

- Maintains CMR status as an F-16C+ pilot and flight lead; qualified in Advanced TGP, IAMS, and LGB weapons
- Defends the US and NCR and enforces ADIZ boundaries as an Alert Pilot; directly responsible to NORAD control
- Performs all Counter Air and Surface Attack missions including DCA, Interdiction, SEAD, DEAD, CAS and ACA
- Supervisor of Flying; oversees daily flying operations; ensures timely & safe execution of combat & training sorties

**III. PERFORMANCE FACTORS**

| | DOES-NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| Job Knowledge, Leadership Skills (to include Promoting a Healthy Organizational Climate), Professional Qualities, Organizational Skills, Judgment and Decisions, Communication Skills (see reverse if marked Does Not Meet Standards) | ☒ | ☐ |

**IV. RATER OVERALL ASSESSMENT** *(Limit text to 6 lines)*

- Furthered the ACA enterprise; scheduled FS pilots for alert shifts; all currencies met--100% NCR coverage achieved
- Spearheaded OPS/MX working relationship; synchronized OPS reqs to MX capabilities--NORAD/CC directives met
- OPS ACA facilities POC; identified facilities shortfalls at ACA; made multiple key upgrades--improved pilot morale
- As 113th OG SOF, served as OG/CC rep for all 121FS flying activities; coordinated MX actions--zero mishaps OPS
- Maintained CMR status; 100+ flying currencies achieved; readiness key to FS objectives--80% readiness levels met
- Appearance of UPR at home & deploy'd w/ O-4; fraternization in uniform at a bar; lied when asked--2 LORs issued

Last performance feedback was accomplished on:  8 Feb 2018  *(IAW AFI 36-2406) (If not accomplished, state the reason)*

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG <br> 113th Operations Support Squadron (ACC) <br> Joint Base Andrews MD | Commander | 30 Aug 19 |
| | SSN  2862 | SIGNATURE  *Chad J Lewis* |

**V. ADDITIONAL RATER OVERALL ASSESSMENT** *(Limit text to 4 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- 113th OG rep to NORAD; attended NCR WEPTAC; integrated newest TTPs into 113th ACA ops--mission success

- WG level responsibilities; provided key insight to WG processes--improved several key relationships within the WG
- Recommend focus on officership/AFI compliance; leadership, professional qualities & judgment need improvement

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG <br> 113th Operations Group (ACC) <br> Joint Base Andrews MD | Commander | 23 Sep 19 |
| | SSN  4765 | SIGNATURE  *Jh E Vargas* |

**VI. REVIEWER** *(If required, limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

THE ADDITIONAL RATER IS ALSO THE REVIEWER

I have carefully considered LtCol Torrence's comments to the referral document of 31 Aug 2019.

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG <br> 113th Operations Group (ACC) <br> Joint Base Andrews MD | Commander | 23 sep 19 |
| | SSN  4765 | SIGNATURE  *Jh E Vargas* |

**VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR** *(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| | | |
| | SSN | SIGNATURE |

**VIII. RATEE'S ACKNOWLEDGMENT**

| I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report. | Yes  No <br> ☐    ☐ | SIGNATURE | DATE |
|---|---|---|---|

AF FORM 707, 20150731, V1    (PREVIOUS EDITIONS ARE OBSOLETE)

PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

| RATEE NAME: TORRENCE, JENNER M. | | |
|---|---|---|

| IX. PERFORMANCE FACTORS (If Section III is marked Does Not Meet Standards, fill in applicable block[s]) | DOES NOT MEET STANDARDS |
|---|---|
| 1. Job Knowledge. Has knowledge required to perform duties effectively. Strives to improve knowledge. Applies knowledge to handle non-routine situations. | ☐ |
| 2. Leadership Skills. Sets and enforces standards. Promotes a Healthy Organizational Climate. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Motivates subordinates. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | ☒ |
| 3. Professional Qualities. Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force Standards (i.e. Fitness standards, dress and appearance, customs and courtesies, and professional conduct.) Accepts personal responsibility. Is fair and objective. | ☒ |
| 4. Organizational Skills. Plans, coordinates, schedules and uses resources effectively. Meets suspenses. Schedules work for self and others equitably and effectively. Anticipates and solves problems. | ☐ |
| 5. Judgment and Decisions. Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities. Adheres to safety and occupational health requirements. Acts to take advantage of opportunities. | ☒ |
| 6. Communication Skills. Listens, speaks, and writes effectively. | ☐ |

**X. REMARKS** (use this section to spell out acronyms from the front)

Aerospace Control Alert (ACA); Close Air Support (CAS); Combat Mission Ready (CMR); Defensive/Offensive Counter Air (DCA/OCA); Dynamic Targeting (DT); Inertially Aided Munitions (IAMS); Interdiction (INT); Laser Guided Bombs (LGB); Tactics, Techniques and Procedures (TTPs); Targeting Pod (TGP); Supervisor of Flying (SOF); Suppression/Destruction of Enemy Air Defenses (SEAD / DEAD)

**XI. REFERRAL REPORT** (Complete only if report contains referral comments or the overall standards block is marked as does not meet standards)

I am referring this OPR to you according to AFI 36-2406, para 1.10. It contains comment(s)/rating(s) that make(s) the report a referral as defined in AFI 36-2406, para. 1.10. Specifically, During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group.

Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command.

Acknowledge receipt by signing and dating below. Your signature merely acknowledges that a referral report has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the report. Once signed, you are entitled to a copy of this memo. You may submit rebuttal comments. Send your written comments to: john.e.vargas.mil@mail.mil

not later than 3 duty days (30 for non-EAD members) from your date below. If you need additional time, you may request an extension from the individuals named above. You may submit attachments (limit to 10 pages), but they must directly relate to the reason this report was referred. Pertinent attachments not maintained elsewhere will remain attached to the report for life in your personnel record. Copies of previous reports, etc. submitted as attachments will be removed from your rebuttal package prior to filing since these documents are already filed in your records. Your rebuttal comments/attachments may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you can fully substantiate and document them. Contact the MPS, Force Management section, or the AF Contact Center if you require any assistance in preparing your reply to this referral report. It is important for you to be aware that receiving a referral report may affect your eligibility for other personnel related actions (e.g. assignments, promotions, etc.). You may consult your commander and/or MPS or Air Force Contact Center if you desire more information on this subject. If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2406, Chapter 10, Correction of Officer and Enlisted Evaluation Reports, once the report becomes a matter of record as defined in AFI 36-2406, Attachment 2.

| NAME, GRADE, BR OF SVC OF REFERRING EVALUATOR | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | 30 AUG 19 |
| 113th Operations Support Squadron (ACC) Joint Base Andrews MD | SIGNATURE Chad of Lewis | |
| SIGNATURE OF RATEE | | DATE |

**INSTRUCTIONS**

**ALL:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in Developmental Education, advanced education, previous or anticipated promotion recommendations on AF Form 709, OPR endorsement levels, family activities, marital status, race, sex, ethnic origin, age, religion or sexual orientation. Evaluators enter only the last four numbers of SSN.

**RATER:** Focus your evaluation in Section IX on what the officer did, how well he or she did it, and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section IV may include recommendations for assignment. Provide a copy of the report to the ratee prior to the report becoming a matter of record and provide follow-up feedback to let the ratee know how their performance resulted in this final product.

**ADDITIONAL RATER:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendation for assignment.

**REVIEWER:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NON-CONCUR" and explain in Section VI. Do not use "NON-CONCUR" simply to provide comments on the report.

**RATEE:** Your signature is merely an acknowledgement of receipt of this report. It does not constitute concurrence. If you disagree with the content, you may file an evaluation appeal through the Evaluation Reports Appeals Board IAW AFI 36-2406 Chapter 10 (Correction of Officer and Enlisted Evaluation Reports), or through the Air Force Board for Correction of Military Records IAW AFI 36-2603 (Air Force Board for Correction of Military Records) and AFPAM 36-2607 (Applicants' Guide to the Air Force Board for Correction of Military Records (AFBCMR)).

**PRIVACY ACT STATEMENT**

AUTHORITY: Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
PURPOSE: Used to document effectiveness/duty performance history; promotion, school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
DISCLOSURE: Voluntary. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
SORN: F036 AF PC A, Effectiveness/Performance Reporting Records

| AF FORM 707, 20150731, V1 | (PREVIOUS EDITIONS ARE OBSOLETE) | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |
|---|---|---|

# ENCLOSURE 12



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR FORCE COMBAT AIR FORCES DIVISION
1460 AIR FORCE PENTAGON, ROOM 5D756
WASHINGTON DC 20330

14 Sep 2019

MEMORANDUM FOR 113 OG/CC AND 113 OSS/CC

FROM: LT COL JENNER M. TORRENCE
1208 5TH ST NE
WASHINGTON, DC 20002

SUBJECT: Rebuttal to Revised Referral Officer Performance Report (OPR)

References:
    (a) Lt Col Torrence Revised Referral OPR 2 Nov 2017–1 Nov 2018 facsimile
    (b) Lt Col Torrence Revised OPR Note from Col Vargas
    (c) Lt Col Torrence Previous Rating Period OPR Correspondence with OPR
       Versions Embedded
    (d) Robert Vance to Col Vargas 7 March 19 Request Extension and Information
    (e) AFI 11-202 Volume 1 *Aircrew Training*, 10 June 2019
    (f) AFI 11-2F-16V1 F-16--*Aircrew Flight Training*, 20 April 2015
    (g) AFI 11-401, *Aviation Management*, 2 January 2014
    (h) AFI 36-2406_AFGM2019-01 *Officer and Enlisted Evaluation System*, 10 May
       2019
    (i) ANGI 36-101 *Air National Guard Active Guard and Reserve Program*, 3 June
       2014
    Note: Available references are embedded in this document.

1. **Purpose:** This document serves the following three purposes.

    a. **Information Request:** This is a request for the appropriate documentation and
    information required to formulate a proper rebuttal and OPR input for the document at
    reference a. This was discussed in my counsel's email to you on 7 Mar 2019, to which
    you did not respond. The specific information required is outlined below.

    b. **Response Time Extension Request:** This is a request for an extension to the 14
    September 2019 deadline you stipulated in the note (b) accompanying the revised OPR
    (a). The extension should allow 30 days from the date you provide the information and
    documentation required to properly formulate a rebuttal. These items are specified below.

    c. **Revised Referral OPR Rebuttal:** In the event you elect not to provide the information,
    documents, and time required for me to properly provide OPR input and respond to the
    referral nature of the referenced OPR, this serves as the rebuttal to the revised OPR. As
    my deployed duties did not allow appropriate time for a complete rebuttal, I will let the
    rater and senior rater failures, evident in the requests for documentation and information,
    stand as the rebuttal itself. Most individuals will be able to distill the wrongfulness of the
    OPR from the requests below. However, as you may have difficulty please reach out

verbally or in writing through my Counsel, Mr. Robert Vance, and we will explain how the requests below illuminate rater failures that are fatal to the OPR's viability.

    (1) The new failures in the revised OPR, the raters' continued neglect of the requisite documented feedback to accompany the OPR, and the raters' refusal to provide supporting documentation for the OPR and underlying administrative actions all provide the required new information discussed in this rebuttal.

2. **Specific Information Requests:** I received your follow-up note to my referral Officer Performance Report (OPR) rebuttal and the revised OPR (b), the OPR deletes a complementary line from the previous OPR version. Also removed was any verifiable digital rater's signature. Instead you opted for a photocopied signature. I intend to respond but first you must retract your false and misleading statements from the OPR and your previous correspondence. I also require the documents and information discussed by my counsel in his March 7, 2019 email (d), to which you did not respond. Please provide the following so that I can respond. My requirements for information to provide an informed response and OPR input follow:

    a.  Revised OPR with a legitimate signature (original ink, or digitally signed).

        (1) I am unable to acknowledge receipt until you send me a legitimate signed copy of the OPR.

    b.  Documentation of the date Lt Col Lewis was assigned as my rater (with verifiable signature and signature dates).

    c.  Documentation that I was advised of Lt Col Lewis as my rater during or prior to the rating period, and of my resultant change in chain-of-command.

        (1) I have already obtained information from MILPDS that he was not assigned as my rater, per my original OPR rebuttal.

    d.  Documentation that the duties listed in the OPR fell within the 113 OSS's purview and authority.

    e.  Documentation of regular supervisory feedback and communication form Lt Col Lewis to myself during the rating period, especially from 26 Jan 18 - 1 Nov 18.

    f.  Documentation of why the duties listed in the OPR required a change of rater.

    g.  Airman Comprehensive Assessment (ACA) documentation if initial feedback via AF Form 724 In Accordance With (IAW) AFI 36-2406 para. 2.7 & 2.8.

    Note: ACA cannot be provided via AF Form 1137 or LOR as this violates AFI 36-2406 para. 2.2.2.6 & 2.7.1, 2.8, 2.9.1., & 2.9.3

h.  Documentation of my job title and duties over the span of the rating period, and the communication of those duties to me.

i.  Documentation that the 113 OG complied with AFI 11-202V1, AFI 11-2F-16V1, & AFI 11-401 in regard to my flying training, currencies, qualification, and required HHQ notifications requirements for lapses in currencies and training requirements. Especially AFI 11-401 paras. 1.3.4, 1.4.1.8., 2.5. The OPR claims I was allowed to maintain these currencies.

j.  Documentation of the 113 OG and Lt Col Lewis's compliance with the following AFI 36-2406 paragraphs: 1.4.2.5, 1.5.2.1, 1.6.3.1, 1.6.3.2, 1.6.3.3, 1.7.1.1, 1.10.2.1, 1.10.2.3, 1.11.4, 1.12.4.4.1, 1.12.4.4.2, 1.12.2., 1.12.3.1, 1.12.3.4, 1.12.4, 1.12.4.1.1, Table 2.1.4, 3.19.

k.  Documentation of how this referral OPR being administered after an involuntary curtailment complies with ANGI 36-101, para 8.5.

l.  A documented explanation of how the number and severity of administrative actions against me, to include this referral OPR, are not arbitrary and capricious given the context of another individual having received only a single LOR, no referral OPR, and the "highest endorsement" for follow-on employment after the 113 WG in light of the following documented misconduct and alleged criminal non-consensual sexual misconduct:

  (1)  Substantiated sexual harassment of a junior officer, the same victim I (then Maj Torrence) am accused of an UPR with, after I intervened in the harassment and alleged non-consensual groping of the victim.

  (2)  The accused surveilling the primary witness (myself) during sexual assault proceedings against himself.

  (3)  The accused allowed the victim to be forcibly disrobed while too intoxicated to consent, at which point I intervened.

  (4)  The accused threatened to "destroy" the victim.

  (5)  The accused lied under oath regarding his own sexual pursuit of the victim, but now has substantiated sexual harassment findings against him.

  Note: The wrongfully substantiated "misconduct" of mine, basing this referral OPR, was almost entirely based on the testimony of the accused or by witnesses recommended by him, a member of the senior raters' social circle, while I chose not to participate in that circle due to moral and ethical aversion the senior rater's requirement for loyalty to himself and his group over laws, regulations, and professional responsibilities.

m. Documentation that I was not excluded from regular 113 OG social and work functions and rosters from 26 Nov 19 - 1 Nov 18.

n. A redaction of the following written false and/or misleading statements from your correspondence.

    (1) "Last performance feedback was accomplished on 8 Feb 2018, IAW AFI 36 2406" – 1 Nov 2018 OPR

        (a) Or provide the applicable Airman Comprehensive Assessment (ACA) documentation via AF Form 724 IAW AFI 36-2406 para. 2.7 & 2.8.

        Note: ACA cannot be provided via AF Form 1137, Reports of Investigation, or LORs as this violates AFI 36-2406 para. 2.2.2.6 & 2.7.1, 2.8, 2.9.1, & 2.9.3

    (2) "Appearance of UPR at home & deploy'd w/O-4; fraternization in uniform at a bar; lied when asked" – 1 Nov 18 OPR

        (a) Inclusion of this alleged misconduct is not only inaccurate but violates AFI 36-2406 para. 1.12.3.4.

        (b) Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It also relies on alleged events that occurred in July of 2016, two rating periods previous.

        (c) Provide the explicit behavior that you allege constituted an "UPR" within timeframes involved in the associated administrative actions and rating period.

        (d) Provide the specific conduct that you allege constituted "fraternization," especially the conduct that allows you to believe I had knowledge of the counterparty's enlisted status and the specific behavior that cause a violation of good order and discipline given the civilian establishment and context of the events.

        (e) Provide the specific statement that I made which you allege as a lie.

o. "Despite rater requests, you failed to provide inputs for the construction of the evaluation." – Col Vargas's 3 Sep 18 Response to OPR Rebuttal (b).

    (1) It was you who failed to respond to my counsel's request for an extension to the OPR input deadline because of my attendance at a formal training being my primary responsibility at that time (d).

    (2) I had already provided input which you could have used in the construction of this OPR in response to my previous OPR (c)., due to the fact that I assumed you would use the legitimate previous rating period end date of 2 April 2018, significantly

overlapping your wrongfully revised 2 Nov 17 start date for this OPR(c). You had access to information with which to fill the redacted statement from your original draft. Retract your above false statement and fill the empty OPR line (a).

p.  "During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group." – 1 Nov 2018 OPR

    (1)  Inclusion of this alleged misconduct is not only inaccurate, but violates AFI36-2406 para. 1.12.3.4.

        (a)  Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It also relies on alleged events that occurred in July of 2016, two rating periods previous.

q.  "Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command."

    (1)  Inclusion of this alleged misconduct is not only inaccurate but violates AFI 36-2406 para. 1.12.3.4.

        (a)  Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It relies on alleged events entirely in the previous rating period.

    (2)  Provide the specific statement that I made which you allege as "untruthful."

r.  Documentation of why you only elected to remove positive substance from the OPR that was not relevant to the rating period, but refused to remove negative information outside the rating period that could have been captured in appropriate rating periods OPR.

s.  Documentation of why you elected to shorten the rating period originally recorded on my previous rater signed OPR (c) in order to afford a timespan where you could administer a referral OPR.

t.  Documented compliance with AFI 36-2406 via either recorded face-to-face, telephonic, or two way electronic feedback to include the following:

    (1)  Precise definitions of the violations you alleged led to this referral OPR to include the elements of these alleged wrongs.

    (2)  Precise events, conduct, and times that satisfied the elements of these wrongs and an explanation of how those elements were satisfied.

    (3)  Precisely what the counseling and direction from my chain of command was that should have mitigated this alleged misconduct.

u. Documentation of why you continue to find the length of my rebuttals to administrative actions noteworthy (b), but are incapable or unwilling to address the substantive details of the rebuttals.

3. **Conclusion:** I respectfully request you provide the above listed documentation and retractions, and provide a response extension of 30 days after you provide the required information. If you elect not to allow an extension, please continue to provide the above documentation and use this document as the rebuttal to the referenced revised referral OPR.

TORRENCE.JENNER. MICHAEL.10784988 50

Digitally signed by TORRENCE.JENNER.MICHAEL.107 849885C
Date: 2019.09.14 19:04:51 +03'00'

JENNER M. TORRENCE, Lieutenant Colonel, USAF

## OFFICER PERFORMANCE REPORT *(Lt thru Col)*

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2406 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. RANK | 4. DAFSC | 5. REASON FOR REPORT | 6. PAS CODE |
|---|---|---|---|---|---|
| TORRENCE, JENNER M. | 4487 | Lt Col | 11F3H | Annual | B91CFL80 |

| 7. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 8. PERIOD OF REPORT | 9. NO. DAYS SUPV. |
|---|---|---|
| 113 Operations Support Squadron (ACC) | FROM 2 Nov 2017 | 365 |
| Joint Base Andrews MD (AGR) | THRU 1 Nov 2018 | NO. DAYS NON-RATED 0 |

| II. JOB DESCRIPTION *(Limit text in 4 lines)* | 10. SRID |
|---|---|
| DUTY TITLE F-16 Flight Lead | 11113 |

- Maintains CMR status as an F-16C+ pilot and flight lead; qualified in Advanced TGP, IAMS, and LGB weapons
- Defends the US and NCR and enforces ADIZ boundaries as an Alert Pilot; directly responsible to NORAD control
- Performs all Counter Air and Surface Attack missions including DCA, Interdiction, SEAD, DEAD, CAS and ACA
- Supervisor of Flying; oversees daily flying operations; ensures timely & safe execution of combat & training sorties

**III. PERFORMANCE FACTORS**

| | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| Job Knowledge, Leadership Skills (to include Promoting a Healthy Organizational Climate). Professional Qualities. Organizational Skills, Judgment and Decisions. Communication Skills (see reverse if marked Does Not Meet Standards) | ☒ | ☐ |

**IV. RATER OVERALL ASSESSMENT** *(Limit text to 6 lines)*

- Furthered the ACA enterprise; scheduled FS pilots for alert shifts; all currencies met--100% NCR coverage achieved
- Spearheaded OPS/MX working relationship; synchronized OPS reqs to MX capabilities--NORAD/CC directives met
- OPS ACA facilities POC; identified facilities shortfalls at ACA; made multiple key upgrades--improved pilot morale
- As 113th OG SOF, served as OG/CC rep for all 121FS flying activities; coordinated MX actions--zero mishaps OPS
- Maintained CMR status; 100+ flying currencies achieved; readiness key to FS objectives--80% readiness levels met
- Appearance of UPR at home & deploy'd w/ O-4; fraternization in uniform at a bar; lied when asked--2 LORs issued

Last performance feedback was accomplished on: **8 Feb 2018** *(IAW AFI 36-2406) (If not accomplished, state the reason)*

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | | 30 Aug 19 |
| 113th Operations Support Squadron (ACC) | SSN | SIGNATURE | |
| Joint Base Andrews MD | 2862 | Chad of Lewis | |

**V. ADDITIONAL RATER OVERALL ASSESSMENT** *(Limit text to 4 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- 113th OG rep to NORAD; attended NCR WEPTAC; integrated newest TTPs into 113th ACA ops--mission success

- WG level responsibilities; provided key insight to WG processes--improved several key relationships within the WG
- Recommend focus on officership/AFI compliance; leadership, professional qualities & judgment need improvement

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| JOHN E. VARGAS, Colonel, ANG | Commander | | |
| 113th Operations Group (ACC) | SSN | SIGNATURE | |
| Joint Base Andrews MD | 4765 | | |

**VI. REVIEWER** *(if required, limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

THE ADDITIONAL RATER IS ALSO THE REVIEWER

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| JOHN E. VARGAS, Colonel, ANG | Commander | | |
| 113th Operations Group (ACC) | SSN | SIGNATURE | |
| Joint Base Andrews MD | 4765 | | |

**VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR
*(Indicate applicable review by marking the appropriate box)*

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| | | | |
| | SSN | SIGNATURE | |

**VIII. RATEE'S ACKNOWLEDGMENT**

| | | SIGNATURE | DATE |
|---|---|---|---|
| I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report. | Yes No ☐ ☐ | | |

| | | |
|---|---|---|
| **AF FORM 707, 20150731, V1** | *(PREVIOUS EDITIONS ARE OBSOLETE)* | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |

RATEE NAME: TORRENCE, JENNER M.

## IX. PERFORMANCE FACTORS (If Section III is marked Does Not Meet Standards, fill in applicable block(s))

| | DOES NOT MEET STANDARDS |
|---|---|
| 1. Job Knowledge. Has knowledge required to perform duties effectively. Strives to improve knowledge. Applies knowledge to handle non-routine situations. | ☐ |
| 2. Leadership Skills. Sets and enforces standards. Promotes a Healthy Organizational Climate. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Motivates Subordinates. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | ☒ |
| 3. Professional Qualities. Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force Standards (i.e. Fitness standards, dress and appearance, customs and courtesies, and professional conduct). Accepts personal responsibility, is fair and objective. | ☒ |
| 4. Organizational Skills. Plans, coordinates, schedules and uses resources effectively. Meets suspenses. Schedules work for self and others equitably and effectively. Anticipates and solves problems. | ☐ |
| 5. Judgment and Decisions. Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities. Adheres to safety and occupational health requirements. Acts to take advantage of opportunities. | ☒ |
| 6. Communication Skills. Listens, speaks, and writes effectively. | ☐ |

## X. REMARKS (use this section to spell out acronyms from the front)

Aerospace Control Alert (ACA); Close Air Support (CAS); Combat Mission Ready (CMR); Defensive/Offensive Counter Air (DCA/OCA); Dynamic Targeting (DT); Inertially Aided Munitions (IAMS); Interdiction (INT); Laser Guided Bombs (LGB); Tactics, Techniques and Procedures (TTPs); Targeting Pod (TGP); Supervisor of Flying (SOF); Suppression/Destruction of Enemy Air Defenses (SEAD / DEAD)

## XI. REFERRAL REPORT (Complete only if report contains referral comments or the overall standards block is marked as does not meet standards)

I am referring this OPR to you according to AFI 36-2406, para 1.10. It contains comment(s)/rating(s) that make(s) the report a referral as defined in AFI 36-2406, para. 1.10. Specifically:  During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group.

Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command.

Acknowledge receipt by signing and dating below. Your signature merely acknowledges that a referral report has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the report. Once signed, you are entitled to a copy of this memo. You may submit rebuttal comments. Send your written comments to:

john.e.vargas.mil@mail.mil

not later than 3 duty days (30 for non-EAD members) from your date below. If you need additional time, you may request an extension from the individuals named above. You may submit attachments (limit to 10 pages), but they must directly relate to the reason this report was referred. Pertinent attachments not maintained elsewhere will remain attached to the report for file in your personal record. Copies of previous reports, etc. submitted as attachments will be removed from your rebuttal package prior to filing since those documents are already filed in your records. Your rebuttal/comments/attachments may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you can fully substantiate and document them. Contact the MPS, Force Management section, or the AF Contact Center if you require any assistance in preparing your reply to this referral report. It is important for you to be aware that receiving a referral report may affect your eligibility for other personnel related actions (e.g., assignments, promotions, etc.). You may consult your commander and/or MPS or Air Force Contact Center if you desire more information on this subject. If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2406, Chapter 10, Correction of Officer and Enlisted Evaluation Reports, once the report becomes a matter of record as defined in AFI 36-2406, Attachment 2.

| NAME, GRADE, BR OF SVC OF REFERRING EVALUATOR | DUTY TITLE | | DATE |
|---|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | | 30 AUG 19 |
| 113th Operations Support Squadron (ACC) Joint Base Andrews MD | SIGNATURE   *Chad J Lewis* | | |
| SIGNATURE OF RATEE | | | DATE |

## INSTRUCTIONS

ALL: Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in Developmental Education, advanced education, previous or anticipated promotion recommendations on AF Form 709, OPR endorsement levels, family activities, marital status, race, sex, ethnic origin, age, religion or sexual orientation. Evaluators enter only the last four numbers of SSN.

