**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

JENNER TORRENCE,

       Plaintiff,

v.

UNITED STATES OF AMERICA,

       Defendant,

Case No. 24-258

Judge Kathryn C. Davis

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

In accordance with the court's scheduling order and pursuant to Rule 52.1(c)(1) of the Rules of the United States Court of Federal Claims, the Plaintiff hereby moves for judgment on the administrative record.

## TABLE OF CONTENTS

**Table of Authorities**      **2**

**Questions Presented**      **4**

**Statement of Facts**      **5**

     I.  Mr. Torrence's Air Force Service.      **5**

     II.  The Events Leading to the First Reprimand.      **6**

     III.  The First Reprimand.      **9**

     IV.  The Events Surrounding the Second Reprimand.      **9**

     V. The Second Reprimand and the Curtailment      **13**

     VI.  The Consequences for Mr. Torrence's Career and Pay      **14**

     VII.  Mr. Torrence's Petitions to the AFBCMR      **15**

**Statement of the Case**      **16**

**Argument**                                                               **18**

    I. Mr. Torrence has presented a justiciable controversy in this action.    **18**

    II.  The Agency's decision rests entirely on the two investigations and
        the two reprimands.                                            **20**

    III.  The first CDI and the first reprimand are procedurally improper
        because they are not supported by a preponderance of the evidence, as
        required by AFI  36-2907.  They also rest on a misreading of AFI 1-1
        and AFI 36-2909.                                               **22**

    IV.  The first reprimand is procedurally improper because it rested on
        evidence Mr. Torrence was not allowed to rebut.                **24**

    V.  The first reprimand is also procedurally improper because it ought
        not to have been issued by a Title 32 commander.               **25**

    VI.  The second CDI and the second reprimand are procedurally improper
        because they are not supported by a preponderance of the evidence, as
        required by AFI 36-2907.                                       **26**

    VII.  The AFBCMR added nothing significant to the weak reasoning of
        the IOs, Col Vargas, and Brig Gen Bozard.  Its final decision is just as
        infirm as theirs.                                              **29**

**Conclusion**                                                             **31**

## TABLE OF AUTHORITIES

**Cases.**

*Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995)

*Clarke Health Care Products v. United States*, 152 Fed. Cl. 570, 574 (2021)

*Doyon v. United States*, No. 19-1964C, 2024 WL 3861736 at *11 (Fed. Cl. Aug. 19, 2024).

*Hary v. United States*, 618 F.2d 704, 706-07 (Ct. Cl. 1980)

*Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1985)

*Keltner v. United States*, 165 Fed. Cl. 484, 500-01 (2023);

*Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)

*Loomis v. United States*, 68 Fed. Cl. 503, 514 (2005)

*Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993)

*Perpich v. DOD*, 496 U.S. 334, 346 (1990)

*Porter v. United States*, 163 F.3d 1304, 1324 (Fed. Cir. 1998).

*Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023)

*Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022).

*Sargisson v. United States*, 913 F.2d 918, 922 (Fed. Cir. 1990)

*SKF USA, Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2021).

*United States v. Carpenter*, 37 M.J. 291, 295 (C.M.A. 1993)

*United States v. DiMuccio*, 61 M.J. 588, 591 (A.F. Ct. Crim. App. 2005)

*United States v. Fosler*, 70 M.J. 225, 230 (C.A.A.F. 2011)

*United States v. Orellanna*, 62 M.J. 595, 599 (N-M Ct. Crim. App. 2005)

*Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir.1988)

*Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009).

*Waters v. United States*, 139 Fed. Cl. 9, 22 (2018)

**Statutes.**

10 U.S.C. § 101(d)(3) (definition: "active service")

10 U.S.C. § 934 (General Article, Uniform Code of Military Justice)

10 U.S.C. § 7311 (twenty years or more: regular or reserve commissioned officers)

10 U.S.C. § 7326 (computation of years of service: voluntary retirement; regular and reserve commissioned officers)

10 U.S.C. § 8929 (Air Force retirement pay statute)

10 U.S.C. § 12646 (commissioned officers: retention of after completing 18 or more, but less than 20, years of service)

10 U.S.C. § 12739 (computation of retired pay)

37 U.S.C. § 204(a)(1) (military pay act)

37 U.S.C. § 301a (incentive pay, aviation career)

37 U.S.C. § 301b (special pay: aviation career officers)

37 U.S.C. § 402 (basic allowance for subsistence)

37 U.S.C. § 403 (basic allowance for housing)

**Executive Orders**

Manual For Courts-Martial, United States (2016)

Manual For Courts-Martial, United States (2024)

**Regulations.**

(Note: The Air Force Instructions listed below are the editions that were current during the events at issue.  They have been superseded by later editions, but the standards at issue in this case have remained unchanged.)

Air Force Instruction 1-1, *Air Force Standards* (Aug. 7, 2012)

Air Force Instruction 36-2907, *Adverse Administrative Actions* (Nov. 26, 2014)

Air Force Instruction 36-2909, *Air Force Professional Relationships and Conduct* (May 1, 1999).

Air National Guard Instruction 36-101, *Air National Guard Active Guard and Reserve (AGR) Program* (21 April 2022)

**Other**

*Adverse Administrative Action Against Title 32 Military Member*, Opinion of the Judge Advocate General of the Air Force 2019-21, 30 April 2019, Air National Guard (AR 566-67).

<u>**QUESTIONS PRESENTED**</u>

The D.C. Air National Guard curtailed Mr. Torrence's service as an Active Guard and Reserve Officer, thereby depriving him of active duty pay and bonus payments related to aviation.  These decisions were explicitly based on reprimands, which in turn were explicitly

based on the findings of two investigating officers, who found that Mr. Torrence committed military misconduct.  The Air Force Board for Correction of Military Records (AFBCMR) has upheld the DC ANG's actions based on these findings.  (1) Were the agency's decisions, to include the AFBCMR's final refusal to grant relief, supported by substantial evidence?  (2) Were the agency's decisions procedurally improper, in violation of Air Force regulations?

<b><u>STATEMENT OF THE FACTS</u></b>

**I.  Mr. Torrence's Air Force Service**

Mr. Torrence received his commission on 10 June 2000.  AR 203.[1]  His primary specialty was as a pilot, AR 640, and he received "senior pilot" status in 2009 after over 7 years of aviation service.  AR 712.  On 29 April 2012, he was released from active duty to join the District of Columbia Air National Guard.  AR 681, 686.  As shown by his Officer Performance Reports from 2012-2017 and his promotion to Major in 2013, his service was entirely successful before the events related below, and he continued to serve as an aviator.  His commander throughout this period was Col John Vargas.  AR 652-53, 660-63, 665-68, 671-73.[2]

From 29 March 2016 to 30 June 2018, Mr. Torrence served in an AGR (Active Guard and Reserve) status.  AR 640-43.  That is, he served on active duty full time, although he worked for a National Guard organization.  10 U.S.C. § 101(d)(3).  For purposes of military retirement, his AGR service counted as active service. 10 U.S.C. § 7326.

