**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

JENNER TORRENCE,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant,

Case No. 24-258

Judge Kathryn C. Davis

**PLAINTIFF'S RESPONSE TO GOVERNMENT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD, AND REPLY IN SUPPORT OF HIS OWN MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

In accordance with the court's order of September 9, 2025, and pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, the Plaintiff responds to the Government's motion for judgment on the administrative record, and replies in support of his own motion.

**TABLE OF CONTENTS**

**Table of Authorities**      **2**

**Factual Issues**      **5**

    I. The First CDI      **5**

        A. The Government's Misstatement      **5**

        B. The First IO needed, but failed, to establish the standard Mr. Torrence allegedly violated.      **6**

    II. The Second CDI      **7**

        A. The Government's Misstatement      **8**

        B. The Second IO needed, but failed, to establish which statements were actually made, which ones were false, and why.      **9**

III.  The First LOR                                                             **10**

**Argument**                                                                   **11**

    I.  Mr. Torrence has properly framed a pay claim, based on standards used
       by this court.                                                         **11**

         A.  Mr. Torrence seeks review under the "substantial evidence"
            standard, and for procedural violations, not "re-weighing" of
            evidence.                                                         **11**

         B.  The two investigations fail the "substantial evidence" test, and
            fail to apply the standards of DAFMAN 1-101 and DAFI 36-2907.    **12**

    II.  Mr. Torrence has properly framed a claim for back pay, and for the
       other forms of relief he seeks.                                        **14**

    III.  The Administrative Record shows that Col Vargas and Brig Gen
       Bozard improperly used  "post-investigative" statements against Mr.
       Torrence, which he was not allowed to rebut.                           **16**

    IV.  Mr. Torrence's EO retaliation claims are not relevant to this action.    **19**

    V.  Mr. Torrence has properly shown that Col Vargas had no authority to
       reprimand him for actions taken on Title 10 status.                    **20**

**Conclusion**                                                                 **24**

**Appendix**                                                                   **25**

Exhibit 1, Statement used against Mr. Torrence per AR 564, but which he was not
       allowed to rebut, dated January 9, 2018.                               **28**

Exhibit 2, Another statement used against Mr. Torrence per AR 564, but which he
       was not allowed to rebut, dated January 13, 2018.                      **31**

Exhibit 3, Statement Mr. Torrence attempted to submit in rebuttal to Exhibits 1 and 2,
       but which was not considered per AR 564.                               **34**

## TABLE OF AUTHORITIES

**Cases.**

*Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995)

*Chappell v. Wallace*, 462 U.S. 296, 303 (1983)

*Consumers Union of the United States v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986)

*United States v. DiMuccio*, 61 M.J. 588, 591-93 (A.F. Ct. Crim. App. 2005)

*Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004)

*Franklin Savings Corp. v. United States*, 56 Fed. Cl. 720, 737 n.19 (2003)

*Gentry v. Commissioner of Social Security*, 741 F.3d 708, 722 (6th Cir. 2014)

*Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)

*Iaccarino v. Duke*, 327 F.Supp.3d 163, 175 (D.D.C. 2018).

*Keltner v. United States*, 148 Fed. Cl. 552, 565 (2020)

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)

*Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006)

*Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co.*
    463 U.S. 29, 43 (1983)

*Parker v. Levy*, 417 U.S. 733, 754 (1974)

*Radziewicz v. United States*, 167 Fed. Cl. 62, 66 (2023)

*Ricci v. United States*, 205 Ct. Cl. 687, 696 (1974)

*Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022)

*Sanders v. United States*, 219 Ct. Cl. 285, 594 F.2d 804, 820 (1979)

*United States v. Ferrando*, 77 M.J. 506, 510-11 (A.F. Ct. Crim. App. 2017)

*United States v. Hale*, 77 M.J. 598, 602-03 (A.F. Ct. Crim. App. 2018)

*United States v. Johanns*, 20 M.J. 155, 159-60 (C.M.A. 1985)

*United States v. Kroop*, 38 M.J. 470, 473 (C.M.A. 1993)

*United States v. Loomis*, 68 Fed. Cl. 503, 514 (2005)

*Van Cleave v. United States*, 70 Fed. Cl. 675, 679 (2006)

*Xcel Energy Services, Inc. v. FERC*, 41 F.4th 548, 560 (D.C. Cir. 2022)

**Statutes.**

10 U.S.C. § 615

10 U.S.C. § 802

10 U.S.C. § 803

10 U.S.C. § 833

32 U.S.C. § 325

**Regulations.**

Department of the Air Force, Instruction 36-2907, *Unfavorable Information File (UIF) Program* (2014)

Department of the Air Force, Instruction 36-2907, *Adverse Administrative Actions* (2022)

Department of the Air Force, Manual 1-101, *Command Directed Investigations* (2021) (DAFMAN 1-101)

Department of Defense, Instruction 1320.14, *DoD Commissioned Officer Promotion Program Procedures* (2020)

**Other**

*Adverse Administrative Action Against Title 32 Military Member*, Opinion of the Judge Advocate General of the Air Force 2019-21, 30 April 2019, Air National Guard (AR 566-67).

*Authority to Impose Administrative Action against State Adjutants General and Other Air National Guard (ANG) Officers*, Opinion of the Judge Advocate General of the Air Force 2014-6, 5 August 2014, Air National Guard.

## FACTUAL ISSUES

The Government's brief misstates several key factual points related to the evidence against Mr. Torrence.  These require some discussion.

**I. The First CDI**

A. The Government's Misstatement

With respect to the first command-directed investigation (CDI), the one about the events on Guam, the Government states:

> Specifically, the IO concluded that Mr. Torrence knowingly had "an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the United States in violation of AFI 1-1 and AFI 36-2909." AR 283.

Dkt. 34 at 3. This is based on a partial quote from the investigation,

> Based on the preponderance of the credible testimony regarding Guam and the circumstantial evidence from COMPLAINANT's observation the night of 4 May 2017, I must conclude that the allegation "Did Lt Col [Torrence], a commissioned officer, and Major [A.M.], a commissioned officer, knowingly have an extramarital affair or unprofessional relationship that was prejudicial to good order and discipline or was of a nature to bring discredit upon the armed forces of the united states in violation of AFI 1-1 and AFI 36-2909?" is SUBSTANTIATED.

(AR 283). However, the Government fails to quote the very next line on the same page:

> The allegation, "…knowingly have an extramarital affair…" is **not substantiated** for the same reason Allegation 1 [i.e., adultery] is not substantiated.