RATER: Focus your evaluation in Section IV on what the officer did, how well he or she did it, and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section IV may include recommendations for assignment. Provide a copy of the report to the ratee prior to the report becoming a matter of record and provide follow-up feedback to let the ratee know how their performance resulted in this final product.

ADDITIONAL RATER: Carefully review the rater's evaluation to ensure it is accurate, unbiased and unfainted. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendation for assignment.

REVIEWER: Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NON-CONCUR" and explain in Section VI. Do not use "NON-CONCUR" simply to provide comments on the report.

RATEE: Your signature is merely an acknowledgement of receipt of this report. It does not constitute concurrence. If you disagree with the content, you may file an evaluation appeal through the Evaluation Reports Appeals Board IAW AFI 36-2406 Chapter 10 (Contacting Officer and Enlisted Evaluation Reports), or through the Air Force Board for Correction of Military Records IAW AFI 36-2603 (Air Force Board for Correction of Military Records) and AFPAM 36-2607 (Applicants' Guide to the Air Force Board for Correction of Military Records (AFBCMR)).

## PRIVACY ACT STATEMENT

AUTHORITY: Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force: AFI 36-2406, and Executive Order 9397 (SSN), as amended.
PURPOSE: Used to document effectiveness/duty performance history, promotion, school and assignment selection, reduction-in-force, control roster, reenlistment, separation, research and statistical analysis.
ROUTINE USES: May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
DISCLOSURE: Voluntary. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
SORN: F036 AF PC A, Effectiveness/Performance Reporting Records

| AF FORM 707, 20150731, V1 | (PREVIOUS EDITIONS ARE OBSOLETE) | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |
|---|---|---|

Lt Col Torrence,

   We've received and considered your 10 page response and agree that one of the bullets in an unsigned section of the evaluation did not fall within the rating period.  Despite rater requests, you failed to provide inputs for the construction of the evaluation.  As such we've removed that bullet and the rater has resigned the evaluation.  You have 7 calendar days to respond to this modification of your evaluation.  The referral memo remains unchanged.  We have your previous response.  Any subsequent response should contain new information.  Again you are limited to 10 pages max, to include any attachments that you want considered.  The due date for your response is 14 SEP 19, 1600 EST.  If we do not receive a response by this time we will assume you do not intend to respond to this updated version.  No extensions will be granted for your response as seven days is already an extension to the three days that you are entitled to.


Respectfully,


Col John Vargas

113 OG/CC

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | Vargas, John E Jr Col USAF 113 WG (USA) <john.e.vargas.mil@mail.mil> |
| **Sent:** | Tuesday, September 3, 2019 10:43 PM |
| **To:** | Jenner Torrence |
| **Cc:** | Robert Vance; Lewis, Chad G (Bubba) Lt Col USAF 113 WG (USA); Torrence, Jenner M (Juice) Lt Col USAF (USA); Thurgood, Lane A Col USAF (USA); Gibson, Jay S (Glib) Col USAF AF-A3 (USA); Jameson, Jennifer M Maj USAF NG DCANG (USA) |
| **Subject:** | Request Response |

Lt Col Torrence,

A response has been sent to you via DoD SAFE (AMRDEC) as well as to your HAF Gov't email (encrypted).

Respectfully,

Colonel Emilio "Vegas" Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 -- 1986

1

154

Lt Col Torrence,

We've received and considered your 10 page response and agree that one of the bullets in an unsigned section of the evaluation did not fall within the rating period. Despite rater requests, you failed to provide inputs for the construction of the evaluation. As such we've removed that bullet and the rater has resigned the evaluation. You have 7 calendar days to respond to this modification of your evaluation. The referral memo remains unchanged. We have your previous response. Any subsequent response should contain new information. Again you are limited to 10 pages max, to include any attachments that you want considered. The due date for your response is 14 SEP 19, 1600 EST. If we do not receive a response by this time we will assume you do not intend to respond to this updated version. No extensions will be granted for your response as seven days is already an extension to the three days that you are entitled to.

Respectfully,

Col John Vargas

113 OG/CC



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR FORCE COMBAT AIR FORCES DIVISION
1460 AIR FORCE PENTAGON, ROOM 5D756
WASHINGTON DC 20330

17 Aug 2019

MEMORANDUM FOR 113 OSS/CC, LT COL CHAD LEWIS

FROM: LT COL JENNER M. TORRENCE
1208 5TH ST NE
WASHINGTON, DC 20002

SUBJECT: Rebuttal to Referral Officer Performance Report

References: See Attachments File Names Sent With this Memorandum

1. **Purpose:** This is a rebuttal to the Referral Officer Performance Report (OPR) delivered to me by the 113 Operations Group Commander (113 OG/CC), Col John Vargas, and signed by the 113 Operations Support Squadron Commander (113 OSS/CC), Lt Col Chad Lewis. The alleged rating period for this OPR is 2 Nov 2017 to 1 Nov 2018. Lt Col Lewis is alleged as the rater for the rating period.
   **Note:** While the reader may draw their own judgments of character, nothing below is intended as a statement about an individual's character, aside from my own, but instead it is a statement and analysis of facts as I recall and understand them. The ethical and moral failures referenced are organizational failures.

2. **Context of Failed Principles, Ethics, Morality and Integrity causal to this Referral OPR:**
   a. Most importantly I want to state the following bolded items unambiguously:
      (1) **I did not lie.** – Referencing allegations basing the OPR's referral nature.
      (2) **I did not fraternize.** – Referencing the 16 Oct 17 incident addressed by the referral OPR and Jan 18 CDI
      (3) **My firm professional and personal position is that there was nothing unprofessional or inappropriate about my relationship with Maj Murphy.** In fact, it was likely the most professionally functional and appropriate working relationships in the organization and an example of how different AFCSs and members with diverse genders, races, religions, and political views should work together. It exemplifies how airmen should act as wingmen to each other in the face of a hostile organization, personal danger, unlawful prejudice, sexual harassment and sexual assault. I proudly hold it up as that example of what to do. The discrimination and other wrongs in this OPR, abandon the mission of the DCNG and the DoD at large, to defend the documents which are foundational to the rights bestowed by this nation on its citizenry. If upheld, the OPR's referral elements are official false statements, and exemplify why the 113 OG is failed organization.
   b. The "substantiations" underpinning the referral nature of the OPR were either manufactured or wrongfully accepted by the 113 OG/CC in order to protect himself and his friend, Maj Paul Doughty, a sexual harasser, coconspirator to sexual assault, and a participant of non-consensual sexual misconduct.
      (1) On 1 Jan 17 and 27 Jan 17, During a deployment to Guam, where Maj Murphy was the only female, and non-pilot officer from the 113 OG, I escorted her from the Viking Club, Tumon Bay, Guam, after Maj Doughty had demanded Maj Murphy's attendance and the created an uncomfortable and dangerous situation for her. On the latter date, Maj Doughty arranged to have Maj Murphy sexually assaulted by an employee at the club, and then groped her against her will after the assault. At this point I intervened and removed her from the establishment. These acute events were within a broader context of substantiated and persistent sexual harassment of Maj Murphy by Maj Doughty.
      (2) Frustrated at my intervention, Maj Doughty began spreading rumors about Maj Murphy and I having an affair. Eventually, on 5 Feb 17 he cornered her and threatened to "destroy" her professionally and to ruin her family. The 113 OG/CC assured Maj Doughty's threats were realized by endorsing a CDI claiming Maj Doughty's allegation against myself and his victim were legitimate via LORs (4, 5, 96).
         (a) In place of any statute, regulation, or institutional value, the Investigating Officer (IO) in the 31 May 17 CDI substituted his own strongly held and discriminatory personal beliefs (held with the conviction of religious beliefs) regarding male female friendship within the context of matrimony. He obscured his personal judgments with non-descript mention of AFI paragraphs which reference impropriety, good order and discipline, and discredit to the armed forces. In this wrongful context

the IO "substantiated" my relationship with Maj Murphy as "inappropriate." This substantiation was based on nothing that can be construed as misconduct between two officers, with no superior subordinate relationship and of similar or identical rank (we were both Majors for the majority of the time), without using gender discriminatory and faith-based value judgments IRT male-female relationships and matrimony. The IO's values contrast starkly with my own foundational values of equality. I am not obligated to adopt his values to be considered in compliance with AFI.

(b) Despite the IO claiming he had based his substantiation on your (Lt Col Lewis's) testimony, in the CDI report of Investigation (ROI), the entirety of testimony presented with any significant derogatory perspective belonged to Maj Doughty, Maj Murphy's harasser, bully, and assault conspirator/participant.

(c) You were the other witness whom the IO alleged played a role in the "substantiation" of the "inappropriate relationship. His reasoning was that you had "counseled" Maj Murphy and I IRT our relationship while we were in Guam and that we had disregarded your counsel. You know there was no correspondence between Maj Murphy, yourself, and me that could be considered counseling. You also know that there was absolutely no direction given by yourself and no implication that you believed my interaction with Maj Murphy was wrongful. The following were the interactions represented as "counseling":

<u>1</u>   On the evening of 13 Jan 17, while inebriated and after you danced with Maj Murphy at Shamrock's Irish Bar (178 low res. Vid.), you told Maj Murphy that an unnamed individual was spreading rumors about Maj Murphy and me. This caused a dramatic verbal interaction between yourself and Maj Murphy for which your lack of sobriety made you ill-prepared. I asked you both to stop the conversation because the environment and your inebriation made resolution unlikely. The next day I invited you to drinks and dinner with Lt Col Veal, Maj Needles, Maj Murphy, and myself. At dinner I asked you to explain your comments to Maj Murphy the night prior. You explained that you did not think there was anything wrong with my relationship with Maj Murphy and that if there was, we would have been trying to hide our friendship. You then gave an example of how your own actions could be unfairly represented in rumors, as you had allowed enlisted females into your room, "Club 470," to party with the pilots (I bring this up to show the arbitrary and capricious nature of the "substitutions" against me relative to your own conduct). You explicitly stated, "If you are not doing anything wrong, keep doing what you are doing." During this conversation Maj Murphy informed you that someone was pursuing her but that it was not me, referring to Maj Doughty, but not revealing his identity to you. I asked you to tell me who was responsible for the rumors you referred to but you refused. I asked you to have them to stop the gossip. I assume you took no action. I asked you to have anyone with a concern to address me directly, and no one did; although, I had to approach Maj Doughty eventually to address threats to destroy Maj Murphy's life.

<u>2</u>   To my knowledge, neither Lt Col Veal nor Maj Needles have ever been questioned IRT this conversation, while every witness Maj Doughty has recommended has been asked to provide derogatory testimony against myself an Maj Murphy. Maj Harbart's testimony is also ignored (62, 67). No person of sound mind and integrity, who watches the referenced video and reflects on the 14 Jan 17 conversation over cocktails, where I asked you to help mitigate any derogatory perception, would claim you provided counsel or that I ignored counsel. If you uphold this referral OPR you will misrepresent your own conduct.

<u>3</u>   On the evening of 7 Feb 17, after I confronted Maj Doughty IRT his threats to Maj Murphy, and explained that his sexual harassment and bullying was being documented by Maj Murphy, he insisted on speaking with you. Again, in this conversation there was no indication that you believed there was anything wrong with my relationship with Maj Murphy nor any direction to change any behavior, and we all agreed to work together as professionals at home station.

<u>4</u>   After returning from Guam you never indicated that you believed there was a problem with my relationship with Maj Murphy nor did you provide direction (96. Pg. 11). When I discussed the unobjective and discriminatory nature of the CDI with you, you disclosed that you could "tell where the IO was trying to go" in his line of questioning. I asked you to explain what could have been viewed as unprofessional about my relationship with Maj Murphy. You brought up another party's example based on the fact that Maj Murphy and I were dropped off by another member at a social event on Anderson AB from the same vehicle. I reiterated how misconstruing this as inappropriate was an act of discrimination, as men and women riding in

the same car together is not inappropriate in any way. Again, you provided no direction, nor did you state that you believed my riding in the same car with Maj Murphy, (or any other action) was inappropriate. Of note, the OPR and 13 Jun 17 LOR claim there was something unprofessional about my relationship with Maj Murphy at home station after the Guam timeframe, but this is explicitly denied by you according to the CDI ROI (96. pg. 11) and explicitly unsubstantiated in the CDI (96 pg. 3). Additionally, the deployed Title 10 commander, who actually had jurisdiction in Guam stated he did not believe there was a perception of an inappropriate relationship (96. pg. 5) The related statement in the LOR and the OPR is a false statement. You should revoke the referral LOR.

5  If you legitimize the CDI and LOR with this OPR it will misrepresent your own actions as counseling, direction, and/or advice that was disregarded and would be disingenuous and wrongful. Maintain your integrity and retract the referral OPR.

(3)  On 28 Feb 17, at the request of her Director of Operations (DO), Maj Clifford Taylor, after returning from Guam, Maj Murphy made an unrestricted report of Maj Doughty's non-consensual sexual acts and harassment to the 113 WG/SARC (63). Unfortunately, Maj Murphy's command failed to properly document the report in an unrestricted fashion. This was well before the above referenced CDI (7-31 May 17), when the unrestricted report was finally formalized in June 17, due to Maj Murphy's need to show the motivation behind Maj Doughy's CDI testimony and rumors in the course of the rebuttal process. Despite her report being initiated prior to any investigation, the 113 OG and 113 WG has used the 113 WG failure to document Maj Murphy's SAPR report properly, to act as if the report was filed in retaliation after she was issued a LOR. As the witness to her harassment and assault, they have used the referenced CDIs and LORs to retaliate against me as well, for my cooperation in that process and for supporting Maj Murphy in the face of the organization's hostility for reporting her assault. If you do not retract this referral OPR you continue that wrongful retribution. This retaliatory intent is also illustrated by the LOR Maj Murphy received for being the victim of the sexual harassment and sexual assault orchestrated and participated in by Maj Doughy (5). This document both blamed her for her own sexual assault, insinuating it was a consensual act, but simultaneously claims she was inebriated. Inebriation is well understood to revoke ability to consent. This is a consistent message in all counter sexual assault and harassment training. The simultaneous allegations are counterfactual and cannot be explained outside of a retaliatory context, a context embraced by this OPR. Additionally, the LOR accuses her of fraternization, while there was no action against the male officers in the exact same social environment. This is wrongful.

(4)  On 16 Oct 17, a female in civilian clothes leaned against me and I did not move away as quickly as I should have. This was certainly an error that I will not repeat. At that point, Maj Doughty, who was still involved in the SAPR process resulting from his participation in Maj Murphy's sexual assault, began taking time-lapse photographs of me. When I approached him about the bullying, he claimed his being accused of sexual assault was somehow my fault and attempted to coerce testimony from me on his behalf. He also made comments that made me concerned he may have been executing other surveillance on myself and Maj Murphy (9). This made me uncomfortable for her safety.

(a)  In the following days I notified Maj Murphy and the command of the blackmail and apparent surveillance by Maj Doughy. The 113 OG/CC's response was to launch an investigation with allegation weighted against me instead of addressing Maj Doughty's witness tampering (133). The command waited until, Maj Doughty's SAPR proceedings were complete, so that his attempts at blackmail, witness tampering, and obstruction of justice could not be considered. That CDI again resulted in false "substantiations" against me and nothing against Maj Doughty. The 113 OG went TDY with the IO in the middle of the investigation, violating the CDI Guide (26). This CDI wrongfully claims "False Statements" and "Fraternization," against me, despite no legitimate evidence of any of my statements having been deceptive or even substantially inaccurate, and my pointing out anything that I thought could be viewed as inconsistent or misinterpreted (13, 50). The "substantiation" also ignored the fact that I had no knowledge that the female who had leaned against me was enlisted and relied on Maj Doughy's self-proclaimed friend's assertion that I should have known somehow despite my having never seen the female prior to the interaction. The CDI contains multiple non-factual statements by the IO that are simply are unsupported by the video or photographic evidence (13, 50, 856). The CDI ignores the fact that the witness (another officer) claiming I should have known the female was enlisted is himself seen in the video with his hand on the female's back and sitting in similar proximity and

posture to her as that that led to the accusations against me. This second CDI was not carried out IAW the CDI Guide relies in unreliable witnesses, and was one more retaliatory measure taken by the 113 OG to protect himself and his friend. It should be revoked along with the OPR.

c.   Throughout the above discrimination and hostility towards SAPR participants, I explained to the 113 OG/CC and other members of the chain of command the unlawful and discriminatory nature of their actions and accusations. I continuously asked for a lawful and specific explanation of how any of my actions were wrongful and what specific behavior of mine the command objected to from a professional standpoint. Such feedback was never provided. I also explained that if the command did not stop their unlawful actions that it would result in complaints. Instead of acting in a lawful fashion, the 113 OG architected the above administrative actions and this OPR to undermine my character and protect himself and his friend, Maj Doughty, from the protected communications of Maj Murphy and myself.

**3. Rebutted OPR statements by rater:**

a.   "Period of Report: From: 2 Nov 2017 THRU 1 NOV 2018": As discussed below this and the previous rating period were illegitimately assigned.

b.   "Job Description" block: These duties are all flying related. I was only allowed to execute them 2 Nov 17 to 26 Jan 18. From 26 Jan 18 to 1 Nov 18, I was ostracized from the flying community, location, and duties via a false assertion that my security clearance was suspended (90.a.&b). The present tense verbiage used in this block is a false statement as of the OPR closeout date. Insinuating that these were my duties for the majority of the rating period is false. This obscures the command's neglect of my professional utility, wellbeing, and ostracism of me Jan-Nov 18, violating AFI1-1 and AFI1-2. This was despite my requests to be utilized (127, 128) violating AFI 2-2. This intentionally damaged my professional viability, allowing my flying currencies to expire. This violated AFI11-202V1, AFI11-2F-16V1, AFI11-401.

c.   "Performance Factors: Does Not Meet Standards"

(1) In regard to my conduct, this severity and impact of this statement is arbitrary and capricious relative to the conduct of my accusers, to include the rating chain itself, who have no such remark on their OPR over the same rating period. This is discussed below.

(2) I acknowledge that I erred on 16 Oct 17 by not moving away when someone leaned against me while I was in uniform. This was a violation of the Dress and Appearance regulation, AH36-2903 para. 2.13.6, for which I am regretful. This mistake will not recur, but it was not fraternization and I was never untruthful about the interaction, in fact I am the one who reported it. As an example of the arbitrary and capricious nature of the OPR, the sexual harasser who captured my violation via photograph in order to protect himself from my testimony to his sexual assault, simultaneously violated para. 2.13.5, but suffers no ill effects. My dress and appearance violation does not warrant a referral OPR

d.   "Rater Overall Assessment"

(1)  "Appearance of UPR at home & deploy'd w/ 0-4; fraternization in uniform at a bar; lied when asked--2 LORs issued"

(a) This is a false statement. The CDI which "substantiates" an "inappropriate relationship" explicitly states that an inappropriate relationship was not substantiated at home station(96 pg. 3), as you do in your sworn testimony to the CDI (96, pg. 11). Such a reversal would make either this OPR or your sworn testimony in the 31 May 17 CDI a false statement.

(b) I have adamantly expressed my professional and personal opinion that my relationship with Maj Murphy was neither unprofessional nor inappropriate. My failure to recognize the 113 OG or IOs discriminatory ideals in regard to gender, matrimony, or good order and discipline does not make me dishonest. The assertion above shows a fundamental lack of understanding IRT what constitutes a lie or false statement. Specifically, there has never been an intent to deceive on my part. This same lack of semantic competence underlies the IO's "substantiations" of false statements. This attempt to force me to agree with the 113 OG's personal ideals, or have my integrity put in question, is a violation of my first amendment rights to freedom of religion, freedom of association, and freedom of speech. Forcing me to concur with the 113 OG's wrongful opinion about what constitutes an "inappropriate relationship" by incriminating myself, or be called a liar, violates the Fifth Amendment right against self-incrimination. I do not believe my relationship with Maj Murphy was inappropriate. This is no lie. I also never lied to the chain of command when asked about any other interaction. If you believe I did, state explicitly what my lie was so that your mistake can be corrected.

(c) Two of three primary statements called "inconsistent by the IO are completely factual. The third was in an informal and impromptu cautionary text to Maj Murphy, which contained a statement that was a poorly recalled description of my interaction with the person who leaned against me. The IOs

159

awareness of the text message was because I told her about it and also made her aware of the inaccuracy in the text message and where to go for a more accurate account. The texts were then reviewed by my counsel to ensure nothing that could be misconstrued as dishonest in light of my conversation with the IO before it was delivered to her (13, 50, 205, 206.a&b, 856). Her use of the text message to imply dishonesty is a false statement on the part of the IO and misrepresents what was in fact an act of transparency as dishonest. This clearly shows her will to disparage. Especially given her complete lack of rigor in presenting Maj Doughty's statements (13, 50, 856). The CDI, resultant LOR and this OPR should be revoked.

c. "Last performance feedback was accomplished on 8 Feb 2018 (IAW AFI36-2406)"
   (1) This is a false statement. I received documentation of the denial of my second LOR rebuttal and UIF instantiation on 8 Feb 18, from Col Vargas with no explanation or feedback IRT my actual behavior or job performance. This was not functional feedback or an ACA and was never documented on an AF Form 724. It was simply delivery of a document which was also absent any actionable information. To use the UIF or rebuttal denial document as ACA violates AFI36-2406 para. 2.2.2.

f. "Name, Grade, BR of SRV, ORGN, Command & Location"
   (1) "Chad G. Lewis, Lt Col, ANG": See below. Lt Col Lewis did not act as my rater.

g. "Additional Rater Overall Assessment"
   (1) "Seamless transition to 113th IG team; brought F-16 experience to shop; furthered the IGI effort for NBC preparation"
      (a) This is another false statement. I was not a part of the IGI shop until 1 Nov 18 and this shop was not under the purview of Lt Col Lewis.
   (2) "Recommend focus on officership/AFI compliance; leadership, professional qualities & judgment need improvement"
      (a) This statement is unactionable, arbitrary and capricious relative to the raters' actions.
         1 No IO or supervisor has ever presented a cohesive or explicit explanation of how any of my actions were wrongful and did not comply with regulation or statute. There has only been handwaving to good order and discipline, non-applicable examples of superior subordinate relationships, false statements by IOs (6, 13, 49, 50, 856).
         2 The only explicit recommendations were from the IO of the first CDI recommending I should have abandon Maj Murphy as a wingman when she was being harassed, bullied, and eventually assaulted. I will never take such dangerous advice. Secondly, at on 16 Feb 19, the 113 OG/CC retroactively recommended that I should have made a speech to the squadron regarding my relationship with Maj Murphy after Lt Col Lewis told Maj Murphy someone was spreading a rumor. That would be an inflammatory way to handle an anonymous rumor. My request of you to have the person concerned address me was much more reasonable approach, that did not yield results because you failed to act on it, or if you did your advice was ignored.
         3 There is nothing to do but disregard this statement for lack of specificity or and no actionable previous feedback (to include missing ACAs). I have independently identified my brief lapse in judgment and AFI36-2903 compliance and I will act on that.

h. "Referral Report"
   (1) "During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group. Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command."
      (a) As explained above, illustrated below and in multiple rebuttals (6, 13, 49, 50, 856), this is a false statement and violates multiple statutes and regulations. Additionally, Maj Murphy and I were both Majors for the vast majority of the time in question. There are many more proximal relationships in the 113 WG between like gendered individual of more disparate rank within the same chain of command that go without question. As examples, you regularly relied upon the First Shirt to make sure you got home from social events in Guam when you were inebriated and you danced and drank with Maj Murphy as your direct subordinate (178). How was my relationship inappropriate if yours was not? Your own conduct should revoke the OPR as arbitrary and capricious.

4. **Statutory violations underpinning or committed in the referral OPR:**
   a. The "substantiation" and ramifications of alleged misconduct are arbitrary and capricious, and should be set aside IAW 5 U.S. Code § 706 (2) (a).
      (1) False Statements

      (a)  The IO "substantiating" this allegation did not define nor show knowledge of elements of the offence of "False Statements," nor does she align any of my behavior with those elements (available in the UCMJ, the USC, and DC Code). This invalidates her "substantiation" and explains why she chose not to explicitly identify any statement of mine as a false statement, despite her erroneous "substantiation." I made no false statement to the IO nor any other party. This failure to identify or align my behavior with the elements of the allegation makes the substantiation both arbitrary and capricious, and thus unlawful. Ironically, the substantiation relies on falsities by the IO (856). See also LOR rebuttal and Article 138 request at references 13 and 50.

  (2)  Fraternization

      (a)  Again, the IO makes no attempt to define the offense of Fraternization, nor align my behavior with the offence, making the "substantiation arbitrary and capricious." Specifically, she makes no attempt to illustrate how my interaction with the enlisted person is prejudice to good order and discipline, and she ignores the fact that I had no knowledge of the person's enlisted status. At one point she does present Maj Doughty's (the person attempting to blackmail me) friend's testimony, that he believed I should have known of the person's status, despite that witness being in flirtatious physical contact with the same enlisted individual (13, 50, 856, 113 OG collected video), and the witness never presenting any fact alluding to a prior interaction between myself and the enlisted person that should have led to such knowledge on my part. Also see rebuttals 13 and 50.