After Mr. Torrence left active duty on 30 June 2018, AR 640, he returned to drilling status, serving only on weekends.   He was mobilized to active duty again on 13 March 2019.

---

[1] His "TAFSMD" (Total Active Federal Military Service Date) represents the date on which his service, and thus his eligibility for retirement, began to be counted.

[2] Each of these reports shows Mr. Torrence's performance during the applicable year, and also shows Col Vargas as commander of his unit. Mr. Torrence later received a further (and expedited) promotion, to lieutenant colonel.  AR 203.

5

AR 617.  However, he was no longer serving as a pilot.  AR 611-614.[3]  This was because, as of

1 May 2018, he had "not flown an OFDA [Operational Flying Duty Accumulator] creditable

flight in a three-month period."  AR 645; *see also* AR 443.[4]

Mr. Torrence left active duty on 28 February 2022 and retired on 1 March 2022.  AR 608-

09.  He was credited with 20 years, 9 months, and 10 days of active service for retirement.  AR

608.

## II.  The Events Leading to the First Reprimand.

On 4 May 2017, Mr. Torrence and Major A.M. were stationed at Joint Base Andrews,

Maryland.  An Airman reported a suspicion that they had had "office sex" in an intelligence

vault.  This led to a Command Directed Investigation (CDI), which unsubstantiated that claim.

AR 32-34.  That particular claim was no part of the eventual reprimands and adverse actions

against Mr. Torrence, and plays no further part in this motion.

During the investigation, the investigating officer (IO)[5] heard rumors that Mr. Torrence

and A.M. had engaged in an "inappropriate relationship" in Guam between 22 December 2016

and 8 February 2017.  He expanded the inquiry to investigate those rumors.  AR 35.[6]

---

[3] These are Mr. Torrence's Officer Performance Reviews for 2019-2021.  Under "Job Description" he is no longer listed as "F-16 Flight Lead," as he was on his prior OPRs, *see* AR 652, because he was no longer able to fly.

[4] AR 443 is part of a "Report on Individual Personnel" and shows Mr. Torrence's last dates flying various aircraft. His last date flying, as shown by that report, was 23 January 2018.

[5] Command Directed Investigations, such as this, are not performed by law enforcement or other investigating organizations.  They are performed by officers who normally have other duties, but are assigned to perform a specific investigation as an additional duty.

[6] Mr. Torrence is referred to as "Lt Col SUBJECT1" in the redacted investigation.  A.M. is referred to as "Maj SUBJECT2."  Maj Paul Doughty, who plays a significant role in the second reprimand, is referred to as "Maj WITNESS7." AR 16. Lt Col Lewis, the deputy commander of the Guam deployment, is referred to as "Lt Col WITNESS5." AR 44 identifies Lt Col Lewis as the Deputy Commander; Mr. Torrence himself identifies Lt Col Lewis as the individual in question at AR 395-96.

If a CDI is to lead to adverse action, Air Force policy requires the underlying facts to first be established by at least a preponderance of the evidence.  AFI 36-2907, paras. 2.2, 4.1.3; AR 45, 212.[7]

The IO found a great many facts, AR 39-44, but only a few directly relevant to this case. Mr. Torrence is not endorsing each fact, in fact he specifically denied several of them in his rebuttal, *see* AR 51, but recognizes that these findings were the basis of the later actions against him.

As noted above, Mr. Torrence was an AGR officer working full time for the D.C. Air National Guard.  As such, he fell under Title 32, U.S. Code, and was subject to the orders of his National Guard chain of command.  But during the deployment to Guam, Mr. Torrence was mobilized as part of a Theater Support Package, answered to a different chain of command, and fell under Title 10, U.S. Code.  AR 38.[8]

Other Airmen in Guam noticed Mr. Torrence and A.M. spending a good deal of time together, arriving at work in the same car, taking the same elevator, or having meals together. Mr. Torrence's wife, who paid a visit at one point "was said to be visibly upset" when she was around Mr. Torrence and A.M.  AR 39.[9]  One of Mr. Torrence's leaders, Lt Col Lewis, talked to

---

[7] At AR 45, the IO notes that the preponderance standard is required by the "CDI Guide" he is following.  At AR 212, an Air Force legal advisor providing an advisory opinion to the AFBCMR notes that the standard applies under AFI 36-2907.

[8]  This CDI finding is significant because this case raises a question of Mr. Torrence's National Guard commander's authority to reprimand him for actions allegedly committed on Title 10 status. *See* Compl. ¶ 29; *United States v. DiMuccio*, 61 M.J. 588, 589-90 (A.F. Ct. Crim. App. 2005); *see also Perpich v. DOD*, 496 U.S. 334, 346 (1990) (National Guard servicemembers called to active duty are relieved of their status in the state Guard for the entire period of federal service).

[9] Mr. Torrence rebutted these claims at AR 66-67, and as the standard of proof is a preponderance of the evidence, something that "was said" by unspecified persons cannot overcome Mr. Torrence's direct account of what actually happened.  Mrs. Torrence herself quite forcefully

him about these appearances and "suggested"—but did not order—that they "knock off" any behavior "that might be perceived by others to show a relationship." AR 39, 41, 44.[10]

Maj Doughty talked separately to Mr. Torrence and A.M. about the appearance they were creating. AR 39. Mr. Torrence thought it was "ridiculous"—as in fact it was—that "a man and woman in the same unit could not be seen together without people around them making assumptions about their motivations." Maj Doughty threatened to "ruin" A.M.'s military career if she was engaging in an "inappropriate" relationship with Mr. Torrence. Maj Doughty then brought his concerns to Lt Col Lewis. Lt Col Lewis met with Mr. Torrence, A.M., and Maj Doughty. He asked the former two if they were engaged in a relationship. They denied it. AR 40.

In analyzing these facts, the IO found no actual sexual relationship between Mr. Torrence and A.M. He cited no authority to establish that such a relationship, *even if true*, would have violated Air Force standards; he simply assumed that it would be "inappropriate." *See* AR 44.[11] In attempting to establish a detrimental effect on good order and discipline, the IO wrote as follows:

> I believe good order and discipline was sacrificed because neither party acknowledged the counsel of the Guam deployment's Deputy Commander (Lt Col [Lewis]) who clearly told them about the appearance of an unprofessional relationship early in the deployment. Additionally, others in the unit began spreading rumors based on their observations further eroding good order and

---

rejected Col Vargas' efforts to impose his personal values on Mr. Torrence through administrative actions, and using her relationship with her husband to do so. AR 131.

[10] AR 44 identifies Lt Col Lewis as the deputy commander of the Guam deployment.