AR 283 (emphasis added). In other words, while the IO (without substantial evidence) did find an "unprofessional relationship," he did *not* find an "extramarital affair" as the Government asserts.[1]

---

[1] The Government also asserts that he was found to have engaged in an unprofessional relationship with a *junior* field grade officer. Dkt. 34 at p. 3, *citing* AR 283. Dkt. 283 does not actually say that Maj A.M. was "junior" to Mr. Torrence, and as Mr. Torrence noted in his own reply (AR 291), they were in fact of equal rank during the Guam deployment and were not in senior/subordinate positions (i.e., neither of them worked for or supervised the other). That is doubtless why no accusation of fraternization was brought against them in the first CDI, nor is

The distinction may seem picayune but it is not.  A central issue in this case is that Government authorities – the IO, Col Vargas, and ultimately Brig Gen Bozard – were using the term "unprofessional" as a euphemism for "sexual" or "apparently sexual" or "suspected-to-be-sexual" without ever saying so.  In so doing, they *assumed* without ever *establishing* that a sexual relationship between these adult officers would have violated Air Force standards, and therefore assumed without ever establishing that the *appearance* of sexual relations would have done the same.  Their adverse findings, and ultimately Mr. Torrence's loss of pay, were based on these groundless assumptions and this equivocal use of language.

> B. The first IO needed, but failed, to establish the standard Mr. Torrence allegedly
>     violated.

As this court has established in the past, while the Armed Forces enjoy a great deal of discretion in setting their own standards and regulating the behavior of their members, they must still *prove* those standards when called upon to do so.  They must certainly do so when using them to deprive a servicemember of pay.

> [W]e must consider whether the ABCMR's determination that the alternative ground of conduct unbecoming an officer justified plaintiff's elimination, irrespective of the homosexual nature of the relationship….[The Government] in its briefing and at oral argument…could not point to Army case-law or Army regulations that would support its notion of Army custom. While we owe a great deal of deference to the Army's determination of its own custom, the matter is justiciable. We require some regulation or case law as proof of what that custom is before we will affirm that determination.

*United States v. Loomis*, 68 Fed. Cl. 503, 514 (2005).  In matters related to private intimate conduct, the military appellate courts have taken exactly the same view: a military "custom"

---

any such accusation mentioned in the first LOR.  The reprimand refers to Maj A.M. only as "another" officer. AR 57.

against a specific form of behavior has to be established with regulations or case law before it can be used to take action against a servicemember. *See United States v. Johanns*, 20 M.J. 155, 159-60 (C.M.A. 1985); *United States v. Kroop*, 38 M.J. 470, 473 (C.M.A. 1993) (Everett, J. opinion, with one judge concurring and two concurring in the result). Both *Johanns* and *Kroop* concerned sexual relations between officers and enlisted personnel, *before* the Air Force had established the customs now set forth in AFI 1-1 and 36-2909. The court in each case held that before such relations could be punishable (as "conduct unbecoming an officer" under 10 U.S.C. § 933), the "service custom" would have to be established, not merely assumed.

The first CDI noted that Mr. Torrence was accused of violating 10 U.S.C. § 933 – the same statute cited in *Johanns* and *Koop* – though it did not specifically make a finding on that subject. AR 277. This signifies because an officer who violates service customs and commits "conduct unbecoming" is subject to criminal prosecution; and the only reason this statute is not unconstitutionally vague is that its scope is limited by military regulations and case law. *See Ricci v. United States*, 205 Ct. Cl. 687, 696 (1974), *citing Parker v. Levy*, 417 U.S. 733, 754 (1974). Mr. Torrence challenges a decision to deprive him of pay and benefits based on "inappropriate" conduct. The Air Force is in the wrong unless it articulated in its decisions just *what* was inappropriate about it, based on Air Force regulations and custom.[2] This the Air Force failed to do.

---

[2] The substantiated allegation went a step further and claimed that Mr. Torrence and Major A.M. "knowingly" had an unprofessional relationship. AR 55. In reality, as shown by this lawsuit, Mr. Torrence *still* does not know what was "unprofessional" about it. Neither the command nor the Government has been able to explain it, but only to keep repeating the words "unprofessional" and "inappropriate."

Neither the IO, Col Vargas, the AFBCMR, nor the Government's brief have managed or even attempted to establish the relevant custom.  They just repeat the word "inappropriate" and handwave at the regulations.  That is not enough to establish substantial evidence.

## II. The Second CDI

### A. The Government's Misstatement

With respect to the findings of "false statements" in the second CDI, the Government states:

> The IO also concluded that Mr. Torrence's statements that the female enlisted ANG member at the bar "fell into his crotch and or straddled him and or he turned his barstool towards them to get up and go to the restroom and a girl is up against him because the bar is jammed and I have to move one leg around [her] at a time to get faced away from the bar" and that then he "pushed her away" are not supported by available video footage evidence. AR350. The IO further concluded that the video footage and photographs shows Mr. Torrence and the female enlisted Toledo ANG member in very close physical contact with Mr. Torrence's hands around her waist. *Id.* Thus, the IO concluded that Mr. Torrence's sworn statement about the events on October 16, 2017, was inconsistent with witness statements and the video footage documenting his physical contact with the enlisted Toledo ANG member. *Id.*

Dkt. 34 at 4-5.  Leaving aside the inaccuracies in the IO's statements (e.g., the video does not show Mr. Torrence's "hands" around the woman's waist, and does not show him "in contact" with her for most of the time the IO cites), the Government again fails to quote the very next sentence:

> *I cannot confirm exactly what was said on the evening of 16 Oct 17 to current witness statements*; however, the inconsistencies between the witness statements, sworn statement submitted to his lawyer, 4 Nov 17 MFR submitted by Lt Col Torrence, Tab E-4, Texts to Maj [A.M.], Tab E-9, and the video, Tab G-1, provide sufficient evidence to show that false statements were made by Lt Col Torrence about what occurred on the night of 16 Oct 17…

8

AR 350.  In other words, the IO did not actually find that Mr. Torrence said the woman

"straddled" him or "fell into his crotch" or made any other specific false statement.  To the

contrary, the IO admitted that she could *not* determine which statements Mr. Torrence actually

made.  She then went on to say that "false statements were made" but did not say *which*

statements were false, or how she determined that they were made at all, let alone why she

thought any specific statement actually made was false.[3]

> B. The second IO needed, but failed, to establish which statements were actually made,
>    which ones were false, and why.

The IO's vague handwave at "inconsistencies" failed to meet the standards of DAFMAN

1-101 and of this court.  This is particularly true in light of the IO's inaccurate rendering of what

the video actually shows.  Dkt. 31 at 11-13.  Unspecified inconsistencies between unspecified

statements and a misperceived video cannot constitute substantial evidence of anything.