  (3)  Inappropriate Relationship

      (a)  My relationship with Maj Murphy was judged as inappropriate with no concrete analysis of the relationship against what it is to be "prejudice to good order and discipline," making the "substantiation" arbitrary and capricious. Equivalent levels of personal companionship are commonly accepted between like gendered or single members of the 113 WG without question, even among members who are within the same chain of command. An example of the arbitrary and capricious nature of this "substantiation" is the failure to recognize 113 OG/CC's friendship with Maj Doughty as inappropriate. This is despite his protection of Maj Doughty after he harassed and groped Maj Murphy, his sponsoring a Military Protective Order breach by Maj Doughty, and socializing with Maj Doughy in clear view of his victim, while refusing social interaction with the victim even when requested by myself due to an injury she sustained. Additionally, Col Vargas actively pursued all evidence against Maj Murphy and myself recommended by Maj Doughty and accepted it even when it was false, ambiguous, and provided by inebriated witnesses (93, 101, 102) and unrelated to the LOR it was used to "substantiate or the referenced rating period. This is while ignoring suggested witnesses regarding the nature of alleged 14 Jan 17 "counseling" (attachment 6 & 49). He also asked that witnesses (Maj Conley) to remove derogatory information about Maj Doughty from testimony. The 113 OG elected to not to expel Maj Doughty despite promises of zero tolerance for sexual harassment (53).The 113 OG took active steps to ensure Maj Doughty found follow-on employment after he sexually harassed Maj Murphy, but took no steps to assist myself or Maj Murphy after our careers were damages for standing up to that harassment. If Col Vargas's relationship with Maj Doughty was not inappropriate, the judgment of my relationship with Maj Murphy as inappropriate is absolutely arbitrary and capricious. The related CDIs, LOR, and this OPR should be revoked.

  b.  The "substantiations" and "evidence" underpinning the allegations in the OPR are unlawful and false.

    (1)  Unlawful Discrimination: If upheld this OPR is unlawful because it relies on discriminatory CDIs, LORs and other disposition making it a perpetuation of that same discrimination.

      (a)  Gender Discrimination

        <u>1</u>  The 31 May 17 CDI ROI relies on my arriving or leaving work in the same car, riding in an elevator, sitting, and eating with a female as being inappropriate. This same allegation would never be levied against two heterosexual men or two heterosexual women participating in the same activities. This make the "substantiation" unlawfully discriminatory. Despite requests on my part no other reason has ever been presented to me that my relationship with Maj Murphy could have been viewed as "inappropriate" during the timeframe of the applicable LOR or rating period. In a nonsensical attempt to explain their disposition, both Col Vargas and Brig Gen Bozard used examples of superior/subordinates having too close of personal relationships to explain how my relationship with Maj Murphy was inappropriate, but I have never been her supervisor or even in her chain of command. Similar personal proximity

frequently goes unquestioned between like gendered officers of much greater rank difference, even in the same chain of command.

   (b) Religious Discrimination
      1  Reference my ignored 13 June 17 LOR rebuttal (6) and Article 138 complaint (29).
      2  The 113 OG/CC directly stated that "Your lack of Christian Faith is not helping you out here" immediately following his administration of the first LOR. This is unlawful.
   (c) Sexual Preference Discrimination
      1  Reference my LOR rebuttal (13) and article 138 complaint (50).
   (d) Marital Status Discrimination (unlawful per D.C. Code)
      1  Both CDIs, LORs and other related dispositions rely on my marital status to "substantiate misconduct. This is unlawful for the DCANG as an entity of the District of Columbia IAW D.C. Code § 2–1402.11.
      2  This also violates AFI36-2406 para. 1.12.2.

(2) Violation of Civil Liberties: These violations should revoke the CDIs, LOR, and this OPR.
   (a) U.S. Constitution First Amendment
      1  Religious Freedom: See rebuttal and Article 138 Request. The OPR insists that I must abide by the 113 OG and IO's strongly held personal beliefs about what constitutes good order and discipline and appropriate behavior inside the context of matrimony, with no reference to any objectively violated regulation or statute. This imposition of strong personal values is a constitutional violation.
      2  Speech (Privacy/Expression): The implication that I "lied" or made "false statements" because I do not agree with the 113 OG or rater about the nature of my relationship with Maj Murphy, or their misunderstanding of fraternization, violates my freedom of speech and exception. Disagreements based on personal beliefs are not lies.
      3  Assembly (Association): The attempt to professionally adjudicate based on my matrimonial status and my relationship with Maj Murphy violates my right to assembly and to intimate association as protected by the First amendment (Perez v. City of Roseville, No. 15-16430 (9th Cir 2019)). This is even more the case in the absence of adultery allegations.
   (b) U.S. Constitution Fourth Amendment
      1  Privacy. The 113 OGs routing of this OPR to multiple parties with no need to know violates the fourth amendment.
   (c) U.S. Constitution Fifth Amendment
      1  Self-Incrimination: The insistence that I must incriminate myself by agreeing with the 113 OG or raters' wrongful ideas of what constitutes an unprofessional relationship or fraternization, or be called a liar, violates the fifth amendment right not to self-incriminate.
      2  Due Process: The CDIs basing this OPR repeatedly violated the "CDI Guide" creating a violation of due process.
   (d) U.S. Constitution Sixth Amendment
      1  Confrontation: The 113 OG made false statements about the written nature of testimony, in order to conceal additional "evidence" he had gathered on Maj Doughty's behalf, in an effort to incriminate me of an "inappropriate relationship" (60, pg 1-2, 88,89). He gathered this inaccurate testimony after I had rebutted the 13 June 17 LOR providing no option to confront the false evidence. This right in Criminal Proceedings is generally honored in adjudicative administrative proceedings as well.
   (e) U.S. Constitution Tenth Amendment
      1  Power reserved to the States: Both CDIs and LORs associated with this OPR rely on my marital status as causal to misconduct. This is a protected trait in DC. Nowhere in the U.S.C. or related federal regulations is the DCNG authorized to discriminate on such a basis for such a purpose as to adjudicate on good order and discipline. To do so ignores DC's protected classes and violates the Tenth Amendment.
   (f) U.S. Constitution Fourteenth Amendment
      1  Due Process: The CDIs basing this OPR repeatedly violated the "CDI Guide" creating a violation of due process.
   (g) Denial of Rights under 10 U.S. Code § 938. Art. 138 (51).
      1  Due to the 113 OG superseding his own jurisdiction as a Title 32 commander to adjudicate on Title 10 matters, a criminal violation under 18 U.S.C. § 242, I was denied my rights to

Article 138 redress, constituting a second violation of 18 U.S.C. § 242" Deprivation of Rights." The associated CDIs, LORs, and OPR should be revoked.

(3) Violation of US Code: The violations should cause the revocation of the CDIs, LOR, and this OPR.

    (a) 18 U.S.C § 242 & 18 U.S. Code § 241 Deprivation of & Conspiracy against rights

        _1_  The above denials of Civil Liberties and other statutory rights by this OPR and its associated administrative actions violates 18 U.S.C § 242 & 241.

    (b) 18 U.S. Code § 1512 Witness Tampering

        _1_  Maj Doughty's blackmail and intimidation leading to the "substantiation" of allegations against me constitute this violation.

        _2_  18 U.S. Code § 371 Conspiracy: The 113 OG's participation in Maj Doughty's witness tampering via this LOR and other administrative action constitute conspiracy to tamper with a witness.

    (c) 18 U.S. Code § 1001 False Statements: There are multiple instances of false statements by the 113 OG, OIs, in the correspondence regarding this OPR, and in the OPR itself.

        _1_  As an example, in the correspondence regarding my rebuttal extension request, you state that you attempted to deliver me the OPR as early as April 19 (211), while the OPR signature is 3 June 19 (207). The OPR and related correspondence are fraudulent and should be revoked.

    (d) 5 U.S.C. §2302(b)(8) Whistleblower Retaliation: The OPR is a continuation of the attempt to obscure sexual harassment, sexual assault, reprisal, and general discrimination by disparaging my character as a witness, interventionist, target, and whistleblower. This is discussed in the narrative above.

**5.  Regulatory and AFI Violations in the OPR:**

  a.  The Letters of Reprimand underpinning the referral OPR are not IAW AFI36-2907 para. 4.5, and provide no actionable feedback with which a referral OPR could be avoided.

  b.  The Referral OPR is not IAW AFI36-2406:

    (1) IAW para. 1.4.2.5. referral OPRs for non-Extended Active Duty (EAD) must be completed 90-days after the close-out date. The rater's signature is dated 3 Jun 19 (207)

        (a) This was 214 days after the alleged 1 Nov 18 close-out, and 427 days after the legitimate 2 Apr 18 close-out. This created extreme challenges in rebuttal response due to the rebuttal process interfering with my deployed duties and travel, as well giving the 113 WG an excuse to inappropriately send the referral information to multiple individuals who had no need to know the information. I was present for duty and available to receive the OPR at the 113 WG on multiple occasions prior to the 90-day completion deadline.

    (2) IAW para 1.5.2.1 Lt Col Lewis was not my functional rater. It defines the rater as "The official in the rating chain designated by management to provide periodic ACA and initiate performance evaluations." Lt Col Lewis never did these things. The intent of the feedback directed by AFI36-2406 is to provide actionable improvement recommendations to the ratee. In the absence of this required feedback and counsel a damaging referral OPR is improper.

        (a) There was no initial or midterm Airman Comprehensive Assessment (ACA) accomplished In Accordance With (IAW) AFI36-2406 Table 2.1.4, and I was not notified of the Change of Rating Official (CRO) at any time during the rating period, via correspondence other that an ACA (183.d, pg. 5). Accordingly, there is no corresponding AF Form 724 documenting any ACA. This violates para. 2.7, 2.8,

            _1_  A ratee having no contact with a rater for an entire rating period is not a plausible rater/rate relationship. This is especially the case for a rating period over which the ratee received a referral OPR. The OPR should be revoked.

        (b) If there is documentation of the CRO it should be presented as part of the response to this rebuttal, and contain digitally verifiable signatures showing it was not retroactively created out of retaliation for my participation in the Sexual Assault Prevention and Response (SAPR) process.

            _1_  This documentation has been requested, and those requests have been ignored (183.d, pg. 5). The MILPDS system verified Lt Col Hawk as my rater as late as February of 2019. (184).

              _a_  Even if such a document exists, it does not rectify failure of Lt Col Lewis to carry out any supervisory duties during the rating period, which dissolves his role as my supervisor regardless of documentation. The CRO is documentarily or functionally fraudulent, or both and the correct 3 Apr 18 to 31 Oct 18 rating period should be reinstated.

      2  Correctly dated OPRs should replace this referral OPR and the previous OPR from 3 April 17 to 2 April 18.

        a  Had the legitimate rating periods been maintained the referral period would have terminated seven months earlier on 2 Apr 18, assuming the referral OPR survives rebuttal despite its wrongfulness. The two most recent rating periods (3 Apr 18 to 31 Oct 18 {CRO} & 1 Nov 18 to 14 Mar 18 {voluntary DCANG Separation to escape retaliatory environment resulting from SAPR participation}) would not be referral periods.

(3)  Had the legitimate rating periods been maintained, the alleged misconduct upon which the referral is based would have fallen within the rating period, or at least a portion of the rating period. As written the CDI.

(4)  IAW para 1.6.3.1. "there must be minimum number of days supervision." There were zero days of actual supervision over me by Lt Col Lewis. He had no correspondence with me related to my duty performance, nor did he notify me that he was my rater.

(5)  IAW para 1.6.3.2 the rater must ensure "the ratee is aware of who is in his or her rating chain." I was never made aware of any rating chain change. I attempted to reach out to Lt Col Wilson, Col Vargas, Col Sheppard, and Col Maldonado for taskings, feedback, and supervision IAW with para. 1.6.9.1 but I was ignored (127, 128). I had no reason to believe my rater had changed to Lt Col Lewis from Lt Col Hawk. Throughout the rating period I engaged with leadership at all levels to understand their disposition and to inform them of their own misconduct and retaliation (6, 13, 49, 50, 67, 168).

(6)  IAW 1.6.3.3. the rater "must provide an ACA IAW Chapter 2" and "are required to perform an assessment at the time the evaluation is presented to the ratee … electronically or telephonically" if the ratee is geographically separated. There was no ACA at any time and there was no electronic or telephonic evaluation, negating any actionable utility to the OPR. It should be revoked.

(7)  Para 1.7.1.1 dictates when rating chain deviations can stray from the supervisory chain. None of the exceptions applied to my situation. Lt Col Lewis did not occupy a supervisory role over any of the duties mentioned in the "Job Description," he did not have any supervisory correspondence with me, nor was he present during any administrative actions against me. He was not my legitimate rater and the OPR should be revoked.

(8)  The previous rating period was wrongfully curtailed via a false CRO in order to make the derogatory rating period as recent as possible despite the alleged misconduct having occurred in the previous rating period.

    (a)  There were no duty changes on or after 1 November 2017 that would warrant a reassignment of my supervision to the 113 OSS/CC. This is reaffirmed by lack of a CRO documentation, MILPDS (184), and the duties which you allege were tasked to me in the "Job Description:" portion of the OPR as these have no relation to the activities of the 113 OSS.

    (b)  The de facto falsity of the CRO is further evidenced by zero supervisory correspondence from the rater to the ratee over the entire rating period.

        1  The rater never complied with AFI36-2406 para. 3.19. "The rater is required to conduct face-to-face (End-of-Reporting Period) feedback in conjunction with presenting the evaluation" by contacting the ratee "face-to-face," telephonically, or electronically. The ratees email and telephone contact number was available and the ratee was in attendance at Unit Training Assemblies throughout and after the rating period.

        2  The rater never complied with AFI36-2406. 1.10.2.3. "A referral evaluation could be detrimental to an Airman's career, therefore face-to-face interaction is required between the rater and ratee."

(9)  IAW 1.10.2.1 The rater should not "make non-specific and/or vague comments about the individual's behavior or performance." Nowhere in the OPR, nor LORs or CDIs acting a basis, does the rater or anyone else define what statement indicated that I "lied" or was "untruthful," or what action of mine satisfied the offenses of an "inappropriate" or "unprofessional relationship" or "Fraternization." If this is to be alleged the specific actions of mine should be called out. The reason this never happened is because there was no referenced behavior of mine that can objectively satisfy the elements of these offenses. Additionally, para. 1.12.4.4.1 states "1.12.4.4.1. Must be reasonably specific, clearly outlining the event and/or behavior" and para. 1.12.4.4.2. demands " 1.12.4.4.2. The ratee must be advised specifically why he or she is considered substandard in order to respond appropriately." The OPR does not do this and should be revoked.

164

(10) IAW para. 1.12.2. and 1.12.3.1. Discriminatory factors especially information regarding the member's familial activities or marital status cannot be considered or included in an OPR. Nearly the entirety of the 31 May 17 CDI and 13 June 17 LOR are based on the "appropriateness" of my relationship with Maj Murphy in the context of my marital status (6, 13, 49, 50, 96, 133). It's "most odd" piece of evidence is a presumption about my partner, Melissa's, demeanor during a family outing with Maj Murphy and others in Guam. The 19 Jan 18 CDI also represents my marital status as relevant. The associated "substantiations" and administrative actions all heavily consider my family activities and marital status. The referral nature of the OPR is entirely based on these administrative actions and heavily considers my marital status as causal to the alleged wrongs. This is prohibited. The LOR should be revoked.

(11) Para. 1.12.3.4. states "Do not include comments regarding events which occurred in a previous reporting period, unless the events ... were not known to and considered by the previous evaluators, and were not previously reflected in an evaluation which is a part of the permanent record (this includes EPRs, OPRs, LOEs and TRs)." All alleged misconduct was well known to and considered by the previous evaluators, as Col Vargas administered the LORs and was in my previous rating chain. Additionally, because the previous OPR was authored over a year late (183.c.), the alleged misconduct had been a part of my record for over a year before the previous OPR was signed and made a part of the permeant record. If there was to be a referral OPR it should, and easily could have been, the 3 Apr 17 – 1 Nov 17 OPR. Instead the command elected to keep the derogatory OPR as recent as possible, indicating retaliation, and violating para. 1.12.3.4.

(12) Para 1.12.4.1.1. states "raters must ensure that information relied upon to document performance, especially derogatory information relating to unsatisfactory behavior or misconduct is reliable and supported by preponderance of the evidence."

   (a) The information relied upon is the false statements of an IO (856), discriminatory "substantiations" based on the testimony of a verified sexual harasser and his friend in an effort to blackmail a witness to his assault, witnesses so intoxicated that one was removed from an establishment and the other disrobed himself in a room occupied by others (93, 101, 102), 15 months outside the rating period, and unrelated to the actual substantiations, and "counsel" initiated by an inebriated DO after dancing and drinking with the counselee (178). This is not "reliable" by any reasonable measure.

   (b) All three allegations were "substantiated" using a preponderance standard. Hypothetically granting that that preponderance was actually met for each substantiation, using the same preponderance standard (as required above), in order to claim all three allegations as factual in the OPR (as the OPR does), the average standard for the substantiation become approximate 4/5ths or 80% likelihood that each allegation actually happened $((.8*.8*.8)/3 \approx .51)$. This is much closer to a "beyond reasonable doubt" standard than a preponderance. As there is no objective evidence for any of the allegations this standard is certainly not met for any of these substantiations. The assertions in the LOR are mathematically fallacious and the LOR should be revoked.

c.  The referral OPR violates ANGI 36-101 para. 8.5 "Commanders considering involuntary curtailment must use all quality force tools available i.e. referral OPRs/EPRs, LORs, Article 15 etc., prior to initiating an involuntary curtailment." In that it was accomplished after the ratee's involuntary curtailment (105, 106).

   (1) The referral OPR could easily have been accomplished before the involuntary curtailment IAW AFI36-2406 Table 3.2.4. or if the legitimate rating period had not been altered, but it was not. The OPR should be revoked, an invitation to fly with the 113 OG as an attached flyer should extended to me, and the gap in my active duty orders created by this unjust curtailment should be repaired.

6.  **Conclusion:** The referral nature of the OPR is accompanied by no actionable counsel nor is it founded on any legitimate explanation of misconduct. It represents the values of an organization working against the tenants that make this nation great. Accolades from such a group are no compliment. As such, should you refuse to revoke this OPR, I will wear it proudly, as a scar for having been among the few in this saga that has upheld my oath of office, and survived with my integrity intact. While imperfect, my actions have represented the values of the Unites and States and its Air Force. I hope that after your consideration, you can say the same.

TORRENCE.JENNER.MI CHAEL.1078498850
Digitally signed by TORRENCE.JENNER.MICHAEL.1078 498850
Date: 2019.08.17 19:30:03 +03'00'

JENNER M. TORRENCE, Lt Col, USAF

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | Vargas, John E Jr Col USAF 113 WG (USA) <john.e.vargas.mil@mail.mil> |
| **Sent:** | Friday, August 9, 2019 11:46 PM |
| **To:** | Jenner Torrence |
| **Cc:** | Robert Vance; Lewis, Chad G (Bubba) Lt Col USAF 113 WG (USA); Torrence, Jenner M (Juice) Lt Col USAF (USA); Thurgood, Lane A Col USAF (USA); Gibson, Jay S (Glib) Col USAF AF-A3 (USA); Jameson, Jennifer M Maj USAF NG DCANG (USA) |
| **Subject:** | RE: [Non-DoD Source] RE: Request Response |

Lt Col Torrence,

   A subsequent/final response has been provided, via a PDF sent through the AMRDEC system, to rvance@vancelf.com as well as jennertorrence@hotmail.com. We await your response.

Respectfully,

Colonel Emilio "Vegas" Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 – 1986

**From:** Vargas, John E Jr Col USAF 113 WG (USA)
**Sent:** Wednesday, July 24, 2019 10:35 AM
**To:** 'Jenner Torrence' <jennertorrence@hotmail.com>
**Cc:** Robert Vance <rvance@vancelf.com>; Lewis, Chad G (Bubba) Lt Col USAF 113 WG (USA) <chad.g.lewis.mil@mail.mil>; Torrence, Jenner M (Juice) Lt Col USAF (USA) <jenner.m.torrence.mil@mail.mil>; Thurgood, Lane A Col USAF (USA) <lane.a.thurgood.mil@mail.mil>; Gibson, Jay S (Glib) Col USAF AF-A3 (USA) <jay.s.gibson.mil@mail.mil>; Jameson, Jennifer M Maj USAF NG DCANG (USA) <jennifer.m.jameson.mil@mail.mil>
**Subject:** RE: [Non-DoD Source] RE: Request Response

Lt Col Torrence,

   At your request we have sent a PDF of the encrypted email to the following email address via AMRDEC: rvance@vancelf.com.

Respectfully,

Colonel Emilio "Vegas" Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 – 1986

**From:** Jenner Torrence <jennertorrence@hotmail.com>
**Sent:** Tuesday, July 23, 2019 5:31 PM
**To:** Vargas, John E Jr Col USAF 113 WG (USA) <john.e.vargas.mil@mail.mil>
**Cc:** Robert Vance <rvance@vancelf.com>; Lewis, Chad G (Bubba) Lt Col USAF 113 WG (USA) <chad.g.lewis.mil@mail.mil>; MacDonald, Keith G Brig Gen USAF 113 WG (USA) <keith.g.macdonald2.mil@mail.mil>; Torrence, Jenner M (Juice) Lt Col USAF (USA) <jenner.m.torrence.mil@mail.mil>; Thurgood, Lane A Col USAF (USA)

1

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | Robert Vance <rvance@vancelf.com> |
| **Sent:** | Wednesday, August 7, 2019 6:17 PM |
| **To:** | Vargas, John E Jr Col USAF 113 WG (USA) |
| **Cc:** | Jenner Torrence |
| **Subject:** | Lt. Col. Jenner Torrence |

Col. Vargas,

I respectfully request that you reconsider the 7 Aug 19 OPR rebuttal deadline that you granted my client, Lt. Col. Jenner Torrence, and instead grant him the full 45 days (until 31 Aug 09) allowed by AFI 36-2406 para. 1.10.5.2.3 in standard scenarios. It is simply impossible for Lt. Col. Torrence to respond by today. Given that Lt. Col. Torrence was not on active duty when the OPR should have closed out, the default timeframe for response should have been 30 days (until 16 Aug 09), per AFI 36-2406 para 1.10.5.3.1.

Lt. Col. Torrence is traveling for deployment-related duties through 8 Aug 19 and consequently will not have the appropriate access to me, an ADC, or requisite documents until he returns to a more normalized work environment. In my view, to deny him a proper rebuttal extension would demonstrate bad faith and suggest further reprisal, as well as deny him the due process he is entitled to pursuant to the applicable AFI. More importantly, it would detract from his current deployed mission.

Regarding your statement that you attempted to deliver the OPR to my client since April 2019, the 113 OG has had his personal and professional email, address and phone numbers for years, as well as my contact information since March 2019. The OPR could have been delivered to either one of us in any number of ways. The preparation and delivery timeline of the OPR was entirely in the hands of the 113 OG and not Lt. Col. Torrence.

Regarding your request that Lt. Col. Torrence sign the OPR, please consider this email documentation of his receipt. He will formalize that documentation by memorandum in the next few days.

Finally, I reiterate my request that you grant Lt. Col. Torrence a referral OPR rebuttal deadline of 31 Aug 19 in accordance with AFI 36-2406. Thank you.

Robert T Vance Jr
Law Offices of Robert T Vance Jr
100 South Broad Street, Suite 1525
Philadelphia PA 19110
215 557 9550 tel / 215 278 7992 fax

1

## OFFICER PERFORMANCE REPORT *(Lt thru Col)*

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2406 carefully before filling in any item)*

| 1. NAME *(Last, First, Middle Initial)* | 2. SSN | 3. RANK | 4. DAFSC | 5. REASON FOR REPORT | 6. PAS CODE |
|---|---|---|---|---|---|
| TORRENCE, JENNER M. | 4487 | Lt Col | 11F3H | Annual | B91CFI.80 |

| 7. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 8. PERIOD OF REPORT | 9. NO. DAYS SUPV. |
|---|---|---|
| 113 Operations Support Squadron (ACC)<br>Joint Base Andrews MD (AGR) | FROM 2 Nov 2017<br>THRU 1 Nov 2018 | 365<br>NO. DAYS NON-RATED<br>0 |

**II. JOB DESCRIPTION** *(Limit text to 4 lines)*

| DUTY TITLE F-16 Flight Lead | 10. SRID<br>11113 |
|---|---|

- Maintains CMR status as an F-16C+ pilot and flight lead; qualified in Advanced TGP, IAMS, and LGB weapons
- Defends the US and NCR and enforces ADIZ boundaries as an Alert Pilot; directly responsible to NORAD control
- Performs all Counter Air and Surface Attack missions including DCA, Interdiction, SEAD, DEAD, CAS and ACA
- Supervisor of Flying; oversees daily flying operations; ensures timely & safe execution of combat & training sorties

**III. PERFORMANCE FACTORS**

| | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| Job Knowledge, Leadership Skills (to include Promoting a Healthy Organizational Climate), Professional Qualities, Organizational Skills, Judgment and Decisions, Communication Skills (see reverse if marked Does Not Meet Standards) | ☒ | ☐ |

**IV. RATER OVERALL ASSESSMENT** *(Limit text to 6 lines)*

- Furthered the ACA enterprise; scheduled FS pilots for alert shifts; all currencies met--100% NCR coverage achieved
- Spearheaded OPS/MX working relationship; synchronized OPS reqs to MX capabilities--NORAD/CC directives met
- OPS ACA facilities POC; identified facilities shortfalls at ACA; made multiple key upgrades--improved pilot morale
- As 113th OG SOF, served as OG/CC rep for all 121FS flying activities; coordinated MX actions--zero mishaps OPS
- Maintained CMR status; 100+ flying currencies achieved; readiness key to FS objectives--80% readiness levels met
- Appearance of UPR in home & deploy'd w/ O-4; fraternization in uniform at a bar; lied when asked--2 LORs issued

Last performance feedback was accomplished on:   8 Feb 2018   (IAW AFI 36-2406) (If not accomplished, state the reason)

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG<br>113th Operations Support Squadron (ACC)<br>Joint Base Andrews MD | Commander | 3 JUN 19 |
| | SSN 2862 | SIGNATURE *Chad of Lewis* |

**V. ADDITIONAL RATER OVERALL ASSESSMENT** *(Limit text to 4 lines)*    ☒ CONCUR    ☐ NON-CONCUR

- 113th OG rep to NORAD; attended NCR WEPTAC; integrated newest TTPs into 113th ACA ops--mission success
- Seamless transition to 113th IG team; brought F-16 experience to shop; furthered the IGI effort for NBC preparation
- WG level responsibilities; provided key insight to WG processes--improved several key relationships within the WG
- Recommend focus on officership/AFI compliance; leadership, professional qualities & judgment need improvement

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG<br>113th Operations Group (ACC)<br>Joint Base Andrews MD | Commander | |
| | SSN 4765 | SIGNATURE |

**VI. REVIEWER** *(If required, limit text to 3 lines)*    ☒ CONCUR    ☐ NON-CONCUR

THE ADDITIONAL RATER IS ALSO THE REVIEWER

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG<br>113th Operations Group (ACC)<br>Joint Base Andrews MD | Commander | |
| | SSN 4765 | SIGNATURE |

**VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR**
*(Indicate applicable review by marking the appropriate box)*    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| | | |
| | SSN | SIGNATURE |

**VIII. RATEE'S ACKNOWLEDGMENT**

| I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report. | Yes  No<br>☐    ☐ | SIGNATURE | DATE |
|---|---|---|---|

| | | |
|---|---|---|
| **AF FORM 707, 20150731, V1** | (PREVIOUS EDITIONS ARE OBSOLETE) | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |

RATEE NAME: TORRENCE, JENNER M.