[11] A central issue in this case is the equivocal use of the word "inappropriate." To be "inappropriate" or "unprofessional" under AFI 1-1 or 36-2909, a relationship must violate the *military* standards set down in those instructions. But "inappropriate" is also used in common language to refer to anything that the speaker thinks is unsuitable or improper based on his own personal standards. Equivocation between these two meanings lies at the heart of the Air Force's wrongdoing, and of this case.

> discipline. Unfortunately, Lt Col [Lewis] never directly ordered them to cease the inappropriate relationship, but their disregard of his warnings demonstrated their inattention (at a minimum) to good order and discipline.

AR 44. Again, the IO *assumed*, rather than demonstrating through cited authority, that an intimate relationship between Mr. Torrence and A.M. would have been "inappropriate" or "unprofessional" in the military sense, and he cited no facts at all to indicate that morale or discipline actually suffered. The fact that Lt Col Lewis *talked* to them about it makes no difference; he issued no orders and they defied no military authority.

## III. The First Reprimand

On 13 June 2017, Col Vargas issued a reprimand to Mr. Torrence, saying,

> You are hereby reprimanded for displaying poor judgment and failure to fulfill your responsibilities as a Field Grade Officer during the period starting on or about December 2016 and ending on or about May 2017. Your actions during this period created the perception of an inappropriate relationship with another officer, were prejudicial to good order and discipline, and were of a nature to bring discredit upon the Armed Forces of the United States in violation of AFIs 1-1 and 36-2909.

AR 46. The only supporting evidence Mr. Torrence received was the (redacted) investigation noted above. AR 50.

## IV. The Events Surrounding the Second Reprimand.

On 21 November 2017, Col Vargas opened an investigation into an altercation between Mr. Torrence and Maj Doughty during the Air Force's Weapons and Tactics (WEPTAC) conference in Tucson, Arizona, and related events. AR 95. As noted by the IO, the "contributing

factors" to this altercation (i.e., the bad blood between Mr. Torrence and Maj Doughty) stretched back to the previous investigation and the Guam deployment. AR 103.[12]

The IO unsubstantiated most of the allegations. She found that neither Maj Doughty nor Mr. Torrence violated Air Force standards in an altercation at a hotel bar. AR 104-05. However, she did find that Mr. Torrence fraternized with an enlisted female Airman on the same occasion, AR 105-07, and that he made false statements related to these allegations. AR 108-11.

The "fraternization" allegations are centered around Mr. Torrence's interactions with a blonde woman in civilian clothes with a civilian hairstyle as shown in the photo and video exhibits to the AR. The IO stated that "The video shows Lt Col Torrence and a blonde female at the bar talking while in very close contact with her back against his body and his hands on her body." AR 105. However, the photos and video do not show this. The IO also stated that "the video clearly show[s] that Lt Col Torrence, while in uniform, is engaging in an unprofessional manner with a female." AR 107. Again, the photos and video do not show any such thing.

The photos were taken by Major Doughty, who said he took them in case he had to "testify as to what he saw." AR 104-05.[13] They cover only a short period of time, as Mr. Torrence notices Maj Doughty taking the pictures and turns to confront him. AR 105. The photos show that Mr. Torrence's right hand is on the woman's left hip, as if to steady her, but her own left arm is draped across her front and holding the strap of her purse. There is nothing

---

[12] Mr. Torrence had earlier discussed the source of this bad blood in a rebuttal to an unfavorable Officer Performance Report (AR 395-97), but the details are not critical to this action.

[13] The sheer pettiness of Maj Doughty's actions boggles the mind. If he had seen a fellow officer interacting "inappropriately" with a woman in civilian clothes whom *he* knew to be enlisted, it would have been his duty to intervene under the Air Force's "wingman" concept. AFI 1-1, para. 2.6; AR 484.

particularly intimate or sexual about their stances.  The video[14] shows Mr. Torrence sitting

behind the woman at the bar, with his left arm on the bar itself; his "hands" are never on her

waist, and the two appear to be conversing sometimes with each other and sometimes with others

off to the left.  The remaining events are best given in tabular form:

| Video Time | Bar Clock Time | What Mr. Torrence Is Doing | What the Woman Is Doing |
|---|---|---|---|
| 0:00:00 | 10:15 | Sitting at the bar behind the woman, sometimes talking to her, sometimes to others off to the left. | Sitting at the bar in front of Mr. Torrence, sometimes talking to him, sometimes to others off to the left. |
| 0:09:29 | 10:25 | Getting up to confront Maj Doughty (in civilian clothes) for the pictures he is surreptitiously taking.  Mr. Torrence does not sit down for the rest of the footage. | Staying at the bar and talking to others. |
| 0:10:17 | 11:26 | Standing almost under the clock, continuing to remonstrate with Maj Doughty | Talking with others at the bar |
| 0:10:30 | 11:26 | Continues to remonstrate with Maj Doughty. | Another officer moves next to her at the bar, and she talks to him and others. |
| 0:11:33 | 11:28 | Continues to remonstrate with Maj Doughty (standing under the bar clock) | The other officer gives her a brief, one-armed hug, the most "intimate" activity shown the whole evening. |
| 0:13:47 | 11:30 | Gesticulations grow animated as he continues to remonstrate with Maj Doughty. | Continues her discussions with the other officer, and other persons offscreen. |
| 0:29:28 | 11:45 | Ends his argument with Maj Doughty, walks off to the left. | Remains onscreen, talking to others, sometimes high-fiving or hugging them. |
| 0:41:46 | 11:54 | Returns to the bar, not close to the woman, and remains standing or leaning with his elbows. | Converses with another man in civilian clothes. |
| 0:42:53 | 11:55 | Walks off to the left. | Remains where she is, talking to the civilian. |
| 0:45:56 | 11:59 | Returns, stands at the bar. | Stands at the bar, talking sometimes to Mr. Torrence and sometimes to the civilian man. |

---

[14] The citations here are to part 2 of video 171016-230008, which begins when the bar's wall clock is showing 10:15, and the video clock is showing 11:00:08 PM.

| 0:46:58 | 12:00 | Remains standing near the bar | Exchanges greetings and hugs with another woman, who leaves. Resumes talking with the civilian. |
|---|---|---|---|
| 0:48:57 | 12:02 | Shakes hands with the civilian | Continues talking with several individuals, mostly Mr. Torrence and the civilian man. |
| 0:50:51 | 12:03 | Remains standing at the bar | Moves off to the left. |
| 0:52:25 | 12:05 | Moves off to the left. | Has not returned. |
| 0:53:51 | 12:06 | Has not returned. | Returns, talks to the civilian, then to others |
| 0:54:48 | 12:07 | Returns, picks up his drink. | Continues talking to others. |
| 0:55:06 | 12:07 | Talks to the civilian. | Talks to others. |
| 0:56:00 | 12:08 | Finishes his drink, talks to others. | A few seconds later, appears to be hugging a civilian around the neck.  The civilian leaves. |
| 0:56:22 | 12:08 | Tries to leave through a locked door | Is not visible, but shortly walks back into view and talks to the civilian. |
| 0:56:55 | 12:09 | Talks briefly to the woman and the civilian | Appears to laugh, then resumes talking to the civilian |
| 0:57:41 | 12:10 | Leaves to the left | Remains, talks to the civilian |
| 0:58:14 | 12:11 | Is gone. | Meets another woman and exits with her to the right. |

At no point is there any "clearly unprofessional" activity between Mr. Torrence and the young woman.