As Mr. Torrence noted in his rebuttal, the comment about "straddling" is an after-the-fact

memory from a different witness,[4] and he cannot understand why that witness would think he

ever said it.  AR 127-128.  That is why the IO could not confirm whether Mr. Torrence really said

it—the witness was reporting it to her from memory over a month after the event.[5]

---

[3] Her vague statement that she was relying on inconsistencies with "the video" is further
undercut by the fact that her summary of the video does not match the video itself.  *See* Dkt. 31
at 10-13.  In particular she claims that Mr. Torrence and the young woman were "from 2315…in
very close contact with continued contact until 0010" when the video shows Mr. Torrence getting
up at 2325, never sitting or standing beside the woman again, and never doing anything
"unprofessional" even for the time they were standing together. Dkt. 31 at 13.  In other words,
the IO not only failed to specify which statements were false or why, but claimed to be finding
false statements based on footage that she had seriously mischaracterized.
[4] At AR 127-28, Mr. Torrence mistakenly identified this witness as Lt Col Wilson.  But in the
CDI itself he was actually identified as Lt Col McDonough (AR 347-48, with the name
redacted).  The witness's name is of no special importance to this action.
[5] Per AR 348, the conversation is supposed to have taken place on 18 October 2017, two days
after the events of 16 October 2017, but per AR 95 the investigation was not even initiated until

Thus, for a moment at AR 350, the IO was at least honest enough to admit she could not place too much weight on a second-hand account of a month-old conversation in branding someone a liar. She then proceeded to do so anyway, but without the specifics of which statements were supposed to be false or even which ones were actually made. Without those specifics, the IO, and the authorities who followed the IO, left this court nothing to affirm. They therefore fail to meet the standards applied by this court. *See Keltner v. United States*, 148 Fed. Cl. 552, 565 (2020), *citing Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co.* 463 U.S. 29, 43 (1983) (noting that the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *see also Van Cleave v. United States*, 70 Fed. Cl. 675, 679 (2006) (same standard for corrections boards). In this case, the relevant *facts* were not found at all, and they cannot be "rationally connected" to the IO's choice to substantiate the allegation.

**III. The First LOR.**

The Government states that "[b]ased on the IO's substantiated allegations in the CID report *and his own observations*, on or about June 13, 2017, Col. John E. Vargas…served him a LOR…" It cites pages 285-86 of the AR, which say *nothing* about any "personal observations" of Col Vargas. The recommendation of Brig Gen Bozard likewise says nothing about "personal observations" of Col Vargas. AR 564. The court should disregard this unsupported statement of the Government's.[6]

---

21 November 2017. Therefore, the witness's statement to the IO could not have been made until over a month after the event.

[6] Col Vargas was not in fact *in* Guam during the events described in the first CDI. The witness list – AR 274 – lists only one witness with the rank of full colonel, and that witness was only able to talk about a stateside act, namely the demeanor of the "complainant" whose accusations led to the (unsubstantiated) Allegation 1. AR 276.

## ARGUMENT

The Government misreads the nature of this action, of the "substantial evidence" test, and of the Air Force's failure to provide substantial evidence.  Mr. Torrence has properly framed a claim for lost pay and benefits based on a lack of substantial evidence and a violation of Air Force regulations.

**I. Mr. Torrence has properly framed a pay claim, based on standards used by this court.**

> A. Mr. Torrence seeks review under the "substantial evidence" standard, and for procedural violations, not "re-weighing" of evidence.

As shown by the complaint and by Dkt. 31, Mr. Torrence has brought a claim that the Air Force took action against him based on the results of two investigations, neither of which was supported by substantial evidence, and therefore failed to meet the procedural requirements of its own regulations, which require a preponderance of the evidence to support adverse action.  The Government has claimed that Mr. Torrence wants the court to "weigh" the evidence in his case, Dkt. 43 at 2, 20-22.  The Government's claim is a pure strawman.  On the central issues in this case there is no substantial evidence to "weigh" anything against.

Under the standards applied by this court, the decisions of a military corrections board are subject to review if they are arbitrary, capricious, unsupported by substantial evidence, or contrary to law (including regulation).  *See Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006), *citing, inter alia, Chappell v. Wallace*, 462 U.S. 296, 303 (1983); *see also Keltner v. United States*, 165 Fed. Cl. 484, 500-01 (2023) (discussing application of "arbitrary and capricious" standards to military pay claims in this court).  A board decision is arbitrary and capricious if it "fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the board, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Radziewicz v. United*

11

*States*, 167 Fed. Cl. 62, 66 (2023), *citing Royal v. United States*, 160 Fed. Cl. 630, 632-33 (2022).  *See also Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co.*, 463 U.S. 29, 43 (1983) (establishing the same standards for "arbitrary and capricious" review under the Administrative Procedure Act).

At Dkt. 34, p. 20-21, the Government appears to be denying these latter explications of the "arbitrary and capricious" standard, and confusing them with a "re-weighing" standard.  But as noted in *Radciewicz*, the correct standards do *not* require a re-weighing of the evidence, but only a determination of whether the conclusion under review is supported by substantial evidence.  *Radciewicz*, 167 Fed. Cl. at 62, *citing Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983).  In other words, if the Agency provides too little evidence *to* weigh, pointing this fact out is not the same as asking the court to "re-weigh the evidence."  A decision that fails to consider an important aspect of the problem or an explanation that runs counter to the evidence before the agency falls into the same category.

> B. The two investigations fail the "substantial evidence" test, and fail to apply the standards of DAFMAN 1-101 and DAFI 36-2907.

The first IO failed to consider an important aspect of the problem before him, namely whether Mr. Torrence's alleged conduct violated any specific standard from an Air Force regulation or custom.  The second IO offered an explanation that ran directly counter to the evidence in front of her, and failed to explain key points of her reasoning.  The decisions of Col Vargas, Brig Gen Bozard, and the AFBCMR adopted the findings of these IOs in their entirety, and thus assumed their arbitrary and capricious character.

The Government argues that "Air Force Instructions recognize only narrow grounds on which a service member may challenge factual findings made in a CDI." Dkt. 34, p. 14.  In reality, these instructions require investigative results and adverse actions—such as

12

reprimands—to be supported by a preponderance of the evidence.  Department of the Air Force, Manual 1-101, *Command Directed Investigations* para. 1.4, 2.2.3.2, 5.7, 6.1.4.4 (2021); DAFI 36-2907, *Adverse Administrative Actions*, para. 1.2.1, 2.2 (2022).[7]  Substantial evidence is less than a preponderance.  *See Xcel Energy Services, Inc. v. FERC*, 41 F.4th 548, 560 (D.C. Cir. 2022); *see also Gentry v. Commissioner of Social Security*, 741 F.3d 708, 722 (6th Cir. 2014) ("Substantial evidence is less than a preponderance but more than a scintilla…").  If the Air Force fails to support its decisions with substantial evidence, it necessarily fails to support them to a preponderance, and thus violates the procedural requirements of its own regulations as well as the other strictures applied by this court. *See Lewis v. United States*, 458 F.3d 1372, 1376 (Fed. Cir. 2006), *citing Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004) (Military Pay Act permits suit in this court "when the military in violation of the Constitution, a statute, *or a regulation*, has denied military pay").[8]  As shown above and in Dkt. 31, the Air Force failed to establish key facts with substantial evidence, let alone a preponderance, and Mr. Torrence is therefore due relief.