## IX. PERFORMANCE FACTORS (If Section III is marked Does Not Meet Standards, fill in applicable block[s])

| | DOES NOT MEET STANDARDS |
|---|---|
| 1. **Job Knowledge.** Has knowledge required to perform duties effectively. Strives to improve knowledge. Applies knowledge to handle non-routine situations. | ☐ |
| 2. **Leadership Skills.** Sets and enforces standards. Promotes a Healthy Organizational Climate. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Motivates Subordinates. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | ☒ |
| 3. **Professional Qualities.** Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force Standards (i.e. Fitness standards, dress and appearance, customs and courtesies, and professional conduct.) Accepts personal responsibility. Is fair and objective. | ☒ |
| 4. **Organizational Skills.** Plans, coordinates, schedules and uses resources effectively. Meets suspenses. Schedules work for self and others equitably and effectively. Anticipates and solves problems. | ☐ |
| 5. **Judgment and Decisions.** Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities. Adheres to safety and occupational health requirements. Acts to take advantage of opportunities. | ☒ |
| 6. **Communication Skills.** Listens, speaks, and writes effectively. | ☐ |

## X. REMARKS (use this section to spell out acronyms from the front)

Aerospace Control Alert (ACA); Close Air Support (CAS); Combat Mission Ready (CMR); Defensive/Offensive Counter Air (DCA/OCA); Dynamic Targeting (DT); Inertially Aided Munitions (IAMS); Inspector General. Inspections (IGI); Interdiction (INT); Laser Guided Bombs (LGB); Tactics, Techniques and Procedures (TTPs); Targeting Pod (TGP); Supervisor of Flying (SOF); Suppression/Destruction of Enemy Air Defenses (SEAD / DEAD)

## XI. REFERRAL REPORT (Complete only if report contains referral comments or the overall standards block is marked as does not meet standards)

I am referring this OPR to you according to AFI 36-2406, para 1.10. It contains comment(s)/rating(s) that make(s) the report a referral as defined in AFI 36-2406, para. 1.10. Specifically. During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group.

Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command.

Acknowledge receipt by signing and dating below. Your signature merely acknowledges that a referral report has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the report. Once signed, you are entitled to a copy of this memo. You may submit rebuttal comments. Send your written comments to: john.e.vargas.mil@mail.mil

not later than 3 duty days (30 for non-EAD members) from your date below. If you need additional time, you may request an extension from the individuals named above. You may submit attachments (limit to 10 pages), but they must directly relate to the reason this report was referred. Pertinent attachments not maintained elsewhere will remain attached to the report for file in your personnel record. Copies of previous reports, etc. submitted as attachments will be removed from your rebuttal package prior to filing since these documents are already filed in your records. Your rebuttal comments/attachments may not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you can fully substantiate and document them. Contact the MPS, Force Management section, or the AF Contact Center if you require any assistance in preparing your reply to the referral report. It is important for you to be aware that receiving a referral report may affect your eligibility for other personnel related actions (e.g. assignments, promotions, etc.). You may consult your commander and/or MPS or Air Force Contact Center if you desire more information on this subject. If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2406, Chapter 10, Correction of Officer and Enlisted Evaluation Reports, once the report becomes a matter of record as defined in AFI 36-2406, Attachment 2.

| NAME, GRADE, OR OF SVC OF REFERRING EVALUATOR | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | 3 JUN 19 |
| 113th Operations Support Squadron (ACC) Joint Base Andrews MD | SIGNATURE *Chad M Lewis* | |

| SIGNATURE OF RATEE | DATE |
|---|---|
| | |

## INSTRUCTIONS

**ALL:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in Developmental Education, advanced education, previous or anticipated promotion recommendations on AF Form 709, OPR endorsement levels, family activities, marital status, race, sex, ethnic origin, age, religion or sexual orientation. Evaluators enter only the last four numbers of SSN.

**RATER:** Focus your evaluation in Section IV on what the officer did, how well he or she did it, and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section IV may include recommendations for assignment. Provide a copy of the report to the ratee prior to the report becoming a matter of record and provide follow-up feedback to let the ratee know how their performance resulted in this final product.

**ADDITIONAL RATER:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendation for assignment.

**REVIEWER:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NON-CONCUR" and explain in Section VI. Do not use "NON-CONCUR" simply to provide comments on the report.

**RATEE:** Your signature is merely an acknowledgement of receipt of this report. It does not constitute concurrence. If you disagree with the content, you may file an evaluation appeal through the Evaluation Reports Appeals Board IAW AFI 36-2406 Chapter 10 (Correcting Officer and Enlisted Evaluation Reports), or through the Air Force Board for Correction of Military Records IAW AFI 36-2603 (Air Force Board for Correction of Military Records) and AFPAM 36-2607 (Applicants' Guide to the Air Force Board for Correction of Military Records (AFBCMR).

## PRIVACY ACT STATEMENT

*AUTHORITY:* Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406, and Executive Order 9397 (SSN), as amended.
*PURPOSE:* Used to document effectiveness/duty performance history; promotion, school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
*ROUTINE USES:* May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
*DISCLOSURE:* Voluntary. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
*SORN:* F036 AF PC A, Effectiveness/Performance Reporting Records

AF FORM 707, 20150731, V1    (PREVIOUS EDITIONS ARE OBSOLETE)    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

169



**DEPARTMENT OF THE AIR FORCE**
113TH WING (ANG)
JOINT BASE ANDREWS MD

31 May 2019

MEMORANDUM FOR LT COL JENNER M. TORRENCE 113 OSS

FROM: 113 OSS/CC
3029 E. Perimeter Rd
JBA, MD 20762

SUBJECT: Referral Officer Performance Report

1. I am referring the attached Officer Performance Report to you according to AFI 36-2406, para 1.10. It contains comments/ratings that make the evaluation a referral as defined by AFI 36-2406, paragraph 1.10.

2. Acknowledge receipt of this correspondence by digitally signing and dating. Your signature on this memo merely acknowledges that a referral evaluation has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the evaluation. Once this memo is signed, you are entitled to copy. You may submit comments to rebut the evaluation and address any concerns pertaining to the evaluation. Send your comments to Col John Vargas no later than 3 duty days from the date you receive this memorandum. You may submit attachments limited to a total of 10 pages (5 pages front and back); but they must directly relate to the reason the evaluation was referred. Pertinent attachments not maintained elsewhere in the official record will remain attached to the evaluation for filling in your official personnel record. Copies of previous evaluations, etc. submitted as attachments, will be removed from your rebuttal package prior to filing the referral evaluation since these documents are already filed in your official records. Contact your MPS/CSS/HR Specialist if you require any assistance in preparing your reply to the referral evaluation.

LEWIS.CHAD.GREG ORY.1140655690
Digitally signed by LEWIS.CHAD.GREGORY.1140655690
Date: 2019.05.31 10.53.48 -04'00'
CHAD G. LEWIS, Lt Col, ANG
Commander, 113 OSS

Attachment:
AF Form 707, 8 Mar 2018

Cc:    113 OG/CC, Col John E. Vargas

1st Ind. Lt Col Jenner Torrence

MEMORANDUM FOR 113 OG/CC Col John E. Vargas

&lt;lane.a.thurgood.mil@mail.mil&gt;; Gibson, Jay S (Glib) Col USAF AF-A3 (USA) &lt;jay.s.gibson.mil@mail.mil&gt;
**Subject:** [Non-DoD Source] RE: Request Response

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

Col Vargas,

I am deployed remotely and may not have access to encrypted .mil email until early August. Please send your correspondence to my counsel, Mr. Robert Vance, per his earlier requests.

VR,

Lt Col Jenner Torrence

**From:** Vargas, John E Jr Col USAF 113 WG (USA) &lt;john.e.vargas.mil@mail.mil&gt;
**Sent:** Tuesday, July 23, 2019 11:35 PM
**To:** Robert Vance &lt;rvance@vancelf.com&gt;; Lewis, Chad G (Bubba) Lt Col USAF 113 WG (USA) &lt;chad.g.lewis.mil@mail.mil&gt;; MacDonald, Keith G Brig Gen USAF 113 WG (USA) &lt;keith.g.macdonald2.mil@mail.mil&gt;; Jenner Torrence &lt;jennertorrence@hotmail.com&gt;; Torrence, Jenner M (Juice) Lt Col USAF (USA) &lt;jenner.m.torrence.mil@mail.mil&gt;; Thurgood, Lane A Col USAF (USA) &lt;lane.a.thurgood.mil@mail.mil&gt;; Gibson, Jay S (Glib) Col USAF AF-A3 (USA) &lt;jay.s.gibson.mil@mail.mil&gt;
**Subject:** Request Response

Lt Col Torrence,
    The 113th has replied to your request via an encrypted email sent to the following .mil account,jenner.m.torrence.mil@mail.mil &lt; Caution-mailto:jenner.m.torrence.mil@mail.mil &gt; . Please see this email for information regarding your request.

Respectfully,

Colonel Emilio "Vegas" Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 -- 1986

2

171

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | rvance vancelf.com <rvance@vancelf.com> |
| **Sent:** | Thursday, March 7, 2019 8:35 PM |
| **To:** | Vargas, John E Jr Col USAF 113 WG (US) |
| **Cc:** | Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA) |
| **Subject:** | [Non-DoD Source] OPR Inputs 2 November 2017 to 1 November 2018 |

Dear Col. Vargas:

I represent Lt Col Jenner Torrence in connection with his matters involving the District of Columbia Air National Guard arising from his advocacy on behalf of Maj Anh-Chi Murphy.

I request a 30-day extension of your deadline for Lt Col Torrence's OPR Inputs. In order to prepare the Inputs, I require documentation of his taskings, feedback, raters, duty title, office and communication of these items to Lt Col Torrence. In this regard, I will communicate with you shortly with details concerning the documents I require in order for Lt Col Torrence to provide you with quality inputs to his OPR.

Thank you for your consideration. Please respond with respect to the requested extension as soon as possible.

Sincerely,

--
Robert T Vance Jr
Law Offices of Robert T Vance Jr
100 South Broad Street, Suite 1525
Philadelphia PA 19110
215 557 9550 tel / 215 278 7992 fax

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | Jenner Torrence <jennertorrence@hotmail.com> |
| **Sent:** | Tuesday, March 5, 2019 4:58 PM |
| **To:** | Vargas, John E Jr Col USAF 113 WG (US); Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA) |
| **Cc:** | Campo, John J Col USAF 113 WG (USA); Lewis, Chad G (Bubba) Lt Col USAF 113 WG (US); rvance vancelf.com; Adelaide Kahn |
| **Subject:** | Re: 2nd Attempt: OPR Inputs 2 NOV 17 to 1 NOV 18 |

Col Vargas,

Apologies for the delay and thank you for the reminder.

I much prefer direct communication but unfortunately, due to reprisal and possible US and DC criminal statute violations by the signatories to my last OPR, I need to ask you correspond through my counsel, Mr. Robert Vance. He is associated with the National Women's Law Center's and in the cc block. If you would, also be so kind to cc myself and his advisors, Protect Our Defenders, through Ms. Adelaide Khahn (also cc'd).

A notification of representation will follow.

Thank you so much and I apologies for the inconvenience.

VR,

Lt Col Jenner "Juice" Torrence

Cell: 202-876-4020

**From:** Vargas, John E Jr Col USAF 113 WG (US) <john.e.vargas.mil@mail.mil>
**Sent:** Tuesday, March 5, 2019 7:36 AM
**To:** jennertorrence@hotmail.com; Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA)
**Cc:** Campo, John J Col USAF 113 WG (USA); Lewis, Chad G (Bubba) Lt Col USAF 113 WG (US)
**Subject:** 2nd Attempt: OPR Inputs 2 NOV 17 to 1 NOV 18

Lt Col Torrence,
    Hello again. We did not receive your acknowledgement as requested so wanted to resend to ensure your awareness. Again, we want to provide you an opportunity to provide inputs for consideration for your 2 NOV 17 to 1 NOV 18 OPR. We need these inputs NLT 1200 EST, 11 MAR 19 (next Monday). Understand that your schedule may be very busy but request a moment of your time to let us know you are tracking this suspense.

Thank you in advance and have a good day.

Respectfully,

Colonel John Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 – 1986

1

173

**jennertorrence@hotmail.com**

| | |
|---|---|
| **From:** | Jenner Torrence <jennertorrence@hotmail.com> |
| **Sent:** | Tuesday, March 5, 2019 4:58 PM |
| **To:** | Vargas, John E Jr Col USAF 113 WG (US); Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA) |
| **Cc:** | Campo, John J Col USAF 113 WG (USA); Lewis, Chad G (Bubba) Lt Col USAF 113 WG (US); rvance vancelf.com; Adelaide Kahn |
| **Subject:** | Re: 2nd Attempt: OPR Inputs 2 NOV 17 to 1 NOV 18 |

Col Vargas,

Apologies for the delay and thank you for the reminder.

I much prefer direct communication but unfortunately, due to reprisal and possible US and DC criminal statute violations by the signatories to my last OPR, I need to ask you correspond through my counsel, Mr. Robert Vance. He is associated with the National Women's Law Center's and in the cc block. If you would, also be so kind to cc myself and his advisors, Protect Our Defenders, through Ms. Adelaide Khahn (also cc'd).

A notification of representation will follow.

Thank you so much and I apologies for the inconvenience.

VR,

Lt Col Jenner "Juice" Torrence

Cell: 202-876-4020

---

**From:** Vargas, John E Jr Col USAF 113 WG (US) <john.e.vargas.mil@mail.mil>
**Sent:** Tuesday, March 5, 2019 7:36 AM
**To:** jennertorrence@hotmail.com; Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA)
**Cc:** Campo, John J Col USAF 113 WG (USA); Lewis, Chad G (Bubba) Lt Col USAF 113 WG (US)
**Subject:** 2nd Attempt: OPR Inputs 2 NOV 17 to 1 NOV 18

Lt Col Torrence,

   Hello again. We did not receive your acknowledgement as requested so wanted to resend to ensure your awareness. Again, we want to provide you an opportunity to provide inputs for consideration for your 2 NOV 17 to 1 NOV 18 OPR. We need these inputs NLT 1200 EST, 11 MAR 19 (next Monday). Understand that your schedule may be very busy but request a moment of your time to let us know you are tracking this suspense.

Thank you in advance and have a good day.

Respectfully,

Colonel John Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 – 1986

1

# ENCLOSURE 13



**DEPARTMENT OF THE AIR FORCE**
113TH WING (ANG)
JOINT BASE ANDREWS MD

9 July 2020

MEMORANDUM FOR RECORD

FROM: 113WG/EO

SUBJECT: Investigating Officer Appointment Brief for FRR I-2018-081-DC-FA-LGO

1.   In accordance with (IAW) Chief National Guard Bureau Manual (CNGBM) 9601.01, National Guard Discrimination Program, dated 25 Apr 17, Enclosures B, Paragraph 3, you were appointed by Col John J. Campo, Vice Commander, 113th Wing, on 7 Jul 20 to conduct an investigation into the allegations of alleged discrimination by Colonel John Vargas against Lt Col Jenner Torrence in the 113th Operations Group.

2.   As this matter has already been through the Informal Resolution Request (IRR) process, which the complainant has appealed through this FRR, National Guard Bureau Equity and Inclusion Complaints Management & Adjudication (NGB-EI-CMA) will make final determination(s) on this FRR.

3.   After reviewing the Leadership Inquiry Report and the Notice of Proposed Resolution associated with the IRR as well as the complainant's FRR, NGB-EI-CMA deemed the IRR inquiry to have been insufficient. The attached memorandum (Tab A), Notice of Acceptance and Request for Investigation of the Discrimination Complaint of Lt Col Jenner Torrence, NGB Case No. I-2018-081-DC-FA-LGO, dated 2 Oct 2018, is provided for your review and direction in this process.

4.   In accordance with CNGBM 9601.01, Enclosure B, Para 4, "The Investigating Officer (IO) will complete an investigation and issue a report with findings to NGB-EO-CMA within 45 calendar days from the date of appointment." Being appointed 7 July 20, your suspense to submit your report with findings to NGB-EI-CMA is 21 Aug 20, unless I grant a written extension.

5.   I have explained the basis of the complaint, the elements of discrimination, your IO responsibilities and FRR timeline and I am at your disposal to provide technical advice on Equal Opportunity and this Formal Resolution Request (FRR) process. Please contact me at allison.d.hartsfield.mil@mail.mil, (240) 857-5243, or (703) 447-0520.

ALLISON D. HARTSFIELD, Captain, DCANG
Director, 113th Wing Equal Opportunity

TAB A:
NGB-EI-CMA Memorandum, Dated 2 Oct 19

I understand the basis of the complaint, the elements of discrimination, and will review all documentation associated with this complaint and develop an investigative plan that will ensure a comprehensive investigation is completed.

PAUL M. FRANKEN
COL, AV, DCARNG
Deputy Commander, MAC

# ENCLOSURE 14



**DISTRICT OF COLUMBIA ARMY NATIONAL GUARD**
MULTI-AGENCY AUGMENTATION COMMAND
2001 EAST CAPITOL STREET SE
WASHINGTON, DC 20003-1719

NGDC-MAC                                                                    30 October 2020

MEMORANDUM FOR Colonel John J. Campo, 113 WG/CC, 3222 East Perimeter Road, Joint Base Andrews, MD, 20762

SUBJECT: Notification of Recusal from Investigating Officer Duties

1. This memo is a formal request to be relieved of my responsibilities as the Investigating Officer (IO) in the discrimination complaint of Lt Col Jenner M. Torrence, NGB Case Number I-2018-081-DC-FA-LGO. I do not take this action lightly and know it may cause additional inconvenience for the Command but am compelled to take this action.

   a. My review of the documents provided prejudices me in carrying out the duties required by the National Guard Bureau to complete this investigation. I do not agree with the series of findings leading to this investigation.

   b. This investigation requires and IO trained in complex investigations and with more familiarity with the United States Air Force complaint processes, regulations, and procedures.

   c. The requirements of this investigation exceeds my ability to apply the necessary time and resources to this activity as an M-DAY Officer.

2. After multiple reviews of over 1,089 documents provided to me by the 113th Wing Equal Opportunity (EO) Office at the start of my duty, I arrived at the following conclusions regarding this case.

   a. The Informal Resolution Request (IRR) inquiry preceding this Formal Resolution Request (FRR) insufficiently addressed the overall circumstances leading to a Letter of Reprimand (LOR) for the complainant. The subsequent Leadership Inquiry Report (LIR) to address Lt Col Torrence's IRR failed to fully consider the nature of the Command Directed Investigation (CDI) which led to the LOR and its potential conflicts therein. My review of the CDI and associated documents demonstrate that the conclusions of the LIR relied on circumstantial evidence, or assumptions of fact and not concrete evidence to materially support actions taken.

   b. The CDI relied heavily on the statements of two Officers; however, my objective view of both of these Officers is that they could have been prejudiced in their statements and actions. This creates considerable doubt in my mind about the veracity of their statements leading to a substantiated claim of an improper relationship of an

1

NGDC-MAC
SUBJECT: Notification of Recusal from Investigating Officer Duties

extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the Armed Forces of the United States in violation of AFI 1-1 and AFI 36-2909. This led to the complaint filed by Lt Col Torrence, and thus are related and require mutual examination.

3.  It is also clear to me that Lt Col Torrence is well-researched, defending himself with vigor, and with the use of civilian attorneys. That is certainly well within his right and does not cause me concern nor impede the ability of an IO to complete this duty. To summarize some of my assessments of exhibits Lt Col Torrence gathered during the course the CDI and subsequent investigations:

   a.  Some of the exhibits and information provided by Lt Col Torrence are irrelevant to the claims and issues at hand. This does not negate or undermine the veracity of other information provided that is directly relevant to overall complaint. In my review of the documents, I assess that documents provided Lt Col Torrence indicates a climate existed where good order and discipline at all levels of Command broke down, especially during the deployment to Guam. This led to claims, and counter claims about the nature of male and female interactions and behavior, both on and off duty. These claims, innuendo, and other actions between the Airmen could have led to perception issues about the appropriateness of the relationship between Lt Col Torrence and Maj Murphy, and the true nature of that relationship.

   b.  Lt Col Torrence highlights several issues with the Command climate that undermined good order and discipline that I do not feel were sufficiently considered during the series of inquiries and CDI. There was no specific evidence shown how his relationship with Maj Murphy specifically undermined good order and discipline. A strong case could be made that actions and statements by others in the Command, towards Maj Murphy in particular, were more detrimental and corrosive to good order and discipline. My assessment, based on documents made available to me, does not indicate that the relationship between Lt Col Torrence and Maj Murphy undermined good order and discipline, thus I disagree with findings in the CDI.

4.  The involvement of civilian attorneys coupled with an initial and potentially future Congressional Inquiry oblige me to make the following recommendations regarding this investigation:

   a.  Appoint a United Stated Air Force Officer in the rank of O-6 or higher to conduct a full review of the circumstances of the original complaint, the resulting CDI, the IRR filed by Lt Col Torrence, and the latest inquiry and subsequent LIR. This Officer should have experience in complex investigations, be on full time status, and have the capability to interview current and prior members of the Command. Justification for this recommendation:

      (1)  A full accounting and investigation of Lt Col Torrence's exhibits is required to determine if the conclusions in the original CDI were incorrect. If the findings are upheld, then Lt Col Torrence will lack any additional procedural or evidentiary actions to

2

NGDC-MAC
SUBJECT: Notification of Recusal from Investigating Officer Duties

extend this investigation. If the findings are reversed, then then two Airmen receive the fair treatment they deserve and the 113th Wing and DCANG are able to demonstrate fairness and adherence to the investigative process.

(2)  The involvement of civilian attorneys, Congressional Inquiry and multiple freedom of information requests demands this case is handled with skill, experience, and fairness that all parties deserve. Failure to do so could lead to additional inquires, procedural actions, and other investigations that will extend the duration and potentially expand the scope of investigations at the 113th Wing.

(3)  The Commanding General, District of Columbia National Guard has affirmed that complaints, especially those involving sexual assault or harassment would receive the highest emphasis by the Command. This investigation is an outcome of events resulting in a SAPR complaint, and therefore, I believe the Command is best served by a thorough look at all aspects of this complaint by someone that exceeds my qualifications.

5.  I regret that I am unable to fulfill my duties in this task, but I do believe my actions are in keeping with the traditions of candor and providing leaders my honest assessment of the facts as I see them. I hope that my observations can help the 113th Wing in its endeavors to rectify this situation in a suitable and equitable manner for all involved.

6.  Point of contact is the undersigned at (703) 969-4389; paul.m.franken.mil@mail.mil.


PAUL M. FRANKEN
COL, AV, DCARNG
Deputy Commander, MAC

CF:
NGB Equality and Inclusion, Compliance Management and Inclusion (NGB-EI-CMA)
113th WG/EO

3

# CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| TORRENCE JENNER MICHAEL | AIR FORCE--ANGUS | ████ 4487 |

| 4a. GRADE, RATE OR RANK | b. PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) N/A |
|---|---|---|---|
| LTC | O5 | 1976███ | |

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| WASHINGTON DC | WASHINGTON DC |

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | b. STATION WHERE SEPARATED |
|---|---|
| 113 OPERATIONS SUPPORT SQ (ACC) | JOINT BASE ANDREWS |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE [ ] NONE |
|---|---|
| ANG, DISTRICT OF COLUMBIA | AMOUNT: $400,000 |

**11. PRIMARY SPECIALTY** (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.)

11F3H, FIGHTER PILOT, F-16, 2 YEARS AND 3 MONTHS; 92T0, PILOT TRAINEE, 0 YEARS AND 0 MONTHS.

| 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|
| a. DATE ENTERED AT THIS PERIOD | 2016 | MAR | 29 |
| b. SEPARATION DATE THIS PERIOD | 2018 | JUN | 30 |
| c. NET ACTIVE SERVICE THIS PERIOD | 02 | 03 | 02 |
| d. TOTAL PRIOR ACTIVE SERVICE | 15 | 07 | 27 |
| e. TOTAL PRIOR INACTIVE SERVICE | 00 | 01 | 23 |
| f. FOREIGN SERVICE | 03 | 11 | 28 |
| g. SEA SERVICE | 00 | 00 | 00 |
| h. INITIAL ENTRY TRAINING | 2000 | SEP | 06 |
| i. EFFECTIVE DATE OF PAY GRADE | 2016 | JUL | 06 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|---|
| Meritorious Service Medal with 1 Oak Leaf Cluster, Air Force Achievement Medal with 1 Oak Leaf Cluster, AF Outstanding Unit Award with 4 Oak Leaf Clusters, National Defense Service Medal, Global War on Terrorism Service Medal, Korean Defense Service Medal, AF Overseas Ribbon Long, AF Longevity Service with 4 Oak Leaf Clusters, AF Training Ribbon | NONE DURING THIS PERIOD |

| | | YES | | NO |
|---|---|---|---|---|
| 15a. COMMISSIONED THROUGH SERVICE ACADEMY | | YES | X | NO |
| b. COMMISSIONED THROUGH ROTC SCHOLARSHIP (10 USC Sec. 2107b) | | YES | X | NO |
| c. ENLISTED UNDER LOAN REPAYMENT PROGRAM (10 USC Chap. 109) (If yes, years of commitment: _____ ) | | YES | X | NO |

| 16. DAYS ACCRUED LEAVE PAID  0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO |
|---|---|---|---|
| | | | X |

**18. REMARKS**

MEMBER SERVED ON TITLE 32 USC 502(A) FOR ANNUAL TRAINING FROM 29 MAR 2016 TO 22 APR 2016 AND ON TITLE 32 502(F) FOR ACTIVE GUARD RESERVE TOUR FROM 23 APR 2016 TO 30 JUN 2018.