The IO found that the young woman was an enlisted Airman from the Ohio Air National Guard.  AR 105-06.  The young woman in question identified herself from the pictures, said the bar was "full of pilots" with "very few females," and said that "nothing was too out of the ordinary."  AR 106.  Mr. Torrence denied knowing she was in the military at all. AR 108. Another officer speculated that "[he] would think anyone would know that the women at the bar were the enlisted services women working refreshment at WEPTAC" by "putting 2 and 2 together."  AR 106.  Beyond this speculation, the IO cited no evidence that Mr. Torrence had any such knowledge.  She nonetheless substantiated a charge of fraternization.  AR 107.

The IO also found that Mr. Torrence made "false statements" about the incident.  She

based this claim by comparing several (mostly second-hand and stale) accounts of things he had

said with the IO's own false account of the video footage described above:

> The video shows from 2315 Lt Col Torrence and a female in very
> close contact with continued contact until 0010 on 17 Oct 17 when
> they both leave the bar.  The video, [Tab G-1], also shows them in
> very close contact.  Additionally, the photographs and video show
> Lt Col Torrence's hands around the female's waist for a period of
> time.

AR 111.  As shown by the table above, the IO's account is false, and does not match the video or

the photos.  The IO also did not specify *which* statements were supposed to be false, only that

"the inconsistencies between [the statements]…and the video…provide sufficient evidence to

show that false statements were made by Lt Col Torrence about what occurred on the night of 16

Oct 17 in regards to the female who was at the bar."  AR 111.

## V. The Second Reprimand and the Curtailment

Based on this investigation, Col Vargas issued a second reprimand against Mr. Torrence,

dated 26 January 2018:

> An investigation disclosed that on or about 16 October 2017…
> you, while in uniform, fraternized with an enlisted member and
> engaged in unprofessional behavior; a discredit to an officer of
> your rank, the Air Force, and the Armed Forces.  Additionally, you
> were untruthful to your chain of command concerning the 16
> October 2017 encounter, choosing to make false verbal and written
> statements about the allegations on a number of occasions.

AR 115.  Again, the only evidence he mentioned was the investigation.  On the same day as the

reprimand, Col Vargas also (falsely) told Mr. Torrence that his security clearance was suspended,

thus preventing him from flying further while he was on active duty.  AR 159.

On 15 March 2018, Mr. Torrence's commander, Brigadier General Jeffrey C. Bozard, recommended the "curtailment" of Mr. Torrence's AGR tour.  He explicitly justified the action as follows:

> I am pursuing this course of action due to substantiated allegations of false statements made to senior Air Force officers and substantiated allegations of unprofessional relationships with both officer and enlisted military members. Each of these substantiated allegations are described and discussed in the attached Command-Directed Investigation (CDI) reports; the resulting Letters of Reprimand are attached as well

AR 564.[15]  The D.C. National Guard commander (Major General William J. Walker) honored his request. AR 466.[16]  Thus, the curtailment—which is the central issue in this case—is based on the investigations and reprimands noted above, and on nothing else.

## VI.  The Consequences for Mr. Torrence's Career and Pay

Under 10 U.S.C. § 7311, an officer who serves 20 years of active duty, including AGR duty, may retire and receive a pension upon retirement under 10 U.S.C. § 7311. Under 10 U.S.C. § 12646, an officer who attains 18 years of active service reaches "sanctuary" and may continue on active duty until he reaches at least 20 years. Under Air National Guard Instruction 36-101, para. 8.2.1, an AGR officer who reaches sanctuary will not have his tour curtailed except by

---

[15] As noted above and below, the IO did not identify which statements were supposed to have been false, so that the claim that such statements were made "to senior officers" goes beyond even what the IO found.

[16] AR 466 is a page from a lawyer's summary of events mentioning that the actual curtailment was ordered by "DCNG/CC" (i.e., the commander of the D.C. National Guard, the equivalent of a state Adjutant General).  The commanding general is not named in the AR, but his name was Major General William J. Walker.  *See* Major General William J. Walker (Retired), https://www.nationalguard.mil/Leadership/Joint-Staff/Special-Staff/Senior-Leader-Management-Office/General-Officer-Management/Biographies/Article/3101174/major-general-william-j-walker-retired/ .  Nothing in the record indicates that Maj Gen Walker added anything to the reasoning of Brig Gen Bozard or Lt Col Vargas.

order of the Secretary of the Air Force.  When General Walker curtailed Mr. Torrence's AGR tour, Mr. Torrence had 17 years, 10 months, and 29 days of active service. AR 640.

Because of the curtailment, Mr. Torrence left active duty on 30 June 2018.  AR 640.  He was able to mobilize again on 13 March 2019, though he was no longer qualified as an aviator. AR 617.  He was credited with 20 year, 9 months, and 10 days of active service for retirement purposes, AR 608-09, but he would have had 257 more days if his AGR tour had not been curtailed.  Under 10 U.S.C. § 12739, Mr. Torrence's retirement pay is proportional to his days of active duty, and would thus be about 3% higher if he had been allowed to serve the additional days.

Under 37 U.S.C. § 301a, an officer receiving basic pay (i.e., an officer on active duty) is entitled to Aviation Career Incentive Pay if he meets certain requirements.  Mr. Torrence met those requirements insofar as he performed operational flying duties for about 16 years (from 2002 until his curtailment in 2018) and accumulated 207 months towards his Operational Flying Duty Accumulator.  AR 204.[17]  He lost his entitlement to this pay when he was not on active duty, and because he was no longer "current" as an aviator, *see* AR 611-14, 645.

Under 37 U.S.C. § 301b, an officer entitled to payments under 37 U.S.C. § 301a may also receive $25,000 per year of Aviation Continuation Pay.  He may do this if he is "qualified to perform operational flying duty" and executes the appropriate agreement before 31 December 2018.  Mr. Torrence was no longer entitled to this pay when his AGR tour was curtailed, because he was no longer entitled to basic pay, and because he was no longer "current" as an aviator.

## VII.  Mr. Torrence's Petitions to the AFBCMR.

---

[17] His accumulated months of operational flying duty are listed as "MO OPS FLY DUTY ACC" near the top of the page.

On 22 June 2021, before his retirement, Mr. Torrence petitioned the Air Force Board for Correction of Military Records to remove the reprimands. AR 249-51. The Board denied relief on 26 April 2022. AR 242-48.