---

[7] DAFMAN 1-101 was not published until April 9, 2021, and does not purport to be superseding an earlier document.  Thus, it is not really relevant to this case.  The Plaintiff is only citing it because the AFBCMR did so, *see* AR 239-40.  Likewise, the AFBCMR cited to DAFI 36-2907, which superseded the older AFI 36-2907 on October 14, 2022 (though without changing the key provisions, namely the standard of proof and the respondent's right to respond to the evidence against him).  AR 239.  The earlier regulation, AFI 36-2907, *Unfavorable Information File (UIF) Program* (Nov. 26, 2014) advised commanders to use a "preponderance of the evidence" standard in para. 4.1.3, and provided for responses by the officer being reprimanded in paras. 2.3.1 and 4.5.1.4.

[8] Furthermore, on matters of factual support, the "substantial evidence" and "arbitrary and capricious" tests are one and the same.  *Franklin Savings Corp. v. United States*, 56 Fed. Cl. 720, 737 n.19 (2003), *citing Consumers Union of the United States v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986); *Iaccarino v. Duke*, 327 F.Supp.3d 163, 175 (D.D.C. 2018).  Thus, if the Air Force's decisions fail the "arbitrary and capricious" standards used by this court, they are not even arguably supported by a preponderance of the evidence, and therefore do not meet the standards set by DAFMAN 1-101 and DAFI 36-2907.

The Government appears to believe that Mr. Torrence's claim is "foreclosed" because the AFBCMR *asserts* the completeness and correctness of these investigations.  Dkt. 34, p. 14.  Of course, such a standard would deprive judicial review of all meaning.  The Government also appears to believe that the investigations were supported by substantial evidence because of *how many* witnesses were interviewed, or *what kinds* of evidence were reviewed, or because the AFBCMR *asserted* their credibility.  Dkt. 34 at 15.  The existence of substantial evidence "is *not* merely a quantitative exercise," and evidence is not substantial "if it really constitutes not evidence but mere conclusion."  *See Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (making these points in the Social Security context).

If the rumored or suspected sexual relations between Mr. Torrence and A.M. did not violate Air Force standards as set down in AFI 36-2907, and would not have violated these standards even if they had been true, then the "number of witnesses" to the rumors does not matter.  The violation is not supported by substantial evidence.  If the IO made claims about Mr. Torrence being in "close contact" with a young woman for about an hour (11:15 PM to 12:10 AM) and implies that they left together, but the video shows that they were not in contact for anywhere near that long and that they left at separate times in separate directions, then the IO's claims are not supported by substantial evidence—no matter how many other persons were present, or how many talked to her about other matters.  If *no* witness brings evidence that Mr. Torrence knew the young woman was enlisted, then it does not matter how many witnesses testify about other matters.  There is no "substantial evidence" of fraternization. (*See* Dkt. 31 at 27-28).

**II. Mr. Torrence has properly framed a claim for back pay, and for the other forms of relief he seeks.**

14

The various actions Mr. Torrence challenges—the reprimands, the negative OPRs, and above all the curtailment which led to his loss of pay, allowances, and retirement money—all trace back to the two investigations, and stand or fall with them.  The Government discusses these forms of relief in separate sections, Dkt. 34 at 18-20, but the reasoning for them all is the same.

The Government cites *Adkins v. United States,* 68 F.3d 1317, 132_ (Fed. Cir. 1995)[9] for the proposition that "[u]nder well-established law, military members may only receive pay and benefits for periods of actual service."  Dkt. 34 at 19.  A careful reading of *Adkins* shows that it stands for the opposite proposition.

In *Adkins*, the Federal Circuit remanded a case to this court because the plaintiff had properly presented a justiciable controversy based on a procedural violation by the Secretary of the Army.  68 F.3d at 1326.  This controversy involved the plaintiff's involuntary retirement and separation from active duty.  68 F.3d at 1321.  The court cautioned the plaintiff that a favorable verdict in this court would not mean a promotion "as a matter of law."  However, it *would* mean that he could obtain "relief equivalent to that afforded an involuntarily discharged service member who prevails…on a claim of arbitrary and capricious conduct by a service secretary." 68 F.3d at 1326.  It gave the example of *Sanders v. United States*, 219 Ct. Cl. 285, 594 F.2d 804, 820 (1979), in which an involuntarily separated servicemember was entitled "if he wishes, [to] restoration to active duty commissioned status and an opportunity for selection in due course by a duly constituted statutory selection board."  *Adkins*, 68 F.3d at 1326, *citing Sanders*, 594 F.2d at 820.

---

[9] The Government appears to have inadvertently dropped the last digit of its pinpoint cite. Plaintiff's counsel could not find its proposition anywhere in the opinion.

15

The court then went on to say,

> Under 37 U.S.C. § 204, an officer is entitled to "the pay of the rank he was appointed to up until he is properly separated from the service." [*Sanders*, 594 F.2d] at 810. If the Court of Federal Claims finds that the Army improperly exercised its authority to retire Adkins, *he will be entitled to back pay* calculated in accordance with law and reinstatement to the rank of lieutenant colonel from the date of his retirement…

*Adkins*, 68 F.3d at 1327 (emphasis added).  Mr. Adkins was not actually on active duty between his retirement date and the date of the court's decision, but that did not matter: if his release from active duty was improperly done, this court could order his compensation with back pay for the active service he *would have done* if he had not been improperly retired.

Unlike Sanders and Adkins, Mr. Torrence is not seeking restoration to active duty, nor is he seeking promotion.  He is simply seeking the back pay and benefits he would have received if his active service had not been improperly curtailed.  Under the reasoning of *Adkins*, this court has authority to grant such relief.

The other forms of relief sought by Mr. Torrence—such as Basic Allowance for Housing, Aviation Career Pay, and a *pro rata* increase in his retirement pay—follow from the same reasoning, from the statutes that require these benefits to be paid, and from the uncontested facts of his military service as described in Dkt. 31, p. 14-15.

### III. The Administrative Record shows that Col Vargas and Brig Gen Bozard improperly used "post-investigative" statements against Mr. Torrence, which he was not allowed to rebut.

The Government complains that Mr. Torrence has not properly supported his claim that Col Vargas obtained two post-rebuttal statements that were not part of the CDI, and used these statements in his filing determination without giving Mr. Torrence a chance to rebut them.  Mr. Torrence will now make amends.

16

In his second AFBCMR petition, Mr. Torrence requested a personal appearance in front

of the AFBCMR (AR 475, block 17), at which he intended to testify about this and related

matters, to include identifying and explaining the visible characters in the video from the 2016

Tucson incident.   Counsel's brief described the matters he intended to testify to:

> Col Vargas responded by conducting an impromptu "inquiry" of
> his own.  He obtained two new witness statements of his own,
> which he used in making his decision but did not give Mr. Torrence
> the opportunity to rebut.  When he decided to act on the reprimand
> [i.e., to file it in Mr. Torrence's personnel files], he verbally told
> Mr. Torrence that he had conducted this "inquiry" and that the
> statements he obtained matched the testimony from the
> investigation.  In fact, the statements were both about temporary
> duty in Las Vegas in 2016, before the Guam deployment.  (This
> TDY, like the Guam deployment, put both Mr. Torrence and Maj
> Murphy under Title 10 orders.)   These "new" statements both
> claimed that Mr. Torrence and Major A.M. had kissed each other.
> Neither these statements nor Col Vargas himself said anything
> about what would have been wrong with that—under Air Force
> standards, at least.   Col Vargas did not give Mr. Torrence a formal
> opportunity to respond to these new statements.