-----------------------------------------------------NOTHING FOLLOWS-----------------------------------------------------

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address - include ZIP Code) |
|---|---|
| 1208 5TH ST NE WASHINGTON DC 20002 | NOT REQUIRED/NO NAME PROVIDED |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (Specify state/locality)   DC   OFFICE OF VETERANS AFFAIRS | X | YES | | NO |
|---|---|---|---|---|
| a. MEMBER REQUESTS COPY 3 BE SENT TO THE CENTRAL OFFICE OF THE DEPARTMENT OF VETERANS AFFAIRS (WASHINGTON, DC) | X | YES | | NO |

| 21.a. MEMBER SIGNATURE | b. DATE (YYYYMMDD) | 22.a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature) | b. DATE (YYYYMMDD) |
|---|---|---|---|
| MEMBER NOT AVAILABLE TO SIGN | N/A | CAC/PKI SIGNED BY DUNNING.ALEXANDER.KING.1250051685 ALEXANDER K. DUNNING, MSgt, NCOIC Personnel Readiness Oct 04 2018 10:54:13 AM (UTC) CAC Serial Number: 1BC3DB   IssuerCN: DOD ID CA-44 | 20181004 |

**DD FORM 214, AUG 2009**       PREVIOUS EDITION IS OBSOLETE       **MEMBER-1**

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle)<br>TORRENCE JENNER MICHAEL | 2. DEPARTMENT, COMPONENT AND BRANCH<br>AIR FORCE--ANGUS | 3. SOCIAL SECURITY NUMBER<br>████ 4487 |
|---|---|---|

| 4a. GRADE, RATE OR RANK<br>LTC | b. PAY GRADE<br>O5 | 5. DATE OF BIRTH (YYYYMMDD)<br>1976████ | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) N/A |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY<br>WASHINGTON DC | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known)<br>WASHINGTON DC |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND<br>113 OPERATIONS SUPPORT SQ (ACC) | b. STATION WHERE SEPARATED<br>JOINT BASE ANDREWS |
|---|---|

**9. COMMAND TO WHICH TRANSFERRED**
ANG, DISTRICT OF COLUMBIA

**10. SGLI COVERAGE** [ ] NONE
AMOUNT: $400,000

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.)<br>11F3H, FIGHTER PILOT, F-16, 2 YEARS AND 3 MONTHS; 92T0, PILOT TRAINEE, 0 YEARS AND 0 MONTHS. | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 2016 | MAR | 29 |
| | b. SEPARATION DATE THIS PERIOD | 2018 | JUN | 30 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 02 | 03 | 02 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 15 | 07 | 27 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 00 | 01 | 23 |
| | f. FOREIGN SERVICE | 03 | 11 | 28 |
| | g. SEA SERVICE | 00 | 00 | 00 |
| | h. INITIAL ENTRY TRAINING | 2000 | SEP | 06 |
| | i. EFFECTIVE DATE OF PAY GRADE | 2016 | JUL | 06 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service)<br>Meritorious Service Medal with 1 Oak Leaf Cluster, Air Force Achievement Medal with 1 Oak Leaf Cluster, AF Outstanding Unit Award with 4 Oak Leaf Clusters, National Defense Service Medal, Global War on Terrorism Service Medal, Korean Defense Service Medal, AF Overseas Ribbon Long, AF Longevity Service with 4 Oak Leaf Clusters, AF Training Ribbon | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed)<br>NONE DURING THIS PERIOD |
|---|---|

| 15a. COMMISSIONED THROUGH SERVICE ACADEMY | | YES | X | NO |
|---|---|---|---|---|
| b. COMMISSIONED THROUGH ROTC SCHOLARSHIP (10 USC Sec. 2107b) | | YES | X | NO |
| c. ENLISTED UNDER LOAN REPAYMENT PROGRAM (10 USC Chap. 109) (If yes, years of commitment: _____) | | YES | X | NO |

| 16. DAYS ACCRUED LEAVE PAID 0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO |
|---|---|---|---|
| | | | X |

**18. REMARKS**
MEMBER SERVED ON TITLE 32 USC 502(A) FOR ANNUAL TRAINING FROM 29 MAR 2016 TO 22 APR 2016 AND ON TITLE 32 502(F) FOR ACTIVE GUARD RESERVE TOUR FROM 23 APR 2016 TO 30 JUN 2018.
-----------------------------------------------------------NOTHING FOLLOWS-----------------------------------------------------------

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code)<br>1208 5TH ST NE<br>WASHINGTON DC 20002 | b. NEAREST RELATIVE (Name and address - include ZIP Code)<br>NOT REQUIRED/NO NAME PROVIDED |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (Specify state/locality) __DC__ OFFICE OF VETERANS AFFAIRS | X | YES | | NO |
|---|---|---|---|---|
| a. MEMBER REQUESTS COPY 3 BE SENT TO THE CENTRAL OFFICE OF THE DEPARTMENT OF VETERANS AFFAIRS (WASHINGTON, DC) | X | YES | | NO |

| 21.a. MEMBER SIGNATURE<br>MEMBER NOT AVAILABLE TO SIGN | b. DATE (YYYYMMDD)<br>N/A | 22.a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature)<br>CAC/PKI SIGNED BY DUNNING.ALEXANDER.KING.1250051685<br>ALEXANDER K. DUNNING, MSgt, NCOIC Personnel Readiness Oct 04 2018 10:54:13 AM (UTC)<br>CAC Serial Number: 1BC3DB   IssuerCN: DOD ID CA-44 | b. DATE (YYYYMMDD)<br>20181004 |
|---|---|---|---|

### SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION<br>RELEASE FROM ACTIVE DUTY | 24. CHARACTER OF SERVICE (Include upgrades)<br>HONORABLE |
|---|---|

| 25. SEPARATION AUTHORITY<br>AFI 36-3209 | 26. SEPARATION CODE<br>MBK | 27. REENTRY CODE<br>N/A |
|---|---|---|

**28. NARRATIVE REASON FOR SEPARATION**
COMPLETION OF REQUIRED ACTIVE SERVICE

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD)<br>NONE | 30. MEMBER REQUESTS COPY 4 (Initials) N/A |
|---|---|

**DD FORM 214, AUG 2009**    PREVIOUS EDITION IS OBSOLETE    **MEMBER-4**

# OFFICER PERFORMANCE REPORT (Lt thru Col)

## I. RATEE IDENTIFICATION DATA (Read AFI 36-2406 carefully before filling in any item)

| 1. NAME (Last, First, Middle Initial) | 2. SSN N | 3. RANK | 4. DAFSC | 5. REASON FOR REPORT | 6. PAS CODE |
|---|---|---|---|---|---|
| TORRENCE, JENNER M. | 4487 | Lt Col | 11F3H | Annual | B91CFL80 |

| 7. ORGANIZATION, COMMAND, LOCATION, AND COMPONENT | 8. PERIOD OF REPORT | | 9. NO. DAYS SUPV. |
|---|---|---|---|
| 113 Operations Support Squadron (ACC) | FROM 2 Nov 2017 | | 365 |
| Joint Base Andrews MD (AGR) | THRU 1 Nov 2018 | | NO. DAYS NON-RATED 0 |

| II. JOB DESCRIPTION (Limit text to 4 lines) | 10. SRID |
|---|---|
| DUTY TITLE F-16 Flight Lead | 11113 |

- Maintains CMR status as an F-16C+ pilot and flight lead; qualified in Advanced TGP, IAMS, and LGB weapons
- Defends the US and NCR and enforces ADIZ boundaries as an Alert Pilot; directly responsible to NORAD control
- Performs all Counter Air and Surface Attack missions including DCA, Interdiction, SEAD, DEAD, CAS and ACA
- Supervisor of Flying; oversees daily flying operations; ensures timely & safe execution of combat & training sorties

## III. PERFORMANCE FACTORS

| | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| Job Knowledge, Leadership Skills (to include Promoting a Healthy Organizational Climate). Professional Qualities, Organizational Skills, Judgment and Decisions, Communication Skills (see reverse if marked Does Not Meet Standards) | ☒ | ☐ |

## IV. RATER OVERALL ASSESSMENT (Limit text to 6 lines)

- Furthered the ACA enterprise; scheduled FS pilots for alert shifts; all currencies met--100% NCR coverage achieved
- Spearheaded OPS/MX working relationship; synchronized OPS reqs to MX capabilities--NORAD/CC directives met
- OPS ACA facilities POC; identified facilities shortfalls at ACA; made multiple key upgrades--improved pilot morale
- As 113th OG SOF, served as OG/CC rep for all 121FS flying activities; coordinated MX actions--zero mishaps OPS
- Maintained CMR status; 100+ flying currencies achieved; readiness key to FS objectives--80% readiness levels met
- Appearance of UPR at home & deploy'd w/ O-4; fraternization in uniform at a bar; lied when asked--2 LORs issued

Last performance feedback was accomplished on: **8 Feb 2018** (IAW AFI 36-2406) (If not accomplished, state the reason)

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | 30 AUG 19 |
| 113th Operations Support Squadron (ACC) | SSN    SIGNATURE | |
| Joint Base Andrews MD | 2862    Chad G Lewis | |

## V. ADDITIONAL RATER OVERALL ASSESSMENT (Limit text to 4 lines)    ☒ CONCUR    ☐ NON-CONCUR

- 113th OG rep to NORAD; attended NCR WEPTAC; integrated newest TTPs into 113th ACA ops--mission success

- WG level responsibilities; provided key insight to WG processes--improved several key relationships within the WG
- Recommend focus on officership/AFI compliance; leadership, professional qualities & judgment need improvement

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG | Commander | 23 SEP 19 |
| 113th Operations Group (ACC) | SSN    SIGNATURE | |
| Joint Base Andrews MD | 4765    John E Vargas | |

## VI. REVIEWER (If required, limit text to 3 lines)    ☒ CONCUR    ☐ NON-CONCUR

THE ADDITIONAL RATER IS ALSO THE REVIEWER

I have carefully considered LtCol Torrence's comments to the referral document of 31 Aug 2019.

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| JOHN E. VARGAS, Colonel, ANG | Commander | 23 SEP 19 |
| 113th Operations Group (ACC) | SSN    SIGNATURE | |
| Joint Base Andrews MD | 4765    John E Vargas | |

## VII. FUNCTIONAL EXAMINER/AIR FORCE ADVISOR
(Indicate applicable review by marking the appropriate box)    ☐ FUNCTIONAL EXAMINER    ☐ AIR FORCE ADVISOR

| NAME, GRADE, BR OF SVC, ORGN, COMMAND & LOCATION | DUTY TITLE | DATE |
|---|---|---|
| | | |
| | SSN    SIGNATURE | |

## VIII. RATEE'S ACKNOWLEDGMENT

| I understand my signature does not constitute agreement or disagreement. I acknowledge all required feedback was accomplished during the reporting period and upon receipt of this report. | Yes  No | SIGNATURE | DATE |
|---|---|---|---|
| | ☐    ☐ | MEMBER DECLINED TO SIGN    John E Vargas    John E. Vargas, 113 OG Commander | 1 OCT 19 |

AF FORM 707, 20150731, V1    (PREVIOUS EDITIONS ARE OBSOLETE)    PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974.

RATEE NAME: TORRENCE, JENNER M.

## IX. PERFORMANCE FACTORS (If Section III is marked Does Not Meet Standards, fill in applicable block(s))

| | DOES NOT MEET STANDARDS |
|---|---|
| 1. **Job Knowledge.** Has knowledge required to perform duties effectively. Strives to improve knowledge. Applies knowledge to handle non-routine situations. | ☐ |
| 2. **Leadership Skills.** Sets and enforces standards. Promotes a Healthy Organizational Climate. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Motivates Subordinates. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | ☒ |
| 3. **Professional Qualities.** Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force Standards (i.e. Fitness standards, dress and appearance, customs and courtesies, and professional conduct.) Accepts personal responsibility. Is fair and objective. | ☒ |
| 4. **Organizational Skills.** Plans, coordinates, schedules and uses resources effectively. Meets suspenses. Schedules work for self and others equitably and effectively. Anticipates and solves problems. | ☐ |
| 5. **Judgment and Decisions.** Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities. Adheres to safety and occupational health requirements. Acts to take advantage of opportunities. | ☒ |
| 6. **Communication Skills.** Listens, speaks, and writes effectively. | ☐ |

## X. REMARKS (use this section to spell out acronyms from the front)

Aerospace Control Alert (ACA); Close Air Support (CAS); Combat Mission Ready (CMR); Defensive/Offensive Counter Air (DCA/OCA); Dynamic Targeting (DT); Inertially Aided Munitions (IAMS); Interdiction (INT); Laser Guided Bombs (LGB); Tactics, Techniques and Procedures (TTPs); Targeting Pod (TGP); Supervisor of Flying (SOF); Suppression/Destruction of Enemy Air Defenses (SEAD / DEAD)

## XI. REFERRAL REPORT (Complete only if report contains referral comments or the overall standards block is marked as does not meet standards)

I am referring this OPR to you according to AFI 36-2406, para 1.10. It contains comment(s)/rating(s) that make(s) the report a referral as defined in AFI 36-2406, para, 1.10. Specifically, During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group.

Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command.

Acknowledge receipt by signing and dating below. Your signature merely acknowledges that a referral report has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the report. Once signed, you are entitled to a copy of this memo. You may submit rebuttal comments. Send your written comments to:
john.e.vargas.mil@mail.mil

n ot later than6 duty days (30 for non-EAD members) from your date below. If you need additional time, you may request an extension from the individuals named above. You may submit attachments (limit to 10 pages), but they must directly relate to the reason this report was referred. Pertinent attachments not maintained elsewhere will remain attached to the report for file in your personnel record. Copies of previous reports, etc. submitted as attachments will be removed from your rebuttal package prior to filing since these documents are already filed in your records. Your rebuttal comments/attachments must not contain any reflection on the character, conduct, integrity, or motives of the evaluator unless you can fully substantiate and document them. Contact the MPS, Force Management section, or the AF Contact Center if you require any assistance in preparing your reply to the referral report. It is important for you to be aware that receiving a referral report may affect your eligibility for other personnel related actions (e.g. assign mentspromotions, etc.). You may consult your commander and/or MPS or Air Force Contact Center if you desire more information on this subject. If you believe this report is inaccurate, unjust, or unfairly prejudicial to your career, you may apply for a review of the report under AFI 36-2406, Chapter 10, Correction of Officer and Enlisted Evaluation Reports, once the report becomes a matter of record as defined in AFI 36-2406, Attachment 2.

| NAME, GRADE, BR OF SVC OF REFERRING EVALUATOR | DUTY TITLE | DATE |
|---|---|---|
| CHAD G. LEWIS, Lt Col, ANG | Commander | 30 AUG 19 |
| 113th Operations Support Squadron (ACC) Joint Base Andrews MD | SIGNATURE *Chad G Lewis* | |

| SIGNATURE OF RATEE | | DATE |
|---|---|---|
| MEMBER DECLINED TO SIGN  *Jhn E Vargas*  JOHN E. VARGAS 113 OG/CC | | 14 SEP 19 |

## INSTRUCTIONS

**ALL:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in Developmental Education, advanced education, previous and anticipated promotion recommendations on AF Form 709. OPR endorsement levels, family activities, marital status, race, sex, ethnic origin, age, religion or sexual orientation. Evaluators enter only the last four numbers of SSN.

**RATER:** Focus your evaluation in Section IV on what the officer did, how well he or she did it, and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section IV may include recommendations for assignment. Provide a copy of the report to the ratee prior to the report becoming a matter of record and provide follow-up feedback to let the ratee know how their performance resulted in this final product.

**ADDITIONAL RATER:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendations for assignment.

**REVIEWER:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NON-CONCUR" and explain in Section VI. Do not use "NON-CONCUR" simply to provide comments on the report.

**RATEE:** Your signature is merely an acknowledgment of receipt of this report. It does not constitute concurrence. If you disagree with the content, you may file an evaluation appeal through the Evaluation Reports Appeals Board IAW AFI 36-2406 Chapter 10 (Correcting Officer and Enlisted Evaluation Reports), or through the Air Force Board for Correction of Military Records IAW AFI 36-2603 (Air Force Board for Correction of Military Records) and AFPAM 36-2607 (Applicants' Guide to the Air Force Board for Correction of Military Records (AFBCMR).

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 United States Code (U.S.C.) 8013, Secretary of the Air Force; AFI 36-2406; and Executive Order 9397 (SSN), as amended.
**PURPOSE:** Used to document effectiveness/duty performance history; promotion, school and assignment selection; reduction-in-force; control roster; reenlistment; separation; research and statistical analysis.
**ROUTINE USES:** May specifically be disclosed outside the DoD as a routine use pursuant to 5 U.S.C. 552a(b)(3). DoD Blanket Routine Uses apply.
**DISCLOSURE:** Voluntary. Not providing SSN may cause form to not be processed or to positively identify the person being evaluated.
**SORN:** F036 AF PC A, Effectiveness/Performance Reporting Records

| AF FORM 707, 20150731, V1 | (PREVIOUS EDITIONS ARE OBSOLETE) | PRIVACY ACT INFORMATION: The information in this form is FOR OFFICIAL USE ONLY. Protect IAW the Privacy Act of 1974. |
|---|---|---|



**DEPARTMENT OF THE AIR FORCE**
**113TH WING (ANG)**
**JOINT BASE ANDREWS MD**

31 May 2019

MEMORANDUM FOR LT COL JENNER M. TORRENCE 113 OSS

FROM: 113 OSS/CC
　　　3029 E. Perimeter Rd
　　　JBA, MD 20762

SUBJECT: Referral Officer Performance Report

1.  I am referring the attached Officer Performance Report to you according to AFI 36-2406, para 1.10. It contains comments/ratings that make the evaluation a referral as defined by AFI 36-2406, paragraph 1.10.

2.  Acknowledge receipt of this correspondence by digitally signing and dating. Your signature on this memo merely acknowledges that a referral evaluation has been rendered; it does not imply acceptance of or agreement with the ratings or comments on the evaluation. Once this memo is signed, you are entitled to copy. You may submit comments to rebut the evaluation and address any concerns pertaining to the evaluation. Send your comments to Col John Vargas no later than 3 duty days from the date you receive this memorandum. You may submit attachments limited to a total of 10 pages (5 pages front and back); but they must directly relate to the reason the evaluation was referred. Pertinent attachments not maintained elsewhere in the official record will remain attached to the evaluation for filling in your official personnel record. Copies of previous evaluations, etc. submitted as attachments, will be removed from your rebuttal package prior to filing the referral evaluation since these documents are already filed in your official records. Contact your MPS/CSS/HR Specialist if you require any assistance in preparing your reply to the referral evaluation.

LEWIS.CHAD.GREG  Digitally signed by
ORY.1140655690   LEWIS.CHAD.GREGORY.11406556
　　　　　　　　　90
　　　　　　　　　Date: 2019.05.31 10:53:48 -04'00'
CHAD G. LEWIS, Lt Col, ANG
Commander, 113 OSS

Attachment:
AF Form 707, 8 Mar 2018

Cc:　113 OG/CC, Col John E. Vargas

1st Ind, Lt Col Jenner Torrence

MEMORANDUM FOR 113 OG/CC Col John E. Vargas

Receipt acknowledged at _____ (time) on _____ (date).

Member Declined to Sign   17 AUG 19
John E. Vargas, 113 OG Commander

JENNER M. TORRENCE, Lt Col, ANG

I have carefully considered Lt Col Torrence's comments to the referral document of 31 May 2019.

JOHN E. VARGAS, Colonel, ANG
Commander, 113 Operations Group

187



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR FORCE COMBAT AIR FORCES DIVISION
1460 AIR FORCE PENTAGON, ROOM 5D756
WASHINGTON DC 20330

14 Sep 2019

MEMORANDUM FOR 113 OG/CC AND 113 OSS/CC

FROM: LT COL JENNER M. TORRENCE
1208 5TH ST NE
WASHINGTON, DC 20002

SUBJECT: Rebuttal to Revised Referral Officer Performance Report (OPR)

References:  (a) Lt Col Torrence Revised Referral OPR 2 Nov 2017–1 Nov 2018 facsimile
(b) Lt Col Torrence Revised OPR Note from Col Vargas
(c) Lt Col Torrence Previous Rating Period OPR Correspondence with OPR
Versions Embedded
(d) Robert Vance to Col Vargas 7 March 19 Request Extension and Information
(e) AFI 11-202 Volume 1 *Aircrew Training,* 10 June 2019
(f) AFI 11-2F-16V1 *F-16--Aircrew Flight Training,* 20 April 2015
(g) AFI 11-401, *Aviation Management,* 2 January 2014
(h) AFI 36-2406_AFGM2019-01 *Officer and Enlisted Evaluation System*, 10 May
2019
(i) ANGI 36-101 *Air National Guard Active Guard and Reserve Program*, 3 June
2014
Note: Available references are embedded in this document.

1. **Purpose:** This document serves the following three purposes.

   a. **Information Request:** This is a request for the appropriate documentation and
   information required to formulate a proper rebuttal and OPR input for the document at
   reference a. This was discussed in my counsel's email to you on 7 Mar 2019, to which
   you did not respond. The specific information required is outlined below.

   b. **Response Time Extension Request:** This is a request for an extension to the 14
   September 2019 deadline you stipulated in the note (b) accompanying the revised OPR
   (a). The extension should allow 30 days from the date you provide the information and
   documentation required to properly formulate a rebuttal. These items are specified below.

   c. **Revised Referral OPR Rebuttal:** In the event you elect not to provide the information,
   documents, and time required for me to properly provide OPR input and respond to the
   referral nature of the referenced OPR, this serves as the rebuttal to the revised OPR. As
   my deployed duties did not allow appropriate time for a complete rebuttal, I will let the
   rater and senior rater failures, evident in the requests for documentation and information,
   stand as the rebuttal itself. Most individuals will be able to distill the wrongfulness of the
   OPR from the requests below. However, as you may have difficulty, please reach out

verbally or in writing through my Counsel, Mr. Robert Vance, and we will explain how the requests below illuminate rater failures that are fatal to the OPR's viability.

  (1) The new failures in the revised OPR, the raters' continued neglect of the requisite documented feedback to accompany the OPR, and the raters' refusal to provide supporting documentation for the OPR and underlying administrative actions all provide the required new information discussed in this rebuttal.

2. **Specific Information Requests:** I received your follow-up note to my referral Officer Performance Report (OPR) rebuttal and the revised OPR (b), the OPR deletes a complementary line from the previous OPR version. Also removed was any verifiable digital rater's signature. Instead you opted for a photocopied signature. I intend to respond but first you must retract your false and misleading statements from the OPR and your previous correspondence. I also require the documents and information discussed by my counsel in his March 7, 2019 email (d), to which you did not respond. Please provide the following so that I can respond. My requirements for information to provide an informed response and OPR input follow:

  a. Revised OPR with a legitimate signature (original ink, or digitally signed).

    (1) I am unable to acknowledge receipt until you send me a legitimate signed copy of the OPR.

  b. Documentation of the date Lt Col Lewis was assigned as my rater (with verifiable signature and signature dates).

  c. Documentation that I was advised of Lt Col Lewis as my rater during or prior to the rating period, and of my resultant change in chain-of-command.

    (1) I have already obtained information from MILPDS that he was not assigned as my rater, per my original OPR rebuttal.

  d. Documentation that the duties listed in the OPR fell within the 113 OSS's purview and authority.

  e. Documentation of regular supervisory feedback and communication from Lt Col Lewis to myself during the rating period, especially from 26 Jan 18 - 1 Nov 18.

  f. Documentation of why the duties listed in the OPR required a change of rater.

  g. Airman Comprehensive Assessment (ACA) documentation if initial feedback via AF Form 724 In Accordance With (IAW) AFI 36-2406 para. 2.7 & 2.8.

    Note: ACA cannot be provided via AF Form 1137 or LOR as this violates AFI 36-2406 para. 2.2.2.6 & 2.7.1, 2.8, 2.9.1., & 2.9.3

h. Documentation of my job title and duties over the span of the rating period, and the communication of those duties to me.

i. Documentation that the 113 OG complied with AFI 11-202V1, AFI 11-2F-16V1, & AFI 11-401 in regard to my flying training, currencies, qualification, and required HHQ notifications requirements for lapses in currencies and training requirements. Especially AFI 11-401 paras. 1.3.4, 1.4.1.8., 2.5. The OPR claims I was allowed to maintain these currencies.

j. Documentation of the 113 OG and Lt Col Lewis's compliance with the following AFI 36-2406 paragraphs: 1.4.2.5, 1.5.2.1, 1.6.3.1, 1.6.3.2, 1.6.3.3, 1.7.1.1, 1.10.2.1, 1.10.2.3, 1.11.4, 1.12.4.4.1, 1.12.4.4.2, 1.12.2., 1.12.3.1, 1.12.3.4, 1.12.4, 1.12.4.1.1, Table 2.1.4, 3.19.

k. Documentation of how this referral OPR being administered after an involuntary curtailment complies with ANGI 36-101, para 8.5.

l. A documented explanation of how the number and severity of administrative actions against me, to include this referral OPR, are not arbitrary and capricious given the context of another individual having received only a single LOR, no referral OPR, and the "highest endorsement" for follow-on employment after the 113 WG in light of the following documented misconduct and alleged criminal non-consensual sexual misconduct:

   (1) Substantiated sexual harassment of a junior officer, the same victim I (then Maj Torrence) am accused of an UPR with, after I intervened in the harassment and alleged non-consensual groping of the victim.