On 2 October 2024, after a remand form this court, Mr. Torrence again petitioned the AFBCMR, asking for relief that more closely paralleled the relief sought in this case, AR 471-73, and including the photos and video as exhibits. The Board declined Mr. Torrence's request for a personal appearance, at which he could have guided them through the video evidence. AR 235, 240. The Board denied relief on 20 March 2025. AR 231.

With respect to the first investigation, the Board provided no analysis beyond what the IO had said:

> With respect to the applicant's LOR dated 13 Jun 17, the Board notes the CDI ROI dated 31 May 17 includes multiple witness testimonies pertaining to the applicant's unprofessional relationship with AM. Moreover, the investigation uncovered other misconduct by members of his unit which resulted in adverse actions.

AR 239-40. The Board performed no analysis to demonstrate anything "unprofessional" about Mr. Torrence's relations with A.M., even if the "worst" rumors had been true. The AFBCMR simply deferred to the IO, exactly as Col Vargas and Brig Gen Bozard had done.

With respect to the second investigation, the Board brushed aside the issue of whether Mr. Torrence knew the woman in civilian clothes was an enlisted Airman,

> However, based on the photographs and the video, the Board *finds it appears the applicant and the enlisted female airman were acquainted.* They were also both attending the same event at the hotel. While the applicant claims his behavior was not lude [sic], this is not the standard to find a relationship is unprofessional.

AR 239. Of course, the photos and video do not show, and are not capable of showing, any such thing.

16

The parties both hoped that the AFBCMR remand might settle this case, whether by granting relief or by grounding the Air Force's decision in substantial evidence. Since it did not do so, the case continues.

## STATEMENT OF THE CASE

This is a military pay claim, and as such is to be judged under the "arbitrary and capricious" standards of the Administrative Procedure Act. *Keltner v. United States*, 165 Fed. Cl. 484, 500-01 (2023); *see also Doyon v. United States*, No. 19-1964C, 2024 WL 3861736 at *11 (Fed. Cl. Aug. 19, 2024), *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009). An agency decision cannot be upheld if it runs counter to the evidence before the agency, or fails to consider an important aspect of the problem before it. *Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023), *citing Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022). As noted in the complaint, this case rests on the following money mandating statutes: 37 U.S.C. § 204(a)(1) (military pay act), 37 U.S.C. § 301a (incentive pay, aviation career), 37 U.S.C. § 301b (special pay: aviation career officers), 37 U.S.C. § 402 (basic allowance for subsistence), 37 U.S.C. § 403 (basic allowance for housing), and 10 U.S.C. § 8929 (Air Force retirement pay statute).

While the facts of this case are somewhat complicated, the heart of the case is not. Mr. Torrence lost his AGR status, his aviation status, and a considerable sum of pay because of two ill-grounded investigations and two reprimands based on those investigations. The investigating officers claimed that Mr. Torrence violated Air Force regulations, but they do not support their conclusions with substantial evidence, and certainly not to the "preponderance" required by AFI 36-2907, para. 2.2. One of the reprimands was also procedurally improper insofar as it was issued by a Title 32 commander over misconduct allegedly committed while on Title 10 status, and both reprimands and both investigations rest on a misreading of standards set down in Air

17

Force regulations.  As Mr. Torrence's curtailment is based explicitly and exclusively on these investigations and reprimands, the decision to curtail his AGR tour and deprive him of pay violated Air Force regulations, and was arbitrary and capricious.

Because Mr. Torrence is challenging the Air Force's failure to follow its own regulations, specifically with regard to standards of proof, his claim is justiciable under *Adkins v. United States.*  Furthermore, because he is challenging the *existence* of military misconduct rather than a "judgment call" about how to deal with established misconduct, his claim can be evaluated under standards this court can apply.

With respect to the first investigation and reprimand, the IO's conclusions are not supported by substantial evidence or a preponderance.  The gossip and rumors cited by the IO established—at most—an appearance or a suspicion that two adult Air Force officers, neither of whom worked for the other, were having sexual relations.  This simply does not establish a violation of the relevant Air Force Instructions, and therefore does not justify Mr. Torrence's curtailment, which was explicitly based on such a violation.

With respect to the second investigation and reprimand, the IO's conclusions are likewise not supported by substantial evidence or a preponderance.  In fact, the IO's factual findings (which the AFBCMR ultimately endorsed) directly contradict the evidence in front of the agency, namely the film footage that does not match the IO's description.  The AFBCMR's effort to augment the IO's reasoning (by claiming the film footage shows the two individuals were "acquainted") likewise fails, because the footage not only does not but cannot possibly show what the AFBCMR claims.

<u>**ARGUMENT**</u>

**I. Mr. Torrence has presented a justiciable controversy in this action.**

18

This court, like other federal courts, gives considerable deference to military personnel decisions.   Such decisions are often found nonjusticiable, and as such inappropriate for judicial relief.  The facts of *this* case present a justiciable controversy.

"The fundamental question of justiciability… is whether 'tests and standards' exist against which a court can measure the challenged action."  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)*, citing Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir.1988).  If Mr. Torrence's curtailment had been based on military aptitude, leadership, or something similar, it would not be justiciable.  Courts have no tests or standards to judge these military intangibles.  But, as shown above and below, Mr. Torrence's curtailment was based entirely on alleged military *misconduct*.  The existence of misconduct is well suited to review under the "substantial evidence" test, which is used for military pay claims in this court.

"Although the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy."  *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995), *citing Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion").  Mr. Torrence's case rests on several regulatory, and thus procedural, violations: (1) the failure of the IOs to support their conclusions to a preponderance of the evidence, as required by AFI 36-2907, para. 2.2; (2) the failure of the investigations to establish a violation of "established Department of the Air Force standards" as required by AFI 36-2907, para. 1.1; (3) the failure of the first IO to apply the standards of AFI 1-1 and 36-2909 in determining what is "inappropriate"; (4) the decision of a reprimanding commander to base his reprimand on evidence the accused was not allowed to rebut, in violation

of AFI 36-2907, para. 2.4.2.6.; and (5) the decision of a Title 32 commander to issue a reprimand for conduct committed on Title 10 status.  It is therefore justiciable under *Adkins*.