(AR 482).  As an attachment to this petition, he included Brig Gen Bozard's curtailment

recommendation, which listed the items being considered in Brig Gen Bozard's March 15, 2018,

decision to recommend curtailment:

> CDI Investigating Officer Report, May 2017 [i.e., CDI #1]
> LOR *and member response*, Jun 2017 [i.e., LOR based on CDI #1]
> *Two additional witness statements*, Jan 2018 [with no mention of "member response"]
> CDI Investigating Officer Report, Jan 2018 [i.e., CDI #2]
> LOR *and member response*, Jan 2018 [i.e., LOR based on CDI #2]
> UIF [Unfavorable Information File, where the reprimands were filed per AR 49]

(AR 564).  If carefully read in light of the rest of the record, this statement supports Mr.

Torrence's claim in his AFBCMR brief, even though he was not allowed to testify to it.

As noted in Brig Gen Bozard's decision, Mr. Torrence was allowed to rebut the first

Letter of Reprimand, the one accusing him of improper relations with Maj A.M., in December

2017.  (AR 50).  But the "two additional witness statements" considered by Brig Gen Bozard were taken in January 2018, and no "member response" is noted.  (AR 564).  Col Vargas' decision to place the Letter of Reprimand was likewise taken in January 2018.  (AR 49).  Thus, it may be seen that Col Vargas was making his filing determination using evidence that Mr. Torrence was not allowed to rebut, exactly as he stated in his second petition.

Lest the court doubt the existence of these statements, they are attached hereto as Exhibits 1 and 2.  While they are not part of the administrative record, they may properly be considered in a military pay claim at least for purposes of determining the scope of relief.  *See Keltner v. United States*, 165 Fed. Cl. 484, 502-03 (2023), *citing Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 578 n.45 (2021).  The first "additional" statement, by Maj David Conley, is dated January 9, 2018, *the same day* Col Vargas signed his decision to file the letter of reprimand against Mr. Torrence.  Compare Exh. 1, p. 2 with AR 49.  The second "additional" statement, by Capt Corydon Butler, is dated January 13, 2018, and was taken by Col Vargas himself.  Exh. 1, p. 2.  Mr. Torrence later attempted to rebut these statements with a statement from two other witnesses (Exh. 3), but as may be seen from AR 564, his effort to respond was simply ignored.  While Mr. Torrence's rebuttals to the two letters of reprimand—which could not and did not address the additional statements—were considered, he was not allowed to rebut the two additional statements.  Brig Gen Bozard considered those statements without rebuttal, which is why AR 564 mentions the statements but no rebuttal.

Mr. Torrence also raised this point in the rebuttal to his negative Officer Performance Reports, which included this account of the same verbal discussion:

> The 113 OG [i.e., Col Vargas] made false statements about the
> written nature of testimony, in order to conceal additional
> "evidence" he had gathered on Maj Doughty's behalf, in an effort
> to incriminate me of an "inappropriate relationship" (60, pg 1-2,

> 88,89). He gathered this inaccurate testimony after I had rebutted the 13 June 17 LOR providing no option to confront the false evidence.

(AR 162).  The record supports Mr. Torrence's allegation and the AFBCMR was well aware of it, and on the second occasion it was in a position to get his testimony on the subject.  It chose instead to deny his personal appearance and to ignore the issue entirely.

In addition to being procedurally improper, these statements exhibit the same infirmity as the first CDI: they do not establish anything that would have been a violation of Air Force standards, even if true.

## IV.  Mr. Torrence's EO retaliation claims are not relevant to this action.

The Government cursorily argues against Mr. Torrence's claim that his command retaliated against him for making protected communications.  Dkt. 34 at 14-15.  However, that claim forms no part of this action.  It is not mentioned in the complaint, in Mr. Torrence's motion for judgment on the administrative record, or in his most recent petition to the AFBCMR.

Since the Government brings it up, the Plaintiff should point out that the issue of reprisal was related to Mr. Torrence's claim that the command's actions violated his equal opportunity rights (as well as Major A.M.'s), a matter that was investigated separately from the current case. The Investigating Officer initially assigned to the EO investigation resigned, in part because "[his] review of the CDI and associated documents demonstrate that the conclusions of the [Leadership Inquiry Report] relied on circumstantial evidence, or assumptions of fact and not concrete evidence to materially support actions taken," AR 179, and "[t]here was no specific evidence shown how [Mr. Torrence's] relationship with Maj [A.M.] specifically undermined good order and discipline….thus [the IO disagreed] with findings in the CDI."  AR 180.  In other

words, the IO could find no support for the findings of the first CDI, and therefore doubted his ability to complete the EO investigation.[10]

Mr. Torrence's view was (and is) that the command's actions based on the first CDI discriminated on the basis of sex and religion, as a similar close friendship with a male officer would not have led to the same result, and the command's censorious conduct had more to do with the Ten Commandments than with any Air Force regulation.[11]  However, this aspect of his ordeal is not directly related to his pay claim in this court, and he has already pursued it to its end through Military Equal Opportunity channels.

## V.  Mr. Torrence has properly shown that Col Vargas had no authority to reprimand him for actions taken on Title 10 status.

As noted in the first CDI, Mr. Torrence was in Title 10 status during most of the accusations to which that investigation pertained.  AR 277.  The IO actually went further, and noted that Mr. Torrence was subject to the Uniform Code of Military Justice while on Title 10 status but not while on Title 32 status.  He even realized that any investigation into whether Mr. Torrence violated Article 133 of the UCMJ might have to be conducted by a Title 10 authority, such as the 201st Mission Support Squadron.  AR 277.  His error lay in believing that the authority to investigate and punish (or take other adverse action) was based on the law allegedly violated, rather than the officer's status at the time of the alleged violation.

---

[10] It is a shame that this officer, who actually had the integrity to tell the command what it did not want to hear about its prior investigation, did not feel up to the task of completing his own.

[11] As noted at AR 401, on the occasion of the first LOR, Col Vargas admonished Mr. Torrence about his "lack of Christian faith."  As noted at AR 313, Mr. Torrence is an atheist and secular humanist who does not consider himself bound by the tenets of Col Vargas' religion or anyone else's.  And as these tenets are not (and cannot properly be) enshrined in Air Force regulations, they cannot properly form the basis of adverse administrative actions.