   (2) The accused surveilling the primary witness (myself) during sexual assault proceedings against himself.

   (3) The accused allowed the victim to be forcibly disrobed while too intoxicated to consent, at which point I intervened.

   (4) The accused threatened to "destroy" the victim.

   (5) The accused lied under oath regarding his own sexual pursuit of the victim, but now has substantiated sexual harassment findings against him.

Note: The wrongfully substantiated "misconduct" of mine, basing this referral OPR, was almost entirely based on the testimony of the accused or by witnesses recommended by him, a member of the senior raters' social circle, while I chose not to participate in that circle due to moral and ethical aversion the senior rater's requirement for loyalty to himself and his group over laws, regulations, and professional responsibilities.

m. Documentation that I was not excluded from regular 113 OG social and work functions and rosters from 26 Nov 19 - 1 Nov 18.

n. A redaction of the following written false and/or misleading statements from your correspondence.

    (1) "Last performance feedback was accomplished on 8 Feb 2018, IAW AFI 36 2406" – 1 Nov 2018 OPR

        (a) Or provide the applicable Airman Comprehensive Assessment (ACA) documentation via AF Form 724 IAW AFI 36-2406 para. 2.7 & 2.8.

        Note: ACA cannot be provided via AF Form 1137, Reports of Investigation, or LORs as this violates AFI 36-2406 para. 2.2.2.6 & 2.7.1, 2.8, 2.9.1., & 2.9.3

    (2) "Appearance of UPR at home & deploy'd w/O-4; fraternization in uniform at a bar; lied when asked" – 1 Nov 18 OPR

        (a) Inclusion of this alleged misconduct is not only inaccurate but violates AFI 36-2406 para. 1.12.3.4.

        (b) Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It also relies on alleged events that occurred in July of 2016, two rating periods previous.

        (c) Provide the explicit behavior that you allege constituted an "UPR" within timeframes involved in the associated administrative actions and rating period.

        (d) Provide the specific conduct that you allege constituted "fraternization," especially the conduct that allows you to believe I had knowledge of the counterparty's enlisted status and the specific behavior that cause a violation of good order and discipline given the civilian establishment and context of the events.

        (e) Provide the specific statement that I made which you allege as a lie.

o. "Despite rater requests, you failed to provide inputs for the construction of the evaluation." – Col Vargas's 3 Sep 18 Response to OPR Rebuttal (b).

    (1) It was you who failed to respond to my counsel's request for an extension to the OPR input deadline because of my attendance at a formal training being my primary responsibility at that time (d).

    (2) I had already provided input which you could have used in the construction of this OPR in response to my previous OPR (c)., due to the fact that I assumed you would use the legitimate previous rating period end date of 2 April 2018, significantly

overlapping your wrongfully revised 2 Nov 17 start date for this OPR(c). You had access to information with which to fill the redacted statement from your original draft. Retract your above false statement and fill the empty OPR line (a).

p.  "During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group." – 1 Nov 2018 OPR

   (1)  Inclusion of this alleged misconduct is not only inaccurate, but violates AFI36-2406 para. 1.12.3.4.

      (a)  Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It also relies on alleged events that occurred in July of 2016, two rating periods previous.

q.  "Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit.  Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command."

   (1)  Inclusion of this alleged misconduct is not only inaccurate but violates AFI 36-2406 para. 1.12.3.4.

      (a)  Related documentation was known to and considered by the previous evaluators, well before the previous evaluation was made a matter of record. It relies on alleged events entirely in the previous rating period.

   (2)  Provide the specific statement that I made which you allege as "untruthful."

r.  Documentation of why you only elected to remove positive substance from the OPR that was not relevant to the rating period, but refused to remove negative information outside the rating period that could have been captured in appropriate rating periods OPR.

s.  Documentation of why you elected to shorten the rating period originally recorded on my previous rater signed OPR (c) in order to afford a timespan where you could administer a referral OPR.

t.  Documented compliance with AFI 36-2406 via either recorded face-to-face, telephonic, or two way electronic feedback to include the following:

   (1)  Precise definitions of the violations you alleged led to this referral OPR to include the elements of these alleged wrongs.

   (2)  Precise events, conduct, and times that satisfied the elements of these wrongs and an explanation of how those elements were satisfied.

   (3)  Precisely what the counseling and direction from my chain of command was that should have mitigated this alleged misconduct.

192

u. Documentation of why you continue to find the length of my rebuttals to administrative actions noteworthy (b), but are incapable or unwilling to address the substantive details of the rebuttals.

3. **Conclusion:** I respectfully request you provide the above listed documentation and retractions, and provide a response extension of 30 days after you provide the required information.  If you elect not to allow an extension, please continue to provide the above documentation and use this document as the rebuttal to the referenced revised referral OPR.

TORRENCE.JENNER.
MICHAEL.10784988
50

Digitally signed by
TORRENCE.JENNER.MICHAEL.107
8498850
Date: 2019.09.14 19:04:51 +03'00'

JENNER M. TORRENCE, Lieutenant Colonel, USAF

Reference B

Lt Col Torrence,

   We've received and considered your 10 page response and agree that one of the bullets in an unsigned section of the evaluation did not fall within the rating period. Despite rater requests, you failed to provide inputs for the construction of the evaluation. As such we've removed that bullet and the rater has resigned the evaluation. You have 7 calendar days to respond to this modification of your evaluation. The referral memo remains unchanged. We have your previous response. Any subsequent response should contain new information. Again you are limited to 10 pages max, to include any attachments that you want considered. The due date for your response is 14 SEP 19, 1600 EST. If we do not receive a response by this time we will assume you do not intend to respond to this updated version. No extensions will be granted for your response as seven days is already an extension to the three days that you are entitled to.


Respectfully,


Col John Vargas

113 OG/CC

*Reference C*

Reply   Reply All   Forward

# RE: FOUO\\OPR

## Torrence, Jenner M (Juice) Lt Col USAF NG DCANG …

| | |
|---|---|
| **To:** | Campo, John J Col USAF 113 WG (USA) |
| **Signed by:** | jenner.torrence.2@us.af.mil |
| **Attachments:** | 111-113ACA_and_CP_of_the_y~1.pdf (210KB);   114-1AF_DC_Tail_Flash_Email.pdf (82KB);   Torrence af707 |

Tuesday, January 15, 2019 12:32

Sir,

Thank you for sending my OPR for review. Sorry it took me so long to turn around.

Per our conversation I've edited it to include a few of the accolades and responsibilities I accomplished that were not included. The only other substantive item I changed was in Col Vargas's push line. I removed the word "attempted" from "attempted to complete assigned tasks," as unless I am forgetting some feedback I believe I accomplished all major assigned tasks.

The other QC that might be needed is on the precise end date for my acting as the 113 ACA/CC. I believe IKE was on terminal leave through Sep 18 for American Airlines indoc and training but I'm not positive of the exact timing.

I'm including a few documents that verify the accolades that I added. I tried to get the 707 to the point that it only requires signatures, but certainly give it a good once over.

Please let me know if you have any questions at all. Thank you for the opportunity to provide feedback.

VR,

Juice

Lt Col Jenner "Juice" Torrence

(8)

113 WG/XP

Cell: 202-876-4020

---

**From:** Campo, John J Col USAF 113 WG (USA)
**Sent:** Sunday, January 06, 2019 14:14
**To:** Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA)
**Subject:** FOUO\\OPR

This e-mail contains FOR OFFICIAL USE ONLY (FOUO) information which must be protected under the Freedom of Information Act (5 U.S.C. 552) and/or the Privacy Act of 1974 (5 U.S.C. 552a). Unauthorized disclosure or misuse of this PERSONAL INFORMATION may result in disciplinary action, criminal and/or civil penalties. Further distribution is prohibited without the approval of the author of this message unless the recipient has a need to know in the performance of official duties. If you have received this message in error, please notify the sender and delete all copies of this message.

---

Please review, sign and send back to me when complete.

Swing by if you have any questions

John J. Campo, Colonel, ANG

Vice Commander, 113th Wing

3252 East Perimeter Road

Joint Base Andrews, MD 20762

DSN 857-2812

Commercial (240) 857-2812

Mobile (610) 476-7412

9/9/2019                                              [Non-DoD Source] OPR Inputs 2 November 2017 to 1 November 2018

## [Non-DoD Source] OPR Inputs 2 November 2017 to 1 November 2018

Reference D

rvance vancelf.com [rvance@vancelf.com]
**Sent:** Thursday, March 07, 2019 12:35
**To:** Vargas, John E Jr Col USAF 113 WG (US)
**Cc:** Torrence, Jenner M (Juice) Lt Col USAF NG DCANG (USA)

Dear Col. Vargas:

I represent Lt Col Jenner Torrence in connection with his matters involving the District of Columbia Air National Guard arising from his advocacy on behalf of Maj Anh-Chi Murphy.

I request a 30-day extension of your deadline for Lt Col Torrence's OPR Inputs. In order to prepare the Inputs, I require documentation of his taskings, feedback, raters, duty title, office and communication of these items to Lt Col Torrence. In this regard, I will communicate with you shortly with details concerning the documents I require in order for Lt Col Torrence to provide you with quality inputs to his OPR.

Thank you for your consideration. Please respond with respect to the requested extension as soon as possible.

Sincerely,

--
Robert T Vance Jr
Law Offices of Robert T Vance Jr
100 South Broad Street, Suite 1525
Philadelphia PA 19110
215 557 9550 tel / 215 278 7992 fax





**DEPARTMENT OF THE AIR FORCE**
**113TH WING (ANG)**
**JOINT BASE ANDREWS MD**

16 October 2019

MEMORANDUM FOR RECORD

FROM:  113 FSS/CC

SUBJECT:  Referral OPRs

1.  On 16 Oct 2019, SSgt Daniel Heine (ARPC) confirmed via telephone that the intent of Referral OPRs were that they should be provided in person, however, not every circumstance enables that to happen.  SSgt Heine further explained that communication with members geographically separated is acceptable by electronic or by telephone.  I explained to him the circumstances of how the OPR that was being referred was delivered and he concurred that AMRDEC or encrypted email was an acceptable means of communication.  Essentially, the intent of the communication with the member was to provide a mechanism for feedback to the ratee and the rater.  In this case, he deemed the communication acceptable.

2.  Any questions pertaining to this MFR can be directed towards Major Dominick Siciliano.

SICILIANO.DOMINIC    Digitally signed by
K.ANTHONY.SR.1029    SICILIANO.DOMINICK.ANTHONY.S
549334    R.1029549334
    Date: 2019.10.16 14:05:26 -04'00'

DOMINICK A. SICILIANO, Major, ANG
Commander



**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS AIR FORCE COMBAT AIR FORCES DIVISION
1460 AIR FORCE PENTAGON, ROOM 5D756
WASHINGTON DC 20330

17 Aug 2019

MEMORANDUM FOR 113 OG/CC AND 113 OSS/CC

FROM:  LT COL JENNER M. TORRENCE
1208 5TH ST NE
WASHINGTON, DC  20002

SUBJECT:  Acknowledgment of Referral Officer Performance Report (OPR) Receipt

1. This memorandum acknowledges the receipt of the referral OPR forwarded to me by the 113 Operations Group (113 OG). The OPR period is alleged as 2 Nov 2017 – 1 Nov 18, and the OPR is signed by Lt Col Chad G. Lewis on 3 June 2019. I attempted to date the acknowledgment form you sent but it was not editable.

2. I will not sign the above referenced OPR, as it contains and relies upon criminal false statements and criminal acts by leaders and member of the 113 Wing as basis. It's administration and associated correspondence was similarly unlawful. I cannot have my signature associated with criminal or otherwise unlawful documents; therefore, the 113 Operations Support Squadron (113 OSS) and 113 OG should substitute this memorandum as acknowledgment of my receiving the referenced OPR.

3. The above referenced OPR and its false assertions are being used to cover-up and trivialize sexual assault, harassment, and general discrimination within the 113 OG. It is being used to disparage the character of those who act as interventionists, reporters, and witnesses to such acts and attempt to address the associated environment. This false disparagement of character is an effort to protect senior officers and other members of the 113 Wing who favor and sponsor such an environment. My signature will not be associated with this effort.

4. The specific unlawful nature of the OPR itself, it's administration, recent associated correspondence, 113 WG members' actions that lead to its administration, as well as associated documents is being addressed via law enforcement, civil litigation, and available administrative channels external to the 113 Wing.

5. As this and the previous rating period's OPR are both impacted by retaliatory and self-protective intent towards me by Col Vargas, resulting from my participation in a SAPR proceeding against his favored subordinate, I have addressed my rebuttal to Lt Col Lewis. This is doubly appropriate as Lt Col Lewis never interacted with me as my rater or provided me any feedback as a superior during the rating period.

TORRENCE.JENN
ER.MICHAEL.107
8498850

Digitally signed by
TORRENCE.JENNER.MICHAEL.
1078498850
Date: 2019.08.17 19:34:00
+03'00'

JENNER M. TORRENCE, Lt Col, USAF



DoD SAFE

Logged on as user: *VARGAS JOHN EMILIO JR*

🏠 Home    📥 Drop-Off    📤 Request a Drop-Off    📥 Pick-up    📤 Outbox    ❓ Help    ↪ Logout

## Drop-Off Completed

Your files have been sent successfully.

| Filename | Size | SHA-256 Checksum | Description |
|---|---|---|---|
| AF70TORENCE.J4457201211101.pdf | 302.7 KB | 1290C74572IFA3310FEC2A38F22-928 C93A53D5571A3DGC787 C82C93D3ECA23D | |
| Terrence PDF 23 SEP 19 v2.pdf | 88.9 KB | 88224EFD74502FF8EC296110C24708263 D69FF90C75E104122EE238F369471E4E215 | |

2 files

From:
VARGAS JOHN EMILIO JR  <john.e.vargas.mil@mail.mil>  USAF  on 2019-09-23 17.11 UTC

To:
Jenner Torrence <jennerterrence@hotmail.com>    Robert Vance <rvance@vance11.com>

Comments:
Lt Col Torence,

Please and your performance report attached for your signature. You have 7 calendar days from today (23 SEP 19), to return the OPR with your endorsement. The suspense for the returned document is 30 SEP 19, 1315 EST. If the Command does not receive the endorsed document by this time, we will assume that you do not intend to sign the

Recipient URL List Show

Pickup History:
None of the files have been picked up yet.

Security  |  About DoD SAFE  |  ♿ Accessibility

WARNING! This Department of Defense internet computer system is subject to monitoring at all times.
Unauthorized access is prohibited by Public Law 99-474 (The Computer Fraud and Abuse Act of 1986). Users are advised to read and agree to the Security Notice.

Server: WEB01 - Version: 1.0.16

1:23 PM
9/23/2019

**Vargas, John E Jr Col USAF 113 WG (USA)**

| | |
|---|---|
| **To:** | Torrence, Jenner M (Juice) Lt Col USAF (USA) |
| **Subject:** | OPR for Signature |

Lt Col Torrence,

Please find your performance report attached for your signature.  You have 7 calendar days from today (23 SEP 19), to return the OPR with your endorsement.  The suspense for the returned document is 30 SEP 19, 1315 EST.  If the Command does not receive the endorsed document by this time, we will assume that you do not intend to sign the OPR and will continue processing; submitting the OPR to ARPC for finalization without your endorsement.  Please note that you are to sign Block VIII as well as Block XI.

Respectfully,

Colonel Emilio "Vegas" Vargas
113th Operations Group Commander
District of Columbia National Guard
(240) 857 – 1986

1

*** The information herein is For Official Use Only (FOUO) which must be protected under the Freedom of Information Act of 1966 and Privacy Act of 1974, as amended. Unauthorized disclosure or misuse of this PERSONAL INFORMATION may result in criminal and/or civil penalties. ***

REPORT ON INDIVIDUAL PERSONNEL

FILE DATE: 07MAR2022

*Click any section header below to open/close that section.*

**Click here to Open All Sections.**
**Click here to Close All Sections.**

| NAME | TORRENCE JENNER MICHAEL |
|---|---|
| GRADE | (05) LTC |
| SSAN | ████4487 |

## GENERAL INFORMATION

| | |
|---|---|
| GENDER | MALE |
| PROJECTED GRADE / LINE NUMBER | / |
| BPZ | NO BPZ |
| PRIOR SERVICE | NO PS |
| DEFERRED | NONE/OTHER |
| COMMISSION SOURCE | (S) ROTC 4 YR (FINANCIAL ASSISTANCE GRANT |
| COMPETITIVE CATEGORY | (1) LAF-A |
| SERVICE COMPONENT | RESERVE |
| RACE | WHITE |
| HISPANIC LATINO DESIGNATION | HISPANIC OR LATINO |
| DOB / AGE | ████1976 / 45 |
| PLACE OF BIRTH | IDAHO |
| CITIZENSHIP | BY BIRTH IN UNITED STATES |
| MARITAL STATUS | MARRIED |
| SPOUSE STATUS | |
| SPOUSE SSAN | |
| DEPENDENTS TOTAL/IN HOUSE | 01 / |
| RELIGION | ATHEIST |

## ASSIGNMENT DATA

| | |
|---|---|
| DUTY LOCATION | (TAYZ) PENTAGON |
| PAS DUTY LOCATION | PENTAGON |
| UNIT | A3X0  HAF  HQ |
| DUTY ADDRESS | U S AIR FORCE HEADQUARTERS (OL A3X0) / A3TC (TAYZ) PENTAGON ADM VIRGINIA (51) 203309998 |
| DUTY PHONE | 3122949000 |
| OFFICIAL EMAIL | JENNER.TORRENCE.2@US.AF.MIL |
| DUTY EFFECTIVE DATE | 04AUG2021 |
| DAS / TOS(YR) | 15MAR2019/02 |
| DUTY TITLE | CHF, CAF FIGHTER/BOMBER BR |
| MAJCOM | HQ USAF AND SUPPORT ELEMENTS (13) |
| MPF | PENTAGON ADM VA (AF DIST WASH) (HH) |
| LEVEL OF ASSIGNMENT | (HQ) HAF |
| TOUR | CONUS |
| COUNTRY/STATE | VIRGINIA (51) |
| PASCODE | HH13F10B |
| POSITION NUMBER | 000201413 |
| ORG STRUCTURE CODE | A3TC |

202

| FUNCTIONAL CATEGORY | (J) RESERVE FORCES AUTHORIZATION ONLY |
|---|---|
| FUNCTIONAL ACCOUNT NUMBER | 10A100 |
| PROGRAM ELEMENT CODE | 0092398A |
| DUTY STATUS | (00) PRESENT FOR DUTY |
| DUTY STATUS DATE EFFECTIVE/EXPIRE | 04JUL2021/ |
| RECORD STATUS | (10) ACTIVE NO PROJECTED ACTION |
| PROJECTED BASE / PAS | / |
| RNLTD | |
| DEROS | |
| DDLDS | 15MAR2019 |
| ASG SELECT DATE | |

| ASSIGNMENT PREFERENCES | CONUS | OS |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |

| SERVICE DATES | |
|---|---|
| UNADJUSTED YEAR GROUP | 2001 |
| GRADE / DOR / EFF / TIG | (05) LTC  / 06JUL2016 / 15MAR2019 / 05 |
| GRADE PROJ / DOR / EFF | / / |
| GRADE PERM / EFF | (05) LTC  / 15MAR2019 |
| GRADE PERM PROJ / PSD / EFF | / / |
| DATE INIT ENTRY MIL SERV | 16FEB1998 |
| ETO | 15MAR2019 |
| TAFMSD / YRS | 22APR2001 / 20 |
| TAFCSD / YRS | 22APR2001 / 20 |
| TFCSD | 10JUN2000 |
| PAY DATE | 10JUN2000 |
| EAD | 15MAR2019 |

| RETIREMENT AND SEPARATION DATA | |
|---|---|
| DOS | 08AUG3888 |
| RET SEP EFF DATE PROJ | |
| RET SEP SDN PROJ | |

| CAREER FIELD DATA | |
|---|---|
| DUTY AFSC | 11F4Y |
| PRIMARY AFSC | 11F4Y |
| 2ND AFSC | 11F3H |
| 3RD AFSC | |
| CORE ID | 11F |
| RATING | PLT |

| RATED/FLYING DATA | |
|---|---|
| AERO RATING CURR CAT DATE | 08FEB2017 |
| AERO RATING CURR | (A) COMMAND PILOT |
| RATED POSITION ID | (4) STAFF OR SUPERVISORY POSITION ABOVE WING LEVEL NONFLYING |

| | |
|---|---|
| **MAJOR WEAPONS SYSTEM** | (AI) FIGHTER |
| **AVN SERVICE CODE** | (3J) CTN ACIP 18-25YR-INACT RESTRICTED |
| **MO OPS FLY DUTY ACC** | 207 |
| **MO OPS FLY DUTY - GATE 12** | 143 |
| **MO OPS FLY DUTY - GATE 18** | 207 |
| **AVIATOR CONTINUATION PAY STATUS** | |
| **AVIATOR CONTINUATION PAY ELIGIBILITY DATE** | |
| **AVIATOR CONTINUATION PAY EFFECTIVE DATE** | |
| **AVIATOR CONTINUATION PAY STOP DATE** | |

| | 1ST PILOT | INST PILOT | COMBAT | 1ST PILOT INSTR PILOT | | AERO TOTAL IND | |
|---|---|---|---|---|---|---|---|
| **HOURS** | 1749 | 287 | 0 | 65 | | 2313 | |

| | 1ST | 2ND | 3RD | 4TH | 5TH | 6TH | 7TH | 8TH | 9TH |
|---|---|---|---|---|---|---|---|---|---|
| **ACFT MOST REC HR FLN** | 1473.6 | 224.4 | 311.1 | 31.9 | 1.2 | 2 | 1.4 | 0 | |
| **AIRCRAFT MOST REC** | F016C | F016D | T38CIFF | T038C | F016B | AT038B | T038A | T037B | |
| **ACFT MOST REC FLN - 1ST-YYMM** | 23JAN2018 | 06OCT2017 | 26APR2012 | 10JAN2012 | 16MAY2005 | 29MAR2002 | 12FEB2002 | | |

| | | DUTY DATA (UP TO LAST 10 ASSIGNMENTS) | | | | |
|---|---|---|---|---|---|---|
| **DAFSC** | **UNIT** | **DUTY TITLE** | **LOCATION** | **CMD** | **EDD** | |
| 11F4Y | A3X0   U S AIR FORCE HEADQUARTERS | CHF, CAF FIGHTER/BOMBER BR | PENTAGON | AHQ | 04AUG2021 | |
| 11F3Y | 113 WING  WING | PLANS AND PROGRAMS CO | JB ANDREWS | ACC | 03NOV2018 | |
| 11F3H | 113 OPERATIONS SUPPORT SQUADRON | F-16 FLT LD | JB ANDREWS | ACC | 11JUN2016 | |
| K11F3H | 121 FIGHTER  SQUADRON | ARCRW FLT EQP OIC; F-16 FLT LD | JB ANDREWS | ACC | 30APR2012 | |
| T11F3Q | 434 FIGHTER TRNG  SQUADRON | ASST OPS OFFICER & T-38C IFF IP | LAUGHLIN | AET | 16SEP2010 | |
| 11F3H | 18 AGGRESSOR  SQUADRON | WEAPONS FLT CC/AF AGRS PLT | EIELSON | PAF | 01DEC2009 | |
| 11F3H | 18 AGGRESSOR  SQUADRON | A FLT CC/ USAF AGRS PILOT | EIELSON | PAF | 06APR2009 | |
| 11F3H | 18 AGGRESSOR  SQUADRON | A-FLT CC/AGRS PILOT | EIELSON | PAF | 22JUN2008 | |
| 11F3H | 18 AGGRESSOR  SQUADRON | CHIEF OF SCHEDULING | EIELSON | PAF | 24SEP2007 | |
| 11F3H | 18 FIGHTER  SQUADRON | CHIEF OF SCHEDULING | EIELSON | PAF | 01MAR2007 | |

| OVERSEAS HISTORY | |
|---|---|
| **DEROS** | |
| **STRD** | 04MAY2002 |
| **ODSD** | 30JUL2010 |
| **CURRENT O/S UNACCOM REASON** | (1) NOT AUTHORIZED |
| **O/S TOUR START/STOP DATES** | 01MAY2006 / 28APR2010 |
| **CURRENT O/S TOUR START DATE** | |

| RESTRICTIONS | |
|---|---|
| **ASG AVL CODE/DATE 1** | (17) PENDING SP/AFOSI INVESTIGATION / 2205 |
| **ASG AVL CODE/DATE 2** | / |
| **DDA AFSC/RSN/DATE** | / / |
| **ASG LIM CODE** | |