As an alternative to the above argument, the "procedural-only" standard of *Adkins* should not be applied to any case where military misconduct is the sole basis for the action at issue, and the *mere existence* of that misconduct is challenged.  The test of *Adkins* is designed to prevent undue judicial meddling in matters of military judgment. *See Adkins*, 68 F.3d at 1322-1323, *citing inter alia, Sargisson v. United States*, 913 F.2d 918, 922 (Fed. Cir. 1990) ("A court lacks the special expertise needed to review reserve officers' records and rank them on the basis of relative merit"); *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1985) ("[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province").  But judging the existence and the evidentiary support for military misconduct is very much the business of courts, even civilian courts and even this court. *See Loomis v. United States*, 68 Fed. Cl. 503, 514 (2005) (considering whether the government had established "conduct unbecoming an officer," and requiring the Government to establish the relevant "service custom" to show it); *Waters v. United States*, 139 Fed. Cl. 9, 22 (2018) (considering and deciding whether an act of adultery was prejudicial to good order and discipline in the Armed Forces).[18]

**II.  The Agency's decision rests entirely on the two investigations and the two reprimands.**

---

[18] The Court of Appeals of the Armed Forces (and its predecessor, the Court of Military Appeals) is by statute required to be a civilian court, and no judge who retires from military service can serve on it until he has been out of the military for at least seven years.  10 U.S.C. § 942(b)(1), (4); *United States v. Carpenter*, 37 M.J. 291, 295 (C.M.A. 1993), *vacated and remanded on other grounds*, 515 U.S. 1138 (1995) (noting that this requirement is to make the highest military appellate court "an independent civilian court unencumbered by ties to any of the military services.").  Thus, the existence of military misconduct is *not* something only military minds can determine, and neither Congress nor the Constitution commits that determination to the military alone.

"[A] claimant seeking back pay on account of a separation or relief from active duty must show both that (a) there was a material legal error or an injustice in the proceedings of the correction board, or other entity within the military department, which led to the adverse action against him, and also (b) that there is an adequate nexus or link between the error or injustice and the adverse action." *Hary v. United States*, 618 F.2d 704, 706-07 (Ct. Cl. 1980), *superseded by statute on other grounds Porter v. United States*, 163 F.3d 1304, 1324 (Fed. Cir. 1998).[19]  Thus, if Mr. Torrence's curtailment (which was a type of relief from active duty) was based on material legal error, he is entitled to relief.

In deciding whether to affirm or reverse an agency's decision, this court generally limits itself to the grounds articulated by the Agency itself, and not any new grounds that may be raised during judicial review.  *See Clarke Health Care Products v. United States*, 152 Fed. Cl. 570, 574 (2021), *citing, inter alia*, *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2021). Thus, the bases actually stated by Mr. Torrence's command for his curtailment should be the sole focus of this court's analysis.

General Bozard justified his decision to request curtailment of Mr. Torrence's AGR service in the following language:

> I am pursuing this course of action due to substantiated allegations of false statements made to senior Air Force officers and substantiated allegations of unprofessional relationships with both officer and enlisted military members. Each of these substantiated allegations are described and discussed in the attached Command-Directed Investigation (CDI) reports; the resulting Letters of Reprimand are attached as well.

---

[19] *Porter* analyzed *Hary* and other case law in light of 10 U.S.C. § 628, a statute covering special selection boards for officers wrongly denied consideration for promotion.  As Mr. Torrence's case has nothing to do with promotion, it is unaffected by *Porter*.

AR 564.  He adds nothing to this justification; therefore, his decision stands or falls with the reprimands and their associated investigations.

The AFBCMR, which rendered the final decision against Mr. Torrence, adds nothing at all to the first reprimand:

> With respect to the applicant's LOR dated 13 Jun 17, the Board notes the CDI ROI dated 31 May 17 includes multiple witness testimonies pertaining to the applicant's unprofessional relationship with AM. Moreover, the investigation uncovered other misconduct by members of his unit which resulted in adverse actions.

AR 239-40.   Since the AFBCMR simply adopts the conclusion of the IO, its decision likewise stands or falls with the IO's own conclusions and whether those meet the standards of AFI 36-2907.

The AFBCMR adds almost nothing to the reasoning of the second CDI, and what it does add does not amount to much.  In particular, its only evidence that Mr. Torrence knew the young woman was enlisted was its nonsensical claim that "based on the photographs and the video, the Board finds it appears the applicant and the enlisted female airman were acquainted."  A photo or soundless video cannot show the kind of knowledge that would make Mr. Torrence guilty of fraternization, not unless the enlisted party is in uniform or is holding up documents demonstrating her status.  Here, too, the AFBCMR's final decision stands or falls with the IO's conclusions, and whether those meet the standards of AFI 36-2907.

**III.  The first CDI and the first reprimand are procedurally improper because they are not supported by a preponderance of the evidence, as required by AFI  36-2907.  They also rest on a misreading of AFI 1-1 and AFI 36-2909.**

Under AFI 36-2907, para. 2.2, any adverse action in the Air Force, to include a reprimand, must be based on "a preponderance of the evidence."  The curtailment in this case was explicitly based on the "substantiated" claims in the CDI reports and on the reprimands. AR

22

564. Thus, if the claims were never supported by a preponderance of the evidence, the correct procedures were not followed, and Mr. Torrence is entitled to relief.

AFI 36-2909, para. 2.2, defines "unprofessional" relationships as relationships that "detract from the authority of superiors or result[] in or reasonably creates the appearance of: favoritism, misuses of office or position, or the abandonment of organizational goals for personal interests." Para. 2.2.2 states that relationships are forbidden if they compromise the integrity of the chain of command, involve favoritism, involve the use of rank or position for personal gain, are exploitative or coercive, or create an adverse effect on good order, discipline, or morale. They are also forbidden if they create the appearance of these things. Paragraphs 2.3.3 and 2.3.4 establish that dating, close friendships, and sexual relations are "subject to the same policy considerations as are other relationships." In other words, between officers and officers (or between enlisted persons and enlisted persons), they only violate 36-2909 if they have one of the adverse effects noted in paragraph 2.2.

The CDI does not establish any such thing about the relationship of Mr. Torrence and A.M. The IO hints, without saying outright, that Mr. Torrence and A.M. created the appearance that they were *having sexual intercourse*—but there is simply nothing in 36-2909 that would forbid a pair of officers, even officers married to other persons, to do this in private if they wished to do so.[20] Perhaps if the IO had been willing to say forthrightly *exactly* what the

---

[20] The *Manual for Courts-Martial* establishes "adultery" – now "extramarital sexual conduct" – as a military offense, but it is *only* an offense if the adultery in question meets the "terminal element" of 10 U.S.C. § 934. That is, to be an offense, the extramarital sexual conduct must be to the prejudice of good order and discipline in the Armed Forces or else must tend to bring the Armed Forces into disrepute. *See United States v. Orellanna*, 62 M.J. 595, 599 (N-M Ct. Crim. App. 2005) ("Thus, in every case of adultery, military prosecutors must satisfy the 'terminal element' requirement…*as well as* prove wrongful sexual intercourse and the existence of a valid marriage"); *United States v. Fosler*, 70 M.J. 225, 230 (C.A.A.F. 2011) ("An accused cannot be convicted under Article 134 if the trier of fact determines only that the accused committed

23

gossipmongers thought Mr. Torrence and A.M. were doing, or might be doing, instead of vaguely hinting that it was "inappropriate," he would then have been forced to ask and answer the question he never reached: "And just what would have been wrong with that?"

Various persons, and the IO himself, appear to use "inappropriate" as a euphemism for "sexual," but nobody—not the IO, not Col Vargas, not Brig Gen Bozard, nor even the AFBCMR—ever gets around to showing that a sexual relationship would have *been* inappropriate under the standards of the Air Force. It might well have been "inappropriate" in the personal moral or religious opinions of these various individuals, but their personal moral or religious opinions cannot justify adverse actions that deprive an officer of pay.