20

Mr. Torrence has cited an Opinion of the Judge Advocate General of the Air Force to show that Col Vargas (his Title 32 commander) had no authority to reprimand him for actions taken on Title 10 status. AR 489, *citing Adverse Administrative Action Against Title 32 Military Member*, Opinion of the Judge Advocate General of the Air Force 2019-21, 30 April 2019, Air National Guard (AR 566-67). This opinion shows that a commander's authority to take adverse action depends on the subject's status *at the time of the misconduct*. AR 566. The AFBCMR rejected this citation without citing any authority. AR 240; Dkt. 31 at 26.

The Government objects to Mr. Torrence's characterization of the AFBCMR's opinion based on the following passage:

> Counsel also argues the applicant's OG/CC was not authorized to issue the applicant the 13 Jun 17 LOR for misconduct committed while the applicant was on Title 10 orders. However, pursuant to the authority delegated to ANG commanders by the SecAF, it is permissible to impose administrative disciplinary actions, such as an LOR, if there is a federal nexus between the officer's ANG membership and a violation of law or federal military standards. In view of the preponderance of the evidence and the substantiated allegations, the Board finds the applicant's LORs dated 13 Jun 17 and 26 Jan 18 and referral OPR ending 1 Nov 18 are required to be filed in his records per 10 U.S.C. § 615(a)(3), DoDI 1320.14 and DAFI 36-2907.

Dkt. 34 at 12, *citing* AR 240.[12]

However, the quoted passage (like the Government's brief) cites *no* authority that a Title 32 commander can reprimand an Airman for actions taken on Title 10 status, nor does it cite anything relevant to the subject. 10 U.S.C. § 615(a)(3), which the AFBCMR cites, is about the materials to be presented to selection boards. DoDI 1320.14, *DoD Commissioned Officer Promotion Program Procedures* (2020) is likewise about promotion selection boards and

---

[12] Previously, Plaintiff's counsel accidentally cited this page as AR 12. (Counsel has the AR in two PDF files, and AR 240 is the twelfth page of the second PDF.) Counsel regrets the error.

materials to be presented to them, and not about a commander's authority to reprimand or punish.[13]  DAFI 36-2907, *Adverse Administrative Actions* (2022), does deal with reprimands but does not directly address the issue at hand.[14]   The AFBCMR was citing these authorities for the general proposition that letters of reprimand have to be filed in an officer's records; it cited no authority at all to rebut Mr. Torrence's argument about Col Vargas' authority to reprimand him.

OpJAGAF 2019-21, unlike the AFBCMR, actually does cite legal authorities relevant to the question.  It cites 10 U.S.C. § 802, which states that Title 10 commanders have disciplinary authority over Air National Guard personnel, but only when "in federal service."[15]  It cites 10 U.S.C. § 803, which states that a person subject to the UCMJ who commits a UCMJ offense *while on active duty* may face discipline from Title 10 authorities even after his release from Title 10 status, though this may require a recall to active duty for that purpose.[16]  It cites *United States v. Ferrando*, 77 M.J. 506, 510-11 (A.F. Ct. Crim. App. 2017) and *United States v. Hale*, 77 M.J. 598, 602-03 (A.F. Ct. Crim. App. 2018), which discuss these statutory provisions.

OpJAGAF 2019-21 also cites OpJAGAF 2014-6 for the proposition that an ANG officer may be subject to administrative action by the Vice Chief of Staff of the Air Force (a federal not a state authority) for offenses committed on Title 32 status, but only if that officer is above the

---

[13] DoDI 1320.14 only mentions the word "reprimand" once, in para 2.4(g)(2), when it makes the secretaries of the military departments responsible to prohibit U.S. Government officials, civilians, and servicemembers from "censuring, reprimanding, or admonishing" promotion board members.

[14] DAFI 36-2907, *Adverse Administrative Actions*, para. 2.4.6.3.4 (2022), states that if a Title 10 commander takes action against an ANG officer on active duty, the ANG officer's Title 32 commander *may not* rescind that action "without coordinating the action with the imposing Title 10 commander."  It thus tends to support the basic principle illustrated by OpJAGAF 2019-21: that Title 10 and Title 32 commanders hold authority in separate spheres, and that officer's status *at the time of the offense* determines which commander holds the authority.  (This provision does not occur in the 2014 edition of AFI 36-2907.)

[15] 10 U.S.C. § 802(a)(3)(ii)

[16] 10 U.S.C. § 803(a); OpJAGAF 2019-21, fn. 8.

rank of colonel (i.e., this does not apply to Mr. Torrence) and only if the offense has a "federal nexus." The AFBCMR quoted the "federal nexus" language (AR 240),[17] which it may have gotten from OpJAGAF 2019-21, but it omits the qualification that the delegation described in that opinion applies only to actions taken by the Vice Chief of Staff of the Air Force (which Col Vargas was not) against officers above the rank of colonel (which Mr. Torrence was not).

The underlying principle illustrated by OpJAGAF 2019-21 is that Title 32 and Title 10 authorities are separate, and that each type of commander is able to reprimand for misconduct committed when the servicemember was under the commander's type of authority. Title 32 commanders reprimand for Title 32 conduct; Title 10 commanders reprimand for Title 10 conduct. This is also supported by 32 U.S.C. § 325(a)(1), which provides that National Guard members mobilized to Title 10 status are relieved from National Guard duty (and thus from the disciplinary authority of their Title 32 commanders) until they are relieved from active duty. *See United States v. DiMuccio*, 61 M.J. 588, 591-93 (A.F. Ct. Crim. App. 2005).[18] If a Title 10 commander is both empowered and limited to take action for offenses committed while on active duty, it logically follows that a Title 32 commander (such as Col Vargas in this case) is both empowered and limited to take action for offenses committed while on Title 32 status.

OpJAGAF 2014-6 establishes a *partial* exception, limited to the Vice Chief of Staff of the Air Force, who may take action against *general* officers for offenses committed in Title 32 status,

---

[17] "However, pursuant to the authority delegated to ANG commanders by the SecAF, it is permissible to impose administrative disciplinary actions, such as an LOR, if there is a federal nexus between the officer's ANG membership and a violation of law or federal military standards."

[18] *DiMuccio* held that a command inspection (in that case a urine drug test) of an Air National Guard member by his Air National Guard unit was invalid (and not usable at court-martial), because the member had been mobilized to active duty while his ANG unit had not. Thus, the Guard unit no longer held command authority over him, and its inspection was not "incident to command." *DiMuccio*, 61 M.J. at 591.

but only if those actions have a "federal nexus."  Under the principle of *inclusio unius est exclusio alterius*, administrative and disciplinary actions are not otherwise permitted to cross the Title 10 – Title 32 boundary.

**CONCLUSION**

The investigations fail to establish key points with substantial evidence.  Every action Mr. Torrence challenges is based wholly on these investigations and their reasoning; these actions are therefore arbitrary and capricious.  The AFBCMR completely failed to rehabilitate the investigations or the actions based on them, but instead simply asserted their completeness and correctness.  Accordingly, the Air Force's actions are due to be overturned, and Mr. Torrence is due to receive the pay he has lost and the equitable relief he has requested.