204

| ASG LIM CODE | |
|---|---|
| ASG LIM CODE | |
| UIF CODE/DATE | / |
| WEIGHT CONT | |

| AIR AND SPACE EXPEDITIONARY FORCE | | |
|---|---|---|
| **AEF INDICATOR** | **AEF INDICATOR START DATE** | **AEF INDICATOR STOP DATE** |
| X4 | 31MAY2019 | |

| SPECIAL EXPERIENCE IDENTIFIER | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **SEI GEN - 1ST** | | | **SEI GEN - 2ND** | | | | **DUTY SEI** | | |
| | | | | | | | | | |
| | **1ST** | **2ND** | **3RD** | **4TH** | **5TH** | **6TH** | **7TH** | **8TH** | **9TH** | **10TH** |
| **HISTORY SEI'S** | | | | | | | | | | |

| SECURITY | |
|---|---|
| **SECURITY CLEARANCE STATUS DATE** | 28APR2014 |
| **SECURITY INVESTIGATION COMPLETION DATE** | 17APR2014 |
| **PRP & SCI STATUS/DATE** | (J) CERTIFIED PRP TRANSFER TO NON-PRP /30APR2012 |
| **PERS SECURITY CLEARANCE STATUS** | (V ) SCI(DCID 1/14 ELIG) |
| **CLEARANCE TYPE** | (7 ) NAC PLUS SPECIAL INVESTIGATIVE INQUIRY |

| JOINT DATA | | | |
|---|---|---|---|
| JSO STATUS | | | |
| JDA OSC ID | | | |
| JSO PROM CAT CURRENT | | (B) HQ(CS) | |
| JSO PROM CAT HISTORY | | (0) N/A | |
| **JDA TOUR START DATE** | **JDA TOUR STOP DATE** | **JDATOUR COMP DEV RSN** | **JDA TOUR TYPE** |
| | | | |

| EDUCATION | | |
|---|---|---|
| **ACAD LEVEL HIGH YYMM** | | 1206 |
| | **HIGH** | **2ND** |
| **EDUCATION LEVEL** | (P) MAS | (N) BAC |
| **ACADADEMIC SPECIALTY** | (1BAA) MIL OPERATIONAL ART/SCI | (4MYY) MECHANICAL ENGINEERING |
| **ACAD INST NAME** | (AIR) AIR UNIV AL | (WSU) WRIGHT ST U OH |
| **METHOD** | (A) MIL SVC ACAD | |

| PROFESSIONAL MILITARY EDUCATION | | | |
|---|---|---|---|
| | **COURSE** | **METHOD OF STUDY** | **DATE** |
| 1 | IDE - AIR COMMAND AND STAFF COLLEGE (ACSC) | (2) NON-RESIDENCE | 1204 |
| 2 | PDE - SQUADRON OFFICER SCHOOL (SOS) | (1) RESIDENCE | 0610 |
| 3 | BDE - AEROSPACE BASIC (BEFORE 2005) | (1) RESIDENCE | 0001 |

| PROFESSIONAL COURSES | | | |
|---|---|---|---|
| | **COURSE** | **REASON** | **DATE** |
| 1 | (15V) REFRESHER PHYSIOLOGICAL HYPOXIA TRAINING- ALL TRACKS | | 1909 |
| 2 | (0A2) EVASION AND CONDUCT AFTER CAPTURE | | 1904 |
| 3 | (ERT) LAW OF WAR (LOW) - BASIC | | 1904 |
| 4 | (4F1) ADVANCED INSTRUMENT SCHOOL | | 1305 |
| 5 | (JIL) TRANSITION TRACK 2 | | 1206 |

205

| 6 | (UTI) IFF INSTRUCTOR TRAINING | 1009 |

### LANGUAGE

| LANGUAGE APT SCORE | | | | | |
|---|---|---|---|---|---|
| | ID | READ | LISTEN | SPEAK | TEST DATE |
| 1st | | | | | |
| 2nd | | | | | |
| 3rd | | | | | |
| 4th | | | | | |
| 5th | | | | | |

### ACQ INFO (CERT LVL & CAREER FLD)

| | CURRENT | 2ND | 3RD |
|---|---|---|---|
| CERTIFICATION DATE | | | |
| CERTIFICATION LEVEL | | | |
| CAREER FIELD | | | |

### OPR DATA (UP TO LAST 10 REPORTS)

| | CLOSE OUT DATE | GRADE | CTL | PERFORMANCE INDICATOR |
|---|---|---|---|---|
| LATEST | 14MAR2021 | 05 | E | Y |
| 2nd | 14MAR2020 | 05 | E | Y |
| 3rd | 14MAR2019 | 05 | E | P |
| 4th | 01NOV2018 | 04 | E | N |
| 5th | 01NOV2017 | 04 | E | Y |
| 6th | 02APR2017 | 04 | E | Y |
| 7th | 02APR2016 | 04 | E | Y |
| 8th | 02APR2015 | 04 | E | Y |
| 9th | 02APR2014 | 04 | E | Y |
| 10th | 02APR2013 | 04 | E | Y |

### DECORATION

| | AWARD | NR | CLOSE DATE | HQ | AUTH | COND | ORDER YYMM |
|---|---|---|---|---|---|---|---|
| 1 | MERIT SVC MDL | 02 | 29FEB2012 | 47 FTW | 00080 | 6 | 1202 |
| 2 | AF ACHIEV MDL | 02 | 12APR2004 | 51 FW | 00106 | 6 | 0404 |



CUI

**DISTRICT OF COLUMBIA NATIONAL GUARD**
**OFFICE OF THE STAFF JUDGE ADVOCATE**
**2001 EAST CAPITOL STREET, S.E.**
**WASHINGTON, D.C. 20003-1719**

11 February 2021

# ADVISORY OPINION

**APPLICANT**: Jenner Torrence
**LEGAL REPRESENTATIVE**: Sean Timmons, Esq, Military and National Security Law Attorney, Managing Partner, Tully Rinckey PLLC
**CASE**: BC-2021-02580
**APPLICATION DATE**: 22 June 2021

References:

   a.  10 USC 1034 (Protected communications; prohibition of retaliatory personnel actions)

   b.  10 USC chapter 79 (Correction of Military Records)

   c.  DODD 1332.41 (Boards for Correction of Military Records and Discharge Review Boards)

   d.  USD(P&R) memorandum (Guidance to Military Discharge Review Boards and Boards for Correction of Military / Naval Records Regarding Equity, Injustice, or Clemency Determinations)

   e.  AFI 1-1 (Air Force Standards)

   f.  AFI 36-2406 (Officer and Enlisted Evaluations Systems)

   g.  AFI 36-2603 (Air Force Board for Correction of Military Records (AFBCMR))

   h.  AFI 36-2909 (Air Force Professional Relationships and Conduct)

   i.  AFI 90-301 (Inspector General Complaints Resolution)

   j.  AFPD 36-26 (Total Force Development)

   k.  AFBCMR Case BC-2021-02580, DD Form 149 (Application for Correction of Military Record Under the Provisions of Title 10, U.S. Code, 1552), dated 22 June 2021

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

This is an advisory opinion of the District of Columbia National Guard (DCNG) in accordance with AFI 36-2603, para 4.2.2. The District of Columbia Air National Guard (DCANG) is that part of the organized militia of the District of Columbia, active and inactive, that is an air force within the DCNG. On 27 January 2022, the DCANG received an email from NGB/AIPS, Recognition & BCMR Program Manager, Ms. Jessica L. Hair, requesting that DCANG route this case to the "DC JAG" for assistance. The HQ-DCANG, Director of Staff – Air, Lt Col Dominick Siciliano, sent an email to the DCNG Staff Judge Advocate on the same day including files via DOD SAFE and requested a review/response to this case. The DD Form 149 for the subject case, BC-2021-02580, was signed by Applicant on 22 June 2021 and the letter from Applicant's Counsel to the Air Force Board for Correction of Military Records (AFBCMR or Board) was dated 14 June 2021.

Notes: the file included for opinion was titled "04_Exhibit_A_DD Form 149 (file order fixed).PDF" which is referenced in this Advisory opinion as DD 149, followed by page numbers for easy reference, e.g., (DD 149, page 10.) This opinion refers to Applicant as either Applicant or Lt Col Torrence.

## APPLICANT'S REQUEST

The Applicant correction and relief that Applicant and his counsel are requesting for the "Performance / Evaluations / Derogatory Information" error or injustice in the service member's record is for "this honorable Board [to] remove and destroy the two Letters of Reprimand issued to Lt Col Torrence on 13 June 2017 and 26 January 2018; or in the alternative, place these two Letters of Reprimand into a secured file. Additionally, we respectfully request this Board remove the Officer Performance Report ending 1 November 2018 from Lt Col Torrence's records." (DD 149, page 1, items 11 and 12). The Applicant indicates that the approximate date of the discovery of the error or injustice was 8 February 2018. (DD 149, page 2, item 15). The explanation for why the Applicant did not submit the request within the statutory three year limitation was "Due to complications flowing from the Covid 19 pandemic, as well as issues arising from an OCONUS deployment, this application has not been timely filed. We respectfully ask that this honorable Board waive the untimely filing of this petition in the interests of justice." (DD 149, page 2, item 18).

## WHETHER THE REQUESTED RELIEF CAN BE ACCOMPLISHED ADMINISTRATIVELY

No, not by the DCANG.

This agency no longer has administrative control over Applicant's service records. Applicant separated from the DCNG in or about February 2019 and transferred to the active Air Force via the Voluntary Limited Period of Active Duty (VLPAD) program for a 3 year assignment. At the conclusion of the assignment, Applicant will retire from the

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

military and will not return to the DCNG. Therefore, the DCNG is unable to remove or place in secure files letters of reprimand and is unable to remove an OPR.

Please see attached email statement (Encl 1) dated 10 February 2022 from Lt Col Dominick Siciliano, Director of Staff – Air, HQ-DCANG.

## WHETHER THE APPLICANT HAS EXHAUSTED SUCH ADMINISTRATIVE MEANS BEFORE PURSUING RELIEF TO THE BOARD

No, the agency is not aware that Applicant has exhausted all administrative means.

It is unclear whether Applicant appealed the OPR via Air Force Evaluation Reports Appeal Board (AFERAB) prior to seeking relief from the AFBCMR as required by AFI 36-2406.

It is unclear whether Applicant timely filed any allegations of reprisal with the Office of the Inspector General as required by AFI 90-301.

## WHETHER THE APPLICATION WAS TIMELY FILED

No.

No correction may be made pursuant to 10 USC 1552(a)(1) unless the claimant or legal representative files a request for the correction within three years after he discovers the error or injustice. However, the AFBCMR may excuse a failure to file within three years after discovery if it finds it to be in the interest of justice. (10 USC 1552(b)). An applicant should explain why the application was untimely filed and why it would be in the interest of justice for the Board to waive the statute of limitations. (AFI 36-2603, para 3.5.2).

The application contains a power of attorney that indicates that Applicant designated the law firm of Tully Rinckey, PLLC, to serve as his attorneys in all matters relating to and/or arising out his employment by the federal government of the United States of America as early as 5 December 2017. (DD 149, page 19). Applicant provides no additional justification beyond the following statement: "Due to complications flowing from the Covid 19 pandemic, as well as issues arising from an OCONUS deployment, this application has not been timely filed. We respectfully ask that this honorable Board waive the untimely filing of this petition in the interests of justice". (DD 149, page 2 item 18).

His deployment via VLPAD was from approximately February 2019 to the Present. The DCNG has no administrative control over his status or assignment and cannot verify the length of the OCONUS deployment.

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

The complications from the COVID-19 pandemic are not explained.

## SUMMARY OF THE RELEVANT FACTS OF THE CASE

From or about April 2017 to on or about January 2018, Applicant was a subject in two separate Command Directed Investigations (CDIs); both CDIs returned substantiated findings of misconduct by Applicant. Each substantiated CDI was followed by a Letter of Reprimand (LOR). These CDIs and LORs are subjects of this case. Following the second substantiated CDI, Applicant's Active Guard Reserve (AGR) assignment was curtailed. The curtailment was ordered by the Commanding General of the DCNG (DCNG-CG or CG). Around 31 May 2019, Applicant's Officer Performance Report (OPR) for the period of 2 November 2017 through 1 November 2018 was referred.

1. **CDI and LOR regarding Unprofessional Relationship**.

   a.  On or about 4 June 2017, a CDI conducted by a senior member of the 113 WG substantiated allegations that Lt Col Torrence had engaged in an unprofessional relationship with a junior field grade officer. (DD 149, pages 22-35). As part of this finding, the Investigating Officer (IO) determined that the unprofessional relationship between the pair stretched over a time period that included both Title 32 AGR (Full-Time National Guard Duty) and Title 10 duty (Active Duty) statuses.

   b.  Based on the CDI report and his own observations, on or about 13 June 2017, the 113 OG/CC served Lt Col Torrence with a Letter of Reprimand (LOR) for the appearance of an unprofessional relationship that was negatively affecting the good order and discipline of the unit. (DD 149, pages 36-39). Lt Col Torrence provided a response to the LOR. (DD 149, pages 40-84). The 113 OG/CC considered Lt Col Torrence's rebuttal and chose to impose the LOR.

2. **CDI and LOR regarding Fraternization and False Statement**.

   a.  On or about 16 October 2017, while attending a Weapons and Tactics Conference (WEPTAC) in Tucson, Arizona, Lt Col Torrence was reported to have had an altercation with another member of the DCANG and to have fraternized with an enlisted ANG member. On 17 November 2017, the 113 OG/CC initiated a CDI concerning the alleged altercation. (DD 149, pages 85-87). The CDI also included allegations that Lt Col Torrence had fraternized with an enlisted ANG member and that Lt Col Torrence had made false statements.

   b.  On 26 January 2018, the CDI report was finalized and provided to the 113 OG/CC. The CDI substantiated allegations that Lt Col Torrence made a false statement and that he fraternized with an enlisted female while he was in uniform at a bar. (DD 149, pages 88-105). Based on the CDI, the 113 OG/CC served Lt Col Torrence with an

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

LOR and UIF. (DD 149, pages 105-108 and 21). Lt Col Torrence provided a rebuttal to the LOR. (DD 149, pages 109-129). The 113 OG/CC considered his response and chose to impose the LOR.

3. **Referred OPR**.

a. On 31 May 2019, 113 OSS/CC, Col Lewis notified Lt Col Torrence that his OPR would be referred according to AFI 36-2406, para 1.10. (DD 149, pages 130-134). On 17 August 2019, Lt Col Torrence provided a rebuttal to this referred OPR. (DD 149, pages 147-158). On 3 September 2019, after considering the rebuttal, the 113 OG/CC, Col Vargas, removed "one of the bullets in an unsigned section of the evaluation that did not fall within the rating period." and afforded Lt Col Torrence an opportunity to provide a response. (DD 149, pages 142-146). On 14 September 2019, Lt Col Torrence provided a rebuttal to the revised referred OPR. (DD 149, pages 135-141).

## APPLICANT'S CONTENTIONS

Applicant, through Counsel, contends that:

1. Applicant was investigated as reprisal for engaging in protected communications concerning another investigation.

2. Command Directed Investigations (CDIs) into allegations regarding Applicant were legally insufficient, wholly inadequate, conducted by a biased investigator, and failed to establish the requisite elements by a preponderance of the evidence.

3. That an impartial review of the first CDI was conducted and indicated that the allegations against Applicant should not have been substantiated.

Applicant raises numerous ancillary issues, many of which are not applicable to Applicant but provide context for his explanations as to why he believes the CDIs, LORs, and OPR were erroneous or unjust.

## ANALYSIS ADDRESSING THE CRUX ISSUES OF THE CASE

The agency identifies the crux issues of the case as:

1. Whether the CDI dated 4 June 2017 was erroneous or unjust;
2. Whether the LOR dated 13 June 2017 was erroneous or unjust;
3. Whether the CDI dated 26 January 2018 was erroneous or unjust;
4. Whether the LOR dated 26 January 2018 was erroneous or unjust; and
5. Whether the referred OPR dated 23 September 2019 was erroneous or unjust.

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

Before addressing each of these, this opinion will highlight the legal, regulatory, and policy authorities for CDIs, LORs, and OPRs relevant to addressing these claims.

The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or to remove an injustice. (10 USC 1552). Generally, such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department. (Id.) BCMRs are authorized to grant relief for errors or injustices. These standards, specifically equity for DRBs and relief for injustice for BCMRs, authorize both boards to grant relief in order to ensure fundamental fairness. (Ref USDPR, Attc, para 2).

The Board shall consider applications individually and fashion relief appropriate to the facts and circumstances of each case. (DODD 1332.41, para 3.2.1).

The applicant has the burden of providing sufficient evidence of material error or injustice. The Board will recommend relief only when a preponderance (more likely than not) of evidence substantiates that the applicant was a victim of an error or injustice. (AFI 36-2603, para 4.1).

AFI 36-2907, *Adverse Administrative Actions*. Adverse administrative actions are intended to improve, correct and instruct subordinates who violate established Air Force standards whether on or off duty. Raters should consider making comments on performance reports when the ratee receives an LOR. Commanders and other members of the operational chain of command can issue administrative action. Administrative counseling, admonishment, and reprimand are quality force management tools available to supervisors, superiors, and commanders. These tools are corrective in nature, not punitive.

The standard of proof for adverse administrative actions is the "preponderance of the evidence." A preponderance of the evidence exists when it is more likely than not events have occurred as alleged. Preponderance of the evidence is not determined by the number of witnesses or exhibits, but by all the evidence and evaluating factors such as witness behavior, opportunity for knowledge, information possessed, ability to recall, as well as related events and relationship to the matter being considered. There is no requirement to prove any allegation beyond a reasonable doubt. For officers, LORs must be filed in the Unfavorable Information File (UIF).

AFI 36-2406, *Officer and Enlisted Evaluation Systems*. Referral procedures are established to allow airmen due process by giving them an opportunity to respond and/or rebut any negative ratings or comments before it becomes a matter of record. Evaluations must be referred when comments, regardless of the ratings, are derogatory in nature, imply or refer to behavior incompatible with or not meeting Air Force standards, and/or refer to disciplinary actions. When considering the Airman's ability to meet standards, consider unacceptable performance as actions that are incompatible with, and/or Airmen who have routinely (a repeated inability to meet standards that

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

would render the aggregated performance assessment over the entire reporting period as below Air Force standards and expectations) and/or significantly (a single instance where failure to meet standards is either egregious in nature or so far short of a standard that it impacts overall aggregated performance assessment) failed to adhere to established Air Force standards and expectations. Evaluations that have become a matter of record are presumed to be accurate and objective, any appeals must provide evidence that clearly demonstrates an error or injustice was made.

1. **Whether the CDI dated 4 June 2017 was erroneous or unjust.** The IO concluded that one allegation was unsubstantiated and one allegation was substantiated. (DD 149, pages 23-35). The agency asserts that this CDI is legally sufficient and that the IO's findings based on a preponderance of the evidence substantiated one of the allegations. CDIs are administrative in nature and not criminal investigations. A preponderance of the evidence is a lower standard than clear and convincing evidence or evidence beyond a reasonable doubt. A conclusion by one IO based on a preponderance of the evidence does not prevent others from reaching different conclusions.

In this CDI, the IO concluded that it was more likely than not that an inappropriate relationship existed between Applicant and a junior field grade officer. Investigating allegations of inappropriate relationships are among the matters appropriate for a CDI. (See SAF/IGQ CDI Guide, pages 6-7).

2. **Whether the LOR dated 13 June 2017 was erroneous or unjust**. This LOR is based on the substantiated allegation in the 4 June 2017 CDI. The basis of the LOR is within the Commander's discretion and authority and concluded that Applicant's actions "created the perception of an inappropriate relationship with another officer, were prejudicial to good order and discipline, and were of a nature to bring discredit upon the Armed Forces of the United States in violation of AFIs 1-1 and 36-2909" (DD 149, page 37). Administrative reprimands are corrective in nature and not punitive. A mere disagreement with the agency about what constitutes an inappropriate relationship is not evidence of a material error or injustice.

3. **Whether the CDI dated 26 January 2018 was erroneous or unjust**. The IO concluded that five allegations were unsubstantiated and two allegations were substantiated. (DD 149, pages 88-109). The agency believes that this CDI is legally sufficient and that the IO's findings based on a preponderance of the evidence substantiated two of the allegations. CDIs are administrative in nature and not criminal investigations. A preponderance of the evidence is a lower standard than clear and convincing evidence or evidence beyond a reasonable doubt. A conclusion by one IO based on a preponderance of the evidence does not prevent others from reaching different conclusions.

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

In this CDI, the IO concluded that it was more likely than not that Applicant engaged in an unprofessional relationship, fraternization, with an enlisted member on or about the night of 16 October 2017. (DD 149, pages 96-98). Further, the IO concluded that it was more likely than not that Applicant made false statements regarding the events that were the subject of the CDI. (DD 149, pages 99-102). Investigating allegations of inappropriate relationships and improper conduct (including conduct which gives the appearance of impropriety), illegal, dishonest, or otherwise brings discredit to the Air Force are among the matters appropriate for a CDI. (See SAF/IGQ CDI Guide, pages 6-7; AFI 1-1, para 2.3.6).

4.  **Whether the LOR dated 26 January 2018 was erroneous or unjust**. This LOR is based on the substantiated allegations in the 19 January 2018 CDI. The basis of the LOR is within the Commander's discretion and authority and concluded that Applicant "while in uniform, fraternized with an enlisted member and engaged in unprofessional behavior; a discredit to an officer of [Applicant's] rank, the Air Force, and the Armed Forces. Additionally, you were untruthful to your chain of command concerning the 16 October 2017 encounter." (DD 149, page 106). Administrative reprimands are corrective in nature and not punitive. Mere disagreements with the agency about what constitutes fraternization, unprofessional behavior, or untruthful statements is not clear evidence of a material error or injustice.

5.  **Whether the OPR was erroneous or unjust**. The referred OPR included derogatory information based on the two prior CDIs: "-Appearance of UPR at home & deploy'd w/O-4; fraternization in uniform at a bar; lied when asked-2 LORs issued" and "During the previous period, Lt Col Torrence engaged in an unprofessional relationship with a junior officer in the same group. Lt Col Torrence was also found to have fraternized with an enlisted member of another Air National Guard unit. Furthermore, it was determined that he was untruthful about these relationships/encounters when questioned by his chain of command" (DD 149, pages 133-134, items IV and XI).

Per AFI 36-2406, evaluations must be referred when comments, regardless of the ratings, are derogatory in nature, imply or refer to behavior incompatible with or not meeting Air Force standards, and/or refer to disciplinary actions. Furthermore, events that occurred in a previous reporting period that add significantly to the evaluation, were not known to and considered by the previous evaluators, and were not already reflected in a previous evaluation in the permanent record (this includes ERPs, OPRs, LOEs, and TRs) can be included in a subsequent evaluation. Additionally, negative incidents from previous reporting periods involving the character, conduct, or integrity of the rate that continue to influence the performance or utilization of the rate may be commented upon in that context only. (AFI 36-2406, para 1.12.3.4).

This OPR evaluation period was from 2 November 2017 thru 1 November 2018. (DD 149, page 133, item 8). The first CDI was concluded on 4 June 2017 and the LOR was given on 13 June 2017, prior to the start of the OPR period. (DD 149, pages 23 and 37).

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

However, the agency had not administratively closed the LOR and had not made reference to the LOR in a prior OPR. On 13 December 2017, Applicant submitted a rebuttal to the LOR that resulted from the CDI. (DD 149, page 41). The rebuttal was considered and the Commander made a decision regarding the LOR during the rating period. Therefore, it was appropriate to address the first CDI and LOR in this OPR even though the events occurred in a previous reporting period. The second CDI was concluded on 26 January 2018 and the LOR was issued on 26 January 2018, both during the OPR period. (DD 149, pages 89 and 106). The Applicant submitted a rebuttal to the LOR on 5 February 2018, during the rating period. (DD 149, page 110). The rebuttal was considered and the Commander made a decision regarding the LOR during the rating period. Therefore, it was appropriate to address the second CDI and LOR in this OPR. If the Board concludes that Applicant has not merited the removal of both LORs, then the referred OPR would remain. The agency asserts that Applicant has not demonstrated that the referred OPR was the result of a material error or injustice.

## RECOMMENDATION

This agency does not recommend that the Board grant the requested relief. Applicant has not met the burden to demonstrate to the Board that the CDIs or resulting LORs were based on material errors or injustices or that the OPR was the result of material error or injustice.

Rather, the Applicant has attempted to argue that his perceived lack of knowledge of other investigations or adverse administrative actions of Airman misconduct in the unit is evidence that he was being unjustly targeted by the Command. The agency notes that there were other instances of misconduct that were investigated and adverse administrative actions taken in the DCANG during the time period, including relating to events that were the subject of his CDIs, for example the deployment to Guam.

While the agency disagrees with many of the characterizations of Applicant's claims, even if the agency viewed Applicant's case in a light most favorable to Applicant it would still conclude that these CDIs, LORs, and the referred OPR were legitimate agency actions. For example, if a junior officer, Maj Doughty, sought to find adverse information about Applicant and provided such evidence to the Command, the Command should not be expected to ignore such information even if it came from a motivated or biased source. Evidence of officer misconduct, even when provided by a source that might be demonstrated to have animus toward the Applicant, can lead to CDIs and consequences a Commander determines that at adverse administrative action is appropriate. More importantly, the original CDI was not retaliation or reprisal against Applicant. Instead, it is more likely an indication of a pattern of CDIs into a unit that was experiencing an overall breakdown of good order and discipline that was broader and more far reaching than the claims investigated regarding Applicant and that are the subject of this case. (See, e.g., DD 149, pages 170-171; see also, 27 July 2018

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

Memorandum for DCNG/CG from 113 WG/SJA Subject: 113th Wing Deployment-related Incidents and Responses (Encl 2)).

After a thorough review of this case, the agency believes that the Board will conclude that the applicant is not the victim of an error or injustice. In accordance with AFI 36-2907, commanders and other members of the operational chain of command can issue administrative actions in an effort to improve, correct, and instruct subordinates who depart from standards of performance, or whose actions degrade the individual and unit's mission. The agency recommends that the Board finds that the actions taken by Applicant's chain of command were within their authority and that insufficient evidence was provided by Applicant to justify overturning their decisions to issue the LORs and the referred OPR.

Applicant was afforded due process when Applicant during the CDIs and when he received the LORs and referred OPR. The conclusions of the CDIs are legally sufficient and the LORs and referred OPR are within the Commander's discretion and authority to take corrective actions and to enforce good order and discipline and compliance with applicable laws, regulations, and policies.

### INSTRUCTIONS ON SPECIFIC CORRECTIVE ACTION TO BE TAKEN IF BOARD RECOMMENDS RELIEF BE GRANTED

If the Board recommends specific relief be granted, this agency would coordinate with Air Reserve Personnel Center (ARPC), Air Force Personnel Center (AFPC), or his gaining command so that this agency could provide information directly to the Air Force office that has administrative control over Applicant's records.

Please see attached email statement dated 10 February 2022 from Lt Col Dominick Siciliano, Director of Staff – Air, HQ-DCANG (Encl 1).