## IV. The first reprimand is procedurally improper because it rested on evidence Mr. Torrence was not allowed to rebut.

The two IOs failed to establish any military misconduct by Mr. Torrence, whether to a preponderance or to any other standard, and this is the most important point in this motion. However, as Brig Gen Bozard included Col Vargas' reprimands as grounds for his curtailment action, the procedural propriety of these reprimands is also at issue in this case.

As noted in Mr. Torrence's final AFBCMR complaint, Mr. Torrence responded to Col Vargas' first reprimand, as he was entitled to do. He pointed out that he was an open atheist and secular humanist who did not share "traditional Abrahamic values" concerning relations between the sexes, and did not consider himself bound to avoid the company of a female officer, even if people who do hold such values might find it scandalous. AR 482; *see also* AR 291.

---

adultery; the trier of fact must also determine beyond a reasonable doubt that the terminal element has been satisfied."). This might happen when, for example, an officer has an affair with the wife of a subordinate. *See Waters v. United States*, 139 Fed. Cl. 9, 22 (2018).

Col Vargas responded by conducting an impromptu "inquiry" of his own, obtaining two new witness statements, which he used in deciding whether to file the reprimand. These new statements allegedly established that Mr. Torrence and A.M. had kissed each other during temporary duty to Las Vegas, which would not have violated Air Force Standards anyway, but Col Vargas used them and told Mr. Torrence they "matched the testimony from the investigation." AR 482. While this "inquiry" does not appear in the text of the first reprimand, AR 654-55, it does underlie Col Vargas' decision to file it, which was made seven months later. AR 656.

The problem was that Col Vargas gave Mr. Torrence no chance to rebut these statements. AR 482. This violated AFI 36-2907, para. 2.4.2.6., which requires any reprimand to include as attachments "relevant statements, portions of investigations, reports, and other documents that serve, in part or in whole, as the basis for the letter." Since the letter was being filed based on these extra statements, they ought to have been included, and more importantly Mr. Torrence ought to have been allowed to respond to them per AFI 36-2907, paras. 2.4.3-2.4.4.

Despite officially being given no opportunity to do so, Mr. Torrence tried to rebut these statements anyway by acquiring and submitting other statements to contradict them. Col Vargas, however, refused to pay attention to this attempted rebuttal. AR 482 n.3.

Thus, Col Vargas' first reprimand was doubly improper, not only because it claimed violations without evidence, but because it was filed without permitting a rebuttal of *all* the evidence used.

## V.  The first reprimand is also procedurally improper because it ought not to have been issued by a Title 32 commander.

Col Vargas' first reprimand was procedurally improper for another reason. As noted in Mr. Torrence's final AFBCMR complaint, it was issued by a Title 32 commander for actions

25

allegedly taken in Title 10 status.  AR 489.  Mr. Torrence cited an Opinion of the Judge Advocate

General of the Air Force to show this is forbidden:

> As the Judge Advocate General of the Air Force has explained in OpJAGAF 2019-21 (Encl. 12), a commander's authority to issue reprimands depends on the status of the accused at the time of the alleged misconduct. Title 10 commanders can reprimand Air Force personnel for what they do on Title 10 status; Title 32 commanders can reprimand Air Force personnel for what they do on Title 32 status. But a Title 10 commander cannot reprimand an ANG member for what he does while under title 32 authority.  By logical inference, a Title 32 commander cannot reprimand an ANG member for what he does on Title 10 status, either.

AR 489.  Mr. Torrence even provided a copy of this opinion, AR 566-67, which points out that

an Airman's status (for purposes of who can reprimand him) is determined "at the time of the

alleged offense."  Nobody except the Secretary of the Air Force can take administrative actions

against Air National Guard officers regardless of their status.  AR 567.  *See also United States v.*

*DiMuccio*, 61 M.J. 588, 591 (A.F. Ct. Crim. App. 2005) (holding that a Title 32 commander had

no inspection authority over an Airman mobilized in Title 10 status).

The AFBCMR asserts the opposite without citing a single authority:

> Counsel also argues the applicant's OG/CC was not authorized to issue the applicant the 13 Jun 17 LOR for misconduct committed while the applicant was on Title 10 orders. However, pursuant to the authority delegated to ANG commanders by the SecAF, it is permissible to impose administrative disciplinary actions, such as an LOR, if there is a federal nexus between the officer's ANG membership and a violation of law or federal military standards

AR 12.  As Mr. Torrence's view is backed by authority, and the AFBCMR's is not, the reprimand

was procedurally improper; and as the curtailment is partly grounded in this reprimand, it too is

procedurally improper, and its effects should not be allowed to stand.

**VI.  The second CDI and the second reprimand are procedurally improper because they are not supported by a preponderance of the evidence, as required by AFI 36-2907.**

Under AFI 36-2907, para. 2.2, any adverse action in the Air Force, to include a reprimand, must be based on "a preponderance of the evidence."  The curtailment in this case was explicitly based on the "substantiated" claims in the CDI reports and on the reprimands. AR 564.  Thus, if the claims were never supported by a preponderance of the evidence, the correct procedures were not followed, and Mr. Torrence is entitled to relief.

Furthermore, in administrative actions—to include military pay claims—an agency action cannot be upheld if it is directly counter to the evidence before the agency, or fails to consider an important aspect of a problem.  *See Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023), *citing Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022).

Fraternization between an officer and an enlisted member is defined in AFI 36-2909, para. 3.1.1., and is drawn from the *Manual for Court-Martial*, Part IV.  Fraternization exists "when a relationship between an officer and an enlisted member puts the enlisted member on terms of military equality with the officer in such a way that prejudices good order and discipline in the armed forces or is of a nature to bring discredit upon the armed forces."[21]  However, it *only* exists if the officer has knowledge of the enlisted member's enlisted status. *Manual For Courts-Martial, United States*, p. IV-133 (2016) (listing as an element of the offense "that the accused then knew the person(s) to be (an) enlisted member(s)").[22]  *See also United States v. O'Connor*, No. ACM 38420, 2015 WL 894346 at *9 (A.F. Ct. Crim. App. Feb. 12, 2015) (noting

---

[21] AFI 36-2909, para. 3.2 specifically forbids various other actions between officers and enlisted members, to include dating and sexual relations.  Since Mr. Torrence is not accused of doing any of these things with the enlisted woman in the Tucson bar, they will form no further part of this brief.

[22] The 2016 edition of the *Manual* was current at the time of the alleged offense; but the relevant element is still to be found in the 2024 edition. *Manual for Courts-Martial, United States*, p. IV-151 (2024).

that "knowledge of the other person's enlisted status is an element of the offense [of fraternization]").