Respectfully Submitted,

Joseph D. Wilkinson II
Senior Counsel, Tully Rinckey, PLLC
D.C. Bar No. 90032185
2001 L Street NW
Washington, DC 20036
Office: (202) 375-2232
FAX: (716) 462-4455
jwilkinson@tullylegal.com

Sean C. Timmons

Sean C. Timmons, Esq., LL.M.
Managing Partner, Tully Rinckey PLLC
Texas Bar No.: 24067908
New York State Bar No.: 5470190
Admitted to Practice in all
Texas Federal Courts
18722 University Blvd., Ste. 235

24

Sugar Land, TX 77479
(832) 240-3273 Phone
(281) 387-3411 Cell
(832) 241-5998 FAX
Stimmons@tullylegal.com
Attorney for Plaintiff

# APPENDIX

# EXHIBIT 1

| STATEMENT OF SUSPECT/WITNESS/COMPLAINANT | | SUSPECT |
|---|---|---|
| | | ☒ WITNESS/COMPLAINANT |

## PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397
PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.
ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.
DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.

## I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| | | 3029/121 | | OFFENSE |
| 20180109 | 12:00 | | 121 FS | COMPLAINT |

## II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) Conley, David, E | SSN | STATUS/GRADE Guard-AD/O-4 |
|---|---|---|

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE |
|---|---|---|
| | | |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER 121 FS/DCANG | DEROS |
|---|---|---|

### SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|

## III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT (Suspect Only)

I have been advised that I am suspected of the following offenses:
None

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|

| SUSPECT INITIALS | |
|---|---|
| | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
|---|---|
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

I fully understand my rights and that my signature does not constitute an admission of guilt.

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|

**AF IMT 1168, 19980401, V2**      PREVIOUS EDITIONS ARE OBSOLETE.      PAGE 1 OF 2 PAGES

## IV. STATEMENT

While TDY to Red Flag in July 2016 I witnessed LtCol Torrence and Major Murphy engage in behavior that seemed to go beyond a professional friendship/relationship. I was invited by LtCol Torrence to join him outside of duty hours to a social event in downtown Las Vegas at Hakkasan Night Club. Maj Murphy was also invited along with other members of the Operations Group. We were all going to rendezvous at a hotel room that was held by Maj Murphy. After socializing briefly in the hotel room we all left to go to the party via 2 separate ubers. Myself and another member of the Operations Group ended up riding in one vehicle while Maj Murphy and her friends rode in another. I do not recall which vehicle LtCol Torrence rode in. Upon arrival, the two groups were separated for at least 30 minutes as we waited in line. Once we got into the club everything was normal. The other member of the OG and myself went to the bar to buy a round of drinks which took a while. As we walked back to the area that we were occupying I witnessed LtCol Torrence and Maj Murphy kissing. I brushed the incident aside as irregular behavior and perhaps a momentary lapse in judgment. As the night went on the club continued to fill with people to the point that movement became very difficult. So much so that at one point I was pushed into a bouncer and subsequently go kicked out of the club. The other individual accompanied me out of the club and I elected to head back to the hotel while he rejoined with other individuals who were still out. End----

End

## V. OATH/SIGNATURE

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

Subscribed and sworn to before me, a person authorized by law to administer oaths, this ___09___ day

of ___January___ , ___2018___ *(year).*

SIGNATURE OF PERSON ADMINISTERING OATH

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page ____ of ____Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

AF IMT 1168, 19980401, V2    *(REVERSE)*    PAGE 2 OF 2    PAGES

# EXHIBIT 2

## STATEMENT OF SUSPECT/WITNESS/COMPLAINANT

| | |
|---|---|
| ☐ | SUSPECT |
| ☐ | WITNESS/COMPLAINANT |

### PRIVACY ACT STATEMENT

AUTHORITY: 10 U.S.C. 8013; 44 U.S.C. 3101; and EO 9397
PRINCIPAL PURPOSES: Used to record information and details of criminal activity which may require investigative action by commanders, supervisors, security police, AFOSI special agents, etc.; and to provide information to appropriate individuals within DoD organizations who ensure proper legal and administrative action is taken.
ROUTINE USES: Information may be disclosed to local, county, state, and federal law enforcement/investigative authorities for investigation and possible criminal prosecution or civil court action. Information extracted from this form may be used in other related criminal and/or civil proceedings.
DISCLOSURE IS VOLUNTARY: SSN is used to positively identify the individual making the statement.

### I. STATEMENT INFORMATION

| DATE (YYYYMMDD) | TIME | LOCATION AND INSTALLATION (Bldg/Room No) | UNIT TAKING STATEMENT | REPEAT (If known) |
|---|---|---|---|---|
| 20180113 | 12:00 | 3029, JB Andrews, MD | 113OG | ☐ OFFENSE ☐ COMPLAINT |

### II. PERSONAL IDENTIFICATION (Print or Type)

| NAME (Last, First, Middle Initial) | SSN | STATUS/GRADE |
|---|---|---|
| Butler, Corydon, B | ▮▮▮▮▮▮▮▮▮ | AD/O-3 |

| LOCAL ADDRESS (Include Zip Code) | DATE AND PLACE OF BIRTH (If required) | TELEPHONE | |
|---|---|---|---|
| ▮▮▮▮▮▮▮▮ | | HOME | DUTY ▮▮▮▮ |

| PERMANENT ADDRESS OR HOME OF RECORD (Include Zip Code) | MILITARY ORGANIZATION/EMPLOYER | DEROS |
|---|---|---|
| | 121 Fighter Squadron | |

#### SPONSOR INFORMATION

| NAME (Last, First, Middle Initial) | GRADE | SSN | ORGANIZATION | DUTY PHONE |
|---|---|---|---|---|
| | | | | |

### III. ACKNOWLEDGEMENT OF OFFENSES AND 5TH AMENDMENT/ARTICLE 31 RIGHTS ADVISEMENT        (Suspect Only)

I have been advised that I am suspected of the following offenses:

| ADVISED BY (Full Name and Rank) | INDIVIDUAL IDENTIFIED HIMSELF/HERSELF AS A (SF, special agent, etc.) |
|---|---|
| | |

| SUSPECT INITIALS | |
|---|---|
| | and advised me that I have the following rights according to the 5th Amendment of the U.S. Constitution/Article 31 of the Uniform Code of Military Justice. |
| | I have the right to remain silent - that is to say nothing at all. |
| | Any statement I make, oral or written, may be used as evidence against me in a trial or in other judicial, non-judicial, or administrative proceedings. |
| | I have the right to consult with a lawyer. |
| | I have the right to have a lawyer present during this interview. |
| | I may obtain a civilian lawyer of my own choice at no expense to the government. |
| | I may request a lawyer any time during this interview. |
| | If I decide to answer questions with or without a lawyer present, I may stop the questioning at any time. |
| | MILITARY ONLY: If I want a military lawyer, one will be appointed for me free of charge. |
| | CIVILIANS ONLY: If I cannot afford a lawyer and want one, a lawyer will be appointed for me by civilian authorities. |

| SUSPECT INITIALS | |
|---|---|
| | I have read my rights as listed above and I fully understand my rights. No promises, threats, or inducements of any kind have been made to me. No pressure or coercion has been used against me. I make the following choice. (Initial One) |
| | I do not want a lawyer. I am willing to answer questions or make a statement or both, about the offense(s) under investigation. |
| | I do not want a lawyer and I do not wish to make a statement or answer any questions. |
| | I want a lawyer. I will not make any statement or answer any questions until I talk to a lawyer. |