### WHETHER THE MATTER PERTAINS TO A HIGH-LEVEL DECORATION

This matter does not pertain to a high-level decoration.

### WHETHER THE MATTER CONTAINS ALLEGATIONS OF REPRISAL

The agency finds that this matter does not contain an allegation of reprisal. (See DD Form 149, Block 13). However, to the extent reprisal is alleged in this case, the agency believes the allegations are without merit. The Applicant was investigated for misconduct unrelated to the alleged reprisal and for matters that are sufficient for a CDI and when substantiated, for LORs and referred OPRs.

### CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

Applicant, through Counsel, alleges that "Lt Col Torrence was the subject of a baseless investigation which was conducted after fraudulent accusations were made in reprisal for engaging in protected communications concerning another investigation" (DD Form 149, page 4). It seems sometimes intentionally vague in the record what this protected communication was, but it appears related to his "previous cooperation in an investigation against [Maj Doughty] and coercion to prevent my further cooperation. (DD 149, pages 101, 110, 116, 119). This alleged reprisal appears to be the CDI into Applicant after Applicant was a witness in an investigation against Maj Doughty providing witness testimony in the first CDI and recording Applicant in a military flight uniform at a bar after hours with a plain-clothes enlisted woman between his legs. (See, e.g., DD 149, pages 8, 96). The other reprisal that shows up several times in this Application relates to alleged reprisal against another Airman, Maj Murphy, who is not the Applicant. (See, e.g., DD 149, pages 6, 47, 50, 100, 124, 127).

Members of the armed forces shall be free from reprisal for making or preparing to make a protected communication (AFI 90-301, 10 USC 1034). The term "reprisal" means taking or threatening to take an unfavorable personnel action, or withholding or threatening to withhold a favorable personnel action on a military member for making or preparing or being perceived as making or preparing to make a protected communication. (AFI 90-301, Attc 1, Terms). However, AFI 90-301 is clear that nothing in the instruction will dissuade commanders from taking timely and appropriate corrective actions for legitimate reasons, including violations of the UCMJ, violations of other criminal statutes, or other misconduct, whether or not information regarding the misconduct came through a protected communication. (AFI 90-301, para 5.2.3). A CDI is appropriate to look into inappropriate unprofessional relationships and whether an office made false statements. (See, e.g., SAF/IQC CDI Guide, para 2.1; AFI 36-2909).

Further, to gain statutory protect of the law, the Air Force member must file the complaint with any IG within one year of becoming aware of the personnel action that is the subject of the allegation. (AFI 90-301, para 5.2.5). The record does not indicate that Applicant filed with any IG within the required time period, although Applicant, through Counsel, notified Col Vargas in 2018 that "you will be receiving calls from Congressional offices and the Office of the Inspector General" in his rebuttal to the LOR dated 26 January 2018. (DD 149, page 110).

### WHETHER THE APPLICANT WAS DIAGNOSED AS EXPERIENCING A MENTAL HEALTH DISORDER

The agency is not aware of whether the applicant was diagnosed as experiencing a mental health disorder. The record does not establish that the applicant was experiencing a mental health disorder during the time period of this matter. (See DD Form 149, item 13).

CUI

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

This legal opinion is a privileged document and is provided for District of Columbia National Guard use only. It should not be released to the public without consent of DCNG OSJA. Point of contact is the undersigned at (202) 685-8894 or robert.j.goodin.mil@army.mil.

GOODIN.ROBERT.J
OHN.1261894552

Digitally signed by
GOODIN.ROBERT.JOHN.1261894
552
Date: 2022.02.11 16:57:13 -05'00'

Encls as.

ROBERT J. GOODIN
LTC, JA, DCARNG
Staff Judge Advocate

**CUI**

THIS MEMORANDUM MAY CONTAIN INFORMATION PROTECTED BY THE ATTORNEY-CLIENT, ATTORNEY WORK PRODUCT, DELIBERATIVE PROCESS, OR OTHER PRIVILEGE. RECIPIENTS ARE NOT AUTHORIZED TO FORWARD OR RELEASE TO ANY RECIPIENTS NOT EXPLICITLY NAMED TO RECEIVE IT BY THE DISTRICT OF COLUMBIA NATIONAL GUARD, OFFICE OF THE STAFF JUDGE ADVOCATE.

| From: | SICILIANO, DOMINICK A Lt Col USAF ANG 113 FSS/DoSA |
|---|---|
| To: | GOODIN, ROBERT J LTC NG DCARNG DCNG-JFHQ |
| Cc: | REYES, NANCY N SMSgt USAF ANG 113 FSS/113 FSS/FSM; Reyes, Nancy R SMSgt USAF NG DCANG (USA) |
| Subject: | RE: AFBCMR Request (UNCLASSIFIED) |
| Date: | Thursday, February 10, 2022 4:16:47 PM |
| Attachments: | image001.jpg |

LTC Goodin,

For all of the questions asked below, we are unable to satisfy the removal or placement of the Letter of Reprimand due to our inability to access the members military service record. For all questions pertaining to the current or previous status of this members military service record, please contact the Air Reserve Personnel Center at 1-800-525-0102. Additionally, there is nothing filed for this members state records here at Headquarters.

Additionally, our inability to satisfy the removal or placement of these records to not reflect the Command's willingness to do so. For questions such as these, I would have to direct you to the WG/CC at 240-857-2811.

Thank you
v/r
Lt Col Siciliano

Dominick A. Siciliano, Lt Col, ANG
Director of Staff - Air
Headquarters – District of Columbia Air National Guard
Govt Iphone: (240) 484-6300

**Please Note: I have migrated to CHES. My new email is:
Dominick.siciliano@us.af.mil



**From:** Goodin, Robert John LTC USARMY NG DCARNG (USA) <robert.j.goodin.mil@army.mil>
**Sent:** Thursday, February 10, 2022 2:00 PM
**To:** SICILIANO, DOMINICK A Lt Col USAF ANG 113 FSS/DoSA <dominick.siciliano@us.af.mil>; Siciliano, Dominick A Lt Col USAF 113 WG (USA) <dominick.a.siciliano.mil@army.mil>; Reyes, Nancy R SMSgt USAF NG DCANG (USA) <nancy.r.reyes2.mil@army.mil>

**Subject:** AFBCMR Request (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Good afternoon, Lt Col Siciliano and SMSgt Reyes,

I am preparing an agency advisory opinion regarding an AFBCMR case regarding Lt Col Jenner M. Torrence, last 4 -4487.  The Airman has asked for the following relief in his request:

1. Removal of the Letter of Reprimand, dated 13 June 2017, from all of Airman's military records;
2. Removal of the Letter of Reprimand, dated 26 January 2018, from all of Airman's military records;
3. In the alternative, placement of the above mentioned Letters of Reprimand into a secured file; and
4. Remove the Officer Performance Report ending 1 November 2018 for Airman's records.

Per AFI 36-2603, para 4.2.2.1, an agency advisory opinion must include a "statement of whether or not the requested relief can be accomplished administratively."

We spoke over the phone briefly about this issue.  Can you please do a due diligence check as to whether the agency (DCNG) has any administrative control over Airman's record and whether the DCNG could administratively accomplish the requested relief if asked by the Board.

Thank you,
Rob

Very respectfully,
ROBERT GOODIN
Lieutenant Colonel, Staff Judge Advocate
Joint Force Headquarters
Office of the Staff Judge Advocate
District of Columbia National Guard
202-997-5968
robert.j.goodin.mil@army.mil

CUI
Controlled by: DCNG-OSJA
CUI Categories: AWP
Limited Dissemination Control: FED
POC: Robert J. Goodin, LTC, DCNG-SJA, 202-997-5968

CONFIDENTIALITY/PRIVACY ACT/ATTORNEY WORK PRODUCT:  This electronic transmission may contain attorney work-product or information protected under the attorney-client privilege, both of which are protected from disclosure under the Freedom of Information Act, 5 USC 552.  Do not release outside of DoD channels without prior authorization from the sender.  This e-mail contains information which must be protected under the Freedom of Information Act (5 U.S.C. 552) and/or the Privacy Act of 1974 (5 U.S.C. 552a).  Unauthorized disclosure or misuse of this PERSONAL INFORMATION may result in

disciplinary action, criminal and/or civil penalties. Further distribution is prohibited without the approval of the author of this message unless the recipient has a need to know in the performance of official duties. If you have received this message in error, please notify the sender and delete all copies of this message.

CLASSIFICATION: UNCLASSIFIED

CUI



**DEPARTMENT OF THE AIR FORCE**
**113th WING**
**JOINT BASE ANDREWS 20762- 5157**

27 July 2018

MEMORANDUM FOR  DCNG/CG

FROM: 113 WG/SJA
        3252 East Perimeter Rd.
        Joint Base Andrews, MD 20762

SUBJECT:  113th Wing Deployment-related Incidents and Responses


1.      On 22 July 2018, the Commanding General of the District of Columbia National Guard (DCNG/CG) requested a document detailing the various investigations and disciplinary actions arising from the deployment of 113th WG members to Guam from November 2016 to early-February 2017 to support theater operations.  During that deployment, Senior Airman Travis Bennett tragically lost his life while swimming in the ocean.  Also during the deployment, members of the 113 WG (DCANG) engaged in activities prohibited by the Uniform Code of Military Justice (UCMJ) and military regulations.  Investigations into these violations also uncovered prohibited conduct by 113th members that both predated and postdated the Title 10 deployment to Guam.  As discussed below, each of these incidents have been fully investigated.  Guardsmen have been disciplined as warranted by the evidence.

2.      Senior Airman Travis Bennett – death of a deployed guardsman

    a.  **Background**:  Senior Airman Travis Bennett was part of a group deployed from the 113th Wing on Title 10 orders to support operations at Andersen Airbase, Guam.  Upon inprocessing at Andersen AB, SrA Bennett received a briefing on the Pacific Air Force (PACAF) High Risk Activity program from the Personnel Support for Contingency Operations (PERSCO).  During the brief, a video was played highlighting the risk of cliff diving at Paget Point and swimming in the surrounding area.  The briefer also explained that all military service members were required to complete an Air Force (AF) Form 4391 prior to participating in any high risk activities and to inform supervisors on plans to perform the high risk activity.

        On or about 20 November 2016, SrA Bennett and four fellow airmen left Andersen AB to visit Paget Bay during off-duty hours.  Upon arriving at Paget Bay, the group made contact with a tour guide.  The tour guide advised the group against swimming in the Mangilao Reef area of Paget Bay.  However, SrA Bennett and two other Airmen decided to jump in the water and swim.  Sometime after jumping in the water, SrA Bennett began to struggle swimming.  SrA Bennett's companions tried to help him out of the water, but they were unable to do so before a large wave pulled SrA Bennett under water.  He never resurfaced.  His partial remains were later found under water and recovered by emergency personnel.

CUI

b. **Subsequent investigative activity**:  The circumstances of SrA Bennett's death were investigated by local authorities and the Air Force Office of Special Investigation (AFOSI).  The investigation determined that SrA Bennett's death was an accident and found that alcohol was not a factor in the death.  SrA Bennett's death was also investigated by the 113 WG, Maj Andre Slaughter, as part of a "formal line of duty determination."

c. **Action**:  SrA Bennett's death was determined to be "in the line of duty."  The LOD was found to be legally sufficient and the LOD finding was determined to be in keeping with the adjudication of similar LOD cases involving active duty members stationed on Guam.

The four airmen who accompanied SrA Bennett to Paget Point were served with non-judicial punishment (NJP) by the active duty commander on Guam.

3.    Senior Airman Deren Blessman & Senior Airman Andrew Stephens – GTC misuse

a. **Background**:  Senior Airman Deren Blessman and Senior Airman Andrew Stephens were both part of a group deployed from the 113th Wing on Title 10 orders to support operations at Andersen Airbase, Guam.  SrA Blessman was an Air Reserve Technician deployed on Title 10 orders.  SrA Stephens was a traditional guardsmen deployed on Title 10 orders.

While deployed to Guam, both SrA Blessman and SrA Stephens frequented the 'G-Spot Gentlemen's Club.'  Both used their government travel cards (GTC) at this establishment to make personal transactions.  SrA Blessman used his GTC for 27 personal transactions at the G-Spot totaling $6,467.00.  SrA Stephens used his GTC at the same establishment to pay $3,210.00 in personal charges.  Additionally, SrA Blessman used his card for approximately $100 in purchases of a personal nature at 'Top Shot Pub.'

b. **Subsequent investigative activity**:  On or about 27 April 2017, 11th Wing Security Forces contacted the 113 AMXS Commander to inform him of an investigation into SrA Blessman and SrA Stephens for suspected misuse of the GTC.  A Report of Investigation (ROI) was completed and provided to 113th leadership and 11th Wing leadership.

c. **Action**:  Based on the ROI, the 11th Wing agreed to serve NJP on both members.  A memorandum authorizing the recall of both Senior Airmen back to activity duty for NJP was signed by the 113 WG/CC and endorsed by the DCNG/CG.  Both members received Article 15s from the 11th Wing and were punished.

4.    Officer misconduct – Guam, WEPTAC, JBA

a. **Background**:  Lt Col Jenner Torrence, Maj Paul Doughty and Maj Anh-Chi Murphy were part of a group deployed from the 113th Operations Group to Guam in Title 10 status as part of a theater support package.  During the deployment, Maj(s) Doughty and Murphy socialized in the same group and were also noted to spend time together outside the group.  During the TDY, the pair were known to frequent bars, restaurants and strip clubs together.  They also were part of a group that were regularly invited to attend "pilot meetings" in the hotel rooms of the Lt Col Michael Crocker, the TSP Commander (TSP/CC), and Lt Col Chad Smith, the Director of Operations (DO).  However, these "pilots meetings," also called "470/471," were nothing more than parties.

"Pilot meetings" and most other social events during the TDY were planned on a social media application called "GroupMe."  Two text groups were formed on GroupMe, a broader

group accessible to most of the deployed 113th members and a smaller text group used by mostly officers. It was not uncommon for members of the smaller group to use sexually suggestive language, racial epithets and other potentially offensive language in group texts. Additionally, various members communicated with one another using a private message function in GroupMe and via standard text messages. TSP/CC and DO were both members of these social media groups and both participated in several threads containing such language. Maj Doughty was a member of both groups and used private messaging functions to communicate with Maj Murphy and others. Maj Murphy was also a member of both groups. She used potentially offensive language describing herself and others in conversations with the smaller group.

During the TDY, Maj Murphy used the name "Jungle Chi" for herself in group texts and conversations with both officer and enlisted members under her command to describe her "party animal" side. The names "Jungle Chi" and "Chinese Jungle Chi" were also used by the TSP/CC, DO, Maj Doughty and others in group texts and conversations with Maj Murphy, usually when inviting her to a party or in discussions about a previous night's events.

On or about 22 December 2016, Maj Doughty, Maj Murphy and others attended a strip club together. While there, a stripper caused Maj Murphy's breasts to be exposed. Either that night or shortly thereafter, Maj Doughty and Maj Murphy began using "Chi's Nips" and "Cheese Nips" as a reference to Maj Murphy's nipples; Maj Murphy's first name is Anh-Chi. Both parties used the words "Chi's Nips" and "Cheese Nips" in text messages and conversations at work and elsewhere throughout the remainder of the deployment.

Throughout the TDY, several TSP members perceived that Lt Col Torrence and Maj Murphy were engaged in an unprofessional relationship. Complaints about the appearance of an unprofessional relationship between the pair reached a point that the DO decided to meet with Lt Col Torrence and Maj Murphy about the issue. On or about the nights of 20 and 21 January 2017, he met with the pair twice in informal settings. The DO did not issue any written paperwork or verbal orders to Lt Col Torrence or Maj Murphy.

On or about 27 January 2017, Maj Murphy, Major Doughty and others attended a strip club together. A number of enlisted members were also at the strip club. During the evening, Maj Murphy and Maj Doughty worked together to have a stripper take Maj Murphy on stage and remove Maj Murphy's clothes. The stripper agreed, Maj Murphy paid the stripper, and the stripper took Maj Murphy onstage and removed her clothes. All of the officers and enlisted members present at the club were able to view Maj Murphy on stage, naked. In June 2017, Maj Murphy alleged that when she left the stage on 27 January 2017, Maj Doughty hid her underwear from her and touched her on her upper, inner thigh without her permission.

On or about 8 February 2017, Maj Doughty and Maj Murphy went to a bar together. While there, they were engaged in what onlookers described as an "intimate conversation." During the conversation, Maj Doughty was witnessed grabbing "Murphy's behind []...just for a few seconds[.]" The same witness said Maj Murphy did not appear offended by the gesture. Later, the conversation became heated when Maj Doughty confronted Maj Murphy for having an unprofessional relationship with Lt Col Torrence. Maj Murphy denied having an unprofessional relationship with Lt Col Torrence. In reply, Maj Doughty said that he would "destroy" her if he found out that she was lying to him. The conversation continued back at the hotel lobby where Maj Doughty told Maj Murphy that, in short, she was "the kind of woman every man would want." Their conversation concluded at 0500.

On or about 4 May 2017, Capt Tom Richards walked in on what he believed to be a sexual act occurring between Lt Col Torrence and Maj Murphy in the OSS SCIF at Joint Base Andrews (JBA). Capt Richards reported what he saw to his chain of command as a potential security incident.

On or about 15 June 2017, after being served with a Letter of Reprimand (LOR), Maj Murphy filed an unrestricted sexual assault allegation against Maj Doughty stating that he had groped her inner thigh on 27 January 2017. In response to that allegation, the 113th Operations Group Commander, Col John Vargas, initiated a No Contact Order (NCO) and a Military Protection Order (MPO) on the same date. The MPO/NCO required that Maj Doughty not contact Maj Murphy by any means and he was required to stay 100 feet from her, her residence, and her workplace.

On or about 16 October 2017, while attending a Weapons and Tactics Conference (WEPTAC) in Tuscon, Arizona, Lt Col Torrence and Maj Doughty were reported to have had a verbal altercation during a social event for the TDY. The altercation began when Lt Col Torrence observed Maj Doughty taking video and photos of him with a cell phone. The video and photos showed Lt Col Torrence at the bar with an enlisted woman standing between his legs. Lt Col Torrence was wearing his flight suit throughout the encounter with the woman.

On 25 October 2017, Maj Murphy observed what she believed to be a violation of the MPO with Maj Doughty.

On or about 19 January 2018, in correspondence related to a disciplinary matter, Maj Murphy complained of violations of the MPO and reiterated earlier sexual harassment claims against Maj Doughty.

b. **Subsequent Investigative Activity**: Prior to 4 May 2017, no allegations of officer misconduct occurring during the deployment to Guam or incidents principally involving Lt Col Torrence, Maj Murphy or Maj Doughty were known to senior leaders in the DCNG or 113th WG. Upon receiving Capt Richards' report of possibly witnessing a sexual act between Lt Col Torrence and Maj Murphy in the OSS SCIF, the 113 Operations Group Commander, Col Carl Magnell,, initiated a CDI. The CDI was investigated by Col Louis Campbell.

Col Campbell's investigation determined that an unprofessional relationship between Lt Col Torrence and Maj Murphy existed. He also determined that the unprofessional relationship between the pair had been an issue during the Title 10 deployment to Guam, predating the May 2017 incident in the JBA SCIF. Col Campbell provided his CDI report to the 113 OG/CC (Col Magnell) on or about 4 June 2017. Col Magnell transferred the responsibility for determining whether the report triggered the need for disciplinary action to Col John Vargas by virtue of his retirement and Col Vargas' assumption of command over the Operations Group. Based on the report, the OG/CC (Col Vargas) served Lt Col Torrence and Maj Murphy with LORs for the appearance of an unprofessional relationship that was negatively affecting the good order and discipline of the unit.

On or about 15 June 2017, after being served with the aforementioned Letter of Reprimand (LOR), Maj Murphy filed an unrestricted sexual assault allegation against Maj Doughty stating that he had groped her inner thigh on 27 January 2017. That same day, the 113 SJA received the unrestricted report and contacted the Air Force Office of Special Investigations

(OSI) for investigative support. Based on the fact that Maj Doughty was in Title 10 status in Guam at the time of the alleged assault, OSI accepted the referral and initiated an investigation. Investigatory oversight and processing transferred to the Title 10 components.

On 17 November 2017, Col John E. Vargas, the 113th Operations Group Commander, initiated a CDI concerning the alleged altercation that took place between Lt Col Torrence and Maj Doughty. Col Tracy D. Smith was appointed as the Investigating Officer (IO) to investigate seven allegations related to the incident. On or about 26 January 2018, the investigation substantiated allegations that Lt Col Torrence had fraternized with an enlisted female and that he made false statements.

On 31 January 2017, 113 WG/CC initiated a CDI concerning an allegations that Maj Doughty sexual harassed Maj Murphy and that he violated a "no contact order." Lt Col Church was appointed as the IO. On or about 8 June 2018, the CDI substantiated an allegation of sexual harassment against Maj Doughty that occurred while he was on Title 10 duty in Guam, but did not substantiate the alleged violation of the "no-contact order." The CDI also produced new allegations that Maj Murphy had engaged in fraternization of a sexual nature while in Title 10 status in Guam. Additionally, new witnesses came forward with eyewitness accounts indicating Lt Col Torrence and Maj Murphy were engaging in unprofessional behavior on deployments that predated the Guam deployment.

c. **Action**: Based on the 4 June 2017 CDI ROI that substantiated an unprofessional relationship between Lt Col Torrence and Maj Murphy, both were served with an LOR on or about 13 June 2017. The subjects' response time for the LORs was held in suspense due to issues related to the OSI investigation, upon the advice of the 113 WG/SJA. After the OSI investigation was complete and there was no new information discovered affecting the propriety of the LORs, on 30 November 2017 the OG/CC (Col Vargas) asked both subjects to provide their responses to the June LORs no later than 3 December 2017. The OG/CC considered the responses and chose to impose the LORs.

The 15 June 2017 sexual assault allegation made by Maj Murphy against Maj Doughty was investigated by OSI from that date until 28 August 2017. OSI provided an ROI to the 11 WG/JA for consideration. In early October 2017, 11 WG/JA informed the Air National Guard Readiness Center/JA (ANGRC) and the 113 SJA that the evidence did not support a court-martial or NJP. The 11th Wing officially notified the victim of its decision and provided its official declination to the ANGRC on or about 15 November 2017. On 4 December 2017, Maj Doughty and Maj Murphy were each issued LORs from the ANGRC/CC and 113 WG/CC for fraternizing with enlisted members and exhibiting poor officership during the 27 January 2017 strip club visit. On or about 22 January 2018, in her response to the LOR, Maj Murphy alleged violations of a no-contact order and repeated allegations of sexual harassment that she had made to OSI. The LORs for both Majors were imposed.

On 26 January 2018, the CDI ROI, investigating the WEPTAC incident, was finalized and provided to the OG/CC (Col Vargas). The ROI contained substantiated allegations that Lt Col Torrence made a false statement and that he fraternized with an enlisted female while he was in uniform at a bar. Based on the ROI, the OG/CC served Lt Col Torrence with an LOR and UIF. After considering the submissions made by Lt Col Torrence, the OG/CC imposed the LOR on 9 February 2018.

CUI

On or about 16 February 18, the 113 WG/CC verbally notified Lt Col Torrence that he would be seeking curtailment of his AGR duty. On or about 13 March 2018, the 113 WG/CC provided Lt Col Torrence written notice (with attachments) detailing his reasoning for this request to the DCNG/CC. Lt Col Torrence provided a rebuttal to the curtailment request to the DCNG/CC. The DCNG/CC approved the curtailment.

The sexual harassment allegation that was substantiated by Lt Col Church's CDI ROI was provided to the 113 WG/CC on or about 5 June 2018. The report was then turned over to ANGRC/JA for consideration by a Title 10 Commander, based on the fact that the substantiated allegation occurred while the parties were in Title 10 status. Additionally, the Title 10 commander will consider the new allegations of fraternization against Maj Murphy. JFHQ and the 113th Wing are awaiting the Title 10 decision on both issues before taking further action.

During the pendency of these matters, Lt Col Torrence and Maj Murphy have raised various claims against the Air Force and National Guard entities. The majority of these claims are rebutted by evidence collected during the various investigations. Recent Equal Opportunity (EO) claims made by Lt Col Torrence were separately investigated and determined to be meritless. Their claims to SAF/IG, reportedly, have met similar fates.

5.    **Conclusion:** Each of the matters above have been thoroughly investigated. Evidence from these investigations is sufficient to answer a myriad of related questions or inquiries. If you have any questions, I can be reached at 202-353-3475 or by email.


MATTHEW F. BLUE, Lt Col, DCANG
Staff Judge Advocate

# DEPARTMENT OF THE AIR FORCE
### WASHINGTON DC

**Office of the Assistant Secretary**

23 February 2022

SAF/MRBC (AFBCMR)
3351 Celmers Lane
Joint Base Andrews NAF Washington, MD  20762-6435

Dear Applicant:
Docket #: **BC-2021-02580**

    Your case has been forwarded to the Air Force Board for Correction of Military Records (AFBCMR). The attached advisory opinion(s) prepared by the office(s) of primary responsibility are forwarded for your review and comment, if desired. This is not a board decision on your application.

    **You have 30 days** from the date of this letter to comment on the advisory opinion(s) or provide additional evidence in support of your request to the address above. Ensure your Docket number is included on all correspondence. If you need more time to comment, you must ask that your case be administratively closed until such time as you are able to proceed. Otherwise, your case will be processed for the Board's consideration based on the available evidence of record.

    The AFBCMR staff will not provide further status. The next correspondence you will receive will be the decision on your case.

    Please advise us of pertinent changes, e.g., address or military status. Due to COVID-19, we have severely minimized the processing of any correspondence received by mail. In order to receive timely processing, please send all questions and correspondence to: saf.mrbc.workflow@us.af.mil. **Please include your docket number with all future correspondence.**

    For further information of a general nature, visit one of the following web sites: http://www.afpc.af.mil/Air-Force-Veteran-Information or https://mypers.af.mil/app/home and type AFBCMR in the search prompt.

Board Analysis Division
AFBCMR

Attachment(s):
Advisory Opinion