The IO's finding of fraternization is based on facts that simply do not match the evidence. She claims that Mr. Torrence and the woman are in "very close contact" from 11:15 PM to 12:10, when the film footage (as noted above) shows nothing like that. AR 111. The IO also claims that the photographs and video "show Lt Col Torrence's hands around the female's waist for a period of time." AR 111. Again as shown above, this is also untrue; he sometimes has one hand on her waist, and that is it. Their brief contact in a crowded bar, when both appear to be engaging in conversation rather than romance, would not establish "fraternization on terms of military equality" even if Mr. Torrence had known she was enlisted. The young woman herself testified that "nothing too out of the ordinary" happened the whole evening, AR 106, and what she said matched what the video shows, while the IO's conclusions do not.

Just as seriously, the IO cites no evidence at all—let alone a "preponderance" as required by regulation—to establish that Mr. Torrence knew the woman's enlisted status. The IO cites only *speculation* by a different officer that "[he] would think anyone would know that the woman at the bar were the enlisted services women working refreshment at WEPTAC." AR 106. What an officer "would think" that another person "would know" is not *evidence*, and it is certainly not a preponderance of the evidence.[23]

---

[23] As noted in Mr. Torrence's final AFBCMR petition, this "evidence" contained an extra irony. The officer in question was in fact Maj Robert Bielanski, who appears on the left side of the photographs. In the film footage, Maj Bielanski moves in next to the woman after Mr. Torrence gets up to confront Maj Doughty. Maj Bielanski is the one who gives the woman a brief, one-armed hug at 0:11:33/11:28. AR 483. As Mr. Torrence noted in his AFBCMR petition, he does not consider this light contact to be "fraternization," AR 483 n.4, AR 491 n.14, but it is more "intimate" than anything Mr. Torrence himself is accused of doing. Mr. Torrence made this point earlier at AR 397-98.

The IO claims to have evidence of false statements, but is unable to say *which* statements were supposedly false.  She admits that she "cannot confirm what was said on the evening of 16 Oct 17 to current witness statements," but then finds (unspecified) "false statements" anyway. Further, her claim of "false statements" is based on her own false account of the film footage, which she compares in a vague way to the other statements she collected.  AR 111.  The IO establishes neither fraternization nor false statements to a preponderance of the evidence, and basing adverse action on her findings is therefore procedurally improper under AFI 36-2907, para. 2.2.  The IO's factual findings are also directly contrary to the evidence in the investigation, they fail to address an important aspect of the problem (namely that "nothing out of the ordinary" happened according to the Airman herself), and they are therefore improper grounds for any agency action.

## VII.   The AFBCMR added nothing significant to the weak reasoning of the IOs, Col Vargas, and Brig Gen Bozard.  Its final decision is just as infirm as theirs.

In denying relief for Mr. Torrence's last petition, the AFBCMR spent eight pages summarizing Mr. Torrence's petition and applicable authorities. AR 232-239.  It spent only one page doing any analysis of its own, AR 239-40.

With respect to the first reprimand, the Board added nothing to the IO's reasoning, or to Col Vargas':

> With respect to the applicant's LOR dated 13 Jun 17, the Board notes the CDI ROI dated 31 May 17 includes multiple witness testimonies pertaining to the applicant's unprofessional relationship with AM. Moreover, the investigation uncovered other misconduct by members of his unit which resulted in adverse actions.

AR 239-40.  With respect to the second reprimand, it made a feeble effort to shore up the weaknesses in the IO's report:

> Counsel contends the photographs and the bar's camera security video invalidate certain findings against the applicant. However, the Board does not find the photographs or video compelling or persuasive to find the applicant did not compromise his standing as an FGO [Field Grade Officer], did not engage in fraternization with an enlisted member or engage in unprofessional behavior for which he received the LOR dated 26 Jan 18. The Board finds the photographs and security video show the bar does not appear to be so busy that people are unable to pass by. The video shows the applicant in a flight suit sitting on a bar stool in very close contact to the female in civilian clothes for an extended period of time. Her back is pressed against him, his right hand is on her right hip and at times her head appears to be leaning back on his shoulder. The applicant stated in his rebuttal response to the LOR he did not know she was an enlisted member and he was not previously acquainted with her. *However, based on the photographs and the video, the Board finds it appears the applicant and the enlisted female airman were acquainted.* They were also both attending the same event at the hotel. While the applicant claims his behavior was not lude [sic], this is not the standard to find a relationship is unprofessional.

AR 239 (emphasis added).  Of course, the photos and soundless video *cannot* show the kind of knowledge required for fraternization.  The woman is in civilian clothes, and that is that.  They are not "in close contact" for "an extended period of time," and nothing about their posture suggests that they are anything but a pair of adults socializing in a place that is meant for socializing.  The AFBCMR's explanation runs counter to the evidence that was before it, and it cannot be upheld. *See Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023), *citing Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022).

The AFBCMR also fails to consider an important aspect of the problem before it, a point advanced in Mr. Torrence's petition, drawn directly from Air Force regulations, and directly contrary to the IO's charges.  Under AFI 1-1, para. 2.6, all Airmen are expected to serve as "wingmen" to each other.  "Being a good wingman means taking care of fellow Airmen and taking action when signs of trouble or distress are observed, specially in situations where Airmen

appear as if they are about to make a poor decision…" AFI 1-1, para. 2.6. If Maj Bielanski, Maj Doughty, or Mr. Torrence, any one of the three, had seen one of the others fraternizing with a woman known to be enlisted, that one would have been bound by regulation to intervene. AR 484. None of them did, because not one of them saw anything improper going on.[24] An administrative action cannot be upheld if the agency fails to take important facts into account, and the AFBCMR missed his point entirely. Since the AFBCMR failed to consider an important aspect of the problem, its decision cannot be upheld. *See Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023), *citing Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022).

In short, the AFBCMR fails as badly as the IO, Col Vargas, and Brig Gen Bozard to establish any military offenses at all to a preponderance of the evidence. Therefore, the court cannot properly uphold the adverse actions against Mr. Torrence, to include the curtailment. Mr. Torrence is entitled to relief.

### <u>CONCLUSION</u>

The court should grant Mr. Torrence's motion for judgment on the administrative record, and grant the relief demanded in the complaint.

Respectfully Submitted,

Joseph D. Wilkinson II
Senior Counsel, Tully Rinckey, PLLC

---

[24] Although, as noted at AR 14 n.13 and 104-05, Maj Doughty did start taking pictures of Mr. Torrence with the enlisted woman, apparently hoping to make further trouble for him. Perhaps Maj Doughty knew she was enlisted, but even if he did, his pictures show nothing really incriminating, and it beggars belief that *all three* of these officers would witness fraternization and do nothing about it.

D.C. Bar No. 90032185
2001 L Street NW
Washington, DC 20036
Office: (202) 375-2232
FAX: (716) 462-4455
jwilkinson@tullylegal.com

*Sean C Timmons*

Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235
Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com
Attorney for Plaintiff