I fully understand my rights and that my signature does not constitute an admission of guilt.

| SIGNATURE OF SUSPECT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|
| | |

| AF IMT 1168, 19980401, V2 | PREVIOUS EDITIONS ARE OBSOLETE. | PAGE 1 OF     PAGES |
|---|---|---|

## IV. STATEMENT

While TDY with the 121st Fighter Squadron to Red Flag Nellis 16-3 I, and some colleagues, went out in Las Vegas. We began the evening at the Hilton Hotel. The room was acquired by Maj Murphy, and present were myself, Maj Conley, Lt Col Torrence, Maj Murphy, and two of Maj Murphy's civilian friends. The plan was to "pregame" at her hotel room, proceed to a concert, and then we would all end the night in Maj Murphy's room which she offered for all members previously stated to crash in. She gave myself and Lt Col Torrence a room key for later in the evening in case we were to get separated. While there we imbibed on some alcoholic drinks, prior to departing for the Hakkasan for a concert by a House Music DJ. While at the event myself and Maj Conley witnessed Maj Murphy and Lt Col Torrence exchange a kiss while dancing. We were all drinking at the time and dancing. Most of the dancing was platonic in nature, but the dancing progressed beyond that between Maj Murphy and Lt Col Torrence. Later in the concert Maj Conley was told to leave the premises by Hakkasan staff. When that occurred I elected to keep "mutual support" and proceeded to leave with Maj Conley. After that we headed to the casinos, and spent the later parts of the night there. When the night came to a close I decided to return to the Hilton per the previously mentioned plan, while Maj Conley decided to return to Nellis. Upon walking to the hotel room and opening the door I witnessed Maj Murphy and Lt Col Torrence in the "pull-out" couch bed. When they saw me open the door Maj Murphy quickly vacated the bed and went into the main bedroom of the suite. I paused at the doorway, in shock, and delayed walking into the suite. Once I proceeded into the room Lt Col Torrence was preparing to leave. Lt Col Torrence quickly left for the night and I proceed to sleep on the couch until the morning, when I left and went back to Nellis.

## V. OATH/SIGNATURE

*"I hereby voluntarily and of my own free will make this statement without having been subjected to any coercion, unlawful influence, or unlawful inducement. I swear (or affirm) I have read this statement, initialed all pages and corrections, and it is true and correct to the best of my knowledge."*

| SIGNATURE OF PERSON MAKING STATEMENT | SIGNATURE OF WITNESS/INTERVIEWER |
|---|---|

*Subscribed and sworn to before me, a person authorized by law to administer oaths, this* _____ 13 _____ *day*

*of* _____ January _____ , _____ 2018 _____ *(year).*

SIGNATURE OF PERSON ADMINISTERING OATH

## VI. INSTRUCTIONS FOR CONTINUATION PAGE(S)

*Use plain bond paper (both sides optional). At the top right of each page, print or type "(Last name of individual making the Statement) on (Date)." At the bottom of each page, print or type: "Page _____ of _____ Pages." The individual must initial the top and bottom entries and sign his/her name at the bottom of each page.*

AF IMT 1168, 19980401, V2    *(REVERSE)*    PAGE 2 OF    PAGES

# EXHIBIT 3

My name is Thu A. Nguyen and I am a dental professional. I have known Mrs. Anh-Chi Murphy for the past 6 or so years. I am writing this to supply my accounts of what happened during my Las Vegas girls trip July 22 - 25, 2016.

A girlfriend and I arrived in Las Vegas the evening of Friday July 22, 2016 to meet Chi for a girls weekend, when she was on break from work. We have rented a room at a Hilton Resort off the Vegas Strip so we could be where everything was.

We all went out that Friday night and the hung around the pool at the hotel the next day. Then on Saturday night (July 23th, 2016), we went out again, joined by some of Chi's co-workers. We first partied at MGM and then eventually made our way to Caesars. Everyone was having a good time dancing the night away until there was some miscommunication between David (Banger) and a bouncer.  That led to David being asked to leave the club. David left and we all agreed to meet him up afterwards elsewhere.  We continued to enjoy the rest of our time at MGM, with some of us dancing too much (I recall Corydon exuberantly dancing with everyone, me and other females). Us three women, wanting to make sure everyone was safe, did not leave each others side.  I was with my girl friend and Chi the whole time. There was no inappropriate behavior between anyone (especially kissing).

Around 1-2 am (Sunday July 24th, 2016), after partying at MGM, our group left to find a taxi to go to the next place and to find David.  On our way to find a ride, Corydon (after already been drinking too much) spotted a group of young females party-goers and started to follow them.  I, personally, tried to pull him to get him to stay with the group, but he didn't want to hear it and left with the group of ladies anyways. He is a grown man so I didn't push it.  We all made it to Caesars and stayed there for a little while, then decided to go to a pub across the street where Chi's other co-workers were hanging out.  We all made it back to our hotel room eventually later that morning.  Chi had offered Jenner to stay on the sofa bed so he wouldn't have to go all the way back to base.  The sofa bed was in the living room area, completely separate from our bedroom (which had a locking door).  As my friend and I were getting ready to go to sleep, Chi left the bedroom to talk to Jenner to make sure he was okay.  The door was open the whole time and we would hear them talking. Then all of a sudden, Corydon opens the door to the hotel room and stumbles in - Chi had given him a spare key, as she was kind enough to also offer him the floor or sofa bed to crash on instead of him going back to base).  Surprised that Corydon even remembered where to go, I peeked my head out the bedroom door and saw Chi and Juice sitting talking while Corydon started to undress and lay down. Chi then dashed back into our bedroom.  I went out after she came in to check on everyone and found that Jenner had offered Corydon the sofa bed and left to go back to base.  When late morning came, us three women got ready to leave to grab some food, Corydon was still there sleeping. We had left and he was getting up about to leave right after us.

Later that Sunday, after some girl bonding time shopping and watching a show, Chi left the hotel to go back to base, for she had to work the next day. My girl friend and I stayed one more night at the Hilton and caught a flight back home early Monday (July 25th, 2016) morning.

This statement is to inform whomever that this may concern that this was what I witnessed. I am positive that there was no inappropriate behavior between Mrs. Murphy and Mr. Torrence. I am sure that Mrs. Murphy's suit of sexual harassment and/or assault should be more of a concern and priority then a weekend in Vegas.

Thu A. Nguyen

I concurred with the statement (Gloria Fung).